Jonathan S. Henes, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELUXE ENTERTAINMENT | ) | Case No. 19-23774 (RDD) |
| SERVICES GROUP INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE DEBTORS (A) TO**
**OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE**
**CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (the "Motion"):[2]

---

[1]    The last four digits of Debtor Deluxe Entertainment Services Group Inc.'s tax identification number are 1725. Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' Solicitation Agent at https://cases.primeclerk.com/deluxe. The location of the Debtors' service address for purposes of these chapter 11 cases is: 50 Main Street, Suite 1014, White Plains, New York, 10606.

[2]    A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion are set forth in the *Declaration of John Eric "Eric" Cummins, Executive Vice President and Chief Financial Officer at Deluxe Entertainment Services Group Inc., (I) in Support of Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration, the DIP Loan Documents, or the DIP Orders, as applicable.

**Preliminary Statement**

1.     Deluxe Entertainment Services Group Inc. ("Deluxe"), together with its Debtor and non-Debtor affiliates, is among the world's leading content creation and distribution companies. With headquarters in both New York and Los Angeles, the Debtors operate in a complex and rapidly shifting media market.  As with many industries, technology has accelerated the rate of change in the media industry, enabling consumers to view their favorite programs and digital content on an increasing number and type of devices and in more locations than previously possible.  The rapid pace of industry and technological change has placed significant pressure on the Debtors' business, despite their leading market position.

2.     As a result, the Debtors face near-term maturities of certain indebtedness, including the Debtors' Existing ABL Facility (maturing in November 2019) and the Existing Term Loans (maturing in February 2020).   These maturities prompted the Debtors to begin exploring comprehensive deleveraging transactions to optimize their balance sheet.

3.     Accordingly, prior to the Petition Date, the Debtors and their advisors engaged with an ad hoc committee of existing term loan lenders (the "Ad Hoc Group") and MacAndrews & Forbes Media Group, Inc. ("MAFCO"), the Debtors' equity owners, to pursue a consensual restructuring transaction.  In pursuit of this transaction, the Ad Hoc Group provided the Debtors with the $73 million Priming Term Loans to provide liquidity to Deluxe while the parties negotiated terms of a consensual deleveraging transaction.  The negotiations culminated in a restructuring support agreement, dated on August 30, 2019 (the "RSA").

4.     As originally contemplated, the RSA provided for an out-of-court debt-for-equity exchange or an in-court "24-hour prepack" that, in either case, required further incremental financing to effectuate such transaction.  As described in the First Day Declaration, S&P was informed of the potential exchange offer and downgraded the corporate credit rating of the

Debtors' Existing Term Loan. The ratings downgrade created an impediment for certain members

of the Ad Hoc Group who own the Debtors' debt as part of a collateralized loan obligation ("CLO")

to be able to provide the additional financing needed by the Debtors on an out-of-court basis.

While certain lenders were able to provide $14 million (which became the Senior Priming Term

Loans), this amount was insufficient to bridge the Debtors through the consummation of the

out-of-court transaction or "24-hour prepack" and was viewed as a "pre-DIP" to bridge the Debtors

to the commencement of these prepackaged chapter 11 cases, where the CLO members of the Ad

Hoc Group are able to provide supplemental financing to the Debtors. The Debtors, the Ad Hoc

Group, and MAFCO amended the RSA on October 2, 2019 to implement the transaction via

prepackaged chapter 11 cases.

5.      On October 3, 2019 (the "Petition Date"), the Debtors commenced these chapter 11

cases to implement the prepackaged restructuring contemplated by the amended RSA and pursuant

to the *Joint Prepackaged Plan of Deluxe Entertainment Services Group Inc. and Its Debtor*

*Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), filed contemporaneously

herewith. The Plan, which is supported by holders of over 91% of the Debtors' Priming Term

Loans and approximately 70% of the Debtors' Existing Term Loans, proposes to deleverage the

Debtors' balance sheet by approximately $800 million. To execute this value-maximizing

transaction and fund these chapter 11 cases, however, the Debtors urgently need access to

additional liquidity. As described in the Baird Declaration, the Debtors have only approximately

$15 million in cash on hand as of the Petition Date. Baird Decl. ¶ 7. Accordingly, this Motion

requests that the Court approve the $115 million superpriority term loan DIP Facility provided by

the Ad Hoc Group. If approved, the Debtors will use the proceeds of the DIP Facility to, among

other things, honor employee wages and benefits, procure goods and services, fund general and

corporate operating needs and the administration of these chapter 11 cases, and consummate the Plan, all in accordance with the initial DIP budget, which is attached as <u>Annex B</u> to the Interim Order (the "<u>Initial Budget</u>").

6.     As described below, in the First Day Declaration, and in the Baird Declaration, the DIP Facility ensures that the Debtors (a) have sufficient funding to consummate the Plan, (b) can continue to operate uninterrupted in these chapter 11 cases, and (c) have continued access to liquidity following the Debtors' emergence from bankruptcy.  In addition, as described in more detail below, the Ad Hoc Group has committed to roll amounts outstanding under the DIP Facility on the Effective Date into new first lien term loans to provide necessary liquidity for the Debtors upon emergence from these chapter 11 cases.  The commitment to provide the new first lien term loans upon emergence will ensure that the Debtors do not need to spend additional time and much needed liquidity to solicit additional financing prior to emergence from these chapter 11 cases. Further, as set forth in the Baird Declaration, the terms of the DIP Facility are reasonable under the circumstances, were the product of good faith, arm's-length negotiations, and will benefit all stakeholders in these chapter 11 cases.  Baird Decl. ¶ 25.

7.     For the reasons set forth herein and in the Baird Declaration, the Debtors believe that the authority to obtain DIP financing, including the use of Cash Collateral (as defined in the Interim Order), is in the best interests of the Debtors, their estates, and their creditors.  Accordingly, the Debtors respectfully request authority to enter into the DIP Loan Documents and to use Cash Collateral, as more fully detailed herein and in the First Day Declaration and the Baird Declaration, subject to the terms and conditions set forth in the orders granting such relief.

<u>**Jurisdiction and Venue**</u>

8.     The United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

4

*Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this DIP Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Bankruptcy Rules 2002-1, 4001-2, 9006-1, 9013-1, and 9014-1, and rule 9014-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Bankruptcy Rules</u>").

<u>**Relief Requested**</u>

11.     By this Motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>"), and a final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"), granting, among other things, the following relief:

- ***DIP Facility***: authority to obtain senior secured, superpriority, postpetition financing in the form of a multiple-draw term loan credit facility (the "<u>DIP Facility</u>," all amounts extended under the DIP Facility, the "<u>DIP Loans</u>") in an aggregate principal amount of up to $115 million (the "<u>DIP Commitments</u>") consisting of new money term loans including (i) an initial draw in the aggregate principal amount of $55 million available upon entry of the Interim Order (the "<u>Initial DIP Loan</u>"); and (ii) on the day that is immediately prior to the Effective Date (as defined in the RSA), a delayed draw in an aggregate principal amount of up to $60 million plus the aggregate amount (if any) of prepetition Senior Priming Obligations (as defined below) that were not repaid, satisfied, and discharged with the proceeds of the Initial DIP Loan (the "<u>Final DIP Loan</u>"), pursuant to the terms and conditions of that certain *Senior Secured Debtor-In-Possession Term Loan Credit Agreement* (as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof,

5

the "DIP Credit Agreement"), by and among Deluxe (the "Borrower"), and each of the other Debtors as guarantors (the "Guarantors"), the relevant lenders (collectively, the "DIP Lenders"), Credit Suisse Loan Funding LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, together with the DIP Lenders, collectively, the "DIP Parties"), and other agents and entities from time to time party thereto, substantially in the form of **Exhibit B**, attached hereto;

- ***DIP Loan Documents***:  authority to execute and deliver all agreements, documents, and instruments contemplated by the DIP Orders, the DIP Term Sheet (attached to the RSA as Exhibit 1-A), the DIP Credit Agreement, the DIP Commitment Letter, and the Fee Letters (collectively, the "DIP Loan Documents"), and to take all actions necessary, appropriate, or required to comply with the Debtors' obligations under the DIP Loan Documents and under the DIP Orders (such obligations, the "DIP Obligations");

- ***DIP Liens and Claims***:  authority to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, super-priority priming liens in the DIP Collateral (as defined in the amended RSA) securing the DIP Facility, and super-priority claims in respect of the obligations under the DIP Facility, each subject to the Carve-Out (as defined below);

- ***DIP Payments***:  authority to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, payment of reimbursable fees, costs, and expenses of the DIP Agents' and DIP Lenders' respective attorneys and advisors, backstop fees, and commitment fees, all to the extent provided in, and in accordance with, the applicable DIP Documents, including on the terms set forth in the DIP Commitment Letter, the DIP Agent Fee Letter, and the Commitment Party Fee Letter attached hereto as **Exhibit C**, **Exhibit D**, and **Exhibit E** (collectively, the "Fee Letters"), respectively.

- ***Cash Collateral***:  authority to use the Cash Collateral of the Prepetition Secured Parties (as defined below);

- ***Adequate Protection***:  approval of the Adequate Protection Obligations (as defined below) to be provided to the Prepetition Secured Parties, to protect the Prepetition Secured Parties' interests in the Cash Collateral, as well as to compensate for any decline in, or diminution of, the value of the Prepetition Secured Parties' interest in the Prepetition Collateral (as defined below);

- ***Automatic Stay***:  modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders;

- ***Final Hearing***:  scheduling by the Court of a final hearing (the "Final Hearing"), if necessary, to consider entry of the Final Order granting the relief requested in this Motion on a final basis; and

- ***Immediate Effectiveness***: waiver of any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

## **Concise Statement Pursuant to Local Bankruptcy Rule 4001-2**

12.    Pursuant to Bankruptcy Rules 4001(b), (c) and (d), and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Facility as provided in the DIP Term Sheet and DIP Orders:[3]

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **DIP Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Debtor Parties**:<br><br>a.  *Borrower*:  Deluxe Entertainment Services Group Inc.<br><br>b.  *Guarantors*:  DX Holdings LLC ("Holdings") and all direct and indirect wholly-owned domestic and foreign subsidiaries of Holdings other than the Borrower (collectively with the Borrower, the "Loan Parties").<br><br>**Lending Parties**:<br><br>a.  *DIP Lenders*:  Those DIP Lenders listed on Schedule 1 (the "Commitment Parties") of that certain DIP Facility Commitment Letter dated September 3, 2019 (the "DIP Commitment Letter").<br><br>b.  *DIP Agent*:  Credit Suisse Loan Funding LLC<br><br>c.  *DIP Backstop Parties*:  Those Commitment Parties that have agreed to backstop the DIP Facility in accordance with the terms of the DIP Commitment Letter.<br><br>**(DIP Credit Agreement, Introduction & Art. 1–Definitions; DIP Commitment Letter)** |
| **DIP Commitments**<br><br>*Local Bankruptcy Rule 4001-2(a)(1);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Commitments**.  The aggregate principal amount of $115 million:<br><br>a.      in one draw on the business day immediately after the date of entry of the Interim Order, on which all conditions precedent are waived (the "Closing Date") the Initial DIP Loan in such aggregate principal amount not exceeding $55,000,000; *provided*, that, to the extent that the Interim Order does not permit the obligations under the Senior Priming Term Loans (the "Senior Priming Obligations") to be repaid, satisfied and discharged in full with proceeds of the Initial DIP Loan, the aggregate principal amount of the Initial DIP Loan shall be reduced by the amount of such accrued and unpaid Senior Priming Obligations that are not permitted to be so discharged; and |

---

[3]    This summary is intended only to assist the Court by reference to the DIP Credit Agreement and the DIP Orders, and is qualified in its entirety by the terms of the DIP Loan Documents, each as may be modified by the DIP Orders.  Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Documents or DIP Orders, as applicable.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | b.    in one draw on the date that is immediately prior to the Effective Date (as defined in the RSA) the Final DIP Loan in an aggregate principal amount equal to the lesser of (i) $60,000,000 *plus* the aggregate amount (if any) of Senior Priming Obligations that were not repaid, satisfied and discharged in full with proceeds of Initial DIP Loan.<br><br>**(DIP Credit Agreement, Art. 1–Definitions & Art. 2–Amounts and Terms of Commitments)** |
| **Maturity**<br><br>*Local Bankruptcy Rule 4001-2(a)(10);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | All unfunded DIP Commitments will terminate, and all DIP Obligations (as defined below) will be immediately due and payable in full in cash on the earliest of:<br><br>a.    the first anniversary of the Closing Date (the "<u>Maturity Date</u>");<br><br>b.    if the Final Order has not been entered by the Bankruptcy Court on or before the date that is thirty-five (35) calendar days after the Petition Date, on such date;<br><br>c.    the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;<br><br>d.    the date of acceleration of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an Event of Default (as defined in the Interim Order) pursuant to the terms of the DIP Credit Agreement; and<br><br>e.    the Effective Date; *provided*, that subject to the approval by the Bankruptcy Court of the Plan and subject further to, and in accordance with, the RSA, DIP Obligations may be satisfied and discharged on the Effective Date pursuant to a refinancing thereof with proceeds of, or (as the case may be) a roll thereof into an exit financing facility as outlined in the DIP Credit Agreement.<br><br>**(DIP Credit Agreement, Art. 1–Definitions)** |
| **Use of Proceeds**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Interim DIP Loan**.  Subject to the applicable DIP Order and the other DIP Loan Documents, proceeds of the Initial DIP Loan will be used only for the following purposes:<br><br>a.    to repay (on a dollar-for-dollar basis), satisfy and discharge all accrued and unpaid prepetition Senior Priming Obligations (including, for the avoidance of doubt, all interest thereon accrued through the Closing Date and all premiums, fees and expenses payable thereon);<br><br>b.    to pay interest, fees, costs and expenses related to the DIP Facility (including the fees, costs, disbursements and expenses of the DIP Agent and its counsel, financial advisors, consultants and other professionals (collectively, the "<u>DIP Agent Advisors</u>"));<br><br>c.    to pay the fees, costs and expenses of the estate professionals retained |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | in the chapter 11 cases and approved by the Bankruptcy Court; |
| | d.    to fund the Carve-Out (as defined below); |
| | e.    to pay the fees, costs, disbursements and expenses of the DIP Lenders (including the fees and expenses of Stroock & Stroock & Lavan LLP ("<u>Stroock</u>"), counsel to certain DIP Lenders, FTI Consulting, Inc. ("<u>FTI</u>"), financial advisor to certain DIP Lenders, and such other consultants, local counsel, financial advisors and other professionals as reasonably required by the Required DIP Lenders[4]); |
| | f.    to make all permitted payments of costs of administration of the chapter 11 cases; |
| | g.    to pay such prepetition expenses as are consented to by the Required DIP Lenders and approved by the Bankruptcy Court; |
| | h.    to satisfy any adequate protection obligations owing under the DIP Orders, as set forth below; |
| | i.    to make any other payments permitted by the Initial Budget and any subsequent approved budget (the "<u>Approved Budget</u>"); and |
| | j.    for general corporate and working capital purposes of the Debtors during the chapter 11 cases. |
| | **<u>Final DIP Loan</u>**.   Subject to the applicable DIP Order and the other DIP Loan Documents, proceeds of DIP Loans made after the Closing Date shall be used solely for the following purposes: |
| | a.    to (and solely in such amount as is required to) repay, satisfy and discharge in full in cash any Prepetition Super Priming Obligations that were not repaid, satisfied and discharged in full with proceeds of Loans made on the Closing Date; |
| | b.    for working capital and general corporate purposes in accordance with the Approved Budget; and |
| | c.    for such other purposes as expressly consented to in writing by the Required DIP Lenders. |
| | Notwithstanding anything to the contrary contained in any DIP Loan Documents, no proceeds of any Loans shall be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facility or the Prepetition Loan Documents; provided that the creditors' committee, if any, may use up to $35,000 of the proceeds in respect of the foregoing. |
| | **(DIP Credit Agreement, Art. 6.9–Use of Proceeds)** |
| **<u>Interest Rates</u>** | **<u>Interest Rate</u>**.  Interest is payable at LIBOR, subject to a 1.00% floor, plus 7.50%; |

---

[4]    "<u>Required DIP Lenders</u>" shall mean the DIP Lenders holding a majority of the aggregate outstanding principal amount of the DIP Loans and the aggregate undrawn commitments under the DIP Facility.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)* | **Default Rate**.  Non-default interest rate plus an additional 2.00% on the DIP Loans payable in cash, on demand.<br><br>**(DIP Credit Agreement, Art. 1–Definitions)** |
| **Conditions**<br><br>*Local Bankruptcy Rule 4001-2(a)(2);*<br><br>*Local Bankruptcy Rule 4001-2(h);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Closing Conditions**.  Conditions to closing shall include, but are not limited to:<br><br>a.  Subject to Section 6.10 of the DIP Credit Agreement, the Administrative Agent (or its counsel) shall have received from each Loan Party a counterpart signature signed by each such Loan Party of (i) this DIP Credit Agreement (solely in respect of the Borrower and Holdings), (ii) the Guarantee and Collateral Agreement, and (iii) in the case of the Borrower only, any Note requested by a Lender at least three Business Days prior to the Closing Date.<br><br>b.  All fees, costs, disbursements and expenses of the DIP Agent, the advisors of the DIP Agent, the DIP Lenders and the advisors to the DIP Lender due under the DIP Credit Agreement shall have been paid in full in cash or shall be so paid on the Closing Date from the proceeds of the Initial DIP Loans.<br><br>c.  The Borrower shall have paid the payments required by the Payment Letter.<br><br>d.  The DIP Agent shall have received an executed legal opinion of Kirkland & Ellis LLP, special New York and California counsel to the Loan Parties.<br><br>e.  The DIP Agent shall have received (i) a certificate of the Borrower and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a certificate of the Borrower certifying as to the satisfaction of the conditions set forth in Section 5.3(a) of the DIP Credit Agreement.<br><br>f.  The DIP Lenders shall have received from the Borrower and each of the Loan Parties, at least three Business Days prior to the Closing Date, (i) documentation and other information requested by any Lender a reasonable period prior to the required delivery date that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (ii) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Lenders shall have received from the Borrower, at least three Business Days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower.<br><br>g.  The Interim Order shall have been entered by the Bankruptcy Court and shall be in full force and effect.<br><br>h.  The Bankruptcy Court shall have entered the Interim DIP Order no later than two (2) Business Days after the Petition Date, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders in their sole discretion. |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

|  |  |  |
|---|---|---|
|  | i. | The DIP Agent and the Lenders shall have received the Initial Budget, which shall be in form and substance satisfactory to the Administrative Agent and the Lenders. |
|  | j. | The Plan shall have been filed with the Bankruptcy Court and each other milestone that is required to be complied with prior to or concurrently with entry of the Interim Order shall have been complied with. |
|  | k. | Subject to Section 6.10 and in the case of the UK Security Documents, subject to the UK Legal Reservations and the UK Perfection Requirements, the Collateral Agent shall have a valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected Lien on the Collateral to the extent required by this Agreement and the Interim DIP Order, having the priorities set forth in the Interim DIP Order and subject to the Carve-Out. |
|  | l. | Each Uniform Commercial Code financing statement and each intellectual property security agreement required by the Security Documents to be filed in order to create in favor of the Collateral Agent, a perfected Lien on the Collateral having the priorities set forth in the Orders shall have been filed. |
|  | m. | The Collateral Agent shall have received the certificates, if any, representing the shares of Pledged Securities held by a Loan Party pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof.Subject to post-closing requirements, the DIP Agent shall have been named as an additional insured with respect to liability policies (other than worker's compensation policies and public liability policies) and the DIP Agent shall be named as loss payee with respect to the property insurance (other than public property policies) maintained by the Borrower and each other Loan Party. |
|  | n. | Subject to Section 6.10 of the DIP Credit Agreement, the Collateral Agent shall have been named as an additional insured with respect to liability policies (other than worker's compensation policies and public liability policies) and the Collateral Agent shall be named as loss payee with respect to the property insurance (other than public property policies) maintained by the Borrower and each other Loan Party. |
|  | o. | The Administrative Agent shall have received a legal, valid and binding copy of an amendment to the Prepetition ABL Intercreditor Agreement, which shall be in form and substance acceptable to the Administrative Agent and the Required DIP Lenders. |
|  | p. | The Administrative Agent shall have received a legal, valid and binding copy of an amendment to the Prepetition Canadian Facility Credit Agreement, which shall be in form and substance acceptable to the Administrative Agent and the Required DIP Lenders. |
|  | q. | The Closing Date shall have occurred on or before the date that is three business days after the date of entry of the Interim Order. |

**Funding Conditions.**  Funding Conditions shall include but are not limited to:

a.  The Bankruptcy Court shall have entered the Final DIP Order no later than thirty five (35) calendar days after the Petition Date, which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders in their sole discretion.

b.  The Bankruptcy Court shall have entered the Confirmation Order no later than thirty five (35) calendar days after the Petition Date, which Confirmation Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders in their sole discretion.

c.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect) as of such earlier date. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date.

d.  The DIP Agent shall have received a copy of the Restructuring Support Agreement, duly executed and delivered by each of the parties thereto, and such Restructuring Support Agreement shall be in full force and effect and shall not have been amended, waived or otherwise modified without the prior written consent of the Required DIP Lenders.  The Restructuring Support Agreement shall be in full force and effect, and no breach, default or event of default shall have occurred and be continuing thereunder. Each Lender that owns Prepetition Loan Obligations shall be a party to the Restructuring Support Agreement.

e.  All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance satisfactory to the Required DIP Lenders.

f.  Subject to Section 6.10 of the DIP Credit Agreement, the Administrative Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected Liens on, and security interests in, the Collateral, in each case, having the priorities set forth in the Orders and subject only to the Carve-Out in all respects.

g.  The Administrative Agent shall have received a signed Borrowing Request from the Borrower in respect of each applicable Loan in

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | accordance with the requirements of Section 2.2 of the DIP Credit Agreement.<br><br>h.<br><br>**(DIP Credit Agreement, Art. 5–Conditions Precedent)** |
| **Fees & Payments**<br><br>*Local Bankruptcy Rule 4001-2(a)(3);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Specified in the Fee Letters.<br><br>**(Fee Letters; Interim Order ¶¶ 2 & 11)** |
| **Liens and Priorities**<br><br>*Local Bankruptcy Rule 4001-2(a)(4);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Liens**.  The DIP Obligations shall be secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens and security interests (such liens and securing interests securing the DIP Obligations, collectively, the "<u>DIP Liens</u>") in all DIP Collateral (as defined below) on the following basis:<br><br>a.  **First Lien on Unencumbered Property**.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, enforceable, non-avoidable and automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not subject to a valid, perfected, enforceable and non-avoidable lien or security interest as of the Petition Date (the "<u>Unencumbered Assets</u>"),[5] subject only to the Carve-Out[5]; and<br><br>b.  **Liens Priming the Prepetition Liens**.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, enforceable, non-avoidable and automatically and fully perfected first priority liens on and security interests in all DIP Collateral (other than Unencumbered Assets, as described in the paragraph entitled "First Lien on Unencumbered Property" above), wherever located, which liens and security interests (x) shall be junior only to (i) the Carve-Out, (ii) Permitted Prior Senior Liens (except to the extent excluded in clause (y)(iii) in this paragraph), and (iii) solely with respect to the "ABL Facility First Priority Collateral" (as defined in the ABL Intercreditor Agreement) and DIP Collateral, in each case, of a type that would constitute "ABL Facility First Priority Collateral" (collectively, the "<u>ABL Priority Collateral</u>"), the Prepetition ABL Loan Liens and the ABL Adequate Protection Liens, and (y) shall be senior to any and all other liens on and security interests in the DIP Collateral, including, without limitation, (i) the Prepetition Term Loan Liens, (ii) any ABL Adequate Protection Liens and Prepetition ABL Loan Liens in "Term Facility First Priority Collateral" (as defined in the ABL Intercreditor Agreement and subject to he Intercreditor Arrangements in the Interim order) and DIP Collateral, in each case, |

---

[5]  For the avoidance of doubt, with respect to ABL Priority Collateral, the DIP Liens shall be junior to the Prepetition ABL Loan Liens and the ABL Adequate Protection Liens on ABL Priority Collateral from after the Petition Date.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

<table>
<tr><td></td><td></td><td>of a type that would constitute "Term Facility First Priority Collateral" (collectively, the "<u>Term Priority Collateral</u>"), and (iii) any liens asserted by MAFCO or any of its affiliates against any of the DIP Loan Parties.</td></tr>
<tr><td></td><td>c.</td><td>For the avoidance of doubt, the DIP Liens in the DIP Collateral consisting of assets of any non-Debtor DIP Loan Parties (including any non-Debtor DIP Loan Parties incorporated or formed in the United Kingdom or Wales) shall be senior to each of the Prepetition Term Loan Liens in such assets subject, in the case of ABL Priority Collateral, to the Prepetition ABL Loan Liens in such ABL Priority Collateral.</td></tr>
<tr><td></td><td>d.</td><td>Notwithstanding anything contained in the Interim Order or in any of the DIP Loan Documents to the contrary, but subject to the Adequate Protection Obligations and the Intercreditor Agreements and the Carve-Out, the DIP Liens and the DIP Superpriority Claim (as defined below) (i) shall not be made subject to or <em>pari passu</em> with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.</td></tr>
<tr><td></td><td>e.</td><td>To the fullest extent permitted by applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and the Interim Order or in favor of the Prepetition Agents and the Prepetition Lenders in accordance with the Interim Order.</td></tr>
<tr><td colspan="2"><strong><u>DIP Superpriority Claim</u></strong>.</td><td></td></tr>
<tr><td></td><td>a.</td><td>Effective immediately upon entry of the Interim Order, the DIP Agent, for itself and for the benefit of the DIP Lenders is to the benefits of section 364(c)(1) and 364(e) of the Bankruptcy Code, and allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases on account of the DIP</td></tr>
</table>

14

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | Obligations with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and any other Claims against the Debtors (the "DIP Superpriority Claims"), subject only to the Carve-Out. |
| | b.    The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code. The DIP Superpriority Claims shall have recourse against each of the Debtors on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, subject to entry of the Final DIP Order, proceeds of Avoidance Actions). The DIP Superpriority Claims shall, at all times be (x) junior only to the Carve-Out, and (y) senior to any and all other administrative expense claims or other claims against the Debtors or their estates, in the Chapter 11 Cases and any Successor Cases, including, without limitation, any claims allowed pursuant to the obligations under or in connection with the Prepetition Obligations and any adequate protection claims granted thereunder. |
| | **(Interim Order ¶¶ 6 & 7)** |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The holders of the prepetition indebtedness or obligations arising thereunder (such indebtedness, the "Prepetition Debt," and all assets securing the Prepetition Debt, the "Prepetition Collateral") may receive such adequate protection as is acceptable to the Required DIP Lenders in their sole discretion. The adequate protection commitments are typical of a DIP financing of this size and are discussed in detail below.<br><br>**(Interim Order ¶ 11)** |
| **Carve-Out**<br><br>*Local Bankruptcy Rule 4001-2(a)(5)*<br><br>*Local Bankruptcy Rule 4001-2(d)* | The Interim Order provides a "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code Trigger Notice Cap, all as detailed in the Interim Order.<br><br> **(Interim Order ¶ 29)** |
| **Covenants**<br><br>*Local Bankruptcy Rule 4001-2(a)(8);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Facility Covenants**. The DIP Loan Documents shall contain usual and customary affirmative and negative covenants and such covenants as shall be determined in accordance with the Documentation Principles, including, without limitation:<br><br>a.    compliance with the Milestones;<br><br>b.    compliance with the reporting requirements in the DIP Credit Agreement;<br><br>c.    maintenance of insurance;<br><br>d.    usual and customary negative covenants, including limitations on incurrence of indebtedness, liens, dispositions of assets, mergers, restricted payments, investments, fundamental changes, transactions with affiliates, burdensome agreements, prepayments of debt and use |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | of proceeds of DIP Facility and Cash Collateral; *provided*, that no priming indebtedness shall be permitted without the consent of all DIP Lenders; **(DIP Credit Agreement, Art. 6–Affirmative Covenants & Art. 7–Negative Covenants)** |
| **Limitations on Use of DIP Facility and Cash Collateral** *Fed. R. Bankr. P. 4001-2(a)(9)* | No proceeds of any DIP Loans shall be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facility or the Prepetition Debt; provided that the creditors' committee, if any, may use up to $35,000 of the proceeds in respect of the foregoing. **(Interim Order ¶ 30)** |
| **Events of Default** *Local Bankruptcy Rule 4001-2(a)(10); Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Loan Documents contain events of default customarily found in loan agreements for similar debtor in possession financings (the "Events of Default"), including but not limited to: |

The DIP Loan Documents contain events of default customarily found in loan agreements for similar debtor in possession financings (the "Events of Default"), including but not limited to:

a.  The Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof or (ii) any interest owed by it on any Loan, or any other amount payable by it hereunder or under any other Loan Document, within three (3) Business Days after any such interest or other amount becomes due in accordance with the terms hereof;

b.  Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate or other document furnished by it at any time under or in connection with the DIP Credit Agreement or any such other Loan Document shall in either case prove to have been inaccurate in any material respect and such inaccuracy is adverse to the Lenders on or as of the date made or deemed made or furnished;

c.  Any Loan Party shall default in the observance or performance of any agreement contained in Section 6.7(a), Section 6.8, Section 6.9, Section 6.10, Section 6.16, Section 6.19, Section 6.20 or Article 7;

d.  (i) Any Loan Party shall default in the observance or performance of any other agreement contained in the DIP Credit Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of Section 8.1 of the Credit Agreement), and such default shall continue unremedied for a period of 15 days after such Loan Party receives from the Administrative Agent or the Required DIP Lenders notice of the existence of such default or (ii) any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1 or Section 6.15 and such default shall continue unremedied for a period of 5 days after such Loan Party receives from the Administrative Agent or the Required DIP Lenders notice of the existence of such default;

e.  Holdings or any of its Restricted Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness for Borrowed Money on the scheduled or original due date with respect

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

thereto beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or (ii) default in making any payment of any interest on any such Indebtedness for Borrowed Money beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness for Borrowed Money or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event of default shall occur, the effect of which payment or other default or other event of default is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required (but after giving effect to any applicable cure period), such Indebtedness for Borrowed Money to become due prior to its Stated Maturity or to become subject to a mandatory offer to purchase by the obligor thereunder; provided that (A) a default, event or condition described in this paragraph shall not at any time constitute an Event of Default unless, at such time, one or more defaults or events of default of the type described in this paragraph shall have occurred and be continuing with respect to Indebtedness for Borrowed Money the outstanding principal amount of which individually exceeds $10,000,000, and in the case of Indebtedness for Borrowed Money of the types described in clauses (i) and (ii) of the definition thereof, with respect to such Indebtedness which exceeds such amount either individually or in the aggregate; (B) this paragraph shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer, destruction or other disposition of the Property or assets securing such Indebtedness for Borrowed Money if such sale, transfer, destruction or other disposition is not prohibited hereunder and under the documents providing for such Indebtedness, or (ii) any Guarantee Obligations except to the extent such Guarantee Obligations shall become due and payable by any Loan Party and remain unpaid after any applicable grace period or period permitted following demand for the payment thereof and (C) a default, event or condition described in this paragraph shall not at any time constitute an Event of Default if the exercise of the rights and remedies by a holder of such Indebtedness against the obligors thereof is subject to the automatic stay in the Chapter 11 Cases; provided, further, that no Event of Default under clause (e) shall arise or result from any change of control (or similar event) under any other Indebtedness for Borrowed Money that is triggered due to the Permitted Investors (as defined herein) obtaining the requisite percentage contemplated by such change of control provision, unless both (x) such Indebtedness for Borrowed Money shall become due and payable or shall otherwise be required to be repaid, repurchased, redeemed or defeased, whether at the option of any holder thereof or otherwise and (y) at such time, Holdings and/or its Restricted Subsidiaries would not be permitted to repay such Indebtedness for Borrowed Money in accordance with the terms of the DIP Credit Agreement;

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | | |
|---|---|---|
| | f. | (i) Holdings or any of its Restricted Subsidiaries shall incur any liability in connection with any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) a failure to meet the minimum funding standards (as defined in Section 302(a) of ERISA), whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Lien shall arise on the assets of Holdings or any of its Restricted Subsidiaries, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Single Employer Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate in a distress termination under Section 4041(c) of ERISA or in an involuntary termination by the PBGC under Section 4042 of ERISA, (v) Holdings or any of its Restricted Subsidiaries shall, or is reasonably likely to, incur any liability as a result of a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan or a Commonly Controlled Plan; and in each case in clauses (i) through (vi) above, which event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in a direct obligation of Holdings or any of its Restricted Subsidiaries to pay money that would reasonably be expected to have a Material Adverse Effect; or dismissal or conversion of the chapter 11 cases; |
| | g. | One or more final judgments or decrees shall be entered against Holdings or any of its Restricted Subsidiaries (other than a judgment or decree against a Loan Party that is a Chapter 11 Debtor entered prior to the Petition Date that is subject to the automatic stay in the Chapter 11 Cases) pursuant to which Holdings and any such Restricted Subsidiaries taken as a whole has a liability (not paid or fully covered by third-party insurance or effective indemnity) of $10,000,000 or more (net of any amounts which are covered by insurance or an effective indemnity), and all such judgments or decrees shall not have been vacated, discharged, dismissed, stayed or bonded within 60 days from the entry thereof; |
| | h. | (i) Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof in accordance with the terms thereof or hereof) to be in full force and effect or shall be asserted in writing by the Borrower or any Guarantor not to be a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Security Document with respect to any material portion of the Collateral of the Loan Parties on a consolidated basis shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priorities set forth in the Orders) in the securities, assets or properties covered thereby, except to the extent that (x) any such loss of perfection or priority results from limitations of foreign laws, rules and regulations as they apply to pledges of Capital Stock in Foreign Subsidiaries or the application thereof, or from the failure |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

|  | of the Collateral Agent (or, in the case of the Prepetition ABL Facility Collateral, the collateral agent under the Prepetition ABL Credit Agreement) to maintain possession of certificates actually delivered to it representing securities pledged under the Guarantee and Collateral Agreement, the other Security Documents or otherwise or to file UCC continuation statements, (y) such loss is covered by a lender's title insurance policy and the Administrative Agent shall be reasonably satisfied with the credit of such insurer or (z) any such loss of validity, perfection or priority is the result of any failure by the Collateral Agent (or, in the case of the Prepetition ABL Facility Collateral, the collateral agent under the Prepetition ABL Credit Agreement) to take any action necessary to secure the validity, perfection or priority of the security interests or (iii) the Guarantee Obligations pursuant to the Security Documents by any Loan Party of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms hereof or thereof), or such Guarantee Obligations shall be asserted in writing by any Loan Party not to be in effect or not to be legal, valid and binding obligations; |
| i. | (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or (ii) for any reason whatsoever, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Investors) shall become the "beneficial owner" (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, of more than the greater of (x) 35% of the then outstanding voting securities having ordinary voting power of Holdings and (y) the percentage of the then outstanding voting securities having ordinary voting power of Holdings owned, directly or indirectly, beneficially (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) by the Permitted Investors (it being understood that if any such person or group includes one or more Permitted Investors, the outstanding voting securities having ordinary voting power of Holdings directly or indirectly owned by the Permitted Investors that are part of such person or group shall not be treated as being owned by such person or group for purposes of determining whether clause (y) is triggered) (any of the foregoing, a "Change of Control"); |
| j. | the Restructuring Support Agreement is terminated by any party thereto or otherwise terminates in accordance with the terms thereof; or |
| k. | certain specified occurrences during the chapter 11 cases. |
|  | **(DIP Credit Agreement, Art. 8–Events of Default)** |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **Milestones**<br><br>*Local Bankruptcy Rule 4001-2(a)(12);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v-vi)* | The DIP Loan Documents will contain the following deadlines with respect to the Cases (the "<u>Milestones</u>"):<br><br>a.    commence the chapter 11 cases on or before October 3, 2019;<br><br>b.    File the Plan of Reorganization, the disclosure statement for the Plan, in form and substance acceptable to the Required DIP Lenders (the "<u>Disclosure Statement</u>"), and the motion (in form and substance acceptable to the Required DIP Lenders) seeking to schedule a combined hearing to consider confirmation of the Plan and approval of the Disclosure Statement on the Petition Date;<br><br>c.    Obtain entry of the Interim DIP Order approving the DIP Facility by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than two (2) Business Days after the Petition Date);<br><br>d.    Obtain entry of (a) the Confirmation Order (as defined in the Restructuring Support Agreement), (b) an order approving the Disclosure Statement and all other related relief, and (c) an order approving the Exit First Lien Facility (which may be the Confirmation Order), in each case, in form and substance acceptable to the Required DIP Lenders, by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-five (35) calendar days after the Petition Date); and<br><br>e.    cause the Effective Date to occur as soon as reasonably practicable after entry of the Confirmation Order by the Bankruptcy Court (but in no event later than fourteen (14) calendar days after the entry of the Confirmation Order).<br><br>**(DIP Credit Agreement, Art. 7.18–Milestones)** |
| **Repayment**<br>*Local Bankruptcy Rule 4001-2(a)(13)* | **Optional Prepayment**.<br><br>a.    The Borrower may at any time and from time to time prepay any of the Loans, in whole or in part, without premium or penalty, upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, (i) two Business Days prior thereto, in the case of Eurocurrency Loans and (ii) one Business Day prior thereto, in the case of ABR Loans, which notice shall specify (x) the date and amount of prepayment and (y) whether the prepayment is of Eurocurrency Loans or ABR Loans; *provided* that if a Eurocurrency Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (*provided* that any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any transaction or the receipt of proceeds to be used for such payment, in each case specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), together with accrued interest to such date on the amount prepaid. Partial optional prepayments of Loans shall be in an aggregate principal amount of at least $1,000,000 or a whole multiple of $100,000 in excess thereof (in the case of prepayments of ABR Loans).

b.  In connection with any optional prepayments by the Borrower of the Loans pursuant to Section 2.11 of the DIP Credit Agreement, such prepayments shall be applied on a pro rata basis to the then outstanding Loans irrespective of whether such outstanding Loans are ABR Loans or Eurocurrency Loans.

**Mandatory Prepayment**.

a.  If (x) any Indebtedness (excluding any Indebtedness expressly permitted to be incurred in accordance with Section 7.1) shall be incurred by Holdings, Borrower or any Restricted Subsidiary or (y) Holdings, Borrower or any Restricted Subsidiary shall effect any Equity Issuance (other than to Holdings, the Borrower or any Restricted Subsidiary), in each case, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied substantially simultaneously with (and in any event not later than one Business Day after) the date of receipt of such Net Cash Proceeds toward the prepayment of the Loans as set forth in Section 2.12(d).

b.  If on any date Holdings or any Restricted Subsidiary shall for its own account receive Net Cash Proceeds from any Asset Sale, Recovery Event or Extraordinary Receipts, such Net Cash Proceeds shall be applied not later than three (3) Business Days after such date toward the prepayment of the Loans as set forth in Section 2.12(d).

c.  Amounts to be applied in connection with prepayments of Loans pursuant to Section 2.12 of the DIP Credit Agreement shall be applied to the prepayment of the Loans in accordance with Section 2.18(b) until paid in full. In connection with any mandatory prepayments by the Borrower of the Loans pursuant to Section 2.12 of the DIP Credit Agreement, such prepayments shall be applied on a pro rata basis to the then outstanding Loans irrespective of whether such outstanding Loans are ABR Loans or Eurocurrency Loans; provided that with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Loans that are ABR Loans to the full extent thereof before application to Loans that are Eurocurrency Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.21. Each prepayment of the Loans under Section 2.12 of the DIP Credit Agreement shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

d.  Notwithstanding anything to the contrary in Section 2.12 of the DIP Credit Agreement (A) to the extent that any or all of the Net Cash

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | Proceeds of any Asset Sale by a Foreign Subsidiary (a "Foreign Asset Sale") or the Net Cash Proceeds of any Recovery Event with respect to a Foreign Subsidiary (a "Foreign Recovery Event"), in each case giving rise to a prepayment event pursuant to Section 2.12(b) are or is prohibited, restricted or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.12 of the DIP Credit Agreement but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit or restricts repatriation to the United States (the Borrower hereby agreeing to use commercially reasonable efforts to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds will be promptly (and in any event not later than five Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans in accordance with Section 2.12 of the DIP Credit Agreement and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all of the Net Cash Proceeds of any Foreign Asset Sale or any Foreign Recovery Event derived from a Foreign Subsidiary would have a material adverse tax consequence (taking into account any foreign tax credit or benefit, in the Borrower's reasonable judgment, expected to be realized in connection with such repatriation) with respect to such Net Cash Proceeds, the Net Cash Proceeds so affected may be retained by the applicable Foreign Subsidiary, provided that, in the case of this clause, on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to prepayments pursuant to Section 2.12 of the DIP Credit Agreement, the Borrower shall apply an amount equal to such Net Cash Proceeds to such prepayments as if such Net Cash Proceeds had been received by the Borrower rather than such Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds had been repatriated (or, if less, the Net Cash Proceeds that would be calculated if received by such Foreign Subsidiary). **(DIP Credit Agreement, Art. 2.11–Optional Prepayments & 2.12–Mandatory Prepayments)** |
| **Automatic Stay** <br><br> *Local Bankruptcy Rule 4001-2(c);* <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The Interim Order provides for the lifting of the automatic stay to allow the DIP Agent and DIP Lenders to exercise (a) upon the occurrence of an Event of Default all rights and remedies under the DIP Loan Documents (other than rights and remedies against the DIP Collateral) and (b) upon the occurrence and during the continuance of an Event of Default, and three (3) business days' prior written notice, all rights and remedies against the DIP Collateral provided for in the DIP Loan Documents. **(Interim Order ¶ 16)** |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **Acknowledgements**<br><br>*Local Bankruptcy Rule 4001-2(f);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The Debtors make certain customary admissions and stipulations with respect to the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Parties and the validity, enforceability and priority of the liens and security interests granted to the agents under the Prepetition Debt (the "<u>Prepetition Agents</u>") to secure such indebtedness.<br><br>**(Interim Order ¶ D)** |
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | Upon execution and delivery of the DIP Loan Documents, the Debtors' obligations under the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Loan Documents or the Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. **(Interim Order ¶ 4)**<br><br>**Indemnification**.  Usual and customary for financings of this type, including reasonable fees, charges and disbursements of the DIP Parties. **(Interim Order ¶ 27)**<br><br>**506(c) Waiver**.  Subject to entry of the Final Order, no costs or expenses of administration shall be surcharged against or recovered from or against any or all of the DIP Agent, DIP Lenders, the Prepetition Secured Parties, the DIP Collateral and the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or otherwise. **(Interim Order ¶ 33)**<br><br>**Marshaling Waiver**.  Subject to entry of the Final Order, the equitable doctrine of "marshaling" shall be waived with respect to the DIP Collateral and Prepetition Collateral pursuant to the terms of the Final Order (if necessary). **(Interim Order ¶ 35)**<br><br>**552 Waiver**:  Subject to entry of the Final Order, each of the DIP Agent, DIP Lenders, and the Prepetition Secured Parties are entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, upon entry of the Final Order, the "equities of the case" exception will not apply. **(Interim Order ¶ 34)** |

## Key Provisions

13.     As a condition to obtaining the proposed financing, the DIP Parties have required, and the Debtors have agreed to, certain provisions that may be considered key provisions to be highlighted to the Court.  These provisions include the following:

- <u>Proceeds of Avoidance Actions</u>.  The superpriority claims shall be chargeable against each of the Debtors and, subject to entry of the Final Order, the DIP Liens shall include liens on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action themselves) arising under chapter 5 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law. **(Interim Order ¶ 5)**.

- <u>Automatic Stay Relief</u>.  The Interim Order provides for the lifting of the automatic stay to allow the DIP Agent and DIP Lenders to exercise (i) upon the occurrence of an Event of Default all rights and remedies under the DIP Loan Documents (other than rights and remedies against the DIP Collateral) and (ii) upon the occurrence and during the continuance of an Event of Default, and three (3) business days' prior written notice, all rights and remedies against the DIP Collateral provided for in the DIP Loan Documents.  **(Interim Order ¶ 16)**.

- <u>Carve-Out</u>.  The DIP Facility provides for a Carve-Out for the Clerk of the Court, any trustee appointed under Bankruptcy Code section 726(b), and Professional Fees.  The Carve-Out is subject to a $75,000 cap in the case of a trustee and a cap of $750,000 with respect to Allowed Professional Fees incurred by Professional Persons retained by the Debtors and Professional Persons retained by the Creditors' Committee (if any) at any time after the first business day after the occurrence and during the continuance of an Event of Default and delivery of a Carve-Out Trigger Notice by the DIP Agent.  **(Interim Order ¶ 29)**.  The Carve-Out does not provide for disparate treatment of the Debtors' and the Creditor' Committee's professionals and therefore is in compliance with Local Bankruptcy Rule 4001-2(d).

- <u>506(c) Waiver</u>.  Subject to the entry of the Final Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.  **(Interim Order ¶ 33)**.

- <u>Fees and Payments</u>.  As detailed above, the Debtors have agreed, subject to the Court's approval, to pay certain fees, payments and expenses of the DIP Parties in connection with the DIP Facility.  **(Interim Order ¶¶ 11 & 12)**.

- <u>Creditor's Committee Investigation</u>.  The Debtors have agreed that the limitations on the use of Cash Collateral or proceeds of the DIP Facility or Carve-Out to fund challenges to the Prepetition Secured Parties' liens or claims shall not apply to the Creditors' Committee's investigations, if any, in an aggregate amount not to exceed $35,000.  The Interim Order also provides that each of the Debtors' Stipulations (as defined in the Interim Order) shall be binding upon all parties, including any Creditor's Committee, unless a party in interest has filed an adversary proceeding or contested matter with respect to any such Debtors' Stipulation (as defined in the Interim Order) by the earlier of 60 days from the date of entry of the Final Order in accordance with Local Bankruptcy Rule 4001-2(f) and entry of a final order confirming the Plan.  **(Interim Order ¶ 30)**.

- <u>Adequacy of the Initial Budget</u>.  The Borrower is required to deliver to the DIP Lenders a budget commencing with the week that includes the Petition Date and a forecast for the thirteen (13) weeks following the Petition Date.  To the extent necessary, such budget will be updated and extended every four weeks until the Maturity Date.  The Debtors believe that the Initial Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the budget.  **(Interim Order ¶ 15)**.

- **Senior Priming Term Loan Payment**.   The Borrower is required to utilize the procedures of the Interim Order to pay down in full the Senior Priming Term Loan.  To the extent the Senior Priming Term Loan is not repaid in full with the proceeds of the DIP Facility upon entry of the Interim Order, on the Effective Date (as defined in the RSA) of the Plan, the holders of the Senior Priming Term Loan obligations shall receive a payment, in cash, equal to 10.0% of the Senior Priming Term Loan obligations as adequate protection from the proceeds of the New First Lien Term Loan (as defined in the amended RSA).

## **Prepetition Capital Structure**

14.    As of the Petition Date, the Debtors and certain of its U.S. subsidiaries are obligors (either as borrower or guarantor) on a principal amount of prepetition funded indebtedness totaling approximately $1.1 billion, consisting of the Existing ABL Facility, Senior Priming Term Loan Facility, the Priming Term Loan Facility, the Existing Term Loan facility, the MAFCO Secured Debt, the Canadian Loans, the Australian Loans, and the MAFCO Unsecured Debt (each as defined herein or in the Plan).  The relative contractual rights and priorities of the lenders under the Existing ABL Facility, Senior Priming Term Loan Facility, Priming Term Loan Facility and the Existing Term Loan facility are governed by that certain (1) Super Priming Term Loan Intercreditor Agreement, dated as of September 19, 2019 (the "Super Priming Intercreditor Agreement"); (2) Amended and Restated Term Loan Intercreditor Agreement dated as of September 19, 2019 (the "A&R Term Loan Intercreditor Agreement") and that certain Third Amended and Restated ABL Intercreditor Agreement dated as of September 19, 2019 (the "Third A&R ABL Intercreditor Agreement" and together with the Super Priming Intercreditor Agreement and the Term Loan Intercreditor Agreement, the "Intercreditor Agreements").  The following table summarizes Deluxe's outstanding funded-debt obligations in greater detail:

| Debt Instrument (as defined herein) | Facility Size | Maturity Date | Outstanding Principal Amount |
|---|---|---|---|
| ABL Loans | $102.5 million | November 29, 2019 | $56.35 million[6] |
| Senior Priming Term Loans | $14 million | February 26, 2020[7] | $10 million[8] |
| Priming Term Loans | $73 million | February 27, 2020 [9] | $73 million |
| Existing Term Loans | $880 million | February 28, 2020 | $783.5 million |
| MAFCO Secured Debt | $4.75 million | Demand[10] | $4.75 million[11] |
| Canadian Loans | $50 million | December 7, 2020 | $49.2 million |
| Australian Loans | A$20 million | N/A[12] | A$15 million[13] |
| MAFCO Unsecured Debt | $132 million | Various dates in 2020 | $117.75 million[14] |
| Total | | | $1,105 million |

## I.    ABL Facility.

15.    On July 31, 2019, DESG and DX Holdings LLC entered into the Third Amended and Restated Asset-Based Revolving Credit Agreement, with the lenders from time to time party thereto (the "Existing ABL Lenders"), Credit Suisse AG, as Administrative Agent (the "Prepetition ABL Agent"), and Bank of America, N.A., as Collateral Agent (the "Existing

---

[6]    The aggregate principal amount of outstanding ABL Loans excludes issued letters of credit and purchase card cash management obligation balance.

[7]    The earlier to occur of (i) the date that is one day prior to the one-year anniversary of the Closing Date, September 18, 2020 and (ii) one day prior to the Initial Term Maturity Date (as defined in the Term Loan Credit Agreement and as such term may be amended or modified from time to time after the Closing Date), February 27, 2020 and (iii) one day prior to the Maturity Date (as defined in the Senior Priming Term Loan Credit Agreement and as such term may be amended or modified from time to time after the Closing Date).

[8]    Amount does not include $4.022 million holdback for potential cash collateralization of letters of credit, and the allowed amount may increase to approximately $14 million.

[9]    The earlier to occur of (i) the date that is one day prior to the one-year anniversary of the Closing Date, July 30, 2020 and (ii) one day prior to the Initial Term Maturity Date (as defined in the Priming Term Loan Credit Agreement and as such term may be amended or modified from time to time after the Closing Date), February 27, 2020 (or such later date to the extent the Priming Term Loans is extended).

[10]    The maturity date is the earlier of: (i) a demand for payment by the payee and (ii) July 17, 2020.

[11]    For the avoidance of doubt, such amount is exclusive of capitalized interest.

[12]    The maturity date is October 14, 2019.  The original maturity is September 30, 2019. The applicable parties agreed to a two-week extension and are in the process of negotiating a longer-time maturity extension.

[13]    The aggregate principal amount of outstanding Australian Loans excludes A$5 million overdraft facility and a A$1.77 million guarantee facility.

[14]    For the avoidance of doubt, such amount is exclusive of capitalized interest.

ABL Facility"). The Existing ABL Facility provided for a revolving credit facility in the aggregate principal amount of $102.5 million. On the same day, the parties to the Existing ABL Facility entered into the Second Amended and Restated ABL Guarantee and Collateral Agreement (the "Existing ABL Collateral Agreement"), under which the guarantors party thereto, including additional guarantors that executed assumption agreements thereto, granted a security interest for DESG's performance in substantially all of its assets, subject to customary exclusions.

## II.    Senior Priming Term Loans.

16.    On September 20, 2019, DESG and DX Holdings LLC entered into that certain Senior Secured Super Priming Term Loan Credit Agreement with the lenders from time to time party thereto (the "Senior Priming Term Loan Lenders"), and Credit Suisse AG, as Administrative Agent and Collateral Agent (the "Senior Priming Term Loan Facility," and the loans thereunder, the "Senior Priming Term Loans"). The Senior Priming Term Loan Facility provided for delayed draw term loans in an aggregate principal amount not to exceed $14 million, and was designed to provide the Deluxe with additional "bridge financing" until the implementation of the current chapter 11 filing. The Senior Priming Term Loan Facility is secured by liens on, and security interests in, substantially all of the property and assets of DESG and guarantors party thereto, subject to the Intercreditor Agreements and customary exclusions for such facility.

## III.    Priming Term Loans.

17.    On July 31, 2019, DESG and DX Holdings LLC entered into that certain Senior Secured Priming Delayed Draw Term Loan Agreement with the lenders from time to time party thereto (the "Priming Term Loan Lenders"), and Credit Suisse AG, as Administrative Agent and Collateral Agent (the "Priming Term Loan Facility"). The Priming Term Loan Facility provided for delayed draw term loans in an aggregate principal amount not to exceed $73.0 million, and was designed to provide the Deluxe with "bridge financing" through the implementation of the

comprehensive deleveraging transaction originally negotiated between the Company and the Ad Hoc Group.  The Priming Term Loan Facility is secured by liens on, and security interests in, substantially all of the property and assets of DESG and guarantors party thereto, subject to the Intercreditor Agreements and customary exclusions for such facility.

**IV.      Existing Term Loan Credit Agreement.**

18.      On July 31, 2019, DESG and DX Holdings LLC entered into that certain Fifth Amended and Restated Credit Agreement by and among Credit Suisse AG as the Administrative Agent and Collateral Agent (the "<u>Existing Term Loan Agent</u>"), and the lenders party thereto from time to time, to extend credit in amount of $880 million in term loans (the "<u>Existing Term Loans</u>"). As of the date hereof, there are approximately $783.5 million in aggregate principal amount of outstanding borrowings under the Existing Term Loans, which mature on February 28, 2020.  All obligations under the Term Loan Credit Agreement, and the guarantees of those obligations, are secured by substantially all assets of the DESG and guarantors party thereto and subject to the Intercreditor Agreements and customary exclusions for such facility.

**A.  MAFCO Secured Debt.**

19.      The MAFCO Secured Debt consists of approximately $4.75[15] million in unpaid principal outstanding (the "<u>MAFCO Secured Debt</u>") under that certain Senior Secured Promissory Note, dated as of July 18, 2019, by and among Deluxe One LLC and MacAndrews & Forbes Media Group, Inc.

---

[15]   For the avoidance of doubt, such amount is exclusive of capitalized interest.

### B.  MAFCO Unsecured Debt.

20.      The MAFCO Unsecured Debt consists of approximately $117.75[16] million in

principal outstanding (the "MAFCO Unsecured Debt") under the following facilities:

- MAFCO May Debt:  approximately $60.75 million in unpaid principal outstanding under that certain Amended and Restated Line of Credit Agreement entered into as of June 20, 2018 and effective as of May 1, 2018 (as amended, amended and restated or otherwise modified from time to time);

- MAFCO April Debt:  approximately $50 million in unpaid principal outstanding under that certain Amended and Restated Line of Credit Agreement, dated as of April 16, 2018 (as amended, amended and restated or otherwise modified from time to time); and

- MAFCO DBSL Debt:  approximately $7 million in unpaid principal outstanding under that certain Loan Agreement, dated as of December 29, 2017 (as amended, amended and restated or otherwise modified from time to time).

## V.      Debt of Foreign Subsidiaries.

### A.  Canadian Loans

21.      The Canadian Loans were incurred under that certain Credit Agreement, dated as

of December 7, 2017 (as amended, amended and restated or otherwise modified from time to time),

by and among, Deluxe Toronto, Ltd., as borrower, DESG, Deluxe (Delaware) Canada Holdings

Corporation, the lenders from time to time party thereto, and Wilmington Trust, National

Association, as Administrative Agent and Collateral Agent.  The original principal amount of the

Canadian Loans are $50.0 million and the unpaid outstanding amount of the Canadian Loans is

$49.2 million.

22.      The Canadian Loans are guaranteed by each of Deluxe (Delaware) Canada

Holdings Corporation, Stereo D Canada Ltd, Atomic Fiction Canada, Inc., Deluxe Distribution

Canada Ltd, Deluxe Media Canada, Inc., and DESG.  The Canadian Loans are secured by a

---

[16]    For the avoidance of doubt, such amount is exclusive of capitalized interest.

security interest granted by certain of the applicable loan parties in substantially all of their assets. The Canadian Loans amortize on the last business day of each March, June, September, and December in an amount of approximately $125,156. The Canadian Loans mature on December 7, 2020.

### B. Australian Loans

23. The Australian Loans were incurred under that certain A$ Facilities Agreement, dated as of July 29, 2015 (as amended, amended and restated or otherwise modified from time to time), by and among, Deluxe Australia Pty Ltd, A.P. Facilities Pty Ltd, Deluxe CS Pty Ltd, and Macquarie Bank Limited. None of the Debtors are borrowers or guarantors under the Australian Loans. The Australian Loans are outstanding in the aggregate principal amount of A$15 million. The Australian Loans consist of:

- A revolving cash advance facility up to the original principal amount of A$15 million with Deluxe Australia Pty Ltd as borrower;

- A letter of credit facility providing for letters of credit up to the original principal amount of A$1,770,000 in the aggregate with Deluxe Australia Pty Ltd as borrower; and

- A revolving overdraft facility up to the original principal amount of approximately A$5 million with A.P. Facilities Pty Ltd as borrower.

### Proposed Postpetition Financing

### I. The Debtors' Need for DIP Financing and Development of the DIP Budget.

24. To continue operating in the ordinary course and to effectuate an efficient and expeditious restructuring, the Debtors need immediate access to liquidity. As described in greater detail herein, the First Day Declaration, and Baird Declaration, the Debtors, with the assistance of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to maintain the Debtors' operations and pay administrative costs during these chapter 11 cases. The Debtors' management also conferred with key operational divisions to understand essential

business metrics in both the near- and long-term.  Based on this analysis, the Debtors and their advisors understood that the Debtors were in dire need of financing.

25.    The Debtors will fund working capital, capital expenditures, and other general corporate purposes with the consensual use of Cash Collateral.  Cash Collateral, however, is insufficient to support the Debtors operations and administration of these chapter 11 cases.  The DIP Facility will provide the necessary liquidity to cover working capital needs, pay administrative expenses, and fund adequate protection payments during these chapter 11 cases, as well as to satisfy the costs associated with consummating the Plan and completing the Debtors' restructuring. As such, the DIP Facility is fundamental to the preservation and maintenance of the Debtors' going-concern value during these chapter 11 cases and critical for the Debtors' successful reorganization.

26.    Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek alternatives and vendors and suppliers may refuse to do business with the Debtors.  This is especially true in a crowded media industry where global release of new content is expected almost as fast as it can be consumed.  Without access to the funds available under the DIP Facility, the Debtors will lack sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing the success of the Debtors' reorganization.  Therefore, the Debtors have an immediate need to be able to access the DIP Facility on an interim basis and throughout the pendency of these chapter 11 cases.

## II.    The Debtors' Efforts to Obtain Financing.

27.    In advance of PJT reaching out to potential financing providers, PJT, the Debtors, and their advisors, undertook an analysis of how much postpetition financing would be required

to operate the Debtors' business and pay administrative costs during the chapter 11 process. Based on this analysis, the Debtors determined that they would require incremental liquidity of approximately $115 million to operate smoothly postpetition, satisfy administrative costs and expenses, and remain adequately capitalized upon emergence. PJT also found that the Debtors' liquidity requirements were severe and immediate.

28.     The Debtors, led by PJT, promptly began contacting parties that were most likely to fund a rescue or DIP financing facility within a limited timeframe. PJT solicited interest from 18 third-party financial institutions to determine the extent to which third parties would be willing to provide debtor-in-possession financing to the Debtors. Of these third-party lenders, 14 executed confidentiality agreements and received access to a data room containing non-public information.

29.     PJT also solicited a debtor-in-possession financing facility proposal from the Ad Hoc Group, which proposed a DIP financing package that would be backstopped by certain lenders of the Debtors' Priming Term Loans (the "Backstop Parties"), the primary parties with which the Debtors were negotiating a global restructuring transaction.

30.     Given the circumstances, the Debtors and their advisors provided extensive diligence and engaged in various, simultaneous conversations and negotiations with the Backstop Parties and third-party lenders to achieve the best possible terms for a DIP term loan facility. Remarkably, the Ad Hoc Group indicated to PJT that they would be willing to consent to a priming DIP facility and informed the Debtors that they had amended the applicable credit documents to permit a $100 million basket of priming liens. Baird Decl. ¶ 13. Nevertheless, no third-party

lender provided the Debtors with an executable out-of-court or postpetition financing on an unsecured, junior-lien, *pari passu*, or priming basis.[17]

31.     After extensive, arms'-length negotiations, the Debtors were able to secured the proposed $115 million DIP Facility from the Ad Hoc Group.  The terms of the DIP Facility provided by the Ad Hoc Group required all parties to continue their marketing and negotiation efforts through the eleventh hour of the Petition Date in order to unearth potential solutions or alternative sources of financing.  Ultimately, in order to garner the necessary amount to fund the Debtors' liquidity needs, the Ad Hoc Group was able to procure a third-party backstop party to substantiate the Ad Hoc Group's backstop commitments.

32.     In addition, the Backstop Parties agreed that, upon confirmation of the Debtors' proposed Plan, the DIP Facility would convert into new first lien term loans, ensuring that the Debtors will not need to solicit additional sources of capital to fund the Debtors' post-emergence capital needs.  Further, all Backstop Parties agreed to sign the RSA documenting their support for the Debtors' proposed plan and solidifying support for a prepackaged, value-maximizing restructuring.  Under the circumstances, and as more fully described in the Baird Declaration, no other lender was able to provide debtor-in-possession financing on better or more favorable terms to the Debtors than the DIP Facility.

33.     The DIP Facility is critical to the Debtors' ability to pay the administrative costs of these chapter 11 cases and fund distributions under the Plan, and provides the Debtors with sufficient liquidity to operate their business.  In tandem with the Debtors' RSA, the DIP Facility

---

[17]   While one third party verbally indicated a willingness to offer up to $20 million of priming DIP financing, that quantum was insufficient to fund the Debtors' liquidity needs and that third-party never provided a written proposal.

provides a speedy path to emergence that is important to reassure customers and vendors, protect

operations, and maximize value for all stakeholders.

## Basis for Relief

### I.    The DIP Financing Should be Approved Pursuant to Section 364(c) of the Bankruptcy Code.

34.    The Debtors propose to obtain financing under the proposed DIP Facility by

providing security interests and liens as set forth above pursuant to section 364(c) of the

Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c)

of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to

obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]."

11 U.S.C. § 364(c).  *See In re Crouse Grp. Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding

that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

35.    Courts generally have set forth a three-part test to determine whether a debtor may

obtain financing under section 364(c) of the Bankruptcy Code.   Specifically, courts consider

whether:

      a.    the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by allowing a lender only an administrative claim);

      b.    the credit transaction is necessary to preserve estate assets; and

      c.    the terms of the transaction are fair, reasonable, and adequate under the circumstances of the debtor-borrower and the proposed lender.

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990); *Norris Square*

*Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988);

*Crouse*, 71 B.R. at 549.

36.     As described in greater detail below and in the Baird Declaration, the Debtors, together with their advisors, sought and marketed alternative sources of postpetition financing to determine whether the Debtors could obtain debtor-in-possession financing as an administrative expense.  No parties were willing to provide postpetition financing solely on an unsecured, administrative priority basis.  Furthermore, and as described in the Baird Declaration, the Debtors do not believe they can adequately protect, preserve, and maximize the value of their estates without access to postpetition financing.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility are fair, reasonable, and adequate.

37.     Where, as here, a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]."  11 U.S.C. § 364(c)(1).  As described above and in the Baird Declaration, the Debtors are unable to obtain unsecured credit.  Therefore, approving the superpriority claims in favor of the DIP Lenders is appropriate under the circumstances.

## II.     The DIP Financing Should be Approved Pursuant to Section 364(d)(1) of the Bankruptcy Code.

### A.     Cause Exists to Authorize the DIP Financing under Section 364 of the Bankruptcy Code.

38.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a debtor may be authorized to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property without the consent of the existing lienholders if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Consent by the secured creditors subject to priming, however, obviates the need to show adequate protection.  *See, e.g., Anchor Savs.*

*Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the super-priority lien, those creditors relieved the debtor of having to demonstrate that they were adequately protected"). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if the Debtors are unable to obtain unsecured or junior secured credit and either (a) the "primed" party has consented or (b) such "primed" party's interests in collateral are adequately protected.

39.    Here, the "primed" parties have provided the requisite consent because the Prepetition Secured Parties have consented to the proposed DIP Facility and the priming liens granted thereunder as part of the Adequate Protection Obligations.

**B.    The Debtors are Unable to Obtain Unsecured or Junior Secured Credit.**

40.    To show that credit is not obtainable on an unsecured basis, the Debtors need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by subsections 364(c) or (d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Savings*, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames*, 115 B.R. at 37–40 (holding that the debtor must show that it made a reasonable effort to seek other sources of financing under subsections 364(a) and (b) of the Bankruptcy Code). Moreover, the Bankruptcy Code and courts do not require debtors to "seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), *aff'd sub nom. Anchor Savings*, 99 B.R. at 117; *In re Reading Tube Indus.*, 72 B.R.

36

329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."); *but see Crouse Grp.*, 71 B.R. at 550 (noting the "relative ease" of establishing the unavailability of unsecured credit, but denying the motion where the debtor only approached one potential lender, and did not contact two large prepetition lenders).

41.     As noted above, after a marketing process for postpetition financing, the Debtors believe that there are no alternative sources of financing reasonably available, and no alternative sources of financing available on better terms than those being provided by the DIP Facility. In fact, no party that PJT communicated with as part of the marketing process, and no other party that PJT was aware of, was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  Indeed, no party was willing to provide postpetition financing on anything other than a "priming" basis with respect to substantially all of the Debtors' assets. Thus, providing the DIP Lenders with a super-priority administrative claim and priming liens is reasonable and appropriate here as it will allow the Debtors to obtain on a consensual basis the critical financing they need to fund their operations and appropriately administer their chapter 11 cases.  Therefore, the Debtors submit that they satisfy the requirements of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors.

**III.    The Debtors Should Be Authorized to Use the Cash Collateral.**[18]

42.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash

---

[18]  Capitalized terms in this subsection not defined in this motion shall have the meaning ascribed to them in the Interim Order.

collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

43.    In addition, section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993)) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding" (citations omitted)).

44.    After extensive arms' length, and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of their Prepetition Collateral, including Cash Collateral, subject to the provision by the Debtors of adequate protection.  Among other things, the adequate protection contemplated by the DIP Facility is designed to protect the Prepetition Secured Parties'

interests in the Debtors' property from any diminution in value caused by the Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of these chapter 11 cases. Specifically, the Debtors have agreed to provide the following forms of adequate protection.

> **A.    Adequate Protection Provided to the Prepetition ABL Lender.**

45.     As set forth in the Interim Order, the Debtors propose to provide the prepetition ABL lender with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "<u>ABL Adequate Protection Obligations</u>"), including:

- ***Adequate Protection Liens***:  valid and perfected security interests in and liens on all ABL Loan Lenders' interests in all DIP Collateral (subject to the Carve-Out and, in the case of the Term Priority Collateral, the DIP Liens, but senior to any and all other liens and security interests in the DIP Collateral, as set out in the Interim Order);

- ***Adequate Protection Claims***:  allowed, superpriority administrative claims under sections 503(b) and 507(b) of the Bankruptcy Code (subject to the Carve-Out and the priorities set out in the Interim Order);

- ***Adequate Protection Payments and Cash Collateralization of Letters of Credit***:  reasonable fees and expenses of the ABL Loan Agent. All Letters of Credit (as defined in the ABL Loan Agreement) outstanding under the ABL Loan Agreement shall be cash collateralized in accordance with the terms thereof.  Interest shall be paid at the default rate provided for in Section 2.15(c) of the ABL Loan Agreement, *provided, however*, that the ABL Loan Lenders shall waive any default interest (and only receive non-default interest) to the extent the Debtors satisfy each of the Milestones set forth in the Interim Order and times provided for in the ABL Loan Agreement. If, at any time, the Aggregate Exposure (excluding the amount of any cash collateralized Letters of Credit, to the extent otherwise included in Aggregate Exposue) exceeds the Borrowing Base Threshold (as defined in the Interim Order), (1) the Debtors shall make an immediate cash payment to the ABL Loan Administrative Agent, for the benefit of the ABL Loan Secured Parties, in an amount equal to such Borrowing Base Deficiency, which payment shall be deemed a permanent repayment of the Loans (as defined in the ABL Loan Agreement) in the amount of such payment, and (2) if the Debtors shall not make such immediate payment to the ABL Loan Administrative Agent, the ABL Loan Secured Parties shall

be deemed to have received relief from the automatic stay, and may exercise all rights and remedies available against the ABL Priority Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise, to permanently repay Loans (as defined in the ABL Loan Agreement) in the amount of such Borrowing Base Deficiency. The Debtors shall continue to comply with their respective obligations under the ABL Loan Documents with respect to cash management systems and the collection of payments in respect of ABL Priority Collateral (including Section 5.4 of the Guarantee and Collateral Agreement (as defined in the ABL Loan Agreement)). Notwithstanding any automatic stay arising as a result of the Chapter 11 Cases, to the extent the payment of any Borrowing Base Deficiency is not made in accordance with the terms hereof, the consent of the ABL Loan Secured Parties to usage of their Cash Collateral shall be suspended until such time as such Borrowing Base Deficiency shall have been paid.

**B.      Adequate Protection Provided to the Prepetition Term Loan Secured Parties.**

46.    As described more fully below and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Term Loan Secured Parties with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Term Loan Adequate Protection Obligations"), including:

- *Adequate Protection Liens*:  valid and perfected security interests in and liens on all DIP Collateral (subject to the Carve-Out and the liens priorities set forth in the Interim Order);

- *Adequate Protection Claims*:  allowed, superpriority administrative claims under section 507(b) of the Bankruptcy Code (subject to the Carve-Out and the priorities set out in the Interim Order);

- *Adequate Protection Payments*:  the reasonable professional fees and expenses of certain of the Prepetition Term Loan Secured Parties, as set forth in the Interim Order.

**C.      Additional Adequate Protection Provided to the Prepetition Secured Parties.**

47.    As described more fully below and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with the following additional Adequate

Protection (the "<u>Additional Adequate Protection</u>," and together with the Term Loan Adequate Protection Obligations and the ABL Adequate Protection Obligations, the "<u>Adequate Protection Obligations</u>"):

- ***Senior Priming Term Loan Payment***: To the extent the prepetition Senior Priming Loan Obligations are not approved by the Interim Order to be paid in full, in cash, on the Closing Date, the Senior Priming Term Loan Lenders shall receive a payment, in cash, equal to 10.0% of the Senior Priming Term Loan Obligations, which payment shall be paid upon the effective date of any chapter 11 plan of the Debtors.

- ***Insurance***: The Borrower shall continue to maintain insurance of the Prepetition Collateral and the DIP Collateral in amounts, and for the risks, and by the entities, as required under the Prepetition Loan Documents, the DIP Loan Documents and the Interim Order;

- ***Financial Reporting***: financial reporting and other reports and notices delivered by the Debtors under the DIP Facility.

48.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential diminution in value to the Cash Collateral. Accordingly, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate. Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of these chapter 11 cases. In light of the foregoing, subject to the terms and limitations set forth in the Interim Order, the Debtors use of Cash Collateral is appropriate.

## IV.     The Scope of the Carve-Out Is Appropriate.

49.     The Adequate Protection Obligations are subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these cases would be restricted.

*See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors and any official committee appointed under section 1102 of the Bankruptcy Code in these chapter 11 cases.

**V.      The Debtors Should be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Loan Documents.**

50.      In connection with negotiating the DIP Facility, the Debtors agreed, subject to Court approval, to pay certain fees, expenses and other payments arising under the DIP Loan Documents or the DIP Orders (the "DIP Payments").  Specifically, the Debtors will pay an initial commitment fee for funding of the DIP Facility, a backstop fee to the Backstop Parties in connection with the backstop commitments, an agency fee and an administration fee to the DIP Agent, which the Debtors propose to seal pursuant to the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to (I) Restrict Access to Certain Confidential Fee Letters Related to Proposed Debtor-In-Possession Financing and (II) Redact Certain Terms in the DIP Motion* (the "Fee Sealing Motion"), filed contemporaneously herewith.  The Debtors have also agreed to pay the fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents.

51.      As described in the Baird Declaration, these fees are reasonable in the context of and the nature and extent of the credit provided under the Debtors' circumstances.  The amounts the Debtors have agreed to pay and other obligations under the DIP Loan Documents and proposed

DIP Orders represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available. The Debtors considered the amounts described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute these chapter 11 cases. Making the DIP Payments in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors, and other parties in interest.

52.    Courts routinely authorize debtors to pay amounts similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates. *See, e.g.*, *In re Sungard Availability Serv's Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 1, 2019) (approving upfront and commitment fees of 3% of the committed DIP amount and 2.5% of the average daily unused delayed draw, respectively); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. April 4, 2018) (approving an upfront fee of 7.75% of the aggregate commitments and an exit fee of 2.50% of the aggregate commitments); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving 3.5% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% up front fee and a 1.0% exit/conversion fee).

## VI.    Good Faith under Section 364(e) of the Bankruptcy Code.

53.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

54.     As explained above, in the Baird Declaration, and in the First Day Declaration, the DIP Facility is the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable (and only) terms on which postpetition financing was available for these chapter 11 cases, and (b) extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Loans will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by section 364(e) of the Bankruptcy Code.

## VII.    Failure to Obtain Immediate Interim Access to the DIP Facility, Including the Use of Cash Collateral, Would Cause Immediate and Irreparable Harm.

55.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rules 4001(b)(2) and

4001(c)(2) & Local Bankruptcy Rule 4001-2(g). Furthermore, section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

56.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, and access the liquidity provided by the DIP Facility. The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. Furthermore, substantially all of the Debtors' available cash constitutes the Cash Collateral of the Prepetition Secured Parties. The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and approval of the DIP Facility, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. The Debtors will also be unable to provide a clear, strong message to the Debtors' customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally. Finally, a condition precedent to the effectiveness of the Plan and of the consensual restructuring contemplated thereby requires entry and approval of the DIP Facility and access to Cash Collateral. In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

57.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility. The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first

day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## VIII.    The Automatic Stay Should Be Modified on a Limited Basis.

58.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the security interests and liens described above to the DIP Parties and the Prepetition Secured Parties, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  Paragraph 7(d) of the Interim Order further provides that the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise all rights and remedies provided for in the DIP Loan Documents and the Interim Order.  Stay modifications of this kind are ordinary and standard features for the use of cash collateral, and in the Debtors' business judgment, are reasonable and fair under the present circumstances.  Accordingly, the Debtors request that the Court grant the requested relief from that automatic stay as provided in the DIP Orders.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

59.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, granting the relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Furthermore, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and

irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Request for a Final Hearing**

60.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 15 days after the date of this DIP Motion and no later than 25 days after the entry of the Interim Order, to hold a hearing (if necessary) to consider entry of the Final Order and the permanent approval of the relief requested in this DIP Motion.[19]  The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

61.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

62.    The Debtors will provide notice of this Motion to:  (a) the United States Trustee for the Southern District of New York, Attn.:  Richard C. Morrissey, Esq.; (b) the Holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Existing ABL Agent; (d) the Senior Priming Term Loan Agent; (e) the Priming Term Loan Agent; (f) the Existing Term Loan Agent; (g) counsel to the Existing ABL Agent, Senior Priming Term Loan Agent,

---

[19]    The DIP Credit Agreement requires that the Final Order be entered no later than 35 days after the Petition Date.

Priming Term Loan Agent, and Existing Term Loan Agent, Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019, Attn.:  Paul H. Zumbro, George E. Zobitz, and Sarah Rosen; (h) counsel to the Ad Hoc Group, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attn.:  Kristopher Hansen, Jonathan Canfield, and Gabriel Sasson; (i) MAFCO; (j) counsel to MAFCO, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attn:  Shana Elberg and Mark McDermott; (k) the United States Attorney's Office for the Southern District of New York; (l) the Internal Revenue Service; (m) the United States Securities and Exchange Commission; (n) the Environmental Protection Agency and all similar state environmental agencies; (o) attorneys general in the states where the Debtors conduct their business operations; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be give.

## No Prior Request

63.    No prior request for the relief sought in this DIP Motion has been made to this or any other court.

*[Remainder of page left intentionally blank.]*

WHEREFORE, for the reasons set forth herein, the First Day Declaration, and the Baird

Declaration, the Debtors respectfully request that the Court enter the Interim Order granting the

relief requested herein and such other relief as is just and proper.

Dated: October 3, 2019          /s/ Jonathan S. Henes
New York, New York              Jonathan S. Henes, P.C.
                                **KIRKLAND & ELLIS LLP**
                                **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                601 Lexington Avenue
                                New York, New York 10022
                                Telephone:    (212) 446-4800
                                Facsimile:    (212) 446-4900

                                *Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELUXE ENTERTAINMENT SERVICES GROUP INC., *et al.,*[1] | ) | Case No. 19-23774 (RDD) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
(I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED PRIMING
SUPERPRIORITY POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH
COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE
PROTECTION, (IV) MODIFYING AUTOMATIC STAY, (V) SCHEDULING FINAL
<u>HEARING, AND (VI) GRANTING RELATED RELIEF</u>**

Upon the motion, dated October 4, 2019 (the "**DIP Motion**"),[2] of the above-captioned

debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter

11 cases (collectively, together with any Successor Cases (as defined below), the "**Chapter 11**

**Cases**"), seeking entry of an interim order (together with all annexes, schedules and exhibits

hereto, this "**Interim Order**"), pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e)

and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy**

**Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and Rules 2002-1(b), 4001-2, 9006-1 and 9013-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern

District of New York (the "**Local Rules**"), *inter alia*:

---

[1]       The last four digits of Debtor Deluxe Entertainment Services Group Inc.'s tax identification number are
1725.   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been
requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is
not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and
noticing agent at https://cases.primeclerk.com/deluxe.  The location of the Debtors' service address for purposes of
these chapter 11 cases is: 50 Main Street, Suite 1014, White Plains, New York, 10606.
[2]       Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the
applicable DIP Loan Documents (as defined herein).

(1)      authorizing the Debtors to obtain postpetition financing on a priming senior secured superpriority basis in an aggregate principal amount not to exceed $115 million (the "**DIP Facility**"), in the form of a new-money term loan facility, of which (x) approximately $55 million in aggregate principal amount shall be borrowed by the Debtors in a single draw to be made by the Debtors on the Closing Date (as defined in the DIP Loan Agreement), and (y) following entry of the Final Order (as defined below), an additional $60 million in aggregate principal amount shall be borrowed by the Debtors in a single draw to be made by the Debtors, in each case, pursuant to the terms and conditions of this Interim Order and that certain *Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement*, substantially in the form attached to the DIP Motion as **Exhibit A** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, and together with all schedules, annexes and exhibits thereto, the "**DIP Loan Agreement**", together with all other agreements, documents (including any and all security, collateral, guarantee and other agreements), instruments and certificates executed and/or delivered in connection therewith, each as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Loan Agreement, the "**DIP Loan Documents**"), by and among Deluxe Entertainment Services Group Inc., as borrower (the "**DIP Borrower**"), DX Holdings LLC ("**DX Holdings**") and each of the other Debtors and non-Debtor subsidiaries of DX Holdings who are guarantors from time to time under the DIP Loan Documents, as guarantors (each, a "**DIP Guarantor**", and collectively, the "**DIP Guarantors**", and together with the DIP Borrower, the "**DIP Loan Parties**"), Credit Suisse AG, as administrative and collateral agent (in such capacities, the "**DIP Agent**"), the initial lenders party thereto (collectively, the "**Initial DIP Lenders**", and together with any additional lenders that become a party thereto from time to time in accordance with the terms thereof, the "**DIP Lenders**", and together with the DIP Agent, the "**DIP Secured Parties**"));

(2)      authorizing the DIP Loan Parties to incur, guarantee (as applicable) on a joint and several basis, and pay the principal, interest, premiums, fees, expenses and all other amounts (including without limitation, all "DIP Obligations" as defined in the DIP Loan Agreement) that may be due, as and when payable, under the DIP Loan Documents (collectively, the "**DIP Obligations**"));

(3)      authorizing the DIP Loan Parties to execute, deliver and to perform under the DIP Loan Documents, and to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the DIP Loan Documents, and the transactions contemplated hereby and thereby;

(4)      authorizing the indefeasible payment in full in cash of all Senior Priming Term Loan Obligations (as defined below), subject to paragraph 31 hereof;

(5)      granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, and authorizing the DIP Loan Parties to incur, the DIP Liens (as defined below) in all DIP Collateral (as defined below), in each case, in accordance with and subject to the relative priorities set forth herein;

2

(6)      granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, and authorizing the DIP Loan Parties to incur, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations;

(7)      authorizing the Debtors' use of Prepetition Collateral (as defined below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facility, solely in accordance with the Approved Budget (as defined below), subject to Permitted Variances (as defined below), and subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents;

(8)      providing adequate protection, as and to the extent set forth herein, to the Prepetition Secured Parties (as defined below) to protect against the risk of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (including Cash Collateral);

(9)      modifying or vacating the automatic stay imposed by Section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(10)     waiving the Debtors' right to surcharge the DIP Collateral and, subject to this Court's approval at the Final Hearing, waiving the Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and waiving the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(11)     authorizing the Debtors to cause and/or require the other DIP Loan Parties to become parties to the DIP Loan Documents as and to the extent required by the DIP Loan Documents, and to grant any liens and perform all DIP Obligations, and to submit to the jurisdiction of this Court with regard to any and all disputes regarding the DIP Loan Documents or this Interim Order; and

(12)     scheduling a final hearing (the "**Final Hearing**") to consider entry of a final order authorizing the relief requested in the DIP Motion on a final basis, which order shall be in form and substance and on terms acceptable in all respects to the Required DIP Lenders (as defined in the DIP Loan Agreement) and the Required ABL Lenders (as defined in the ABL Loan Agreement as "Required Lenders") (the "**Final Order**"), and approving the form of notice with respect to the Final Hearing.

The Court having reviewed the DIP Motion, the DIP Loan Documents on file with the

Court, the *Declaration of John Eric "Eric" Cummins, Executive Vice President and Chief*

*Financial Officer of Deluxe Entertainment Services Group Inc., (I) in Support of Chapter 11*

*Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2*

(the "**First Day Declaration**") and any exhibits thereto, the *Declaration of James H. Baird in*

3

*Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief in Support of the DIP Motion* (the "**DIP Declaration**"), the pleadings filed with the Court, the evidence and arguments proffered or adduced at the hearing held before this Court on October 4, 2019 (the "**Interim Hearing**"), and upon the record of these Chapter 11 Cases; and adequate notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Rules; and all objections, if any, to the relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

## IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED:[3]

A.    *Chapter 11 Cases.*    On October 3, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (this "**Court**") commencing these Chapter 11 Cases.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    ***Debtors-in-Possession***.    The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.  As of the date hereof, the United States Trustee (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases (together with any statutory committee that may appointed or formed in the Chapter 11 Cases or any Successor Cases the "**Official Committee**").

C.    ***Jurisdiction and Venue***.    The Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings and over the persons and property affected thereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2) and 1334.  Venue for these Chapter 11 Cases and the proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief set forth herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001,  6004 and 9014 and Local Rules 2002-1(b), 4001-2, 9006-1 and 9013-1.

D.    ***Debtors' Stipulations***.    In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange for and in recognition of the priming of the Prepetition Term Loan Liens (as defined below) and the consent of the Prepetition Secured Parties to usage of Cash Collateral, the Debtors hereby admit, stipulate, acknowledge and agree (subject to paragraph 31 hereof), to the following:

(i)    ***Junior Term Loans***

(a)    **Junior Prepetition Term Loan Facility.**  Pursuant to the *Fifth Amended and Restated Credit Agreement* dated as of July 31, 2019 (as amended on September 19, 2019, and as further amended, supplemented or modified prior to the Petition Date, the "**Junior Term Loan Agreement**", and together with all other agreements, documents, instruments and certificates executed or delivered in connection

5

therewith, collectively, including, without limitation, the Junior Term Loan Guarantee and Collateral Agreement (as defined below) and the Priming Term Loan Intercreditor Agreement (as defined below), the "**Junior Term Loan Documents**"), by and among Deluxe Entertainment Services Group Inc. ("**DESG**"), as borrower, DX Holdings, Credit Suisse AG, as administrative agent and collateral agent (the "**Junior Term Loan Agent**"), and the lenders party thereto from time to time (collectively, the "**Junior Term Loan Lenders**", and together with the Junior Term Loan Agent, the "**Junior Term Loan Secured Parties**"), the Junior Term Loan Lenders provided a term loan facility to DESG. Pursuant to the *Second Amended and Restated Term Loan Guarantee and Collateral Agreement* dated as of July 31, 2019 (as amended, supplemented or modified prior to the Petition Date, the "**Junior Term Loan Guarantee and Collateral Agreement**"), by and among DX Holdings, DESG, the Subsidiary Guarantors and Grantors from time to time party thereto, including additional guarantors that executed assumption agreements thereto (collectively, together with DX Holdings, the "**Junior Term Loan Guarantors**", and together with DESG, the "**Junior Term Loan Parties**"), and the Junior Term Loan Agent, the Junior Term Loan Guarantors jointly and severally, unconditionally and irrevocably, guaranteed the Junior Term Loan Obligations (as defined below).

(b) **Junior Term Loan Obligations.** As of the Petition Date, without defense, counterclaim, or offset of any kind, the Junior Term Loan Parties were jointly and severally indebted and liable to the Junior Term Loan Secured Parties in the aggregate principal amount of at least $783.5 million, plus accrued but unpaid interest, plus any other amounts, including, without limitation, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, and any other charges, amounts, liabilities, obligations and costs of whatever nature, whether or not contingent, whenever arising or accruing, that may be due, owing or chargeable in respect thereof, including all "Obligations" as defined in the Junior Term Loan Agreement, in each case, as and to the extent provided in the Junior Term Loan Documents (collectively, the "**Junior Term Loan Obligations**").

(c) **Junior Term Loan Collateral.** To secure the Junior Term Loan Obligations, the Junior Term Loan Parties granted to the Junior Term Loan Agent, for the benefit of itself and the Junior Term Loan Lenders, properly perfected continuing liens, mortgages on and security interests in (collectively, the "**Prepetition Junior Term Loan Liens**") all "Collateral" as defined in the Junior Term Loan Agreement (collectively, the "**Prepetition Junior Term Loan Collateral**") it being understood that the Prepetition Junior Term Loan Collateral does not include any property or assets that have been expressly excluded from the definition of "Collateral" in the Junior Term Loan Agreement, in each case, subject to the relative rankings and priorities set forth in the ABL Intercreditor Agreement and the Priming Term Loan Intercreditor Agreement (each as defined below).

(ii) *Priming Term Loans.*

6

(a)    **Priming Term Loan Facility.**    Pursuant to the *Senior Secured Priming Delayed Draw Term Loan Credit Agreement* dated as of July 31, 2019 (as amended on September 19, 2019, and as further amended, supplemented or modified prior to the Petition Date, the "**Priming Term Loan Agreement**", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including, without limitation, the Priming Term Loan Guarantee and Collateral Agreement (as defined below), and the Priming Term Loan Intercreditor Agreement, collectively, the "**Priming Term Loan Documents**"), among DESG, as borrower, DX Holdings, Credit Suisse AG, as administrative agent and collateral agent (the "**Priming Term Loan Agent**"), and the lenders party thereto from time to time (collectively, the "**Priming Term Loan Lenders**", and together with the Priming Term Loan Agent, the "**Priming Term Loan Secured Parties**"), the Priming Term Loan Lenders provided a priming term loan facility to DESG.  Pursuant to the *Priming Term Loan Guarantee and Collateral Agreement* dated as of July 31, 2019 (as amended, supplemented or modified prior to the Petition Date, the "**Priming Term Loan Guarantee and Collateral Agreement**"), by and among DX Holdings, DESG, the Subsidiary Guarantors and Grantors from time to time party thereto, including additional guarantors that executed assumption agreements thereto (collectively, together with DX Holdings, the "**Priming Term Loan Guarantors**", and together with DESG, the "**Priming Term Loan Parties**"), and the Priming Term Loan Agent, the Priming Term Loan Guarantors jointly and severally, unconditionally and irrevocably, guaranteed the Priming Term Loan Obligations (as defined below).

(b)    **Priming Term Loan Obligations.**    As of the Petition Date, without defense, counterclaim, or offset of any kind, the Priming Term Loan Parties were jointly and severally indebted and liable to the Priming Term Loan Secured Parties in the aggregate principal amount (including amounts due under the Applicable Premium (as defined in the Priming Term Loan Agreement)) of at least $73 million, plus any other amounts, including, without limitation, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, and any other charges, amounts, liabilities, obligations and costs of whatever nature, whether or not contingent, whenever arising or accruing, that may be due, owing or chargeable in respect thereof, including all "Obligations" as defined in the Priming Term Loan Agreement, in each case, as and to the extent provided in the Priming Term Loan Documents (collectively, the "**Priming Term Loan Obligations**").

(c)    **Priming Term Loan Collateral.**    To secure the Priming Term Loan Obligations, the Priming Term Loan Parties granted to the Priming Term Loan Agent, for the benefit of itself and the Priming Term Loan Lenders, properly perfected continuing priming liens, mortgages on and security interests in (collectively, the "**Prepetition Priming Term Loan Liens**") all "Collateral" as defined in the Priming Term Loan Agreement (collectively, the "**Prepetition Priming Term Loan Collateral**"), it being understood that the Prepetition Priming Term Loan Collateral does not include any property or assets that have been expressly excluded from the definition

of "Collateral" in the Priming Term Loan Agreement, in each case, subject to the relative rankings and priorities set forth in the Intercreditor Agreements (as defined below).

(iii)    *Senior Priming Term Loan*

(a)    **Senior Priming Term Loan Facility.**    Pursuant to the *Super Secured Super Priming Term Loan Credit Agreement* dated as of September 19, 2019 (as amended, supplemented or modified prior to the Petition Date, the "**Senior Priming Term Loan Agreement**", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, collectively, including, without limitation, the Senior Priming Term Loan Guarantee and Collateral Agreement (as defined below) and the Senior Priming Intercreditor Agreement (as defined below), the "**Senior Priming Term Loan Documents**", and together with the Priming Term Loan Documents and the Junior Term Loan Documents, the "**Prepetition Term Loan Documents**"), among DESG, as borrower, DX Holdings, Credit Suisse AG, as administrative agent and collateral agent (the "**Senior Priming Term Loan Agent**"), and the lenders party thereto from time to time (collectively, the "**Senior Priming Term Loan Lenders**", and together with the Term Loan Agent, the "**Senior Priming Term Loan Secured Parties**", and together with the Priming Term Loan Secured Parties and the Junior Term Loan Secured Parties, the "**Prepetition Term Loan Secured Parties**"), the Senior Priming Term Loan Lenders provided a senior priming term loan facility to DESG. Pursuant to the *Super Priming Term Loan Guarantee and Collateral Agreement* dated as of September 19, 2019 (as amended, supplemented or modified prior to the Petition Date, the "**Senior Priming Term Loan Guarantee and Collateral Agreement**"), by and among DX Holdings, DESG, the Subsidiary Guarantors and Grantors from time to time party thereto, including additional guarantors that executed assumption agreements thereto (collectively, together with DX Holdings, the "**Senior Priming Term Loan Guarantors**", and together with DESG, the "**Senior Priming Term Loan Parties**"), and the Senior Priming Term Loan Agent, the Senior Priming Term Loan Guarantors jointly and severally, unconditionally and irrevocably, guaranteed the Senior Priming Term Loan Obligations.

(b)    **Senior Priming Term Loan Obligations.**    As of the Petition Date, without defense, counterclaim, or offset of any kind, the Senior Priming Term Loan Parties were jointly and severally indebted and liable to the Senior Priming Term Loan Secured Parties in the aggregate principal amount (including amounts due under the Applicable Premium (as defined in the Priming Term Loan Agreement)) of at least $10 million, plus accrued but unpaid interest as of the Petition Date, plus any other amounts, including, without limitation, accrued and unpaid interest (including at the default rate), any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, and any other charges, amounts, liabilities, obligations and costs of whatever nature, whether or not contingent, whenever arising or accruing, that may be due, owing or chargeable in respect thereof, including all "Obligations" as defined in the Senior Priming Term Loan Agreement, in each case, as and to the extent provided in the Senior Priming Term Loan Documents (collectively, the "**Senior Priming Term Loan Obligations**", and together

with the Priming Term Loan Obligations and the Junior Term Loan Obligations, the "**Prepetition Term Loan Obligations**").

(c)    **Senior Priming Term Loan Collateral.**    To secure the Senior Priming Term Loan Obligations, the Senior Priming Term Loan Parties granted to the Senior Priming Term Loan Agent, for the benefit of itself and the Senior Priming Term Loan Lenders, properly perfected continuing liens, mortgages on and security interests in (collectively, the "**Prepetition Senior Priming Term Loan Liens**", and together with the Prepetition Priming Term Loan Liens and the Prepetition Junior Term Loan Liens, the "**Prepetition Term Loan Liens**") all "Collateral" as defined in the Senior Priming Term Loan Agreement (collectively, the "**Prepetition Senior Priming Term Loan Collateral**"), it being understood that the Prepetition Senior Priming Term Loan Collateral does not include any property or assets that have been expressly excluded from the definition of "Collateral" in the Senior Priming Term Loan Agreement, in each case, subject to the relative rankings and priorities set forth in the Intercreditor Agreements.

(iv)    *ABL Loan Facility*

(a)    **ABL Loan Facility.**    Pursuant to the *Third Amended and Restated Asset-Based Revolving Credit Agreement*, dated as of July 31, 2019 (as amended on September 19, 2019, and as further amended, supplemented or modified prior to the Petition Date, the "**ABL Loan Agreement**", and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, collectively, including, without limitation, the ABL Guarantee and Collateral Agreement (as defined below), the ABL Intercreditor Agreement, the "**ABL Loan Documents**"), among DESG, as borrower, DX Holdings, Credit Suisse AG, as administrative agent (the "**ABL Loan Administrative Agent**"), Bank of America, N.A., as collateral agent (the "**ABL Loan Collateral Agent**", and together with the ABL Loan Administrative Agent, the "**ABL Loan Agents**"; the ABL Loan Agents, together with the Junior Term Loan Agent, the Priming Term Loan Agent and the Senior Priming Term Loan Agent, the "**Prepetition Agents**"), and the lenders party thereto from time to time (collectively, the "**ABL Loan Lenders**", and together with the ABL Loan Administrative Agent and the ABL Loan Collateral Agent, the "**ABL Loan Secured Parties**"), the ABL Loan Lenders provided an asset-based revolving credit facility to the ABL Loan Parties (the "**ABL Loan Facility**").    Pursuant to the *Second Amended and Restated ABL Guarantee and Collateral Agreement* dated as of July 31, 2019 (as amended, supplemented or modified prior to the Petition Date, the "**ABL Guarantee and Collateral Agreement**"), by and among DX Holdings, DESG, the Subsidiary Guarantors and Grantors from time to time party thereto, including additional guarantors that executed assumption agreements thereto (collectively, together with DX Holdings, the "**ABL Loan Guarantors**", and together with DESG, the "**ABL Loan Parties**"), and the ABL Loan Collateral Loan Agent, the ABL Loan Guarantors jointly and severally, unconditionally and irrevocably, guaranteed the ABL Loan Obligations (as defined below).

(b)    **ABL Loan Obligations.**    As of the Petition Date, without defense, counterclaim, or offset of any kind, the ABL Loan Parties were jointly and severally indebted and liable to the ABL Loan Secured Parties in the aggregate principal amount of

9

$56.35 million,[4] plus any other amounts, including, without limitation, accrued and unpaid interest (including at the default rate), any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), treasury, cash management and derivative obligations, indemnification obligations, and any other charges, amounts, liabilities, obligations and costs of whatever nature, whether or not contingent, whenever arising or accruing, that may be due, owing or chargeable in respect thereof, including all "Obligations" as defined in the ABL Loan Agreement, in each case as and to the extent provided in the ABL Loan Documents (collectively, the "**ABL Loan Obligations**").

   (c) **ABL Loan Collateral.** To secure the ABL Loan Obligations, the ABL Loan Parties granted to the ABL Loan Collateral Agent, for the benefit of itself and the ABL Loan Lenders, properly perfected continuing liens, mortgages on and security interests in (collectively, the "**Prepetition ABL Loan Liens**") all "Collateral" as defined in the ABL Loan Agreement (collectively, the "**Prepetition ABL Loan Collateral**"), it being understood that the Prepetition ABL Loan Collateral does not include any property or assets that have been expressly excluded from the definition of "Collateral" in the ABL Loan Agreement, in each case, subject to the relative rankings and priorities set forth in the ABL Intercreditor Agreement.

   (v) *Intercreditor Agreements.*

   (a) The relative rights and remedies of the (i) the Senior Priming Term Loan Secured Parties, the Priming Term Loan Secured Parties, the Junior Term Loan Secured Parties and the ABL Loan Secured Parties (collectively, the "**Prepetition Secured Parties**"), and (ii) the relative priority of their respective security interests in any shared or common prepetition collateral constituting Prepetition Junior Term Loan Collateral, Prepetition Priming Term Loan Collateral, Prepetition Senior Priming Term Loan Collateral and Prepetition ABL Loan Collateral (collectively, "**Prepetition Collateral**"), respectively, are governed by the following intercreditor agreements:

   (1) the Super Priming Term Loan Intercreditor Agreement dated as of September 19, 2019, and as further amended, supplemented or modified prior to the Petition Date (the "**Senior Priming Intercreditor Agreement**"), among DESG, as a Grantor (as defined therein), each Other Senior Lien Representative from time to time party thereto (as defined therein), each Other Junior Lien Representative from time to time party thereto (as defined therein), the Senior Priming Term Loan Agent, the Priming Term Loan Agent and the other Grantors from time to time party thereto;

   (2) the Amended and Restated Term Loan Intercreditor Agreement dated as of September 19, 2019, and as further amended, supplemented or modified prior to the Petition Date (the "**Priming Term Loan Intercreditor**

---

[4] For the avoidance of doubt, such amount is exclusive of issued letters of credit and purchase card obligations.

10

**Agreement**"), among DESG, as a Grantor (as defined therein), each Other Senior Lien Representative from time to time party thereto (as defined therein), each Other Junior Lien Representative from time to time party thereto (as defined therein), the Senior Priming Term Loan Agent, the Priming Term Loan Agent, the Term Loan Agent and the other Grantors from time to time party thereto; and

(3)    the Third Amended and Restated ABL Intercreditor Agreement dated as of September 19, 2019, and as further amended, supplemented or modified prior to the Petition Date (the "**ABL Intercreditor Agreement**", and together with the Senior Priming Intercreditor Agreement and the Priming Term Loan Intercreditor Agreement, the "**Intercreditor Agreements**"), among DESG, as borrower, DX Holdings, the subsidiaries of DESG party thereto, the ABL Loan Collateral Agent, the Senior Priming Term Loan Agent, the Priming Term Loan Agent, the Junior Term Loan Agent and each Other Term Loan Agent (as defined therein) from time to time party thereto.

(b)    Pursuant to section 510(a) of the Bankruptcy Code, each of the Intercreditor Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (as defined below), shall (i) remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights, and remedies of the Prepetition Secured Parties and the DIP Secured Parties, respectively, and (iii) not be deemed to be amended, altered, or modified by the terms of this Interim Order or the DIP Loan Documents, unless expressly set forth herein or therein.

(vi)    **Validity and Enforceability of Prepetition Liens.**    Each of the Prepetition Senior Priming Term Loan Liens, the Prepetition Priming Term Loan Liens, the Prepetition Junior Term Loan Liens and the Prepetition ABL Loan Liens (collectively, the "**Prepetition Liens**"), respectively, have been properly recorded and perfected under applicable non-bankruptcy law, and are valid, binding, enforceable, non-avoidable and perfected liens in the Prepetition Collateral securing the applicable facility, respectively, with priority over any and all other liens in the Prepetition Collateral securing the applicable facility, subject only to (x) pre-existing liens expressly permitted under the Senior Priming Term Loan Documents, the Priming Term Loan Documents, the Junior Term Loan Documents and the ABL Loan Documents (collectively, the "**Prepetition Loan Documents**"), respectively, solely to the extent such liens were senior to the respective Prepetition Liens and such permitted senior liens were existing, valid, enforceable, properly perfected and non-avoidable liens as of the Petition Date or were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code against any of the DIP Loan Parties, the "**Permitted Prior Senior Liens**")[5] and (y) the relative rights and priorities set forth in the Intercreditor Agreements

---

[5]    Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Senior Liens are valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties or any Official Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Prior Senior Liens and/or security interests (subject to the terms of this

(as applicable).  The Prepetition Liens are not subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or other claim, cause of action or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise. The Prepetition Liens were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby.

(vii)    **Validity and Enforceability of Prepetition Obligations.**  The Senior Priming Term Loan Obligations, the Priming Term Loan Obligations, the Junior Term Loan Obligations and the ABL Loan Obligations (collectively, the "**Prepetition Obligations**"), respectively, and the Prepetition Loan Documents, respectively, (a) are legal, valid, binding and enforceable against each of the Senior Priming Term Loan Parties, the Priming Term Loan Parties, the Junior Term Loan Parties and the ABL Loan Parties (collectively, the "**Prepetition Loan Parties**"), respectively (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (b) are not subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or any other claim, cause of action or challenge of any kind or nature whatsoever, whether  under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.  Any payments made on account of the Prepetition Obligations to or for the benefit of the Prepetition Secured Parties prior to the Petition Date were proper and not subject to avoidance, disgorgement, recharacterization, disallowance or any other claim, cause of action or challenge of any kind or nature whatsoever, whether pursuant to the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

(viii)    **No Control.** None of the DIP Secured Parties nor the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Loan Documents and/or the Prepetition Loan Documents.

(ix)    **Release.**  To the best of the Debtors' knowledge, as of the date of this Interim Order, there exist no claims or causes of action against any of the DIP Secured Parties or any of the Prepetition Secured Parties.  The Debtors, on behalf of themselves and their respective estates, hereby forever and irrevocably discharge release the DIP Secured Parties and the Prepetition Secured Parties and each of their respective former, current and future officers, directors, employees, shareholders, owners, members, managers, partners, subsidiaries, affiliates, funds or managed accounts, agents, advisors, attorneys, accountants, investment bankers, consultants and other representatives,

---

Interim Order).  For the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Prior Senior Lien. Any alleged claim arising or asserted as a right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the DIP Facility, the DIP Liens and the DIP Collateral as such claims had with respect to the Prepetition Liens in the Prepetition Collateral.

together with each of their predecessors and successors in interest (collectively, the "**Releasees**") from any and all claims, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, reimbursement obligations (including, attorneys' fees), costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, fixed or contingent, pending or threatened, of any kind or nature whatsoever, whether arising at law or in equity (including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, recharacterization, subordination, avoidance, any claim arising under or pursuant to Section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law or any other claim or cause of action arising under the Bankruptcy Code or applicable non-bankruptcy law), including, without limitation, any claim or cause of action arising under, in connection with, or related to the Debtors or their estates, the extent, amount, validity, enforceability, priority, security and perfection of any of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents and/or the transactions contemplated thereunder, or any and all other acts, omissions or events occurring prior to entry of this Interim Order.

(x)     **Cash Collateral.**  All of the Debtors' cash, whether existing on or after the Petition Date or thereafter, wherever located (including, without limitation, all cash in any deposit accounts of the Debtors), whether as original collateral or proceeds of other Prepetition Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of Section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

(xi)     **Default.**  The Prepetition Loan Parties are in default under the Prepetition Loan Documents, including as a result of the Chapter 11 Cases, and an event of default has occurred under the Prepetition Loan Documents.

E.     ***Findings Regarding Corporate Authority.*** Each DIP Loan Party has all requisite corporate power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

F.     ***Findings Regarding Postpetition Financing and Use of Cash Collateral.***

(i)     *Request for Postpetition Financing.*  The DIP Loan Parties seek authority to enter into the DIP Facility and use Cash Collateral, in each case, on the terms described herein and in the DIP Loan Documents, in order to administer the Chapter 11 Cases and fund the operation of their businesses.  At the Final Hearing, the Debtors will seek final approval of the DIP Loan Documents, the proposed postpetition financing arrangements and use of Cash

13

Collateral arrangements pursuant to the Final Order, and notice of the Final Hearing and the

Final Order will be provided in accordance with this Interim Order.  Good cause has been shown

for the entry of this Interim Order.

(ii)    *Immediate Need for Postpetition Financing and Use of Cash Collateral.*

The Debtors' need to use Cash Collateral on an interim basis and to obtain credit pursuant to the

DIP Facility as provided for herein on an interim basis is immediate and necessary to avoid

serious and irreparable harm to the Debtors, their estates, their creditors and other parties-in-

interest, and to enable the Debtors to continue operations and to administer and preserve the

value of their estates.  The ability of the Debtors to finance their operations, maintain business

relationships with their vendors, suppliers and customers, pay their employees and otherwise

finance their operations requires the availability of working capital from the DIP Facility and the

use of Cash Collateral.  Without the ability to access the Interim Financing (as defined below)

and the DIP Facility, and without authority to use Cash Collateral, the Debtors, their estates and

their creditors would suffer immediate and irreparable harm, and the Debtors' chances for a

successful reorganization would be jeopardized.  The Debtors do not have sufficient available

sources of working capital and financing to operate their businesses or maintain their properties

in the ordinary course of business without the DIP Facility and without authority to use

Cash Collateral.

(iii)    *No Credit Available on More Favorable Terms.*  The Debtors have been

unable to obtain financing from sources other than the DIP Lenders on terms more favorable

than those provided under the DIP Facility and the DIP Loan Documents.  The Debtors have

been unable to obtain adequate unsecured credit allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain

adequate credit for money borrowed (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Postpetition financing is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders:  (1) the DIP Liens on all DIP Collateral, as set forth herein, (2) the DIP Superpriority Claim, and (3) the other protections set forth in this Interim Order.  After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and is in the best interests of all of their stakeholders.

(iv)     *Use of Proceeds of the DIP Facility and Cash Collateral.*  As a condition to entry into the DIP Loan Documents, the extension of credit under the DIP Facility and the consent to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), the DIP Agent and the DIP Lenders require, and the DIP Loan Parties have agreed, that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Loan Documents, and only for the expenditures set forth in and permitted by the Approved Budget, and for no other purpose.  The repayment in full in cash of the outstanding Senior Priming Term Loan Obligations upon the Closing Date is necessary because the Senior Priming Term Loan Lenders, the Priming Term Loan Lenders and the Junior Term Loan Lenders (collectively, the "**Prepetition Term Loan Lenders**", and together with the ABL Loan Lenders, the "**Prepetition Lenders**") would not have otherwise provided the DIP Facility or consented to the subordination of their Prepetition Term Loan Liens

15

to the DIP Liens, and the Prepetition Secured Parties would not have otherwise consented to the DIP Loan Parties' use of their Prepetition Collateral (including Cash Collateral).

(v)    *Adequate Protection*.  The Prepetition Term Loan Lenders have consented to the subordination of their Prepetition Term Loan Liens to the DIP Liens, and the Prepetition Secured Parties have agreed to permit the Debtors' use of Prepetition Collateral (including Cash Collateral), in each case, in accordance with and subject to the terms hereof, the Approved Budget and the DIP Loan Documents.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive adequate protection, as and to the extent set forth in this Interim Order, against the risk of diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (a) the use, sale or lease by the Debtors (or other decline in value) of such collateral, (b) the market value decline of such collateral, (c) the imposition of the DIP Liens and the priming (solely to the extent provided for herein) of the Prepetition Liens, (d) the imposition of the Carve-Out (defined below), and (e) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**Diminution in Value**").

(vi)    *New Loan*.  The DIP Facility (including the Interim Financing) constitutes new loans and financial accommodations from the DIP Lenders to the DIP Loan Parties, separate and distinct from the loans and financial accommodations provided prior to the Petition Date under the Prepetition Loan Documents, and the proceeds of the DIP Facility may only be borrowed, and such proceeds and Cash Collateral may only be used, in compliance with this Interim Order, the Approved Budget and the DIP Loan Documents.

(vii)    *Sections 506(c) and 552(b)*.  As a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Secured Parties'

16

agreement to subordinate their liens and superpriority claims to the Carve-Out (defined below),
(b) the Prepetition Term Loan Secured Parties' agreement to subordinate their Prepetition Liens
to the DIP Liens, the DIP Superpriority Claim (as defined below) and the Carve-Out, and (c) the
Prepetition Term Loan Secured Parties' and the ABL Loan Secured Parties' agreement to
consent to the use of Cash Collateral, in each case, in accordance with and subject to the
Approved Budget, the DIP Loan Documents and this Interim Order, each of the DIP Secured
Parties and the Prepetition Secured Parties are entitled to receive, subject to this Court's approval
at the Final Hearing, (1) a waiver of any "equities of the case" exceptions or claims under
Section 552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of Section 506(c) of
the Bankruptcy Code (which waiver shall be without prejudice to the contention of the DIP
Agent and the DIP Lenders that Section 506(c) of the Bankruptcy Code does not apply to
secured claims incurred pursuant to section 364 of the Bankruptcy Code).

(viii)    *Good Faith of the DIP Agent and the DIP Lenders*.  The DIP Agents and
the DIP Lenders have indicated a willingness to provide postpetition financing to the Debtors
subject to, among other things:  (a) the entry by the Court of this Interim Order and the Final
Order; (b) approval by the Court of the terms and conditions of the DIP Facility and the DIP
Loan Documents; and (c) entry of findings by the Court that such financing is essential to the
Debtors' estates, that the DIP Agent and the DIP Lenders are extending postpetition credit to the
Debtors pursuant to the DIP Loan Documents and this Interim Order in good faith, and that the
DIP Agents' and DIP Lenders' claims, superpriority claims, security interests and liens and other
protections granted pursuant to this Interim Order and the DIP Loan Documents will have the
protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any

17

subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ix)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.    The extension of credit under the DIP Facility and the DIP Loan Documents, the fees and other amounts paid and to be paid thereunder, and the Cash Collateral arrangements described therein and herein (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (c) are supported by reasonably equivalent value and fair consideration.  The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arms' length among the DIP Loan Parties, the DIP Secured Parties and the Prepetition Secured Parties.  The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

(x)    *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties-in-interest, including:  (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (v) counsel to the DIP Agent and counsel to the DIP Lenders; (vi) counsel to each of the Prepetition Agents; (vii) all other known parties with liens of record on assets of the Debtors as

18

of the Petition Date; (viii) all financial institutions at which the Debtors maintain deposit accounts; (x) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (xi) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 and Local Rules 2002-1, 4001-2 and 9013-1 or requesting to receive notice prior to the date hereof.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances, and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

(xi)  *Relief Essential; Necessity of Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates, and is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

**NOW THEREFORE,** based upon the foregoing findings and conclusions, the DIP Motion, the First Day Declaration, the DIP Declaration and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      **DIP Motion Approved.**  The DIP Motion is granted on an interim basis, and the Interim Financing (as defined below) is authorized and approved, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents. Any objections to the DIP Motion or to the entry of this Interim Order that have not been

withdrawn, waived, or settled, and all reservation of rights included therein, are hereby overruled on the merits.

2.    **Authorization of DIP Facility.**    The Debtors are hereby expressly and immediately authorized and empowered (and to cause the other DIP Loan Parties to the extent permitted under applicable law), (a) to establish the DIP Facility, (b) to enter into the DIP Loan Documents and to borrow, incur, guarantee (as applicable), provide security for, and pay the DIP Obligations in accordance with and subject to the terms of this Interim Order and the DIP Loan Documents, (c) to execute and/or deliver and perform under any and all DIP Loan Documents and all other instruments, certificates, agreements and documents, and (d) to take any and all other actions, which may be reasonably necessary or required, or otherwise requested by the DIP Agent or the Required DIP Lenders, for the performance by the DIP Loan Parties under the DIP Loan Documents and the implementation of any of the transactions contemplated by the DIP Loan Documents or this Interim Order.  Without limiting the foregoing, the Debtors are hereby authorized and empowered to pay, in accordance with this Interim Order, the principal, interest, costs, fees, payments, indemnities, expenses and other amounts provided in the DIP Loan Documents, including, without limitation, all closing fees, unused line fees, arrangement fees, structuring fees, duration fees, commitment fees, backstop fees, servicing fees, audit fees, appraisal fees, servicing fees, liquidator fees, administrative agent's fees, prepayment premiums or similar amounts (including, without limitation, any amounts due under the *Payments Letter*, dated October 2, 2019,  by and between DESG and signatories thereto and the *Deluxe Entertainment Services Group Inc. Senior Secured Super-Priority Debtor-In-Possession Term Loan Facility Fee Letter*, dated October 3, 2019, by and between DESG and the Commitment Parties (as defined therein) (together, the "**Payment Letters**")), the fees and disbursements of

the DIP Agent and the DIP Lenders (including the fees and expenses of (a) Stroock & Stroock & Lavan LLP ("**Stroock**"), as counsel, and FTI Consulting Group ("**FTI**"), as financial advisor, to the Initial DIP Lenders, and any other advisor or consultant retained by the Initial DIP Lenders (collectively, the "**DIP Lender Professionals**"), and (b) Cravath, Swaine & Moore LLP, as lead counsel ("**Cravath**"), and Norton Rose Fulbright, as local UK counsel ("**Norton Rose**"), to the DIP Agent (including any successor or replacement agent or counsel), and all other DIP Obligations, in each case, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, as such amounts become earned, due and payable under the DIP Loan Documents, without the need to obtain further Court approval. The DIP Loan Parties shall be jointly and severally liable for all DIP Obligations. The DIP Loan Parties, the DIP Agent and the DIP Lenders are hereby expressly authorized and empowered to take all actions determined by the DIP Agent and the Initial DIP Lenders to be reasonably necessary or advisable to syndicate the DIP Facility to the extent contemplated in the DIP Loan Documents (and neither the Initial DIP Lenders nor the DIP Agent shall be liable to any person or entity with respect to any act taken or omitted from being taken in connection with such syndication). Any DIP Loan Documents entered into by any DIP Loan Party prior to the date hereof consistent with the this Interim Order are hereby approved and ratified in full.

3.   **Authorization to Borrow.**   To prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order, or (ii) the DIP Termination Date (as defined below), the DIP Borrower is hereby authorized to borrow under the DIP Facility (and the DIP Guarantors are hereby authorized to unconditionally guarantee, on a joint and several basis, the repayment of the

DIP Facility) up to the aggregate principal amount of $55 million (the "**Interim Financing**"), in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

4.      **DIP Obligations.**  This Interim Order and the DIP Loan Documents shall constitute and evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding and enforceable against each of the DIP Loan Parties, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "**Successor Cases**"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.  All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order and/or the DIP Loan Documents by any DIP Loan Party are granted to or for the benefit of the DIP Loan Parties for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.  No obligation, payment, transfer, or grant of security hereunder and/or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under Sections 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counter-

claim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

**5.      DIP Liens.**

(a)      Effective immediately upon entry of this Interim Order, the DIP Agent, for the benefit of itself and each of the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "**DIP Liens**") in all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations.

(b)      The term "**DIP Collateral**" means all assets and properties of the Debtors and the other DIP Loan Parties, whether tangible or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors and the other DIP Loan Parties (including under any trade names, styles, or derivations thereof), whether owned or consigned by or to, or leased from or to, or thereafter acquired by, the Debtors and the other DIP Loan Parties, and regardless of where located, whether prior to or after the Petition Date, including, without limitation, all of the Debtors and the other DIP Loan Parties' rights, title and interests in (1) all Prepetition Collateral, (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures;

23

(9) all real property interests; (10) all interests in leaseholds, (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) all other claims and causes of action and the proceeds thereof (including, subject to this Court's approval at the Final Hearing, proceeds of all claims and causes of action arising under chapter 5 of the Bankruptcy Code ("**Avoidance Actions**")); (20) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors and the other DIP Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; *provided*, *however*, that the DIP Collateral shall not include Excluded Collateral (as defined in the DIP Loan Agreement); *provided*, *further*, *however*, that DIP Collateral shall include all rents, profits, proceeds and products of Excluded Collateral.  Notwithstanding any provision of the DIP Loan Agreement, this Interim Order or any other DIP Loan Document to the contrary, no non-Debtor subsidiary or affiliate of the DIP Borrower shall be, or later be required to (i) become a DIP Loan Party or DIP Guarantor, (ii) grant a security interest, pledge or otherwise encumber any of its assets, or (iii) incur any indebtedness, in each case, to the extent such subsidiary or

24

affiliate is contractually prohibited from doing so (unless, in each case, the DIP Borrower or the applicable subsidiary or affiliate has obtained consent from the applicable contractual counterparty to take any such action after using commercially reasonable efforts to obtain the same and only so long as such prohibition was not created solely in contemplation of the DIP Loan Documents and this Interim Order).

   6.  **Priority of DIP Liens**.

   (a)  The DIP Liens shall have the following priorities:

   (1)  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, enforceable, non-avoidable and automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not subject to a valid, perfected, enforceable and non-avoidable lien or security interest as of the Petition Date (the "**Unencumbered Assets**"), subject only to the Carve-Out[6]; and

   (2)  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, enforceable, non-avoidable and automatically and fully perfected first priority liens on and security interests in all DIP Collateral (other than Unencumbered Assets, as described in, and which shall be treated as set forth in, sub-paragraph (a)(1)), wherever located, which liens and security interests (x) shall be junior only to (i) the Carve-Out, (ii) the Permitted Prior Senior Liens (except to the extent excluded in clause (y)(iii) in this paragraph 6(a)(2)), and (iii) solely with respect to the "ABL Facility First Priority Collateral" (as defined in the ABL Intercreditor Agreement, after giving effect to paragraph 43 of this Interim Order) and DIP Collateral, in each case, of a type that would constitute "ABL Facility First Priority Collateral"

---

[6] For the avoidance of doubt, with respect to ABL Priority Collateral, the DIP Liens shall be junior to the Prepetition ABL Loan Liens and the ABL Adequate Protection Liens on ABL Priority Collateral from after the Petition Date.

(collectively, the "**ABL Priority Collateral**"), the Prepetition ABL Loan Liens and the ABL Adequate Protection Liens, and (y) shall be senior to any and all other liens on and security interests in the DIP Collateral, including, without limitation, (i) the Prepetition Term Loan Liens, (ii) any ABL Adequate Protection Liens and Prepetition ABL Loan Liens in "Term Facility First Priority Collateral" (as defined in the ABL Intercreditor Agreement, after giving effect to paragraph 43 of this Interim Order) and DIP Collateral, in each case, of a type that would constitute "Term Facility First Priority Collateral" (collectively, the "**Term Priority Collateral**"), and (iii) any liens asserted by MacAndrews & Forbes Media Group, Inc. or any of its affiliates against any of the DIP Loan Parties.

(c)    For the avoidance of doubt, the DIP Liens in the DIP Collateral consisting of assets of any non-Debtor DIP Loan Parties (including any non-Debtor DIP Loan Parties incorporated or formed in the United Kingdom or Wales) shall be senior to each of the Prepetition Term Loan Liens in such assets subject, in the case of ABL Priority Collateral, to the Prepetition ABL Loan Liens in such ABL Priority Collateral.

(d)    Notwithstanding anything contained herein or in any of the DIP Loan Documents to the contrary, but subject to paragraphs 11 and 43 hereof and the Carve-Out, the DIP Liens and the DIP Superpriority Claim (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any

26

intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

(e)     To the fullest extent permitted by applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order or in favor of the Prepetition Agents and the Prepetition Lenders in accordance with this Interim Order.

7.     **DIP Superpriority Claim.**  Effective immediately upon entry of this Interim Order, the DIP Agent, for itself and for the benefit of the DIP Lenders, is hereby granted, pursuant to section 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases on account of the DIP Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Debtors (the "**DIP Superpriority Claim**"), subject only to the Carve Out.  The DIP Superpriority Claims shall, for purposes of section

27

1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall have recourse against each of the Debtors on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, subject to entry of the Final DIP Order, proceeds of Avoidance Actions). The DIP Superpriority Claims shall, at all times be (x) junior only to the Carve Out, and (y) senior to any and all other administrative expense claims or other claims against the Debtors or their estates, in the Chapter 11 Cases and any Successor Cases, including, without limitation, any claims allowed pursuant to the obligations under or in connection with the Prepetition Obligations and any adequate protection claims granted thereunder.

8.      **No Obligation to Extend Credit.**  The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance under the **DIP** Loan Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders in their discretion.

9.      **Deposit and Use of DIP Facility Proceeds.**

(a)      *[RESERVED]*

(b)      *Use of DIP Facility Proceeds and Cash Collateral.*  From and after the Closing Date, the DIP Loan Parties shall be permitted to draw upon the Interim Financing and use the proceeds of the DIP Facility and Cash Collateral only for the following purposes, in each case, solely in accordance with and subject to this Interim Order, the DIP Loan Documents and in compliance with the Approved Budget (subject to Permitted Variances):    (i) for the indefeasible payment in full of the Senior Priming Term Loan Obligations; (ii) for the payment of prepetition amounts acceptable to the Required DIP Lenders and the Required ABL Lenders

as authorized by the Court pursuant to orders approving the "first day" motions filed by the Debtors; (iii) in accordance with the terms of the DIP Loan Documents and this Interim Order and/or the Final Order (as applicable), (A) for the payment of working capital and other general corporate needs of the DIP Loan Parties in the ordinary course of business, and (B) for the payment of expenses incurred in connection with the Chapter 11 Cases; (iv) to make the adequate protection payments expressly required hereunder (including the cash collateralization of letters of credit as set forth herein); and (v) to pay the fees and expenses related to the DIP Facility.  For the avoidance of doubt, none of the DIP Loan Parties will use any proceeds of the DIP Facility or the Cash Collateral in a manner or for a purpose other than those consistent with the Approved Budget and this Interim Order.

(c)    ***Repayment of Senior Priming Term Loan Obligations.***  Immediately upon entry of this Interim Order, in connection with the Interim Financing, the DIP Loan Parties are authorized to draw on the DIP Facility to pay in full in cash the Senior Priming Term Loan Obligations (including, without limitation, accrued and unpaid interest (at the non-default rate), the Applicable Premium (as defined in the Senior Priming Term Loan Agreement), fees, expenses, legal fees, disbursements and other amounts properly chargeable thereunder).  The repayment of the Senior Priming Term Loan Obligations provided for herein shall be subject to the reservation of rights of parties-in-interest set forth in paragraph 31 hereof, and upon expiration of the Challenge Period (as defined below) without a timely Challenge (as defined below) being brought, or upon the final resolution of a Challenge brought in compliance with the provisions of this Interim Order and applicable law (where such Challenge did not have the effect of successfully impairing any of the Senior Priming Term Loan Obligations), the DIP

29

Loan Parties' repayment of the Senior Priming Term Loan Obligations shall be deemed to be indefeasible, final and not subject to challenge or dismissal in any respect.

10. **Authorization to Use Cash Collateral.** Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and solely to the extent expressly permitted in the Approved Budget, the DIP Loan Parties are authorized to use Cash Collateral and proceeds of the DIP Facility until the DIP Termination Date (as defined below) or the Cash Collateral Termination Date (as defined below). All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents (subject to the Intercreditor Agreements). Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the DIP Loan Parties' use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Loan Documents and the Approved Budget (subject to the Intercreditor Agreements).

11. **Adequate Protection.**

(a) **Adequate Protection for Prepetition Term Loan Secured Parties.** Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Prepetition Term Loan Secured Parties shall receive the following adequate protection:

(1) ***Term Loan Adequate Protection Liens.*** Each of the Senior Priming Term Loan Agent, the Priming Term Loan Agent and the Junior Term Loan Agent (collectively, the "**Prepetition Term Loan Agents**"), respectively, for its/their benefit and for the benefit of the Prepetition Term Loan Lenders under the applicable facility, respectively, are hereby granted continuing, valid, binding, enforceable and automatically

30

perfected postpetition liens on all DIP Collateral to the extent of any Diminution in Value of the Prepetition Term Loan Agent's and Prepetition Term Loan Lenders' interests in the Prepetition Collateral (including Cash Collateral) (the "**Term Loan Adequate Protection Liens**"), which adequate protection liens  (x) shall rank junior only to (1) the Carve-Out, (2) the DIP Liens, (3) the Permitted Prior Senior Liens, and (4) solely with respect to ABL Priority Collateral, the ABL Adequate Protection Liens and the Prepetition ABL Loan Liens, (y) shall have the relative rank and priority among the respective Prepetition Term Loan Secured Parties as set forth in **Annex A** hereto, in accordance with the Intercreditor Agreements, and (z) shall rank senior to any and all other liens and security interests in DIP Collateral, including the Prepetition Term Loan Liens and the Prepetition ABL Loan Liens on Term Priority Collateral.

(2)      *Senior Priming Term Loan Payment*.   To the extent that the Senior Priming Loan Obligations are not approved by the Interim Order to be paid in full, in cash, on the Closing Date as set forth in paragraph 9(b) hereof, the Senior Priming Term Loan Lenders shall receive a payment, in cash, equal to 10.0% of the Senior Priming Term Loan Obligations, which payment shall be paid upon the effective date of any chapter 11 plan of the Debtors.

(3)      *Term Loan Adequate Protection Claim*.  Pursuant to section 507(b) of the Bankruptcy Code, each of the Prepetition Term Loan Agents, respectively, for its benefit and for the benefit of the Prepetition Term Loan Lenders, respectively, are hereby granted an allowed superpriority administrative expense claim (the "**Term Loan Adequate Protection Claim**") against each of the Debtors on a joint and several basis, and which shall be payable from and have recourse to all DIP Collateral; *provided,*

31

*however*, that the Term Loan Adequate Protection Claim (x) shall rank junior only to the (1) Carve-Out, and (2) the DIP Superpriority Claim, (y) shall rank *pari passu* with the ABL Adequate Protection Claim, and (z) shall be senior to any and all other administrative expense claims or other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases.

(4)      ***Adequate Protection Payments.***  The Debtors shall pay all reasonable and documented fees, costs and expenses of (x) the Prepetition Term Loan Agents (including all reasonable and documented fees and expenses of Cravath and Norton Rose), and (y) the ad hoc committee of beneficial owners (or nominees, investment managers, advisors, or subadvisors for the beneficial owners) of the Senior Priming Term Loans, the Priming Term Loans and the Existing Term Loans represented by Stroock and FTI, as may be reconstituted from time to time (the "**Ad Hoc Committee**") (including all reasonable and documented fees and expenses of (A)  Stroock, (B) FTI, and (C) such other professionals as may be retained by the Ad Hoc Committee), in each case, whether incurred prior to or following the Petition Date (and without duplication of any amounts to be paid pursuant to paragraph 2 hereof).  The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only, and shall be provided to counsel to the Debtors, with a copy to the U.S. Trustee and counsel to any Official Committee (collectively, the "**Notice Parties**").  If no objection to payment of the requested fees and expenses are made, in writing by any of the Notice Parties within ten (10) calendar days after delivery of such invoices (the "**Fee Objection Period**"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors.  If an objection

(solely as to reasonableness) is made by any of the Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.  Payments of any amounts set forth in this paragraph 11 shall not be subject to recharacterization, subordination or disgorgement.

(b)    **Adequate Protection for ABL Loan Secured Parties.**    Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, the ABL Loan Secured Parties shall receive the following adequate protection:

(1)    **ABL Adequate Protection Liens.**    The ABL Loan Agents, for their benefit and for the benefit of the ABL Loan Lenders, is hereby granted continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP Collateral to the extent of any Diminution in Value of the ABL Loan Agents' and ABL Loan Lenders' interests in the Prepetition Collateral (including Cash Collateral) (the "**ABL Adequate Protection Liens**", and together with the Term Loan Adequate Protection Liens, the "**Adequate Protection Liens**"), which adequate protection liens (x) shall rank junior only to (1) the Carve-Out, (2) in the case of Term Priority Collateral, the DIP Liens, and (3) Permitted Prior Senior Liens, and (y) shall be senior to any and all other liens and security interests in the DIP Collateral.

(2)    **ABL Adequate Protection Claim.**    As further adequate protection, pursuant to section 507(b) of the Bankruptcy Code, the ABL Loan Agents, for their benefit and for the benefit of the ABL Loan Lenders, are hereby granted an allowed superpriority administrative expense claim (the "**ABL Adequate Protection Claim**", and

33

together with the Term Loan Adequate Protection Claim, the "**Adequate Protection Claims**") against each of the Debtors on a joint and several basis, and which shall be payable from and have recourse to all DIP Collateral; *provided, however,* that the ABL Adequate Protection Claim shall (x) rank junior only to the (1) Carve-Out, and (2) the DIP Superpriority Claim, (y) rank *pari passu* with the Term Loan Adequate Protection Claim, and (z) shall rank senior to any and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases.

(3)    **Adequate Protection Payments and Cash Collateralization of Letters of Credit.**

(i)    The Debtors shall pay all reasonable and documented fees, costs and expenses of the ABL Loan Agents and the ABL Loan Lenders (including all reasonable and documented fees and expenses of Cravath, Norton Rose, and one financial advisor retained by the ABL Loan Agents and the ABL Loan Lenders; *provided, however*, that the ABL Loan Agents and the ABL Loan Lenders shall not engage a financial advisor unless and until such time as the Required ABL Lenders determine in good faith that the information provided by the DIP Lender Professionals and the Professional Persons is insufficient for the ABL Loan Lenders' purposes of evaluating a potential exit financing or for the protection of the ABL Loan Lenders' interest in the ABL Priority Collateral)[7], *provided*, *further*, *however*, that any such financial advisor shall be subject to reasonable hourly rates and shall not be entitled to any success fee, transaction fee, or similar fee, whether incurred prior to or following the Petition Date

---

[7] It is understood and agreed that the adequate protection payments contemplated herein shall in no manner alter the fees and expenses that are reimbursable pursuant to the terms of the ABL Loan Documents.

34

(and without duplication of any amounts to be paid pursuant to paragraphs 2 or 11
hereof).  The invoices for such fees and expenses shall not be required to comply with the
U.S. Trustee guidelines, may be in summary form only, and shall be provided to the
Notice Parties.  If no objection to payment of the requested fees and expenses are made,
in writing by any of the Notice Parties within the Fee Objection Period, then, without
further order of, or application to, the Court or notice to any other party, such fees and
expenses shall be promptly paid by the Debtors.  If an objection (solely as to
reasonableness) is made by any of the Notice Parties within the Fee Objection Period to
payment of the requested fees and expenses, then only the disputed portion of such fees
and expenses shall not be paid until the objection is resolved by the applicable parties in
good faith or by order of the Court, and the undisputed portion shall be promptly paid by
the Debtors.

(ii)      The Debtors shall pay in full, in cash and in immediately available
funds all accrued and unpaid (whether accrued prior to or after the Petition Date) interest,
fees, indemnifications and other amounts (other than principal), at the rates, without
allowing any continuations of existing LIBOR loans, and at the default rate provided for
in Section 2.15(c) of the ABL Loan Agreement; *provided*, *however*, that the ABL Loan
Lenders shall waive any default interest (and only receive non-default interest) to the
extent the Debtors satisfy each of the Milestones (as defined below) set forth in
paragraphs 22(b)(17)) and times provided for in the ABL Loan Agreement.

(iii)      If, at any time following the entry of this Interim Order, the
Aggregate Exposure (as defined in the ABL Loan Agreement) (excluding the amount of
any cash collateralized Letters of Credit (as defined in the ABL Loan Agreement), to the

extent otherwise included in Aggregate Exposure) exceeds the Borrowing Base Threshold (as defined below) (any such excess, a "**Borrowing Base Deficiency**"), (1) the Debtors shall, concurrently with delivery of such Borrowing Base Certificate (and in any event no later than the close of business on the date of such delivery), make an immediate cash payment to the ABL Loan Administrative Agent, for the benefit of the ABL Loan Secured Parties, in an amount equal to such Borrowing Base Deficiency, which payment shall be deemed a permanent repayment of the principal amount of the Loans (as defined in the ABL Loan Agreement) in the amount of such payment, and (2) if the Debtors shall not make such immediate payment to the ABL Loan Administrative Agent, then the ABL Loan Secured Parties shall be deemed to have received relief from the automatic stay, and may exercise all rights and remedies available against the ABL Priority Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise, to permanently repay Loans (as defined in the ABL Loan Agreement) in the amount of such Borrowing Base Deficiency.  The Debtors shall continue to comply with their respective obligations under the ABL Loan Documents with respect to cash management systems.  Notwithstanding any automatic stay arising as a result of the Chapter 11 Cases, to the extent the payment of any Borrowing Base Deficiency is not made in accordance with the terms hereof, the consent of the ABL Loan Secured Parties to usage of their Cash Collateral shall be suspended until such time as such Borrowing Base Deficiency shall have been paid.  The "**Borrowing Base Threshold**" shall mean an amount equal to (x) the Borrowing Base, based on the most recently delivered Borrowing Base Certificate (as defined below), minus (y) the greater

36

of (i) the sum of the Pre-Carve-Out Trigger Reserve Estimate (as defined below) and the Post-Carve-Out Trigger Notice Cap (as defined below) and (ii) $7 million.

(iv)      Concurrent with the initial funding of the DIP Loans, all Letters of Credit outstanding under the ABL Loan Agreement shall be cash collateralized in accordance with the terms thereof.  To the extent not so cash collateralized, then the ABL Loan Collateral Agent shall  be deemed to have received relief from the automatic stay, and may exercise all rights and remedies available against the ABL Priority Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise, to cash collateralize such Letters of Credit, in accordance with the ABL Loan Documents.

(c)      Except as expressly provided in paragraph 6 or this paragraph 11, the Adequate Protection Liens and the Adequate Protection Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code, in each case, until such time as the Prepetition Term Loan Obligations and the ABL Loan Obligations, as applicable, are indefeasibly paid in full in cash.  Payments of any

37

amounts set forth in this paragraph 11 shall not be subject to recharacterization, subordination or disgorgement.

12.    **Additional Adequate Protection.**    As further adequate protection to the Prepetition Secured Parties:

(a)    ***Insurance.***    The DIP Borrower shall continue to maintain insurance of the Prepetition Collateral and the DIP Collateral in amounts, and for the risks, and by the entities, as required under the Prepetition Loan Documents, the DIP Loan Documents and this Interim Order.

(b)    ***Financial Reporting; Access to Books and Records.***    The DIP Borrower will provide to the DIP Agent, the DIP Lenders, the Prepetition Agents, the Ad Hoc Committee and their respective professionals such reports and information described in section 6.15 of the DIP Loan Agreement, and such other reports and information as may be reasonably requested by each the foregoing.  In addition, without limiting the rights of access and information afforded the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP Lenders under this Interim Order, the DIP Loan Documents and/or the Prepetition Loan Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Ad Hoc Committee reasonable access to the Debtors' premises and their books and records, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the Debtors hereby authorize their independent certified public accountants, attorneys, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Ad Hoc Committee all such information

38

as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors.

(c)    The Debtors shall furnish an updated certificate (a "**Borrowing Base Certificate**") to the Prepetition Agents and the DIP Agent, for delivery to the respective Prepetition Lenders and DIP Lenders, as soon as available, but in any event (i) in the case of a month-end Borrowing Base Certificate, within fifteen business days of the end of the month and (ii) in the case of a mid-month Borrowing Base Certificate, by the end of the month, which Borrowing Base Certificate shall calculate the Borrowing Base (as defined in the ABL Loan Agreement) as of the end of such each such period, and provides an estimate of unpaid Professional Fees (as defined below) accrued or incurred by Professional Persons through the end of such period (the "**Pre-Carve-Out Trigger Reserve Estimate**"), in the form previously agreed to with the ABL Loan Collateral Agent, and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Prepetition Agents, DIP Lenders or Ad Hoc Committee may reasonably request. The Debtors shall furnish a Borrowing Base Certificate as of September 15, 2019 on or before October 9, 2019.

13.    **Section 507(b) Reservation.**  The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to paragraphs 11 and 12 of this Interim Order shall not be deemed an admission that the interests of such Prepetition Secured Parties are indeed adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of such Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection; *provided,* however*,* that any such additional adequate protection approved by the Court (subject to paragraph 43 hereof) shall, except with respect to

the ABL Priority Collateral (including the ABL Adequate Protection Liens) in favor of the ABL

Loan Secured Parties, at all times be subordinate and junior to the DIP Obligations and the DIP

Liens granted under this Interim Order and the DIP Loan Documents.  Without limiting the

foregoing, nothing herein shall impair or modify the application of section 507(b) of the

Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to

compensate for any Diminution in Value during any of the Chapter 11 Cases.

**Provisions Common to DIP Financing and
Use of Cash Collateral Authorization**

14.    **Amendments.**  Notwithstanding anything contained herein to the contrary, no

amendment, modification or supplement of any of the DIP Loan Documents shall be effective

unless in writing and in accordance with the applicable DIP Loan Documents.  Subject to the

terms and conditions of the applicable DIP Loan Documents, the DIP Loan Parties and the

applicable DIP Secured Parties may make any nonmaterial amendment, modification or

supplement of any provision of the DIP Loan Documents, and the DIP Loan Parties and the

Required DIP Lenders may waive any provisions in the DIP Loan Documents, without further

notice to any person or entity or approval of the Court.  In the case of any material amendment,

modification or supplement to the DIP Loan Documents that is adverse to the DIP Loan Parties

(a "**Material Amendment**"), the Debtors shall provide notice (which may be provided via

electronic mail or other electronic means) to counsel to the Notice Parties and the ABL Loan

Agents; *provided, however*, that any amendment, modification or supplement to the DIP Loan

Documents for the purpose of adding additional financial institutions as DIP Lenders and

reallocating the commitments for the DIP Facility among the DIP Lenders in connection with

any syndication of the DIP Facility shall not require notice to any person or entity or further

order of the Court.  If no objections are timely received (or if the Notice Parties and the ABL

40

Loan Agents indicate via electronic mail or otherwise that they have no objection) to a Material Amendment within five (5) calendar days from the date of delivery of such notice, the DIP Loan Parties may proceed to execute such Material Amendment, which shall become effective immediately upon execution.  If a Notice Party or an ABL Loan Agent timely objects, approval of the Court will be necessary to effectuate a Material Amendment.

15.    **Budget.**

(a)    **Initial Budget.**  The Debtors have prepared and delivered to the DIP Agent, the Initial DIP Lenders, the ABL Loan Lenders and the ABL Loan Agents (and the DIP Agent, the Initial DIP Lenders, the ABL Loan Lenders and the ABL Loan Agents  have approved) an initial budget, a copy of which is attached hereto as **<u>Annex B</u>** (the "**Initial Budget**"), which reflects the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the period from the week immediately prior to the week in which the Closing Date occurs through and including the end of the 13th calendar week thereafter.  The Initial Budget (as supplemented by any budget that is approved by the Required DIP Lenders and the Required ABL Lenders in accordance with the terms of the DIP Loan Documents and this Interim Order) shall be deemed the "Approved Budget" for all purposes hereof, until superseded by a subsequent Approved Budget pursuant to the provisions of the DIP Loan Documents and this Interim Order.

(b)    **Updated Budgets.**  The Debtors shall prepare in good faith and deliver to the DIP Agent, the DIP Lenders, the professionals for the Initial DIP Lenders, the ABL Loan Agents and the ABL Loan Lenders, updated cash flow statements, consistent with the form and level of detail of the Initial Budget and otherwise in form and substance acceptable to the Required DIP Lenders and the Required ABL Lenders, as and to the extent required by, and at

41

such times, and for the periods required under, the DIP Loan Agreement.  Each budget delivered

to the DIP Agent, the DIP Lenders, the ABL Loan Agents or the ABL Loan Lenders shall be

accompanied by such supporting documentation as reasonably requested by the DIP Agent, the

DIP Lenders, the DIP Lender Professionals, the ABL Loan Agents and/or the ABL Loan

Lenders, and shall be prepared in good faith, with due care and based upon assumptions the

Debtors believe to be reasonable.  For the avoidance of doubt, no amendment, modification or

update to an Approved Budget shall be effective without the approval of (i) the Required DIP

Lenders or the DIP Lender Professionals, or (ii) the Required ABL Lenders.

> (c)    **Budget Compliance.** All borrowings under the DIP Facility, and the use

of Cash Collateral, shall at all times comply with the Approved Budget, on the terms and subject

to the permitted variances expressly set forth in the DIP Loan Agreement without giving effect to

any amendment or waiver thereof unless consented to by the Required ABL Lenders (the

"**Permitted Variances**").  The Debtors shall provide all budget, variance reports, other reports

and other access to information as required in section 6.15 of the DIP Loan Agreement without

giving effect to any amendment or waiver thereof unless consented to by the Required ABL

Lenders.  In addition, the Debtors shall comply with all Financial Covenants (as defined in the

DIP Loan Documents) in the DIP Loan Agreement without giving effect to any amendment or

waiver thereof unless consented to by the Required ABL Lenders.  The Debtors' failure to

comply with the Approved Budget (subject to Permitted Variances), to provide the reports and

other information required in section 6.15 of the DIP Loan Agreement, or maintain compliance

with all financial maintenance covenants in the DIP Loan Agreement, shall constitute a DIP

Termination Event and a Cash Collateral Termination Event.

16.    **Modification of Automatic Stay.**  Subject to paragraph 23 hereof, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit:  (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claim, and to perform such acts as the DIP Agent or the DIP Lenders may reasonably request, to assure the perfection and priority of the DIP Liens; (b) the Debtors to take all appropriate action to grant the Adequate Protection Liens and the Adequate Protection Claims set forth herein, and to take all appropriate action (including such action as the ABL Loan Agents or the ABL Loan Lenders may reasonably request) to ensure that the Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents, the Payment Letters and this Interim Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) subject to paragraphs 23 and 43 hereof, the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any "Event of Default" under the DIP Loan Agreement, all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein (subject, in each case, to the terms of the Intercreditor Agreements); (g) the ABL Loan Agents to exercise their rights under paragraph 11(b)(3)(iii) of this Interim Order, and (h) the implementation of all of the terms, rights, benefits,

privileges, remedies and provisions of this Interim Order and the DIP Loan Documents, in each

case, without further notice, motion or application to, or order of this Court.

17.     **Perfection of DIP Liens and Postpetition Liens.**  This Interim Order shall be

sufficient and conclusive evidence of the validity, perfection and priority of all liens granted

herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without

the necessity of execution, filing or recording any financing statement, mortgage, notice or other

instrument or document that may otherwise be required under the law or regulation of any

jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into

any deposit account control agreement) to validate or perfect (in accordance with applicable law)

such liens, or to entitle the Prepetition Agents, the Prepetition Lenders, the DIP Agent or the DIP

Lenders to the priorities granted herein (other than, to the extent applicable, any such filings

required under foreign law to validate or perfect such liens on DIP Collateral of non-Debtor DIP

Loan Parties).  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Agents,

without any further consent of any party, is authorized to execute, file or record (and the DIP

Agent or Prepetition Agents may require the execution, filing or recording), as each, in its sole

discretion deems necessary, such financing statements, mortgages, notices of lien, and other

similar documents to enable the DIP Agent and the Prepetition Agents to further validate,

perfect, preserve and enforce the DIP Liens or other liens and security interests granted

hereunder, perfect in accordance with applicable law or to otherwise evidence the DIP Liens

and/or the Adequate Protection Liens, as applicable, and all such financing statements,

mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the

Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required

in order to create or perfect the DIP Liens and/or the Adequate Protection Liens (other than, to

the extent applicable, any such filings required under foreign law to validate or perfect such liens

on DIP Collateral of non-Debtor DIP Loan Parties).  The DIP Loan Parties are authorized and

directed to execute and deliver promptly upon demand to the DIP Agent or the Prepetition

Agents all such financing statements, mortgages, notices, and other documents as the DIP Agent

or the Prepetition Agents may reasonably request.  The DIP Agent or the Prepetition Agents,

each in its discretion, may file a photocopy of this Interim Order as a financing statement with

any filing or recording office or with any registry of deeds or similar office, in addition to or in

lieu of such financing statements, notices of lien, or similar instruments.  To the extent that any

Prepetition Agent is a secured party under any account control agreement, listed as an additional

insured, loss payee under any of the Debtors' insurance policies or is the secured party under any

loan document, financing statement, deed of trust, mortgage or other instrument or document

which may otherwise be required under the law of any jurisdiction to validate, attach, perfect or

prioritize liens (any such instrument or document, a "**Security Document**"), the DIP Agent is

also deemed to be the secured party under each such Security Document, and shall have all the

rights and powers attendant to that position (including, without limitation, rights of

enforcement), and shall act in that capacity and distribute any proceeds recovered or received in

accordance with the terms of this Interim Order and/or the Final Order, as applicable, and the

other DIP Loan Documents (subject, in each case, to the terms of the Intercreditor Agreements).

The Prepetition Agents shall serve as agents for the DIP Agent solely for the purposes of

perfecting its security interests in and liens on all DIP Collateral that is of a type such that

perfection of a security interest therein (but for the entry of this Interim Order) may be

accomplished only by possession or control by a secured party.

45

18.    **Protection of DIP Lenders' Rights and Adequate Protection Liens.** Subject to paragraph 43 hereof, so long as there are any DIP Obligations outstanding under the DIP Loan Documents, the Prepetition Agents and the Prepetition Lenders shall (a) have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Interim Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan Documents or the Adequate Protection Liens (as defined below), including, without limitation, in respect of the occurrence or continuance of any event of default under any of the Prepetition Loan Documents, (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (c) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the DIP Loan Documents and/or this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing, and (d) deliver or cause to be delivered, at the Debtors' cost and expense (for which the Prepetition Agents shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP Agent and the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of the Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

46

19.      **Proceeds of Subsequent Financing.**    Without limiting the provisions of the
immediately preceding paragraph, if the Debtors, any trustee, any examiner with enlarged
powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any
Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the
Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents at any time prior
to the indefeasible payment in full in cash of all of the DIP Obligations and the Prepetition
Obligations, the satisfaction of the Superpriority DIP Claim and the Adequate Protection
Claims, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit
under the DIP Facility and this Interim Order (including subsequent to the confirmation of any
plan with respect to any or all of the Debtors and the Debtors' estates), then, unless otherwise
agreed by the Required DIP Lenders in their discretion, (i) all of the cash proceeds derived from
such credit or debt shall immediately be turned over to the DIP Agent to be applied to the
DIP Obligations pursuant to the DIP Loan Agreement, and (ii) after payment in full of all DIP
Obligations in cash, all the cash proceeds derived from such credit or debt shall immediately be
turned over to the Prepetition Agents to be applied pursuant to the applicable Prepetition Loan
Documents, in each case, consistent with the Intercreditor Agreements (as and to the extent
applicable).

20.      **Maintenance of DIP Collateral.**    The Debtors shall continue to maintain all
property, operational and other insurance as required and as specified in the DIP Loan
Documents.  The Debtors shall provide the DIP Agent and its counsel (for distribution to the DIP
Lenders) with evidence of such insurance within one (1) calendar day after entry of this Interim
Order.  Upon entry of this Interim Order and to the fullest extent provided by applicable law,
each of the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any

47

further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.  The Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any order that may be entered by the Court in accordance with this Interim Order, which has first been agreed to by the Required DIP Lenders and the Required ABL Lenders.  The Debtors shall not open any new Deposit Account or Securities Account (in each case, as defined in the ABL Intercreditor Agreement), other than the Adequate Assurance Account, that is not subject to the security interests of each of the Prepetition Secured Parties.

21.    **Disposition of DIP Collateral.**    The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) other than in the ordinary course of business without the prior written consent of the Required DIP Lenders and, in the case of any ABL Priority Collateral, the Required ABL Lenders and the Required DIP Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lenders or Required ABL Lenders, as applicable), except as otherwise provided for in the DIP Loan Documents or otherwise ordered by the Court, and, in each case, subject to the Intercreditor Agreements.

22.    **Termination Date.**

(a)    **DIP Termination Events.**    Each of the following shall constitute a termination event under this Interim Order (each a "**DIP Termination Event**", and the date upon which such DIP Termination Event occurs, the "**DIP Termination Date**"), unless waived in writing by the Required DIP Lenders:  (1) the occurrence of an "Event of Default" under and as defined in the DIP Loan Agreement; (2) the scheduled maturity date of the DIP Facility; (3) 4:00 p.m. New York time on the date that is thirty-five (35) calendar days after the Petition Date, if

48

the Final Order, in form and substance acceptable to the DIP Agent and the Required DIP

Lenders, has not been entered by such date; (4) the date of consummation of any sale of all or

substantially all the assets of the Debtors;  (5) the effective date of a chapter 11 plan; (6) the

Debtors seek any amendment, modification, or extension of this Interim Order without the prior

written consent of the Required DIP Lenders (and no such consent shall be implied by any other

action, inaction, or acquiescence of the DIP Secured Parties); (7) the failure by the Debtors to

timely perform any of the material terms, provisions, conditions, covenants, or other obligations

under this Interim Order, or (8) the occurrence of the Cash Collateral Termination Date (as

defined below).

(b)    **Cash Collateral Termination Events.** Each of the following shall

constitute a termination event under this Interim Order with respect to the usage of Cash

Collateral (each a "**Cash Collateral Termination Event**", and the date upon which such Cash

Collateral Termination Event occurs, the "**Cash Collateral Termination Date**"), unless waived

in writing by the Required ABL Lenders:

(1)    4:00 p.m. New York time on the date that is 35 calendar days after
the Petition Date, if the Final Order, in form and substance acceptable to the ABL Loan
Agents and the Required ABL Lenders, has not been entered by such date;

(2)    any Debtor's failure to comply with any of the terms, provisions,
conditions, covenants or obligations under this Interim Order that is material to the
interests of the Prepetition ABL Secured Parties, including, but not limited to, failure to
comply with the Approved Budget (subject to Permitted Variances);

(3)    the failure of the Debtors to make any payment under this Interim
Order to any ABL Loan Agent or the ABL Loan Lenders (as applicable) within one (1)
business day after such payment becomes due (other than payments required under
paragraph 11(b)(3)(i) of this Interim Order, which payments shall be made as required
therein);

(4)    the entry of an order in the Chapter 11 Cases amending,
supplementing, staying, vacating or otherwise modifying this Interim Order in a manner
materially adverse to the ABL Loan Agents or the ABL Loan Lenders without the prior
written consent of the Required ABL Lenders;

49

(5)    the cessation of Liens, security interests or superpriority claims granted with respect to the ABL Loan Obligations to be valid, binding, enforceable and non-avoidable, and (with respect to the Liens), fully and properly perfected, in all respects;

(6)    the occurrence of a DIP Termination Event, unless waived or cured in accordance with paragraph 22(a) hereof (if applicable);

(7)    the payment of, or application by any Debtor for authority to pay, any prepetition claim without the Required ABL Lenders' prior written consent other than (i) as provided in any "first day order" in form and substance acceptable to the Required ABL Lenders, or (ii) as set forth in the Approved Budget (subject to the Permitted Variances);

(8)    the Debtors shall institute any proceeding or investigation, or support the same instituted by any other person, challenging the status and/or validity of the Liens securing the Prepetition ABL Loan Obligations;

(9)    the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Debtor, for an order seeking the appointment of, in either case, without the consent of the Required ABL Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Debtors or with the power to conduct an investigation of (or compel discovery from) the ABL Loan Agents or the ABL Loan Lenders;

(10)    the filing of any pleading by any Debtor in opposition, or in support of any other person's opposition, to any motion filed in the Court by the ABL Loan Agents or the ABL Loan Lenders seeking confirmation of the amount of their claims or the validity or enforceability of the Prepetition ABL Loan Liens or the ABL Adequate Protection Liens, except with regard to good faith disputes over the payment of expenses and fees or contingent obligations;

(11)    the payment of or granting adequate protection with respect to any prepetition Indebtedness (other than with respect to payment permitted under any "first day order" in form and substance satisfactory to the Required ABL Lenders or as set forth in this Interim Order);

(12)    the dismissal of any of the Chapter 11 Cases, other than in respect of DX Holdings;

(13)    the conversion of any of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the conversion of any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(14)    the remittance, use or application of Cash Collateral by the Debtors other than in accordance with this Interim Order;

(15)    the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under this Interim Order or the Liens granted hereunder;

(16)    the entry of an order in the Chapter 11 Cases avoiding or requiring repayment or disgorgement of any portion of the payments made on account of the ABL Loan Obligations (including any of the adequate protection payments made pursuant to the terms hereof);

(17)    the failure of the Debtors to:

1. Obtain entry of (a) an order (the "**Confirmation Order**") confirming a chapter 11 plan that (a) repays in full, in cash, the ABL Loan Obligations on the effective date of the plan, or (b) is otherwise in form and substance acceptable to the Required ABL Lenders with respect to the treatment of the ABL Loan Obligations thereunder (the "**Acceptable Plan**"), and (b) an order approving a disclosure statement for such chapter 11 plan, in form and substance acceptable to the Required ABL Lenders (the "**Disclosure Statement**"), and all other related relief, in each case, in form and substance acceptable to the Required ABL Lenders with respect to the treatment of the ABL Loan Obligations thereunder, by November 15, 2019;

2. Cause the effective date of the Acceptable Plan to occur no later than fourteen (14) calendar days after the entry of the Confirmation Order; *provided* that if the Confirmation Order is entered after November 7, 2019, the Debtors shall use commercially reasonable efforts to lift any stay of effectiveness of the Confirmation Order within seven (7) calendar days after the entry of the Confirmation Order.

Each of the Debtors' obligations set forth in this paragraph 22(b)(17) shall be referred to in this Interim Order as a "**Milestone**".

(18)    the filing by any Debtor of any plan of reorganization, or any amendment to such plan, that is not an Acceptable Plan;

(19)    the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization other than an Acceptable Plan;

(20)    the bringing of a motion by any Debtor, or the entry of any order by the Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code secured by a senior lien on (x) ABL Priority Collateral or (y) Term Priority Collateral in excess of the threshold set forth in the ABL Intercreditor Agreement in the definition of "Term Loan Priority Claims", in either case, that does not provide for the repayment of all ABL Loan Obligations in full in cash; (ii) to use cash collateral of the ABL Loan Agents or the ABL Loan Lenders under section 363(c) of the Bankruptcy Code without the prior written consent of the ABL Loan Agents and the Required ABL Lenders; or (iii) that requests or seeks authority for or that approves or provides authority to take any other action or actions materially adverse to

51

the rights and remedies of the ABL Loan Agents or the ABL Loan Lenders or their interest in any DIP Collateral or Prepetition Collateral;

(21)    the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any ABL Priority Collateral, or (y) with respect to any Lien of or the granting of any Lien on any ABL Priority Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the ABL Loan Agents;

(22)    the Debtors' failure to comply with paragraphs 11(b)(3)(iii) or 11(b)(3)(iv) of this Interim Order;

(23)    any lien or security interest purported to be created under the ABL Loan Documents shall cease to be, or shall be asserted by any Debtors not to be, a valid and perfected lien on or security interest in any Prepetition ABL Loan Collateral, with the priority required by the ABL Loan Documents and this Interim Order;

(24)    except as expressly provided by this Interim Order, the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien in ABL Priority Collateral equal or superior to that granted to the ABL Loan Agents, on behalf of itself and the ABL Loan Secured Parties, without the prior written consent of the Required ABL Lenders;

(25)    the entry of an order precluding the ABL Loan Agents from having the right to, or being permitted to, "credit bid", subject to the terms of the Intercreditor Agreements and paragraph 43 hereof;

(26)    except as expressly provided by this Interim Order, any attempt by any Debtor to reduce, avoid, set off or subordinate, or the entry of an order in any of the Chapter 11 Cases reducing, avoiding, setting off or subordinating, the ABL Loan Obligations or the Liens securing such ABL Loan Obligations to any other debt;

(27)    an application for any of the orders that would constitute a Cash Collateral Termination Event shall be made by a person other than the ABL Loan Agents or the ABL Loan Lenders and such application is not, to the extent requested by the ABL Loan Agents or the Required ABL Lenders, contested by any Debtor in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(28)    the termination of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; and

(29)    the sale, without the ABL Loan Agents' and the Required ABL Lenders' consent, of all or substantially all of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise, except in the case of an Acceptable Plan.

23. **Rights and Remedies Upon Termination Events.**

(a)    **DIP Termination Event.**  Subject in all respects to paragraph 43 hereof,

immediately upon the occurrence and during the continuation of a DIP Termination Event, the

DIP Agent may, and at the request of the Required DIP Lenders, shall (and any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under section 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to), upon the delivery of written notice (which may include electronic mail) to the Debtors, counsel to the Debtors, counsel for the ABL Loan Agents, counsel for any Official Committee, and the U.S. Trustee (collectively, the "**Remedies Notice Parties**"), (a) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (b) terminate, reduce or restrict any commitment to extend credit to the Debtors to the extent any such commitment remains, (c) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (d) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the other DIP Loan Documents to use any Cash Collateral (subject to the last sentence of this Paragraph 23(a)); (e) invoke the right to charge interest at the default rate under the DIP Loan Documents, (f) freeze monies or balances in the Debtors' accounts; (g) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, (h) otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (i) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law; *provided, however,* that prior to the exercise of any right in clauses (f) though (i) of this paragraph, the DIP Agent shall be required to provide three (3) business days' written notice to the Remedies Notice Parties of the DIP Agent's intent to exercise its

53

rights and remedies (the "**DIP Remedies Notice Period**").   Unless during such DIP Remedies Notice Period the Court determines that a DIP Termination Event has not occurred, the DIP Agent and the DIP Lenders shall be deemed to have received relief from the automatic stay, and may foreclose on all or any portion of the DIP Collateral (including Term Loan Adequate Protection Liens on Term Priority Collateral), collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise (in each case, subject to paragraph 43 hereof).   Upon the occurrence and during the continuation of a DIP Termination Event and the expiration of the DIP Remedies Notice Period, the DIP Agent and any liquidator or other professional acting at the direction of the DIP Agent will have the right to access and utilize, on a royalty-free basis, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations that the Debtors have a right to occupy to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the DIP Collateral, including pursuant to any Court approved sale process.   The Debtors shall cooperate with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise, and the Debtors waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in this Interim Order and in the DIP Loan Documents, other than to dispute whether a DIP Termination Event has in fact occurred; *provided*, *however,* that that none of the DIP Secured Parties shall object to a request

by the Debtors for an expedited hearing before the Court to contest whether a DIP Termination Event has in fact occurred.  Notwithstanding anything to the contrary set forth in this paragraph 23, but subject to paragraph 22(b) hereof, during the DIP Remedies Notice Period, the Debtors may use Cash Collateral to pay only the following amounts and expenses:  (i) the Carve-Out (subject to paragraph 29 hereof); and (ii) amounts that the Debtors and the Required DIP Lenders have determined in good faith are in the ordinary course, are critical to the preservation of the Debtors and their estates and have been approved in advance in writing by the Required DIP Lenders.

        (b)    **Cash Collateral Termination Event.**  Subject in all respects to paragraph 43 hereof, immediately upon the occurrence and during the continuation of a Cash Collateral Termination Event, the ABL Loan Agents may, and at the request of the Required ABL Lenders, shall (and any automatic stay otherwise applicable to the ABL Loan Secured Parties, whether arising under section 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the ABL Loan Agents to), upon the delivery of written notice (which may include electronic mail) to the Remedies Notice Parties:  (a) terminate and/or revoke the Debtors' right, if any, under this Interim Order to use any Cash Collateral of the ABL Loan Secured Parties (subject to the last sentence of this Paragraph 23(b)); (b) freeze monies or balances in the Debtors' accounts; (c) immediately set-off any and all amounts constituting ABL Priority Collateral in accounts maintained by the Debtors with the ABL Loan Agents or the ABL Loan Lenders against the ABL Loan Obligations; (d) otherwise enforce any and all rights against the ABL Priority Collateral, including, without limitation, disposition of any ABL Priority Collateral for application towards the ABL Loan Obligations; and (e) take any other actions or exercise any

other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law; *provided, however,* that prior to the exercise of any right in clauses (c) though (e) of this paragraph, the ABL Loan Agents shall be required to provide three (3) business days' written notice to the Remedies Notice Parties of the ABL Loan Agents' intent to exercise its rights and remedies (the "**Cash Collateral Remedies Notice Period**").  Unless during such Cash Collateral Remedies Notice Period the Court determines that a Cash Collateral Termination Event has not occurred, the ABL Loan Agents and the ABL Loan Lenders shall be deemed to have received relief from the automatic stay, and may foreclose on all or any portion of the ABL Priority Collateral (including ABL Adequate Protection Liens on ABL Priority Collateral), collect accounts receivable, and apply the proceeds thereof to the Prepetition ABL Obligations, occupy the Debtors' premises to sell or otherwise dispose of the ABL Priority Collateral, or otherwise exercise all rights and remedies available against the ABL Priority Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise (in each case, subject to paragraph 43 hereof).  Upon the occurrence and during the continuation of a Cash Collateral Termination Event and the expiration of the Cash Collateral Remedies Notice Period, the ABL Loan Agents and any liquidator or other professional acting at the direction of the ABL Loan Agents will have the right to access and utilize, on a royalty-free basis, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations that the Debtors have a right to occupy to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the ABL Priority Collateral, including pursuant to any Court approved sale process.  The Debtors shall cooperate with the ABL Loan Agents and the ABL Loan Lenders in their exercise of rights and remedies,

56

whether against the ABL Priority Collateral or otherwise, and the Debtors waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the ABL Loan Agents and the ABL Loan Lenders set forth in this Interim Order and in the ABL Loan Documents, other than to dispute whether a Cash Collateral Termination Event has in fact occurred; *provided*, *however,* that that none of the ABL Loan Secured Parties shall object to a request by the Debtors for an expedited hearing before the Court to contest whether a Cash Collateral Termination Event has in fact occurred.  Notwithstanding anything to the contrary set forth in this paragraph 23(b), but subject to paragraph 22(b) hereof, during the Cash Collateral Remedies Notice Period, the Debtors may use Cash Collateral to pay only the following amounts and expenses:  (i) the Carve-Out; and (ii) amounts that the Debtors and the Required ABL Lenders have determined in good faith are in the ordinary course, are critical to the preservation of the Debtors and their estates and have been approved in advance in writing by the Required ABL Lenders.   For the avoidance of doubt, all references to "ABL Priority Collateral" in this Interim Order shall include any DIP Collateral in which the ABL Loan Secured Parties have a Prepetition ABL Lien or an ABL Adequate Protection Lien, in each case that constitutes ABL Priority Collateral, subject to the terms hereof and the relative rights and priorities set forth herein and in the Intercreditor Agreements.

24.    **Landlord Agreements; Access.**    All landlord agreements to which the Prepetition Agents are a party shall be deemed amended to include the DIP Agent as beneficiary thereunder, and such agreements shall thereafter be additionally enforceable by the DIP Agent against, and binding upon, each landlord party thereto (subject in each case to the terms of the Intercreditor Agreements and paragraph 43 hereof).  Any title, landlord's lien, right of distraint

57

or levy, security interest or other interest that any landlord or mortgagee may have in any DIP

Collateral or Prepetition Collateral of the Debtors located on such leased premises, to the extent

the same is not void under section 545 of the Bankruptcy Code, is hereby expressly subordinated

to the DIP Liens.  Without limiting any other rights or remedies of the DIP Agent or the other

DIP Secured Parties, or otherwise available at law or in equity, and subject to the terms of the

DIP Loan Documents and paragraph 43 hereof, upon three (3) business days' written notice to

counsel to the Debtors and any landlord, lienholder, licensor, or other third party owner of any

leased or licensed premises or intellectual property, that a DIP Termination Event has occurred

and is continuing, the DIP Agent, (i) may, unless otherwise expressly provided in any separate

agreement by and between the applicable landlord or licensor and the DIP Agent or the

Prepetition Agents, as applicable (the terms of which shall be reasonably acceptable to the

parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of

exercising any remedy with respect to DIP Collateral located thereon, and (ii) shall be entitled to

all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to

use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets

of the Debtors, which are owned by or subject to a lien of any third party and which are used by

Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph 24,

without interference from lienholders or licensors thereunder; *provided*, *however*, that the DIP

Agent (on behalf of the DIP Secured Parties) shall pay only rent and additional rent, fees,

royalties, or other monetary obligations of the Debtors that first arise after the written notice

referenced above from the DIP Agent and that accrue during the period of such occupancy or use

by DIP Agent calculated on a per diem basis.  Nothing herein shall require the Debtors, the DIP

Agent or the other DIP Secured Parties, to assume any lease or license under Bankruptcy Code

section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties herein.

25.    **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.**  The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, reversed, amended or vacated by a subsequent order of the Court or any other court, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, reversal, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders arising prior to the effective date of any such modification, reversal, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

26.    **DIP and Other Expenses.**  The Debtors are authorized and directed to pay, in cash and on a current basis, all out-of-pocket fees, costs, disbursements and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Interim Order, whether or not the transactions contemplated hereby are consummated, including, without limitation, legal, accounting, collateral examination, monitoring and appraisal

59

fees and expenses, financial advisory fees and expenses, fees and expenses of other consultants and indemnification and reimbursement of fees and expenses (including, for the avoidance of doubt, all fees, expenses and disbursements of the DIP Lender Professionals). Payment of all such fees and expenses shall not be subject to review or allowance by the Court. The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only, and shall be provided to counsel to the Debtors, with a copy to the Notice Parties. If no objection to payment of the requested fees and expenses are made, in writing by any of the Notice Parties within the Fee Objection Period, then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors. If an objection (solely as to reasonableness) is made by any of the Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors. Notwithstanding the foregoing, the Debtors are authorized, without further notice or hearing, to (a) pay on the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Agent and the Initial DIP Lenders incurred on or prior to such date to the extent otherwise payable in accordance with the terms of the DIP Loan Agreement, and (b) to pay on the Final Borrowing Date (as defined in the DIP Loan Agreement) all reasonable and documented fees, costs and out-of-pocket expenses of the DIP Agent and DIP Lenders incurred on or prior to such date to the extent otherwise payable in accordance with the terms of the DIP Loan Agreement. Payments of any amounts set forth in this paragraph 26 shall not be subject to recharacterization, subordination or disgorgement.

27. **Indemnification.** The Debtors shall jointly and severally indemnify and hold harmless the DIP Agent (solely in its capacity as DIP Agent), each DIP Lender (solely in its capacity as DIP Lender) and each of their respective officers, directors, employees, parents, subsidiaries, affiliates, agents, advisors, attorneys and representatives (each, an "Indemnified **Party**") from and against any and all claims, damages, losses, liabilities, costs and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Liens, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the DIP Facility, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct.

28. **Proofs of Claim.** The DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successors Cases for any claim allowed herein or therein in respect of the ABL Loan Obligations or the Prepetition Term Loan Obligations. Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases shall not

apply to the DIP Agent, the DIP Lenders, any Prepetition Agent or any Prepetition Lenders; *provided, however*, that notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of itself and the DIP Lenders, and the Prepetition Agents on behalf of the Prepetition Lenders, respectively, may (but are not required) in their discretion to file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases for any claim allowed herein, and any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor. Any proof of claim filed by the DIP Agent, any Prepetition Agent or any Prepetition Lenders shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.

29.    **[Carve-Out.**

(a)    *Carve-Out*. For purposes of this Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees (including success or transaction fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals"), and any Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor

Professionals, the "Professional Persons") at any time before or on the first Business Day (as defined in the DIP Loan Agreement) following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees in an aggregate amount not to exceed $750,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the DIP Lenders, the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Ad Hoc Committee and counsel to the ABL Loan Administrative Agent, and counsel to the Official Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked; *provided that* nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), (iii), or (iv) above, on any grounds.

(b)     On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Official Committee (if any) (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including Cash Collateral) as of such date and any available cash thereafter held by any Chapter 11 Debtor to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees.

(c)    The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims (including the DIP Superpriority Claim). On the Termination Declaration Date,  after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.

(d)    All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facility has been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Prepetition Lenders to be paid to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, in accordance with their rights and priorities as of the Petition Date in accordance with the Intercreditor Agreements.

(e)    All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facility has been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been

64

terminated, in which case, any such excess shall be paid to the Prepetition Agents to be paid to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, in accordance with their rights and priorities as of the Petition Date in accordance with the Intercreditor Agreements.

(f)     Notwithstanding anything herein or the DIP Loan Documents to the contrary: (i) if either of the Carve-Out Reserves is not funded in full in the amounts set forth herein, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the DIP Agent or the Prepetition Agents, as applicable; (ii) following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded or unless the proceeds of such sweep or foreclosure are applied immediately to fund the Carve-Out Reserves, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent or the Prepetition Agents for application in accordance with this Interim Order; (iii) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP Loans under the DIP Facility or increase or reduce the balance of the DIP Superpriority Claim outstanding; (iv) the failure of the Carve-Out Reserves to satisfy, in full, the Allowed Professional Fees shall not affect or impair the priority of the Carve-Out; and (v) in no way shall any of the Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any budget or financial projection delivered in connection with this Interim Order or the DIP Facility be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by, or that may be administrative claims allowed against, the Debtors.  For the avoidance of

65

doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(g)     Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.  Any payment or reimbursement made on a final basis on or after the occurrence of the Termination Declaration Date in respect of any Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

(h)     For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities (including the DIP Superpriority Claim and the DIP Liens) and any and all other forms of adequate protection, liens, or other claims securing the DIP Obligations or the Prepetition Obligations (including any liens and claims granted on account of the Adequate Protection Liens and Adequate Protection Claims).][8]

30.     **Limitations on the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve-Out.**  No DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out or any other amounts may be used, directly or indirectly, by any of the Debtors, any Official Committee or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements,

---

[8]     Subject to ongoing negotiation.

costs or expenses incurred in connection therewith):  (a) to object to, contest, prevent, hinder, delay or interfere with, in any way, the DIP Agent's, the DIP Lenders', the Prepetition Agents' or the Prepetition Lenders' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral or Cash Collateral, once a DIP Termination Event or Cash Collateral Termination Event occurs (other than with respect to rights otherwise granted herein with respect to the DIP Remedies Notice Period or the Cash Collateral Remedies Notice Period); (b) except to the extent expressly permitted by the terms of the DIP Loan Documents and this Interim Order,  to use or seek to use Cash Collateral or, to sell or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the Required DIP Lenders and the Required ABL Lenders; (c) except to the extent expressly permitted by the DIP Loan Documents, to use or seek to use any insurance proceeds constituting DIP Collateral without the consent of the Required DIP Lenders and the Required ABL Lenders; (d) except to the extent expressly permitted by the DIP Loan Documents, to seek authorization to incur Indebtedness (as defined in the DIP Loan Agreement) or to incur liens or security interests;  (e) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Releasees with respect to any transaction, occurrence, omission, action or other matter arising under, in connection with or related to this Interim Order, the DIP Facility, the DIP Loan Documents, the DIP Obligations, the Prepetition Liens, the Prepetition Obligations or the Prepetition Loan Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy

67

Code, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claim, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Claims or the Prepetition Obligations, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the DIP Collateral, the Prepetition Collateral, the Prepetition Obligations, the Term Loan Adequate Protection Claims, and the ABL Adequate Protection Claims, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's, the DIP Lenders', the Prepetition Agents' or the Prepetition Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents or Prepetition Loan Documents and this Interim Order and/or the Final Order (as applicable); *provided*, *however*, that no more than $35,000 may be used for allowed fees and expenses incurred solely by any Official Committee, if appointed, in investigating, but not objecting to, challenging, litigating (including by way of discovery), opposing, or seeking to subordinate or recharacterize the validity, enforceability, perfection and priority of the Prepetition Liens, the Prepetition Obligations or the Prepetition Loan Documents during the Challenge Period (as defined below).

68

31. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.**

(a)      The stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph D of this Interim Order (collectively, the "**Stipulations**"), shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes.

(b)      The Stipulations shall be binding upon all other parties in interest (including without limitation, any Official Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, in all circumstances and for all purposes, unless (1) an Official Committee, if any, or a party in interest (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the expiration of the Challenge Period (as defined below)), has timely and duly filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "**Challenge Proceeding**") by the Challenge Period (as defined below), objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents, or otherwise asserting or prosecuting any Avoidance Action or any other claim, counterclaim, cause of action, objection, contest or defense (a "**Challenge**") against any of the Prepetition Secured Parties or any of their respective affiliates, subsidiaries, officers, directors, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and the respective successors and assigns thereof (in each case, in their respective capacities as such), arising under, in connection with or related to the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents,

69

and (2) there is entered a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding; *provided, however,* that (i) as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date, and (ii) any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred).

(c)       If no such Challenge Proceeding is timely and properly filed prior to the expiration of the Challenge Period, then, without further notice to any person or entity or order of the Court, (a) the Stipulations shall be binding on all parties in interest (including, without limitation, any Official Committee);   (b) the Prepetition Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, offset, avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases;  (c) the Prepetition Loan Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the Debtors (subject to the Intercreditor Agreements) in the Chapter 11 Cases and any Successor Cases; (d) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; (e) the Prepetition Obligations, the Prepetition Liens and the Prepetition Loan Documents shall not be subject to any other or further claim or Challenge by any Official Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases or any Successor Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates; and (f) the repayment of the Senior Priming Term Loan Obligations shall be irrevocable and shall not be subject to recharacterization, disgorgement or any other Challenge under any circumstances.

70

(d)     If any such Challenge Proceeding is timely and properly filed during the Challenge Period, the Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 31(b) hereof) on any Official Committee and on any other person or entity, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

(e)     The "**Challenge Period**" shall mean the date that is (A) the earlier of (i) sixty (60) days after the Petition Date, or (ii) two (2) business days prior to the date of the hearing to consider confirmation of the Debtors' proposed prepackaged chapter 11 plan, or (B) such later date that has been agreed to in writing by the affected Prepetition Agent (at the direction of the Required Lenders, as defined in the Prepetition Term Loan Documents or the ABL Loan Documents, as applicable), or as ordered by the Court, for good cause shown, in each case, prior to the expiration of the deadline to commence a Challenge.

(f)     Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Official Committee or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

32.     **No Third Party Rights.**  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

33.     **Section 506(c) Waiver.**  In partial consideration for, among other things, the Carve-Out, the payments to be made under the Approved Budget to administer the Chapter 11 Cases, and consent to the use of Cash Collateral, no costs or expenses of administration which

have been or may be incurred in the Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Prepetition Lenders upon the Prepetition Collateral, as applicable) shall be charged against any of the DIP Secured Parties, the DIP Collateral (including in respect of the Adequate Protection Liens) or any of the DIP Obligations (or, subject to this Court's approval at the Final Hearing, the Prepetition Secured Parties, the Prepetition Collateral or any of the Prepetition Obligations) pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the DIP Agent, the affected DIP Lender, the affected Prepetition Agent and the affected Prepetition Lender, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

34.    **Section 552(b) Waiver.**  The Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to this Court's approval at the Final Hearing, the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties or the Prepetition Obligations. Accordingly, any valid, perfected and non-avoidable liens created by the Prepetition Loan Documents in any Prepetition Collateral shall attach with the same validity, priority, and perfection in and to any and all proceeds of such Prepetition Collateral, subject to Permitted Prior Senior Liens (if any).

35.    **No Marshaling/Application of Proceeds.**  In no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable,

72

and all proceeds shall be received and applied in accordance with this Interim Order, the DIP
Loan Documents and the Prepetition Loan Documents, as applicable.

36.    **Right to Credit Bid.**  Each of the DIP Agent (at the direction of the Required
DIP Lenders) and the Prepetition Agents (at the direction of the Required Lenders, as defined in
the Prepetition Term Loan Documents or the ABL Loan Documents, as applicable), shall have
the unqualified right to "credit bid" up to  the full amount of the DIP Obligations or the
Prepetition Obligations, as applicable, in connection with any sale or other disposition of all or
any portion of the DIP Collateral or the Prepetition Collateral, respectively, including, without
limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of
any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy
Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of
DIP Collateral or Prepetition Collateral under or pursuant to (a) section 363 of the Bankruptcy
Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy
Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725
of the Bankruptcy Code (subject in each case to the Intercreditor Agreements).  The DIP Agent
(at the direction of the Required DIP Lenders) and the Prepetition Agents (at the direction of the
Required Lenders, as defined in the Prepetition Term Loan Documents or the ABL Loan
Documents, as applicable), have the absolute right to assign, transfer, sell or otherwise dispose of
its rights to credit bid, except as may be prohibited by the DIP Loan Documents.

37.    **Discharge Waiver/Release.**  The DIP Obligations shall not be discharged by the
entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases,
notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP
Obligations have been indefeasibly paid in full in cash, on or before the effective date of such

73

confirmed plan of reorganization, or each of the DIP Secured Parties has otherwise agreed in writing, including as may be provided in the Acceptable Plan (as defined in the DIP Loan Agreement).  None of the Debtors shall propose or support any Chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of (i) the DIP Obligations in full in cash on or prior to the earlier to occur of the effective date of such Chapter 11 plan or sale, without the written consent of the DIP Agent and the Required DIP Lenders, and (ii) the ABL Loan Obligations in full in cash on or prior to the earlier to occur of the effective date of such Chapter 11 plan or sale, without the written consent of the ABL Loan Administrative Agent and the Required ABL Lenders.

38.    **Rights Preserved.**  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:   (a) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders under the DIP Loan Documents, the Bankruptcy Code, the applicable Prepetition Loan Documents or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders (subject to

74

the Intercreditor Agreements).  Notwithstanding anything herein to the contrary, the entry of this

Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly,

the Debtors' or any party-in-interest's right to oppose any of the relief requested in accordance

with the immediately preceding sentence, except as expressly set forth in this Interim Order.

39.    **Joint and Several Liability.**  Nothing in this Interim Order shall be construed to

constitute a substantive consolidation of any of the Debtors' estates, it being understood,

however, that the Debtors shall be jointly and severally liable for the obligations hereunder and

in accordance with the terms of this Interim Order.

40.    **No Waiver by Failure to Seek Relief.**  The failure of the DIP Agent, the DIP

Lenders, the Prepetition Agents or the Prepetition Lenders to seek relief or otherwise exercise

their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition

Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of

their respective rights hereunder, thereunder or otherwise.  No delay on the part of any party in

the exercise of any right or remedy under this Interim Order shall preclude any other or further

exercise of any such right or remedy or the exercise of any other right or remedy.  None of the

rights or remedies of any party under this Interim Order shall be deemed to have been amended,

modified, suspended or waived unless such amendment, modification, suspension or waiver is in

writing and signed by the party against whom such amendment, modification, suspension or

waiver is sought.  No consents required hereunder by any of the DIP Agent, the DIP Lenders, the

Prepetition Agents or the Prepetition Lenders shall be implied by any inaction or acquiesce by

any of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders.

41.    **Binding Effect of this Interim Order.**  Immediately upon entry by the Court,

this Interim Order shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the

Prepetition Agents and the Prepetition Lenders, and it shall become valid and binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, any and all other creditors of the Debtors, any Official Committee or other committee appointed in the Chapter 11 Cases, any and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases or any Successor Cases, or upon dismissal of any of the Chapter 11 Cases.

42.    **No Modification to Interim Order.**    Until and unless the DIP Obligations and the Prepetition Obligations evidenced by the Prepetition Loan Documents have been indefeasibly paid in full in cash, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Required DIP Lenders and the Required Consenting Creditors (as defined in the DIP Loan Agreement), (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP Superpriority Claim, other than the Carve-Out; (b) without the prior written consent of the Prepetition Agents (at the direction of the Required Lenders, as defined in the Prepetition Term Loan Documents or the ABL Loan Documents, as applicable) and the Required Consenting Creditors, any order authorizing the use of Cash Collateral resulting from the DIP Collateral or the Prepetition Collateral that is inconsistent with this Interim Order; (c) without the prior written consent of the Required DIP Lenders, grant any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as

expressly provided in the DIP Loan Documents or this Interim Order; or (d) without the prior

written consent of the applicable Prepetition Agents (at the direction of the Required Lenders, as

defined in the Prepetition Term Loan Documents or the ABL Loan Documents, as applicable),

the Required DIP Lenders and the Required Consenting Creditors, grant any lien on any of the

Prepetition Collateral with priority equal or superior to the Prepetition Term Loan Liens or the

Term Loan Adequate Protection Liens other than the DIP Obligations or as specifically provided

in this Interim Order.

43.    **Intercreditor Arrangements.**

(a)    Notwithstanding anything contained herein to the contrary, the Debtors,

the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders each shall be

bound by, and in all respects the DIP Facility shall be governed by, and subject to the terms and

provisions of the Intercreditor Agreements as though the DIP Agents and the DIP Lenders were

party thereto, and shall not be modified by entry of this Interim Order.  For purposes of the ABL

Intercreditor Agreement, the DIP Credit Agreement shall be deemed to constitute a "Term

Additional Agreement", the DIP Agent shall be deemed to constitute an "Other Term Loan

Agent" and the "Designated Term Loan Agent" and the DIP Obligations shall be deemed to

constitute "Term Loan Priority Claims" and in each case shall be subject to the terms of such

Intercreditor Agreement as if the DIP Agent and the DIP Lenders were party thereto (it being

understood and agreed that all Adequate Protection Liens granted herein shall constitute "Liens"

of the ABL Loan Secured Parties or Term Loan Secured Parties, as applicable, for purposes of

the ABL Intercreditor Agreement).

(b)    Until the DIP Obligations have been indefeasibly paid and satisfied in full

in cash, (A) the DIP Agent and the DIP Lenders shall have the sole and exclusive right to enforce

rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of the Term Priority Collateral (including Term Priority Collateral on which Adequate Protection Liens have been granted hereunder); and (B) the ABL Loan Agents, the ABL Loan Lenders, the Prepetition Term Loan Agents, and the Prepetition Term Loan Lenders (x) will not exercise any right or remedies with respect to any Term Priority Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by DIP Agent or any DIP Lenders to enforce its rights and remedies relating to the Term Priority Collateral.  Following the indefeasible payment and satisfaction in full in cash of the DIP Obligations, until the Prepetition Term Loan Obligations have been indefeasibly paid and satisfied in full in cash, (A) subject to the Intercreditor Agreements, the Prepetition Term Loan Agents and Prepetition Term Loan Lenders shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of the Term Priority Collateral (including Term Priority Collateral on which Adequate Protection Liens have been granted hereunder); and (B) the ABL Loan Agents and the ABL Loan Lenders (x) will not exercise any right or remedies with respect to any Term Priority Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by Prepetition Term Loan Agents and the Prepetition Term Loan Lenders to enforce their rights and remedies relating to the Term Priority Collateral.

(c)    Until the Prepetition ABL Loan Obligations have been indefeasibly paid and satisfied in full in cash, (A) the ABL Loan Agents and the ABL Loan Lenders shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding

78

the sale, release, or other disposition of any of the ABL Priority Collateral; and (B) the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agents and the Prepetition Term Loan Lenders (x) will not exercise any right or remedies with respect to any ABL Priority Collateral (including any right of setoff or any right under any lockbox or control agreement with respect to deposit accounts or securities accounts) or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the ABL Loan Agents or any ABL Loan Lender to enforce its rights and remedies relating to the ABL Priority Collateral.

(d)     For the avoidance of doubt, (x) absent the prior written consent of the Required ABL Lenders, in no event shall the security interests granted to the DIP Secured Parties or the Prepetition Term Loan Secured Parties hereunder (including Adequate Protection Liens) on ABL Priority Collateral be senior to, or *pari passu* with, the security interests of the ABL Loan Secured Parties thereon, and (y) absent the prior written consent of the Required Lenders (as defined in each of the Prepetition Term Loan Documents) or the Required DIP Lenders, as applicable, in no event shall the security interests granted to the ABL Loan Secured Parties hereunder on Term Priority Collateral be senior to, or *pari passu* with, the security interests of the DIP Secured Parties or the Prepetition Term Loan Secured Parties thereon.

44.     **Order Controls.**  In the event of any conflict or inconsistency between or among (a) the express terms or provisions of any of the DIP Loan Documents, the DIP Motion, any other order of the Court or any other agreement, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term of provision herein is

phrased in terms of "defined in: or "as set forth in" the DIP Loan Agreement, the terms and provisions of this Interim Order shall govern and control.

45.    **Limitation of Liability.** In determining to make any loan under the DIP Loan Agreement or permitting the use of Cash Collateral pursuant to this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the DIP Loan Parties to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the DIP Loan Parties (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29, U.S. §§ 9601 et seq., as amended, or any similar federal or state statute. Furthermore, nothing in this Interim Order, the DIP Loan Documents, or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the DIP Loan Parties.

46.    **Survival.** The provisions of this Interim Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases, (b) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of the Chapter 11 Cases, or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of the

80

Chapter 11 Cases, following dismissal of any of the Chapter 11 Cases, or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated, and (ii) in respect of the Prepetition Obligations, all of the Prepetition Obligations have been indefeasibly paid in full in cash (or, in respect of outstanding letters of credit, cash collateralized). The DIP Protections (defined below), as well as the terms and provisions concerning the indemnification of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, shall continue in any of the Chapter 11 Cases following dismissal of any of the Chapter 11 Cases, termination of the provisions of this Interim Order, and/or the indefeasible payment in full of the DIP Obligations.

47. **Dismissal.** If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) the rights, privileges, benefits and protections afforded herein and in the DIP Loan Documents, including the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Claims (collectively, the "**DIP Protections**"), shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Prepetition Obligations have been indefeasibly paid in full in cash (and that all DIP Protections and the Prepetition Secured Parties' adequate protection shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction,

81

notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' adequate protection.

48.    **Entry of this Interim Order/Waiver of Applicable Stay.**  The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of the Court maintained in regard to the Chapter 11 Cases.  This Interim Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3).

49.    **Notice of Entry of this Interim Order.**  The Debtors' counsel shall serve a copy of this Interim Order or a suitable notice respecting same on all of the following parties:  (a) the United States Trustee for the Southern District of New York, Attn.:  Richard C. Morrissey, Esq.; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the ABL Loan Agents; (d) the Senior Priming Term Loan Agent; (e) the Priming Term Loan Agent; (f) the Junior Term Loan Agent; (g) counsel to the ABL Loan Agents, Senior Priming Term Loan Agent, Priming Term Loan Agent, and Junior Term Loan Agent, Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019, Attn.:  Paul H. Zumbro, George E. Zobitz, and Sarah Rosen; (h) counsel to the Ad Hoc Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attn.:  Kristopher Hansen, Jonathan Canfield, and Gabriel Sasson; (i) MacAndrews & Forbes Media Group, Inc.; (j) counsel to MacAndrews & Forbes Media Group, Inc., Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attn:  Shana Elberg and Mark McDermott; (k) the United States Attorney's Office for the Southern District of New York; (l) the Internal Revenue Service;  (m) the  United States  Securities  and  Exchange  Commission;  (n) the Environmental Protection Agency and all similar state environmental agencies; (o) attorneys

82

general in the states where the Debtors conduct their business operations; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.

50.    **Final Hearing.**  The Final Hearing shall take place on October 24, 2019, at 10:00 a.m. New York time, and parties shall have until October 21, 2019 at 5:00 p.m. New York time, to file an objection if necessary and serve such objection on the parties set forth in paragraph 49.  Any objections by creditors or any other party-in-interest to the DIP Motion or any of the provisions of this Interim Order shall be deemed waived unless filed and received in accordance with the foregoing on or before the close of business on such date.  In the event the Court modifies any of the provisions of this Interim Order or other documents following the Final Hearing, such modifications shall not affect the rights and priorities of the DIP Agent and the DIP Lenders pursuant to this Interim Order with respect to the DIP Collateral and any portion of the DIP Facility that arises, or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically modified pursuant to the Final Hearing.

51.    ***Nunc Pro Tunc* Effect of this Interim Order.**  This Interim Order shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d) and 7062 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

52.    **Submission of Jurisdiction.**  The non-Debtor DIP Loan Parties hereby submit themselves to the jurisdiction of the Court to resolve any and all disputes regarding the DIP Loan Documents and this Interim Order, and agree to be bound by this Court's decisions with regard

to any such disputes or orders.  The DIP Loan Parties are hereby authorized to grant liens and claims to the DIP Secured Parties and the Prepetition Secured Parties, which liens and claims (subject to paragraph 31 shall not be subject to any claim or cause of action, defense, subordination (whether equitable, contractual or otherwise), set off, recoupment, disallowance, disgorgement, recharacterization, impairment or any other challenge of any kind or nature whatsoever.  To the extent permitted by applicable law, the Debtors shall cause any controlled non-Debtor affiliates not to take any actions seeking to avoid any transfers made, or obligations incurred, in furtherance of the transactions contemplated by the DIP Loan Documents.

53.    **Retention of Jurisdiction.**  The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

Dated: _____ [●], 2019
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**Annex A**

| ABL Priority Collateral | Term Priority Collateral |
|---|---|
| 1. ABL Adequate Protection Liens | 1. DIP Liens |
| 2. Prepetition ABL Loan Liens | 2. Term Loan Adequate Protection Liens held by Senior Priming Term Loan Secured Parties |
| 3. DIP Liens | 3. Term Loan Adequate Protection Liens held by Priming Term Loan Secured Parties |
| 4. Term Loan Adequate Protection Liens held by Senior Priming Term Loan Secured Parties | 4. Term Loan Adequate Protection Liens held by Junior Term Loan Secured Parties |
| 5. Term Loan Adequate Protection Liens held by Priming Term Loan Secured Parties | 5. Prepetition Term Loan Liens |
| 6. Term Loan Adequate Protection Liens held by Junior Term Loan Secured Parties | 6. ABL Adequate Protection Liens |
| 7. Prepetition Term Loan Liens | 7. Prepetition ABL Loan Liens |

## **<u>Annex B</u>**

### **Initial Budget**

# Deluxe Entertainment Services Group
**Illustrative DIP Budget**

*Dollars USD (in thousands)*

| Line Item | 9/6 Actual | 9/13 Actual | 9/20 Actual | 9/27 Actual | 1 — 10/4 | 2 — 10/11 | 3 — 10/18 | 4 — 10/25 | 5 — 11/1 | 6 — 11/8 | 7 — 11/15 | 8 — 11/22 | 9 — 11/29 | 10 — 12/6 | 11 — 12/13 | 12 — 12/20 | 13 — 12/27 | 14 — 12/31 | TOTAL Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL US RECEIPTS** | 6,987 | 5,776 | 8,461 | 12,799 | 8,965 | 7,277 | 7,277 | 12,277 | 18,712 | 9,548 | 10,048 | 18,548 | 18,713 | 12,341 | 13,841 | 18,841 | 14,841 | 9,530 | 180,760 |
| *Payroll — Salaries Wages & Benefits* | (989) | (11,847) | (930) | (12,425) | (937) | (11,736) | (1,065) | (10,249) | (2,565) | (9,906) | (1,865) | (13,016) | (2,565) | (9,795) | (1,865) | (9,896) | (2,565) | (9,655) | (87,680) |
| Payroll | (178) | (10,880) | (138) | (10,866) | (140) | (10,631) | (165) | (9,944) | (165) | (9,601) | (165) | (12,711) | (165) | (9,490) | (165) | (9,591) | (165) | (9,350) | (72,447) |
| Severance | - | (248) | - | (256) | - | (300) | - | (300) | - | (300) | - | (300) | - | (300) | - | (300) | - | (300) | (2,100) |
| 401K | (812) | - | (792) | (4) | (797) | (5) | (900) | (5) | (900) | (5) | (900) | (5) | (900) | (5) | (900) | (5) | (900) | (5) | (6,232) |
| Benefits | - | (719) | - | (1,298) | - | (800) | - | - | (1,500) | - | (800) | - | (1,500) | - | (800) | - | (1,500) | - | (6,900) |
| *Other Operating Costs — Freelancers* | (492) | (417) | (1,283) | (870) | (806) | (650) | (1,150) | (1,450) | (650) | (650) | (650) | (1,950) | (650) | (650) | (650) | (1,950) | (650) | (650) | (13,156) |
| Facilities | (2,676) | (484) | (165) | - | (1,129) | (1,961) | (152) | - | (30) | (3,075) | (170) | (40) | - | (3,005) | (270) | (40) | - | - | (9,871) |
| Credit Card | - | - | (2,620) | - | - | - | (1,934) | - | - | - | - | (2,159) | - | - | - | (2,200) | - | - | (6,293) |
| Capital Expenditures | (389) | (356) | (688) | - | (1,024) | (1,296) | (1,204) | (318) | (1,051) | (900) | (337) | (645) | (200) | (470) | (698) | (645) | (100) | (100) | (8,987) |
| Rebates | - | - | - | - | (625) | - | - | - | (625) | - | - | - | - | - | - | - | - | - | (1,250) |
| Ordinary Course Professionals | (34) | (65) | (25) | (1) | (60) | (50) | (50) | (50) | (50) | (150) | (150) | (150) | (145) | (150) | (150) | (150) | (150) | (150) | (1,605) |
| Other Vendors | (1,356) | (1,330) | (2,290) | (456) | (8,186) | (2,826) | (961) | 892 | (3,146) | (2,260) | (2,000) | (2,600) | (3,902) | (1,900) | (3,085) | (2,600) | (1,854) | (1,100) | (35,528) |
| Insurance | (89) | - | - | - | (156) | (119) | - | (151) | (156) | - | - | (67) | (89) | - | - | - | - | (67) | (806) |
| Taxes | (888) | - | (87) | - | - | (49) | (34) | (200) | - | (34) | (34) | - | - | (59) | - | (155) | - | - | (591) |
| **TOTAL US OPERATING DISBURSEMENTS** | (6,913) | (14,199) | (8,089) | (13,751) | (12,924) | (18,638) | (6,564) | (11,360) | (8,473) | (16,941) | (5,202) | (20,594) | (7,529) | (16,059) | (6,748) | (17,540) | (5,319) | (11,877) | (165,767) |
| *Inter'l Funding — UK* | - | - | (1,000) | - | - | - | (2,000) | - | - | - | - | (2,000) | - | - | - | (2,000) | - | - | (6,000) |
| Canada | (3,417) | 5,930 | - | - | - | (2,250) | (765) | (2,125) | (1,515) | (2,550) | (915) | (2,240) | (765) | (3,065) | (2,615) | (765) | (125) | - | (20,995) |
| Australia | - | - | (1,000) | 2,700 | (700) | (750) | (1,100) | (1,500) | 1,000 | (450) | (550) | 750 | 750 | - | 370 | 1,100 | (1,500) | - | (3,380) |
| India | - | - | (500) | (2,000) | (700) | - | (250) | (600) | (600) | (500) | (750) | (400) | (3,900) | (200) | (100) | (100) | (2,300) | - | (14,450) |
| **TOTAL INTERNATIONAL FUNDING** | (3,417) | 4,730 | (1,500) | 700 | (700) | (3,000) | (4,115) | (4,225) | (3,115) | (3,500) | (2,215) | (6,140) | (3,915) | (3,800) | (1,795) | (3,615) | (4,565) | (125) | (44,825) |
| **OPERATING CASH FLOW** | (3,343) | (3,693) | (1,128) | (252) | (4,659) | (14,361) | (3,402) | (3,308) | 7,124 | (10,893) | 2,631 | (8,186) | 7,268 | (7,517) | 5,299 | (2,314) | 4,958 | (2,472) | (29,833) |
| *North America Debt Service — ABL Interest/Fees* | - | - | - | - | (1,261) | - | - | - | (350) | - | - | - | - | - | - | - | (800) | - | (2,411) |
| DDTL Interest/Fees | - | - | (840) | - | (34) | - | - | - | (1,789) | - | - | - | - | - | - | - | - | - | (1,823) |
| Super Priming Term Loan Repayment | - | - | - | - | (10,877) | - | - | - | - | - | - | - | - | - | - | - | - | - | (10,877) |
| DIP Interest/Fees | - | - | - | - | (11,500) | - | - | - | (510) | - | - | - | - | - | - | - | - | - | (12,010) |
| New Exit 1L Term Loan Cash Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,581) | (1,581) |
| New Exit 2L Term Loan Cash Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,238) | (1,238) |
| **TOTAL US DEBT SERVICE** | - | - | (840) | - | (23,672) | - | - | - | (2,650) | - | - | - | - | - | - | - | - | (3,619) | (29,942) |
| *Non-Operating Disbursements — Professional Fees* | (401) | (862) | (3,795) | (1,226) | (4,756) | (1,647) | (1,450) | (1,398) | (7,004) | (373) | (150) | (150) | (150) | (26) | - | - | - | - | (17,103) |
| Utility Deposit | - | - | - | - | (500) | - | - | - | - | 500 | - | - | - | - | - | - | - | - | - |
| Transaction Related Expenses | (187) | - | 2,914 | - | - | - | - | - | (4,580) | - | - | - | - | - | - | - | - | (4,580) | (9,161) |
| **TOTAL NON-OPERATING DISBURSEMENTS** | (588) | (862) | (882) | (1,226) | (5,256) | (1,647) | (1,450) | (1,398) | (11,584) | 127 | (150) | (150) | (150) | (26) | - | - | - | (4,580) | (26,264) |
| **NET CASH FLOW** | (3,931) | (4,554) | (2,850) | (1,478) | (33,587) | (16,007) | (4,852) | (4,706) | (7,110) | (10,766) | 2,481 | (8,336) | 7,118 | (7,543) | 5,299 | (2,314) | 4,958 | (10,672) | (86,038) |
| *Funding — ABL Line* | - | - | - | - | - | - | - | - | (22,350) | - | - | - | - | - | - | - | - | - | (22,350) |
| Cash Collateralization | - | - | - | - | - | (6,808) | - | - | - | - | - | - | - | - | - | - | - | - | (6,808) |
| DDTL Draw | 16 | 4,876 | 9,986 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Draw | - | - | - | - | 55,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 55,000 |
| Exit Financing | - | - | - | - | - | - | - | - | 60,000 | - | - | - | - | - | - | - | - | - | 60,000 |
| **TOTAL LOC DRAWS/(REPAYMENTS)** | 16 | 4,876 | 9,986 | - | 55,000 | (6,808) | - | - | 37,650 | - | - | - | - | - | - | - | - | - | 85,842 |
| US Opening Cash Balance | 11,332 | 7,416 | 7,738 | 14,874 | 13,396 | 34,808 | 11,993 | 7,141 | 2,435 | 32,975 | 22,209 | 24,690 | 16,354 | 23,472 | 15,929 | 21,228 | 18,914 | 23,872 | 13,396 |
| Total Cash Flow | (3,916) | 322 | 7,136 | (1,478) | 21,413 | (22,815) | (4,852) | (4,706) | 30,540 | (10,766) | 2,481 | (8,336) | 7,118 | (7,543) | 5,299 | (2,314) | 4,958 | (10,672) | (196) |
| **US Ending Cash Balance** | 7,416 | 7,738 | 14,874 | 13,396 | 34,808 | 11,993 | 7,141 | 2,435 | 32,975 | 22,209 | 24,690 | 16,354 | 23,472 | 15,929 | 21,228 | 18,914 | 23,872 | 13,200 | 13,200 |
| Illustrative Float | - | - | - | - | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) |
| **Illustrative US Ending Liquidity** | 7,416 | 7,738 | 14,874 | 13,396 | 33,808 | 10,993 | 6,141 | 1,435 | 31,975 | 21,209 | 23,690 | 15,354 | 22,472 | 14,929 | 20,228 | 17,914 | 22,872 | 12,200 | 12,200 |

*Illustrative Restructuring Period* (spanning forecast weeks 1–14)

**<u>Exhibit B</u>**

**DIP Credit Agreement**

FIRST INTERIM ORDER FILING VERSION 10-4-2019

**SENIOR SECURED SUPER-PRIORITY PRIMING**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

among

**DELUXE ENTERTAINMENT SERVICES GROUP INC.,**
as the Borrower,

**DX HOLDINGS LLC,**
as Holdings,

**The Several Lenders from Time to Time Parties Hereto,**

**CREDIT SUISSE AG,**
as Administrative Agent and Collateral Agent,

_____

**Dated as of October [●], 2019**

TABLE OF CONTENTS

Page

ARTICLE 1.    DEFINITIONS ...................................................................................1

1.1    Defined Terms .....................................................................................1
1.2    Other Definitional Provisions ..........................................................32
1.3    Exchange Rates; Currency Equivalents ...........................................33
1.4    Covenants ..........................................................................................33
1.5    Divisions ............................................................................................34

ARTICLE 2.    AMOUNT AND TERMS OF COMMITMENTS ...........................34

2.1    Loans ..................................................................................................34
2.2    Procedure for Loan Borrowing .........................................................34
2.3    [Reserved] ..........................................................................................35
2.4    [Reserved] ..........................................................................................35
2.5    [Reserved] ..........................................................................................35
2.6    [Reserved] ..........................................................................................35
2.7    Defaulting Lenders.............................................................................35
2.8    Interest; Register; Repayment of Loans ...........................................36
2.9    Loan Commitment Payments, etc .....................................................37
2.10   Termination or Reduction of Loan Commitments............................37
2.11   Optional Prepayments ......................................................................37
2.12   Mandatory Prepayments ...................................................................37
2.13   Conversion and Continuation Options..............................................39
2.14   Maximum Number of Eurocurrency Loans ......................................40
2.15   Interest Rates and Payment Dates .....................................................40
2.16   Computation of Interest and Other Payments ..................................40
2.17   Inability to Determine Interest Rate..................................................41
2.18   Pro Rata Treatment and Payments ....................................................42
2.19   Requirements of Law .........................................................................43
2.20   Taxes ..................................................................................................45
2.21   Indemnity ...........................................................................................48
2.22   Illegality .............................................................................................49
2.23   Change of Lending Office .................................................................49
2.24   Replacement of Lenders ...................................................................49

ARTICLE 3.    [RESERVED] .......................................................................................51

ARTICLE 4.    REPRESENTATIONS AND WARRANTIES................................51

4.1    Financial Condition............................................................................51
4.2    No Change ..........................................................................................51
4.3    Existence; Compliance with Law .....................................................51
4.4    Corporate Power; Authorization; Enforceable Obligations .............52
4.5    No Legal Bar .......................................................................................53

NY 77805691v5

4.6 No Material Litigation ........................................................................53
4.7 No Default............................................................................................53
4.8 Ownership of Property; Liens .............................................................53
4.9 Intellectual Property............................................................................53
4.10 Taxes ...................................................................................................54
4.11 Federal Regulations ............................................................................54
4.12 ERISA .................................................................................................54
4.13 Investment Company Act ....................................................................55
4.14 Subsidiaries.........................................................................................55
4.15 Environmental Matters........................................................................55
4.16 Accuracy of Information, etc ..............................................................55
4.17 Security Documents ............................................................................56
4.18 [Reserved]...........................................................................................58
4.19 Anti-Terrorism ....................................................................................58
4.20 Use of Proceeds...................................................................................58
4.21 Labor Matters ......................................................................................58
4.22 Budget .................................................................................................59
4.23 OFAC ...................................................................................................59
4.24 FCPA....................................................................................................59
4.25 Centre of Main Interests......................................................................59
4.26 Initial Budget ......................................................................................59
4.27 Orders ..................................................................................................59
4.28 Bankruptcy Matters.............................................................................60

ARTICLE 5.    CONDITIONS PRECEDENT ...........................................................60

5.1 Conditions to Closing Date and Initial Loans....................................60
5.2 Conditions to Each Borrowing............................................................62

ARTICLE 6.    AFFIRMATIVE COVENANTS........................................................63

6.1 Financial Statements ...........................................................................64
6.2 Certificates; Other Information...........................................................65
6.3 Payment of Taxes................................................................................66
6.4 Conduct of Business and Maintenance of Existence, etc ...................66
6.5 Maintenance of Property; Insurance ...................................................66
6.6 Inspection of Property; Books and Records; Discussions ...................67
6.7 Notices .................................................................................................68
6.8 Additional Collateral, etc ....................................................................68
6.9 Use of Proceeds...................................................................................74
6.10 Post Closing Date................................................................................74
6.11 Credit Ratings .....................................................................................75
6.12 Line of Business..................................................................................75
6.13 Changes in Jurisdictions of Organization; Name................................75
6.14 Mafco Line of Credit ..........................................................................75
6.15 Additional Chapter 11 Reporting........................................................75
6.16 Restructuring Obligations ...................................................................76

6.17     UK Pensions ..........................................................................76
6.18     Lender Meetings .................................................**Error! Bookmark not defined.**
6.19     Centre of Main Interests ....................................................76
6.20     People with Significant Control Regime ............................76
6.21     Sale Process ......................................................**Error! Bookmark not defined.**

ARTICLE 7.          NEGATIVE COVENANTS ..........................................................77

7.1      Financial Covenants ...........................................................77
7.2      Indebtedness .......................................................................77
7.3      Liens ...................................................................................81
7.4      Fundamental Changes .........................................................84
7.5      Dispositions of Property .....................................................84
7.6      Restricted Payments ...........................................................86
7.7      Investments .........................................................................88
7.8      Prepayments, Etc. ...............................................................90
7.9      Transactions with Affiliates ...............................................91
7.10     Sales and Leasebacks .........................................................91
7.11     Changes in Fiscal Periods ...................................................92
7.12     Negative Pledge Clauses .....................................................92
7.13     Clauses Restricting Subsidiary Distributions .....................94
7.14     Limitation on Hedge Agreements .......................................95
7.15     Capital Expenditures ..........................................................95
7.16     Business of Holdings ..........................................................95
7.17     Chapter 11 Cases ................................................................96
7.18     Milestones ...........................................................................96

ARTICLE 8.          EVENTS OF DEFAULT ............................................................96

8.1      Events of Default ................................................................96
8.2      Specified Event of Default ................................................103
8.3      Bankruptcy Code and Other Remedies .............................103

ARTICLE 9.          THE AGENTS ..........................................................................106

9.1      Appointment .....................................................................106
9.2      Delegation of Duties .........................................................106
9.3      Exculpatory Provisions .....................................................106
9.4      Reliance by the Agents .....................................................107
9.5      Notice of Default ...............................................................107
9.6      Non-Reliance on Agents and Other Lenders .....................107
9.7      Indemnification .................................................................108
9.8      Agent in Its Individual Capacity ......................................108
9.9      Successor Agents ..............................................................108
9.10     Authorization to Release Liens and Guarantees ...............109
9.11     Agents May File Proofs of Claim .....................................110
9.12     [Reserved] .........................................................................110

iii

9.13     [Reserved] ...........................................................................................110
9.14     [Reserved] ...........................................................................................110
9.15     [Reserved] ...........................................................................................110
9.16     Appointment of the Collateral Agent as UK Security Trustee ...........................110

ARTICLE 10.     MISCELLANEOUS .............................................................113

10.1     Amendments and Waivers ...............................................................113
10.2     Notices; Electronic Communications .................................................116
10.3     No Waiver; Cumulative Remedies ....................................................118
10.4     Survival ..............................................................................................119
10.5     Payment of Expenses; Indemnification .............................................119
10.6     Successors and Assigns; Participations and Assignments ...............121
10.7     Adjustments; Set off ..........................................................................125
10.8     Counterparts .......................................................................................126
10.9     Severability ........................................................................................126
10.10    Integration ..........................................................................................126
10.11    GOVERNING LAW ...........................................................................126
10.12    Submission to Jurisdiction; Waivers ................................................126
10.13    Acknowledgments...............................................................................127
10.14    Confidentiality ...................................................................................128
10.15    Release of Collateral and Guarantee Obligations; Subordination of Liens .........130
10.16    Accounting Changes ..........................................................................131
10.17    WAIVERS OF JURY TRIAL .............................................................132
10.18    USA PATRIOT ACT and UK "Know Your Customer" Checks ........132
10.19    Interest Rate Limitation ....................................................................132
10.20    Payments Set Aside............................................................................133
10.21    Electronic Execution of Assignments and Certain Other Documents ................133
10.22    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ..........133
10.23    Judgment Currency ............................................................................135

iv

SCHEDULES:

| | |
|---|---|
| 1.1 | Loan Commitments |
| 4.3 | Existence; Compliance with Law |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.6 | Litigation |
| 4.8A | Excepted Property |
| 4.8B | Owned Real Property |
| 4.14 | Subsidiaries |
| 4.17 | UCC Filing Jurisdictions |
| 6.10 | Post Closing Date Matters |
| 7.7 | Existing Investments |
| 7.12 | Existing Negative Pledge Clauses |
| 7.13 | Clauses Restricting Subsidiary Distributions |
| 7.18 | Milestones |

EXHIBITS:

| | |
|---|---|
| A | [Reserved] |
| B | Form of Compliance Certificate |
| C | [Reserved] |
| D | Form of Assignment and Assumption |
| E | [Reserved] |
| F-1 | Form of Exemption Certificate for Non-US Lenders That Are Not Partnerships |
| F-2 | Form of Exemption Certificate for Non-US Participants That Are Not Partnerships |
| F-3 | Form of Exemption Certificate for Non-US Participants That Are Partnerships |
| F-4 | Form of Exemption Certificate for Non-US Lenders That Are Partnerships |
| G | [Reserved] |
| H | Form of Joinder Agreement |
| I | [Reserved] |
| J | Form of Note |

ANNEXES:

| | |
|---|---|
| A | Initial Budget |

NY 77805691v5

SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of October [●], 2019, among DELUXE ENTERTAINMENT SERVICES GROUP INC., a Delaware corporation (the "Borrower") and a debtor and a debtor-in-possession in the Chapter 11 Cases, DX HOLDINGS LLC, a Delaware limited liability company ("Holdings"), as a debtor and a debtor-in-possession in the Chapter 11 Cases, the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders") and CREDIT SUISSE AG, as Administrative Agent and Collateral Agent.

## RECITALS

**WHEREAS**, each of the Borrower, Holdings, Bobco Productions, LLC, DELUXE 3D LLC, Deluxe Creative Services Inc. (F/K/A Deluxe Media Creative Services Inc.), Deluxe (Delaware) Canada Holdings Corporation, Deluxe Digital Cinema Inc., Deluxe Digital Distribution Inc., Deluxe Encore Inc., Deluxe Government Solutions LLC, Deluxe India Holdings 1 LLC, Deluxe India Holdings 2 LLC, Deluxe Laboratories LLC, Deluxe Media Inc. (F/K/A Deluxe Digital Studios, Inc.), Deluxe Media Management Inc., Deluxe Shared Services Inc., Deluxe One LLC (F/K/A Deluxe Mediusone LLC), Global Digital Media Xchange LLC, MediaRecall LLC, SFERA Labs, LLC, SFERA Studios LLC, Softitler Net, Inc., TS Interest Holdco 1 LLC, TS Interest Holdco 2 LLC, TS GP 2 LLC, TS US LLC and Company 3 LLC (collectively, the "Chapter 11 Debtors" and each, a "Chapter 11 Debtor") filed voluntary petitions for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court");

**WHEREAS**, each Chapter 11 Debtor is continuing in the possession of its assets and continuing to operate its business and manage its properties as a debtor and a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has asked the Lenders to provide the Borrower with a senior secured super-priority priming term loan facility in an aggregate principal amount of up to $115,000,000, and the Lenders are willing to do so, subject to the terms and conditions set forth in this Agreement and the Orders; and

**WHEREAS**, the Obligations of the Borrower are guaranteed by the Guarantors and, subject to the Carve-Out, secured by Liens on the Collateral, in each case, as set forth in, and subject to, the Loan Documents and the Orders.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## ARTICLE 1.   DEFINITIONS

1.1    Defined Terms.    As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"2017 Mafco Broadcast Services Loan": an unsecured loan in an aggregate principal amount of $7,000,000 from MacAndrews & Forbes Media Group, Inc., as lender, to Deluxe Broadcast Services Limited d/b/a Media Cloud.

"2018 Mafco Line of Credit Agreement": the Amended and Restated Line of Credit Agreement dated as of April 16, 2018, as amended, between the Borrower and MacAndrews & Forbes Media Group, Inc., as lender, under which $47,750,000 in aggregate principal amount is outstanding as of the Closing Date.

"2018 Mafco Loan": an unsecured loan in an aggregate principal amount of $50,000,000 from MacAndrews & Forbes Media Group, Inc., as lender, to the Borrower.

"2019 Mafco Note": the Senior Secured Promissory Note, dated as of July 18, 2019, by Deluxe One LLC, a Delaware limited liability company, in favor of MacAndrew & Forbes Media Group, Inc., a Delaware corporation, as amended, restated, supplemented, waived or otherwise modified from time to time.

"ABL Designated Banking Services Obligations":  as defined in the Prepetition ABL Intercreditor Agreement.

"ABL Designated Swap Obligations":  as defined in the Prepetition ABL Intercreditor Agreement.

"ABR":  for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect for such day (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Eurocurrency Rate for a one-month interest period beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1%; provided that, for the avoidance of doubt, the Eurocurrency Rate for any day shall be based on the rate appearing on the Screen on such day at approximately 11 A.M., London time, as the Eurocurrency Rate for deposits denominated with a one-month interest period.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the Eurocurrency Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Eurocurrency Rate, as the case may be; provided, further, that the ABR shall not be less than 2.50%.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"Accounting Changes":  as defined in Section 10.16.

"Administrative Agent":  Credit Suisse AG, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors and permitted assigns in such capacity in accordance with Section 9.9.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the

2

direction of the management and policies of such Person, in either case whether by contract or otherwise.

"Agents":  the collective reference to the Collateral Agent and the Administrative Agent[, and solely for purposes of Sections 10.13 and 10.14 and the definitions of Obligations, the Lead Arranger].

"Aggregate Exposure":  with respect to any Lender at any time, an amount equal to the sum of (i) the aggregate then unpaid principal amount of such Lender's Loans and (ii) the aggregate amount of such Lender's undrawn Loan Commitments.

"Aggregate Exposure Percentage":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the total Aggregate Exposures of all Lenders at such time.

"Agreed Purposes": as defined in Section 10.14.

"Agreement": this Senior Secured Super-Priority Priming Debtor-In-Possession Credit Agreement, as amended, supplemented, waived or otherwise modified from time to time.

"Agreement Currency": as defined in Section 10.23.

"Applicable Margin":  for any day, 6.50% with respect to ABR Loans and 7.50% with respect to Eurocurrency Loans.

"Approved Budget": means the Initial Budget, until supplemented by a Budget that has been approved by the Required DIP Lenders in their sole discretion.

"Approved Fund":  as defined in Section 10.6(b).

"Asset Sale":  any Disposition of Property or series of related Dispositions of Property by Holdings or any of its Restricted Subsidiaries not in the ordinary course of business (a) under Section 7.5(p) or (b) not otherwise permitted under Section 7.5.

"Assignee":  as defined in Section 10.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit D or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Bankruptcy Code": as defined in the Recitals.

 "Bankruptcy Court": as defined in the Recitals.

"Beneficial Ownership Certification": a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

NY 77805691v5

"Benefited Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors":  (a) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the board of directors of the general partner of the partnership, or any committee thereof duly authorized to act on behalf of such board or the board or committee of any Person serving a similar function; (c) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof or any Person or Persons serving a similar function; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower":  as defined in the preamble hereto.

"Borrower Materials":  as defined in Section 10.2(c).

"Borrowing Request":  as defined in Section 10.2(c).

"Budget":  a 13-week cash flow forecast (in form and substance consistent with the Initial Budget and acceptable to the Required DIP Lenders) setting forth all line-item and cumulative cash receipts and expenditures (including all necessary and required expenses which the Borrower and its Subsidiaries expect to incur) on a weekly basis for the 13-week period covered thereby.

"Budget Covenant": as defined in Section 7.1(a).

"Business":  the business activities and operations of the Borrower and/or its Subsidiaries on the Closing Date.

"Business Day":  a day (a) other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close and (b) with respect to notices and determinations in connection with, and payments of principal and interest on, Eurocurrency Loans, that is also a day for trading by and between banks in Dollar deposits in the London interbank eurocurrency market.

"Capital Expenditures":  for any period, (a) the additions to property, plant and equipment or computer software (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person, other intangible assets and intellectual property and software development expenditures and other capital expenditures of the Borrower and its consolidated Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP and (b) Capital Lease Obligations incurred by the Borrower and its consolidated Subsidiaries during such period; provided that in any event the term "Capital Expenditures" shall exclude:  (i) [reserved], (ii) [reserved]; (iii) [reserved]; (iv) [reserved]; (v) capital expenditures to the extent they are made with the proceeds of equity contributions (other than in respect of Disqualified Capital Stock) made to the Borrower after the Closing Date

and applied within five calendar days of such contribution; (vi) capitalized interest in respect of operating or capital leases; (vii) the book value of any asset owned to the extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; and (viii) any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP, provided that for the purposes of this definition, "GAAP" shall mean generally accepted accounting principles in the United States as in effect on the Closing Date.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, and any and all equivalent ownership interests in a Person (other than a corporation).

"Carve-Out":  as defined in the Orders.

"Cash Equivalents":

(a)      direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within 18 months from the date of acquisition thereof;

(b)      certificates of deposit, time deposits and eurodollar time deposits with maturities of 18 months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 18 months and overnight bank deposits, in each case, with any United States commercial bank having capital and surplus at the date of acquisition thereof in excess of $250,000,000;

(c)      repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (a) and (b) above entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)      commercial paper having a rating of at least A-1 from S&P or P-1 from Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and maturing within 18 months after the date of acquisition and Indebtedness and preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 18 months or less from the date of acquisition;

(e)      readily marketable direct obligations issued by or directly and fully guaranteed or insured by any state of the United States or any political subdivision thereof

5

having one of the two highest rating categories obtainable from either Moody's or S&P with maturities of 18 months or less from the date of acquisition;

(f)    marketable short-term money market and similar securities having a rating of at least P-1 or A-1 from Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and in each case maturing within 18 months after the date of creation or acquisition thereof;

(g)    investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(h)    (x) such local currencies in those countries in which the Borrower and its Restricted Subsidiaries transact business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (f) or otherwise customarily utilized in countries in which the Borrower and its Restricted Subsidiaries operate for short term cash management purposes; and

(i)    investments in funds which invest substantially all of their assets in Cash Equivalents of the kinds described in clauses (a) through (g) of this definition.

"Cash Management Obligations":  obligations in respect of any overdraft and other liabilities arising from treasury, depository and cash management services, credit or debit card, or any automated clearing house transfers of funds provided to Holdings, the Borrower or any other Loan Party.

"Certificated Security":  as defined in the Guarantee and Collateral Agreement.

"Change of Control":  as defined in Section 8.1(j).

"Chapter 11 Cases":  as defined in the Recitals.

"Chapter 11 Debtors":  as defined in the Recitals.

"Charges":  as defined in Section 10.19.

"Chattel Paper":  as defined in the Guarantee and Collateral Agreement.

"Closing Date": October [●], 2019.

"Code":  the Internal Revenue Code of 1986, as amended from time to time (unless otherwise indicated).

"Collateral":  all the "Collateral" as defined in any Security Document and shall include (without limitation) the Mortgaged Properties.

6

"Collateral Agent":  Credit Suisse AG, in its capacity as collateral agent for the Secured Parties under the Security Documents and any of its successors and permitted assigns in such capacity in accordance with Section 9.9.

"Commodity Exchange Act":  the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Commonly Controlled Plan":  as defined in Section 4.12(b).

"Compliance Certificate":  a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Confidential Information":  as defined in Section 10.14.

"Confirmation Order":  the final order entered by the Bankruptcy Court in the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code, in form and substance acceptable to the Administrative Agent and the Required DIP Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified or subject to the possibility of appeal, in each case, without the prior written consent of the Required DIP Lenders.

"Consolidated Adjusted EBITDA": the Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries calculated in a manner consistent with the Consolidated Adjusted EBITDA set forth in the business plan that was delivered to the Specified Financial Advisor on September 1, 2019.

"Consolidated Total Assets":  at any date, the total assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower for the most recently completed fiscal quarter for which financial statements have been delivered pursuant to Section 6.1 or, prior to the first such delivery, the latest financial statements referred to in Section 4.1.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any written or recorded agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Customer Advances":  the advances and inducements paid by the Borrower or any of the Subsidiaries to any of their customers, whether or not such payments are refundable or recoupable.

"Debtor Relief Laws":  the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

receivership, insolvency, reorganization, administration or similar debtor relief Laws of the Specified Jurisdictions or other applicable jurisdictions from time to time in effect.

"Default":  any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender":  subject to Section 2.7, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect with respect to its funding obligations hereunder, (c) has failed, within seven Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority, or (e) owns Prepetition Loan Obligations and is not a party to the Restructuring Support Agreement.

"Deluxe One": Deluxe One LLC, a Delaware limited liability company.

"Deluxe One Assets": the property and assets of Deluxe One.

"Designated Acquisition": the acquisition consummated pursuant to that certain Asset Purchase Agreement, dated as of August 22, 2019, by and among Company 3 LLC, a Delaware limited liability company, Autumn Post LLC, a Delaware limited liability company, PowerHouse VFX, LLC, a Delaware limited liability company and, solely with respect to Section 11.13 thereof, Deluxe Creative Services Inc., a Delaware corporation, which closed prior to the Closing Date and was 100% financed from the proceeds of the Priming Term Facility Loans.

"Designated Jurisdiction" any country or territory to the extent that the government of such country or territory itself is the subject of any Sanction.

"Disclosure Statement": as defined in Schedule 7.18.

"Disposition":  with respect to any Property, any sale, sale and leaseback, assignment, conveyance, transfer or other disposition thereof, in each case, to the extent the same constitutes a complete sale, sale and leaseback, assignment, conveyance, transfer or other

8

disposition, as applicable.    The terms "<u>Dispose</u>" and "<u>Disposed of</u>" shall have correlative meanings.

"<u>Disqualified Capital Stock</u>":  Capital Stock that (a) requires the payment of any dividends (other than dividends payable solely in shares of Qualified Capital Stock), (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof (other than solely for Qualified Capital Stock), in each case in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation on a fixed date or otherwise (including as the result of a failure to maintain or achieve any financial performance standards) or (c) is convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness, Capital Stock or other assets other than Qualified Capital Stock, in the case of each of clauses (a), (b) and (c), prior to the date that is 91 days after the date in clause (a) of the definition of "Maturity Date" (other than (i) upon payment in full of the Obligations (other than indemnification and other contingent obligations for which no claim has been asserted) or (ii) upon a "change in control"; <u>provided</u> that any payment required pursuant to this clause (ii) is subject to the prior repayment in full of the Obligations (other than indemnification and other contingent obligations for which no claim has been asserted) that are then accrued and payable and the termination of the Loan Commitments); <u>provided</u> <u>further</u>, <u>however</u>, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of Holdings, the Borrower or the Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Holdings, the Borrower or a Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"<u>Disqualified Institution</u>":   business competitors of the Borrower and its Subsidiaries and such business competitors' Affiliates, in each case, identified by Borrower in writing to the Administrative Agent from time to time.  A list of the Disqualified Institutions will be posted by the Administrative Agent on the Platform and available for inspection by all Lenders.

"<u>Dollars</u>" and "<u>$</u>":  dollars in lawful currency of the United States.

"<u>Domestic Subsidiary</u>":  any direct or indirect Restricted Subsidiary that (i) is organized under the laws of any jurisdiction within the United States and (ii) is not a direct or indirect Subsidiary of a Foreign Subsidiary.

"<u>E&Y</u>":  Ernst & Young LLP.

"<u>Effective Date</u>": the effective date of the Plan of Reorganization.

"<u>Eligible Assignee</u>":  any Person that meets the requirements to be an assignee under Section 10.6(b) (subject to receipt of such consents, if any, as may be required for the assignment of the applicable Loan or Loan Commitment to such Person under Section 10.6(b)(i)).

"<u>Environmental Laws</u>":  any and all applicable laws, rules, orders, regulations, statutes, ordinances, codes or decrees (including common law) of any international authority,

foreign government, the Specified Jurisdictions or any state, provincial, local, municipal or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment, natural resources or human health and safety as it relates to Releases of Materials of Environmental Concern, as has been, is now, or at any time hereafter is, in effect.

"Environmental Liability": any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, to the extent arising from or relating to: (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the Release of any Materials of Environmental Concern or (e) any contract, agreement or other consensual arrangement pursuant to which any Environmental Liability under clause (a) through (d) above is assumed or imposed.

"Equity Issuance": any issuance by Holdings or any Restricted Subsidiary of its Capital Stock in a public or private offering.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Base Rate":

(a)    for any Interest Period with respect to a Eurocurrency Loan, the rate per annum equal to (i) the Intercontinental Exchange Benchmark Administration Ltd. LIBOR Rate or the successor thereto if the Intercontinental Exchange Benchmark Administration Ltd. is no longer making a LIBOR rate available ("LIBOR"), as published by Reuters (or such other commercially available source providing quotations of LIBOR as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for deposits in the relevant currency (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or, (ii) if such rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in the relevant currency for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurocurrency Loan being made, continued or converted and with a term equivalent to such Interest Period would be offered by the Administrative Agent's London Branch (or other branch of the Administrative Agent or Affiliate) to major banks in the London or other offshore interbank market for such currency at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b)    for any interest calculation with respect to an ABR Loan on any date, the rate per annum equal to (i) LIBOR, at approximately 11:00 a.m., London time determined on such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the

NY 77805691v5

approximate amount of the ABR Loan being made or maintained and with a term equal to one month would be offered by the Administrative Agent's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

"Eurocurrency Loans":  Loans the rate of interest applicable to which is based upon the Eurocurrency Rate.

"Eurocurrency Rate":  with respect to each day during each Interest Period pertaining to a Eurocurrency Loan, a rate per annum determined for such day in accordance with the formula below; provided, that the Eurocurrency Rate shall, in no event, be less than 1.00%.

Eurocurrency Base Rate
_____

1.00 - Eurocurrency Reserve Requirements

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurocurrency Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Event of Default":  any of the events specified in Section 8.1; provided that any requirement set forth therein for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act":  the Securities Exchange Act of 1934, as amended.

"Excluded Accounts":  as defined in the Guarantee and Collateral Agreement.

"Excluded Collateral":  as defined in Section 6.8(e).

"Excluded Equity Securities":  (i) to the extent applicable law requires that any Subsidiary issue directors' qualifying shares, such shares or nominee or other similar shares, (ii) [reserved], (iii) any Capital Stock of any Subsidiary that is not held directly by a Loan Party, (iv) [reserved] and (v) any other Capital Stock owned on or acquired after the Closing Date (other than Capital Stock in a wholly owned Subsidiary) in accordance with this Agreement but only in the case of this clause (v) if, and to the extent that, and for so long as granting a security interest or other Liens therein would violate applicable law or regulation (in each case, after giving effect to Section 9-406(d), 9-407(a) or 9-408 of the Uniform Commercial Code, if and to the extent applicable and other applicable law) binding on such Capital Stock.

"Excluded Real Property":  (a) any Real Property of a non-Chapter 11 Debtor that is subject to a Lien expressly permitted by Section 7.3(g) (securing Indebtedness incurred pursuant to Section 7.2(c)) (in each case, solely to the extent that the Indebtedness secured by such Lien would prohibit a Lien on such Real Property to secure the Obligations), (b) any Real Property with respect to which, in the reasonable judgment of the Administrative Agent (in

11

consultation with the Required DIP Lenders), the cost of providing a mortgage on such Real Property in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Lenders therefrom, unless a Lien on such Real Property may be granted pursuant to the Orders and (c) any Real Property to the extent providing a mortgage on such Real Property would (i) result in adverse tax consequences to Holdings, the Borrower or any of Holdings' Subsidiaries as reasonably determined by the Borrower and the Required DIP Lenders (provided that any such designation of Real Property as Excluded Real Property shall be subject to the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed)), (ii) violate any applicable Requirement of Law, (iii) be prohibited by any applicable Contractual Obligations (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law) or (iv) give any other party (other than a Loan Party or a wholly-owned Subsidiary) to any contract, agreement, instrument or indenture governing such Real Property the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law).

"Excluded Subsidiary": any Subsidiary that is (a) an Unrestricted Subsidiary, (b) an Immaterial Subsidiary, (c) [reserved], (d) a Foreign Subsidiary that is not organized under the laws of, or incorporated in, a Specified Jurisdiction, (e) [reserved], (f) a Subsidiary that is prohibited by applicable Requirement of Law from guaranteeing the Facilities, or which would require governmental (including regulatory) consent, approval, license or authorization to provide a guarantee unless, such consent, approval, license or authorization has been received, (g) a Subsidiary that is prohibited from guaranteeing the Facilities by any Contractual Obligation in existence on the Closing Date (or, in the case of any newly-acquired Subsidiary, in existence at the time of acquisition thereof but not entered into in contemplation thereof), provided that this clause (g) shall not be applicable if (1) the other party to such Contractual Obligation is a Loan Party or a Restricted Subsidiary of Holdings or (2) consent has been obtained to provide such guarantee or such prohibition is otherwise no longer in effect, (h) a Subsidiary with respect to which a guarantee by it of the Facilities would result in material adverse tax consequences (other than any such consequences contemplated by Section 10.15(d), which shall be governed thereunder) to Holdings, the Borrower or one or more Restricted Subsidiaries, as reasonably determined by the Borrower, (i) a not-for-profit subsidiary, (j) [reserved], (k) a Subsidiary that is not wholly owned directly or indirectly by Holdings and/or one or more of its Restricted Subsidiaries and is expressly prohibited from guaranteeing the Facilities by its organizational documents, including any applicable equityholder agreement, (l) [reserved], or (m) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (with consent of the Required DIP Lenders), the cost or other consequences of guaranteeing the Facilities shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom; provided that (x) if a Subsidiary executes the Guarantee and Collateral Agreement as a "Guarantor," then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Guarantee and Collateral Agreement as a "Guarantor" in accordance with the terms hereof and thereof) and (y) the Borrower may designate in a prior written notice to the Administrative Agent and the Lenders that a Subsidiary does not to constitute an "Excluded Subsidiary"; provided, further that no Chapter 11 Debtor shall be an Excluded Subsidiary.

"Excluded Taxes": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient, (i) net income

Taxes (however denominated), net profits Taxes, franchise Taxes, and branch profits Taxes (and net worth Taxes and capital Taxes imposed in lieu of net income Taxes), in each case, (A) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, if such Recipient is a Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (B) that are Other Connection Taxes, (ii) if such Recipient is a Lender, any U.S. federal withholding Taxes (including backup withholding) imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Loan Commitment or this Agreement pursuant to a law in effect on the date on which (A) such Lender becomes a party to this Agreement (other than pursuant to an assignment request by the Borrower under Section 2.24) or (B) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with Section 2.20(d) and (iv) any withholding Taxes imposed under FATCA.

"Existing Foreign Intercompany Indebtedness": (i) the revolving promissory note by Deluxe UK Holdings Limited and Deluxe Two UK Holdings Limited (subsequently dissolved) in favor of the Borrower, dated as of January 27, 2006, in an aggregate principal amount not to exceed $154,377,935 at any time outstanding and (ii) the amended and restated revolving promissory note by Deluxe Toronto Ltd. in favor of the Borrower, dated as of January 3, 2012 in an aggregate principal amount not to exceed $40,987,000 at any time outstanding.

"Exit First Lien Facility": that certain term loan facility to be provided either by (a) the Lenders, and/or (b) third parties acceptable to the Chapter 11 Debtors and the Requisite Consenting Creditors (each as defined in the Plan of Reorganization), in each case, upon terms and conditions consistent with those set forth in the Restructuring Support Agreement and otherwise acceptable to the Requisite Consenting Creditors.

"Extraordinary Receipts" means receipt by any Loan Party or any of their respective Subsidiaries of Net Cash Proceeds not in the ordinary course of business, including, without limitation, (i) foreign, federal, state or local tax refunds, (ii) pension plan reversions, (iii) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action or litigation, (iv) indemnity payments in respect of any purchase and sale agreement and related documentation and (v) any purchase price adjustment (or similar payments) received in connection with any purchase and sale agreement and related documentation.

"Facility": the facility under this Agreement providing for the Loans.

"Fair Market Value": with respect to any assets, Property (including Capital Stock) or Investment, the fair market value thereof as determined in good faith by the Borrower.

"Fair Value": the amount at which the assets (both tangible and intangible), in their entirety, of Holdings and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions would change hands between a willing buyer and a willing

seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"FATCA":  Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements (together with any law implementing such agreements).

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Final Borrowing Amount": an amount equal to the lesser of (i) $60,000,000 plus the aggregate amount (if any) of Prepetition Super Priming Obligations outstanding as of the Final Borrowing Date and (ii) such amount as is approved for borrowing by the Borrower on the Final Borrowing Date by the Bankruptcy Court in the Final DIP Order.

"Final Borrowing Date": the Business Day that is immediately prior to the Effective Date.

"Final DIP Order":  the final order entered by the Bankruptcy Court in the Chapter 11 Cases approving the Loans and the Facility, in form and substance acceptable to the Administrative Agent and the Required DIP Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified or subject to the possibility of appeal, in each case, without the prior written consent of the Required DIP Lenders.

"Foreign Guarantors":  the collective reference to the UK Guarantors and any other Foreign Subsidiary that may from time to time guarantee all or any part of the Obligations.

"Foreign Subsidiary":  any Restricted Subsidiary of Holdings that is not a Domestic Subsidiary.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Global Intercompany Note": an intercompany note in form and substance reasonably acceptable to the Administrative Agent and the Borrower.

NY 77805691v5

"Governmental Authority":  any nation or government, any state, province or other political subdivision thereof and any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and, as to any Lender, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners and any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee and Collateral Agreement":  the Guarantee and Collateral Agreement, dated as of the Closing Date, among Holdings, the Borrower and each Subsidiary Guarantor, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) pursuant to which the guaranteeing person has issued a guarantee, reimbursement, counterindemnity or similar obligation, in either case guaranteeing or by which such Person becomes contingently liable for any Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets or any Investment permitted under this Agreement.  The amount of any Guarantee Obligation of any guaranteeing Person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case, the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such Person in good faith.

"Guarantors":  the collective reference to Holdings and the Subsidiary Guarantors.

"Guaranty":  collectively, the guaranty made by the Guarantors under the Guarantee and Collateral Agreement in favor of the Secured Parties, together with each other guaranty delivered pursuant to Section 6.8.

NY 77805691v5

"Hedge Agreements":  all agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, entered into by Holdings or any Restricted Subsidiary, provided that no phantom stock, deferred compensation or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any of its Subsidiaries shall be a Hedge Agreement.

"Holdings":  as defined in the introductory paragraph of this Agreement.

"Immaterial Subsidiary":  on any date, any Restricted Subsidiary of the Borrower (other than a Chapter 11 Debtor) designated as such by the Borrower, but only to the extent that such Restricted Subsidiary has less than 5% of Consolidated Total Assets and 5% of annual consolidated revenues of the Borrower and its Restricted Subsidiaries as reflected on the most recent financial statements delivered pursuant to Section 6.1 prior to such date or, prior to the first such delivery, the latest financial statements referred to in Section 4.1; provided that at no time shall all Immaterial Subsidiaries have in the aggregate Consolidated Total Assets or annual consolidated revenues (as reflected on the most recent financial statements delivered pursuant to Section 6.1 prior to such time or, prior to the first such delivery, the latest financial statements referred to in Section 4.1) in excess of 7.5% of Consolidated Total Assets or annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries.

"Indebtedness" of any Person:  without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by (i) bonds (excluding surety bonds), debentures, notes or similar instruments, and (ii) surety bonds, (c) all obligations of such Person for the deferred purchase price of Property or services already received, (d) all Guarantee Obligations by such Person of Indebtedness of others, (e) all Capital Lease Obligations of such Person, (f) [reserved], (g) the principal component of all obligations, contingent or otherwise, of such Person (i) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instrument in respect of which a back-to-back letter of credit has been issued under or permitted by this Agreement) and (ii) in respect of bankers' acceptances and (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Capital Stock of such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; provided that Indebtedness shall not include (A) trade and other payables, accrued expenses and liabilities and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue arising in the ordinary course of business, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset, (D)  earn-out and other contingent obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP and (E) obligations owing under any Hedge Agreements or in respect of Cash Management Obligations. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the

instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof (or provides for reimbursement to such Person).

"Indebtedness for Borrowed Money": (a) to the extent the following would be reflected on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries prepared in accordance with GAAP, the principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries with respect to (i) borrowed money, evidenced by debt securities, debentures, acceptances, notes or other similar instruments and (ii) Capital Lease Obligations, (b) reimbursement obligations for letters of credit and financial guarantees (without duplication) (other than ordinary course of business contingent reimbursement obligations) and (c) Hedge Agreements. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of Holdings, the Borrower or any Subsidiary in respect of any Hedge Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Holdings, the Borrower or such Subsidiary would be required to pay if such Hedge Agreement were terminated at such time.

"Indemnified Liabilities": as defined in Section 10.5.

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the immediately preceding clause (a), Other Taxes.

"Indemnitee": as defined in Section 10.5.

"Initial Borrowing Amount": an amount equal to the lesser of (a) $55,000,000; provided that, to the extent that the Interim DIP Order does not permit all Prepetition Senior Priming Obligations (including any premiums, including any "make-whole" premiums) to be repaid, satisfied and discharged in full with proceeds of the Loans on the Closing Date, such aggregate principal amount shall be reduced by the amount of such Prepetition Senior Priming Obligations (including any premiums, including any "make-whole" premiums) that are not permitted to be so repaid, satisfied and discharged on the Closing Date and (b) the amount approved for borrowing by the Borrower on the Closing Date by the Bankruptcy Court in the Interim DIP Order.

"Initial Budget": a Budget for the 13-week period beginning as of the Monday of the week immediately prior to the week in which the Closing Date occurs and attached as Annex A hereto, as the same may be amended, supplemented or modified from time to time with the prior consent of the Required DIP Lenders.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Instrument": as defined in the Guarantee and Collateral Agreement.

NY 77805691v5

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under the Specified Jurisdictions, multinational or foreign laws or otherwise, including copyrights, copyright licenses, domain names, patents, patent licenses, industrial designs, trademarks, trademark licenses, trade names, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreements":  collectively, the Prepetition ABL Intercreditor Agreement, the Prepetition Term Loan Intercreditor Agreement and the Prepetition Super Priming Term Loan Intercreditor Agreement.

"Interest Payment Date":  with respect to any Loan (a) the last Business Day of each calendar month to occur while such Loan is outstanding and the final maturity date of such Loan and (b) the date of any repayment or prepayment made in respect of such Loan.

"Interest Period":  as to any Eurocurrency Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurocurrency Loan and ending one, two, three or six months (or such other period agreed to by all such Lenders and the Administrative Agent or such period shorter than one month agreed to by the Administrative Agent) thereafter, as selected by the Borrower in its notice of borrowing or notice of continuation or conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurocurrency Loan and ending one, two, three or six or (if agreed to by all Lenders) twelve months (or such other period agreed to by all such Lenders and the Administrative Agent or such period shorter than one month agreed to by the Administrative Agent) thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 1:00 P.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)    any Interest Period that would otherwise extend beyond the date in clause (a) of the definition of "Maturity Date" shall end on such date; and

(iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Interim DIP Order":  that certain Interim Order [●], which Interim DIP Order shall be in form and substance acceptable to the Administrative Agent and the Required DIP

18

Lenders and shall be in full force and effect, and shall not, subject to entry of the Final DIP Order, be reversed, vacated, stayed, amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders.

"Investments":  as defined in Section 7.7.

"Joinder Agreement":   an agreement substantially in the form of Exhibit H or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Judgment Currency": as defined in Section 10.25.

"Junior Financing":  as defined in Section 7.8(a).

"Junior Financing Documentation":   any documentation governing any Junior Financing.

["Lead Arranger":]

"Lender Advisors":  as defined in Section 6.9(a).

"Lenders":  as defined in the preamble hereto.

"Lien":    any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan Commitment":  as to any Lender, the obligation of such Lender, to make Loans on the Closing Date and on the Final Borrowing Date in an aggregate principal amount not to exceed the amount set forth under the heading "Loan Commitment" opposite such Lender's name on Schedule 1.1 or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed or reduced from time to time pursuant to the terms hereof.  The aggregate amount of the Loan Commitments on the Closing Date is $115,000,000.

"Loan Documents":   the collective reference to this Agreement, the Security Documents, the Notes (if any), and any other agreement, document or instrument entered into by any Loan Party in connection herewith or therewith, as the case may be and identified therein as a Loan Document, together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"Loan Parties":  Holdings, the Borrower and each Subsidiary Guarantor.

"Loans": as defined in Section 2.1(a).

"Mafco": MacAndrews & Forbes Incorporated.

"Mafco Indebtedness": Indebtedness under (i) the 2018 Mafco Line of Credit Agreement, (ii) the 2018 Mafco Loan and (iii) the 2017 Mafco Broadcast Services Loan.

"Management Conference Call": as defined in Section 6.15(e).

"Material Adverse Effect":  a material adverse effect on (a) the business, operations, assets, financial condition or results of operations of Holdings and its Restricted Subsidiaries, taken as a whole, in each case, other than as occurs as a result of events leading up to and following a comprehensive delevering transaction, or (b) the material rights and remedies available to the Administrative Agent and the Lenders, taken as a whole, or on the ability of the Loan Parties, taken as a whole, to perform their payment obligations to the Lenders, in each case, under the Loan Documents, in each case, other than events leading up to, related to, or resulting from the commencement or continuation of a proceeding under chapter 11 of the Bankruptcy Code and the commencement or continuation of the Chapter 11 Cases, the events that customarily occur following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the consummation of the transactions contemplated by the "first day" pleadings or the Plan of Reorganization.

"Material Real Property":  any Real Property located in the Specified Jurisdictions and owned in fee by a Loan Party on the Closing Date having an estimated Fair Market Value exceeding $1,500,000 and any after-acquired Real Property located in the Specified Jurisdictions owned in fee by a Loan Party having a gross purchase price exceeding $1,500,000 at the time of acquisition.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity and any other substances that are defined as hazardous or toxic under any Environmental Law, that are regulated pursuant to any Environmental Law.

"Maturity Date": the earliest of: (a) the first anniversary of the Closing Date; (b) the date that is thirty-five (35) calendar days after the Petition Date if the Final DIP Order has not been entered by the Bankruptcy Court on or before such date; (c) the date of consummation of any sale of all or substantially all of the assets of the Chapter 11 Debtors pursuant to section 363 of the Bankruptcy Code; (d) the date of acceleration of the Loans and the termination of the Loan Commitments upon the occurrence of an Event of Default pursuant to the terms of this Agreement; and (e) the Effective Date.

"Maximum Rate":  as defined in Section 10.19.

"Milestones": as defined in Section 7.18.

"Moody's": Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mortgage":  any mortgage, deed of trust, hypothec, assignment of leases and rents or other similar document delivered on or after the Closing Date by any Loan Party in favor of, or for the benefit of, the Collateral Agent for the benefit of the Secured Parties, with respect

20

to Mortgaged Properties, each in form and substance reasonably acceptable to the Administrative Agent and the Borrower (taking into account the law of the jurisdiction in which such mortgage, deed of trust, hypothec or similar document is to be recorded), as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Mortgaged Properties</u>":  all Material Real Property owned by a Loan Party that is, or is required to be, subject to a Mortgage pursuant to the terms of this Agreement.

"<u>Multiemployer Plan</u>":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Flows</u>": for any period, an amount equal to (x) total receipts for such period <u>less</u> (y) total disbursements for such period (excluding disbursements in respect of regularly scheduled interest and amortization on Indebtedness for Borrowed Money and any professional fees), in each case, for all such categories as set forth in the Approved Budget.

"<u>Net Cash Proceeds</u>": (a) in connection with any Asset Sale, any Recovery Event or any Extraordinary Receipts occurring after the Closing Date, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), in each case, received by any Loan Party, net of (i) (x) selling expenses, including, attorneys' fees, accountants' fees, investment banking fees, brokers' fees and consulting fees, and (y) other customary fees and expenses actually incurred by any Loan Party in connection therewith; (ii) taxes paid or estimated by the Borrower in good faith (in consultation with the Required DIP Lenders) to be payable by any Loan Party as a result thereof; and (iii) the <u>pro rata</u> portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or any Domestic Subsidiary as a result thereof; and (b) in connection with any Equity Issuance or capital contributions or issuance or sale of debt securities or instruments or the incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"<u>Non-Defaulting Lender</u>":  any Lender other than a Defaulting Lender.

"<u>Non-Excluded Subsidiary</u>":  any Restricted Subsidiary of Holdings or the Borrower which is not an Excluded Subsidiary.

"<u>Non-Guarantor Subsidiary</u>":  any Restricted Subsidiary of Holdings (other than the Borrower) or the Borrower, in each case, which is not a Subsidiary Guarantor.

"<u>Non-US Lender</u>":  as defined in Section 2.20(d).

"<u>Note</u>":  any promissory note evidencing any Loan, which promissory note shall be in the form of Exhibit J, or such other form as agreed upon by the Administrative Agent and the Borrower.

21

"<u>Obligations</u>":  the unpaid principal of, premium on and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of the Chapter 11 Cases or any other petition in bankruptcy, or the commencement of any other insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding) the Loans and all other obligations and liabilities of the Borrower to the Administrative Agent, the Collateral Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"<u>OFAC</u>":  the Office of Foreign Assets Control of the United States Department of the Treasury.

"<u>Orders</u>":  the Interim DIP Order and/or the Final DIP Order, as the context requires.

"<u>Other Affiliate</u>":  the Sponsor and any Affiliate of the Sponsor, other than Holdings, any Subsidiary of Holdings and any natural person.

"<u>Other Connection Taxes</u>": with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>":  any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.24).

"<u>Parent Company</u>":  any direct or indirect parent of Holdings.

"<u>Payment Letter</u>": that certain letter, dated October 2, 2019, executed by the Borrower and the Commitment Parties (as defined therein).

"<u>Participant</u>":  as defined in Section 10.6(c)(i).

"<u>Participant Register</u>":  as defined in Section 10.6(c)(iii).

"<u>PBGC</u>":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

22

"Permitted Business":  the Business and any other services, activities or businesses incidental or related, similar or complementary to any line of business engaged in by Holdings and/or its Subsidiaries as of the Closing Date or any business activity that is a reasonable extension, development or expansion thereof or ancillary thereto.

"Permitted Investors":  the collective reference to the Sponsor and any Affiliates of any Person included in the definition of Sponsor herein (but excluding any operating portfolio companies of the foregoing), the members of management of any Parent Company, Holdings or any of its Subsidiaries that have ownership interests in any Parent Company or Holdings as of the Closing Date, and the directors of Holdings or any of its Subsidiaries or any Parent Company as of the Closing Date.

"Permitted Refinancing":  with respect to any Person, refinancings, replacements, modifications, refundings, renewals or extensions of Indebtedness (or of a prior Permitted Refinancing of Indebtedness); provided that (a) there is no increase in the principal amount (or accreted value) thereof (except by an amount equal to accrued interest, fees, discounts, redemption and tender premiums, penalties and expenses and by an amount equal to any existing commitment unutilized thereunder and as otherwise permitted under the applicable clause of Section 7.2), (b) the weighted average life to maturity of such Indebtedness (other than a revolving credit facility that does not include scheduled commitment reductions prior to maturity) is greater than or equal to the shorter of (i) the weighted average life to maturity of the Indebtedness being refinanced and (ii) the remaining weighted average life to maturity of the date in clause (a) of the definition of "Maturity Date" (other than a shorter weighted average life to maturity for customary bridge financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for a shorter weighted average life to maturity than the shorter of (i) the weighted average life to maturity of the Indebtedness being refinanced and (ii) the remaining weighted average life to maturity of the date in clause (a) of the definition of "Maturity Date"), (c) immediately after giving effect to such refinancing, replacement, refunding, renewal or extension, no Event of Default shall be continuing and (d) neither Holdings nor any Restricted Subsidiary shall be an obligor or guarantor of any such refinancings, replacements, modifications, refundings, renewals or extensions except to the extent that such Person was (or, would have been required to be) such an obligor or guarantor in respect of the applicable Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or such Person is permitted to incur such Indebtedness or a Guarantee thereof at the time pursuant to Section 1.01(e) or otherwise.

"Permitted Transferees":  with respect to any Person that is a natural person (and any Permitted Transferee of such Person), (a) such Person's immediate family, including his or her spouse, ex-spouse, children, step-children and their respective lineal descendants, (b) the estate of Ronald O. Perelman and (c) any other trust or other legal entity the primary beneficiary of which is such Person's immediate family, including his or her spouse, ex-spouse, children, step-children or their respective lineal descendants and which is controlled by such Person.

"Permitted Variance": as defined in Section 7.1.

NY 77805691v5

"Person":    an individual, partnership, corporation, limited liability company, unlimited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date": October [3], 2019.

"Plan":  at a particular time, any employee benefit plan as defined in Section 3(3) of ERISA and in respect of which Holdings or any of its Restricted Subsidiaries is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, including a Multiemployer Plan.

"Plan of Reorganization":  a plan of reorganization under the Chapter 11 Cases (including all related schedules, supplements, exhibits and orders, as applicable), which shall be consistent with the Restructuring Support Agreement and otherwise shall be in form and substance satisfactory to the Required DIP Lenders.

"Platform":  IntraLinks or another similar electronic system and/or the SEC's website at www.sec.gov or another relevant website, if any, to which each Lender and the Administrative Agent has access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

"Pledged Securities":  as defined in the Guarantee and Collateral Agreement.

"Preferred Stock": any Capital Stock with preferential right of payment of dividends or upon liquidation, dissolution, winding up or some other event.

"Prepetition Agent":  Credit Suisse AG, as "Administrative Agent" under, and as such term is defined in, the Prepetition Credit Agreements.

"Prepetition ABL Credit Agreement":  that certain the Third Amended and Restated Asset-Based Revolving Credit Agreement dated as of July 31, 2019, among the Borrower, the other borrowers party thereto, Holdings, the lenders from time to time party thereto, Credit Suisse AG, as administrative agent, and Bank of America, N.A., as collateral agent, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition ABL Facility Collateral": the "ABL Facility First Priority Collateral" as defined in the Prepetition ABL Intercreditor Agreement.

"Prepetition ABL Facility Loan Documents":  the "Loan Documents" (or any similar term) under the Prepetition ABL Credit Agreement.

"Prepetition ABL Facility Loans":  the "Loans" under the Prepetition ABL Credit Agreement.

"Prepetition ABL Intercreditor Agreement":  the Third Amended and Restated ABL Intercreditor Agreement, dated as of September 19, 2019, among the Borrower, the other Loan Parties, the collateral agent under the Prepetition ABL Facility Loan Documents, the collateral agent under the Term Facility Loan Documents, the collateral agent under the

24

Prepetition Priming Term Facility Loan Documents and the collateral agent under the Prepetition Super Priming Term Facility Loan Documents, as amended on the Closing Date and as may be further amended, amended and restated, supplemented, waived or otherwise modified from time to time.

"Prepetition ABL Obligations": all "Obligations", as such term is defined in the Prepetition ABL Credit Agreement.

"Prepetition Canadian Facility Credit Agreement": the Credit Agreement, dated as of December 7, 2017, among Deluxe Toronto Ltd., as the Borrower, the Borrower, as Deluxe, Deluxe (Delaware) Canada Holdings Corporation, as Parent, the several lenders from time to time parties thereto, and Wilmington Trust, National Association, as Administrative Agent and Collateral Agent, as the same has been amended, amended and restated, supplemented or otherwise modified from time to time (including as amended on October 3, 2019).

"Prepetition Credit Agreements": collectively, the Prepetition Term Credit Agreement, the Prepetition Priming Credit Agreement, the Prepetition Super Priming Credit Agreement and the Prepetition ABL Credit Agreement (and, individually, each a "Prepetition Credit Agreement").

"Prepetition Lenders": collectively, all "Lenders", as such term is defined in each of the Prepetition Credit Agreements.

"Prepetition Loan Documents": collectively, the "Loan Documents" as such term is defined in each of the Prepetition Credit Agreements.

"Prepetition Loan Obligations": collectively, all Prepetition Term Obligations, all Prepetition Priming Obligations, all Prepetition Super Priming Obligations and all Prepetition ABL Obligations.

"Prepetition Priming Credit Agreement": that certain Senior Secured Priming Delayed Draw Term Loan Credit Agreement dated as of July 31, 2019, among the Borrower, Holdings, the lenders from time to time party thereto, and Credit Suisse AG, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Priming Obligations:" all "Obligations", as such term is defined in the Prepetition Priming Credit Agreement.

"Prepetition Priming Term Loan Intercreditor Agreement": the Amended and Restated Priming Term Loan Intercreditor Agreement, dated as of September 19, 2019, among the Borrower, the other Loan Parties, the collateral agent under the Term Facility Loan Documents, the collateral agent under the Priming Term Facility Loan Documents and the collateral agent under the Super Priming Term Facility Loan Documents, as amended, supplemented, waived or otherwise modified from time to time.

NY 77805691v5

"Prepetition Secured Parties":   collectively, Prepetition Agent and the other Persons constituting "Secured Parties", as such term is defined in each of the Prepetition Credit Agreements.

"Prepetition Super Priming Credit Agreement":  that certain Senior Secured Super Priming Term Loan Credit Agreement dated as of September 19, 2019, among the Borrower, Holdings, the lenders from time to time party thereto, and Credit Suisse AG, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Super Priming Obligations":  all "Obligations", as such term is defined in the Prepetition Super Priming Credit Agreement.

"Prepetition Super Priming Term Loan Intercreditor Agreement":  the Priming Term Loan Intercreditor Agreement, dated as of September 19, 2019, among the Borrower, the other Loan Parties, the collateral agent under the Term Facility Loan Documents, the collateral agent under the Priming Term Facility Loan Documents and the collateral agent under the Super Priming Term Facility Loan Documents, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Prepetition Term Credit Agreement":  that certain Fifth Amended and Restated Credit Agreement, dated as of July 31, 2019, among the Borrower, Holdings, the several banks and other financial institutions or entities from time to time parties thereto as lenders and agents and Credit Suisse AG, as administrative agent and collateral agent thereunder, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Term Loan Intercreditor Agreement":  the Amended and Restated Term Loan Intercreditor Agreement, dated as of September 19, 2019, among the Borrower, the other Loan Parties, the collateral agent under the Term Facility Loan Documents, the collateral agent under the Priming Term Facility Loan Documents and the collateral agent under the Super Priming Term Facility Loan Documents, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Term Obligations":  all "Obligations", as such term is defined in the Prepetition Term Credit Agreement.

"Prime Rate":  the rate of interest per annum determined from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City and notified to the Borrower.

"Property":   any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"Public Information":  as defined in Section 10.2(c).

"Public Lender":  as defined in Section 10.2(c).

26

"Qualified Capital Stock":  any Capital Stock that is not Disqualified Capital Stock.

"Real Property":  collectively, all right, title and interest of Holdings or any of its Restricted Subsidiaries in and to any and all parcels of real property owned or leased by Holdings or any such Restricted Subsidiary together with all improvements and appurtenant fixtures, easements and other property and rights incidental to the ownership, lease or operation thereof.

"Recipient":  (a) any Lender, (b) the Administrative Agent and (c) any other Agent, as applicable.

"Recovery Event":  any settlement of or payment in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any asset of Holdings or any Restricted Subsidiary, in an amount for each such event exceeding $500,000.

"Register":  as defined in Section 10.6(b)(iv).

"Regulation":  as defined in Section 4.25.

"Related Parties":  with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Related Persons":  as defined in Section 10.5.

"Release":  any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure or facility.

"Remedies Notice Period":  as defined in the applicable Order.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Replaced Lender":  as defined in Section 2.24.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived by the PBGC in accordance with the regulations thereunder.

"Representatives":  as defined in Section 10.14.

"Required DIP Lenders":  at any time, the holders of more than 50% of the sum of (i) the aggregate unpaid principal amount of the Loans and (ii) the aggregate amount of the undrawn Loan Commitments; provided, however, that determinations of the "Required DIP Lenders" shall exclude any Loan Commitments or Loans held by Defaulting Lenders.

"<u>Requirement of Law</u>":  as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"<u>Responsible Officer</u>":  the chairman, chief executive officer, president, chief administrative officer, chief financial officer (or similar title), chief accounting officer, controller or treasurer (or similar title), and, with respect to financial matters, the chief financial officer (or similar title), chief accounting officer, controller or treasurer (or similar title); any reference herein or in any other Loan Document to a Responsible Officer shall be deemed to refer to a Responsible Officer of the Borrower, unless otherwise specified.

"<u>Restricted Indebtedness</u>": Indebtedness of Holdings, the Borrower or any Restricted Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 7.8(a), (c) or (d).

"<u>Restricted Payments</u>":  as defined in Section 7.6.

"<u>Restricted Subsidiary</u>":  any Subsidiary of Holdings which is not an Unrestricted Subsidiary.

"<u>Restructuring Support Agreement</u>":  that certain Restructuring Support Agreement (including all exhibits, schedules and attachments hereto), dated as of August 30, 2019 (as amended by that certain Amendment No. 1 to Restructuring Support Agreement, dated as of October 2, 2019, and as may be further amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof), by and among the Chapter 11 Debtors, the Consenting Creditors (as defined therein), and Mafco.

"<u>S&P</u>":  S&P Global Ratings, or any successor to the rating agency business thereof.

"<u>Sanction(s)</u>": any international economic sanction administered or enforced by OFAC, the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"<u>Screen</u>":  the relevant display page for the Eurocurrency Base Rate (as reasonably determined by the Administrative Agent) on the Bloomberg Information Service or any other such service provider; <u>provided</u> that if the Administrative Agent determines that there is no such relevant display page or otherwise in Bloomberg or other such service provider for the Eurocurrency Base Rate, "Screen" means such other comparable publicly available service for displaying the Eurocurrency Base Rate (as reasonably determined by the Administrative Agent).

"<u>SEC</u>":  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"<u>Secured Obligations</u>":  the Obligations.

NY 77805691v5

"Secured Parties":   collectively, the Lenders, the Administrative Agent, the Collateral Agent, any other holder from time to time of any of the Secured Obligations and, in each case, their respective successors and permitted assigns.

"Security Documents":  the collective reference to the Orders, the Guarantee and Collateral Agreement, the UK Security Documents and all other security documents (including any Mortgages) hereafter delivered to the Administrative Agent or the Collateral Agent granting or purporting to grant a Lien on any Property of any Loan Party to secure the Secured Obligations.

"Single Employer Plan":  any Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and in respect of which Holdings or any of its Restricted Subsidiaries is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Specified Financial Advisor": FTI Consulting, as financial advisor to certain Lenders.

"Specified Jurisdictions":  the United States and England and Wales.

"Sponsor":   (a) Mafco, (b) each of Mafco's direct and indirect subsidiaries and Affiliates, (c) Ronald O. Perelman, (d) any of the directors or executive officers of Mafco or (e) any of their respective Permitted Transferees.

"Spot Rate":  with respect to any currency, the rate determined by the Administrative Agent to be the rate quoted by the Administrative Agent as the spot rate for the purchase by the Administrative Agent of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by it if it does not have as of the date of determination a spot buying rate for any such currency.

"Stated Maturity":  with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the re-purchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"Stroock": as defined in Section 6.9(a).

"Subject Disposition": as defined in Section 6.20.

"Subsidiary":   as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership or other entity are at the time owned, or the management of which is

otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person; <u>provided</u> that any joint venture that is not required to be consolidated with the Borrower and its consolidated Subsidiaries in accordance with GAAP shall not be deemed to be a "Subsidiary" for purposes hereof.  Unless otherwise qualified, all references to a "<u>Subsidiary</u>" or to "<u>Subsidiaries</u>" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of Holdings.

"<u>Subsidiary Guarantors</u>":    (a) each Subsidiary of Holdings (other than any Excluded Subsidiary and the Borrower) and (b) any other Subsidiary of Holdings (other than the Borrower) that is a party to the Guarantee and Collateral Agreement (including, for the avoidance of doubt, each Foreign Guarantor).

"<u>Synthetic Purchase Agreement</u>": any swap, derivative or other agreement or combination of agreements pursuant to which Holdings, the Borrower or any Restricted Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third party from a person other than Holdings, the Borrower or any Restricted Subsidiary of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness; <u>provided</u> that no phantom stock or similar plan providing for payments only to current or former directors, officers or employees of Holdings, the Borrower or the Restricted Subsidiaries (or to their heirs or estates) shall be deemed to be a Synthetic Purchase Agreement.

"<u>Tax Group</u>":  a consolidated, affiliated, unitary, fiscal unity or similar tax group.

"<u>Tax Payments</u>":  payments in cash by the Borrower or any of its Subsidiaries (or by Holdings on behalf of the Borrower or any of its Subsidiaries) to Mafco or any of its subsidiaries (other than Holdings or any of its subsidiaries) in respect of Taxes pursuant to the Tax Sharing Agreement.

"<u>Tax Sharing Agreement</u>":  (i) the Tax Sharing Agreement dated as of January 3, 2012, among Mafco, Holdings, the Borrower and certain of the Subsidiaries, and any amendments, modifications or supplements thereof, or (ii) an agreement substantially similar to the agreement described in clause (i) that is entered into by Holdings, the Borrower, certain of the Subsidiaries and a party other than Mafco that, as a result of an event other than a Change in Control, becomes the parent of a Tax Group of which Holdings, the Borrower and certain of the Subsidiaries are members.

"<u>Taxes</u>":    all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Transactions</u>":  collectively, (a) the execution, delivery and performance by the Loan Parties and their applicable Subsidiaries of the Loan Documents to which they are or are intended to be a party, (b) the borrowing of Loans and the use of proceeds thereof, (c) the Chapter 11 Cases, (d) the consummation of all other transactions contemplated by or relating to

any of the foregoing and (e) the payment of the fees, costs, disbursements and expenses incurred in connection with the consummation of the foregoing (the "Transaction Costs").

"Transaction Costs": as defined in "Transactions."

"Type":  as to any Loan, its nature as an ABR Loan or Eurocurrency Loan.

"UCC" or "Uniform Commercial Code": the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the creation or perfection of security interests.

"UK Debenture":  the English law governed debenture  to be entered into pursuant to Section 6.10 granted by each UK Guarantor in favor of the Collateral Agent.

"UK Guarantor":  any Subsidiary Guarantor that is incorporated in England and Wales.

"UK Legal Reservations": in the case of any UK Guarantor or any UK Security Document: (i) the principle that certain remedies may be granted or refused at the discretion of the court, the limitation of enforcement by laws relating to bankruptcy, insolvency, liquidation, reorganization, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and secured creditors; (ii) the time barring of claims under applicable limitation laws and defenses of acquiescence, set off or counterclaim and the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of stamp duty may be void; (iii) the principle that in certain circumstances Collateral granted by way of fixed charge may be recharacterized as a floating charge or that Collateral purported to be constituted as an assignment may be recharacterized as a charge; (iv) the principle that additional interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void; (v) the principle that a court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant; (vi) the principle that the creation or purported creation of Collateral over any contract or agreement which is subject to a prohibition on transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach of the contract or agreement over which Collateral has purportedly been created; (vii) similar principles, rights and defenses under the laws of any relevant jurisdiction; (viii) the making or the procuring of the appropriate registrations, filing, endorsements, notarization, stampings and/or notifications of the Security Documents and/or the Collateral created thereunder and (ix) any other matters which are set out as qualifications or reservations (however described) as to matters of law (but not of fact) in any legal opinion delivered to the Administrative Agent pursuant to any Loan Document.¶

"UK Perfection Requirement": any registration, filing, endorsement, notarization, stamping, notification or other action or step to be made or procured in any jurisdiction in order to create, perfect or enforce the Lien created by a Security Document and/or to achieve the relevant priority for the Lien created thereunder.

"UK Security Documents": the UK Debenture, the UK Share Mortgage and all other security documents governed by English law hereafter delivered to the Collateral Agent purporting to grant a Lien on any Property of any Loan Party to secure the Secured Obligations.

31

"UK Share Mortgage": the English law governed equitable share mortgage to be entered into pursuant to Section 6.10 granted by the Borrower in favor of the Collateral Agent.

"United Kingdom": the United Kingdom of Great Britain and Northern Ireland.

"United States":  the United States of America.

"Unrestricted Subsidiary":  each of the following Persons: Centro Digital Pictures (Shanghai) Limited, Centro Digital Pictures Limited, Centro TV Limited, Laurels Limited, IT Holding S.r.l., Digital Roma S.r.l., Deluxe Asia Holdings Limited, Deluxe Laboratories Limited and Deluxe Media Technologies Limited.

"Updated Budget": as defined in Section 6.15.

"US Lender":  as defined in Section 2.20(e).

"USA Patriot Act":  as defined in Section 10.18.

"Variance Report Date": as defined in Section 6.15.

"Variance Report": as defined in Section 6.15.

1.2    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to Holdings and its Subsidiaries or the Borrower and its Subsidiaries, as the case may be, not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," and (iii) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Annex, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The term "license" shall include sub-license.  The term "documents" includes any and all documents whether in physical or electronic form.

(e)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)      Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

1.3      Exchange Rates; Currency Equivalents.  If any basket is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates.

1.4      Covenants.  For purposes of determining compliance with Section 7, in the event that an item or event meets the criteria of more than one of the categories described in a particular covenant contained in Section 7, the Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item or event (or any portion thereof) and may include the amount and type of such item or event in one or more of the relevant clauses or subclauses, in each case, within such covenant.  If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of calculation had been the applicable rate for the entire period (taking into account the net effect of any Hedge Agreements applicable to such Indebtedness).  Furthermore, (A) for purposes of Section 7.1, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on the applicable Spot Rate, in the case of such Indebtedness incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness), on the date that such Indebtedness was incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the applicable Spot Rate on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of accrued interest, fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing, (B) for purposes of Sections 7.3, 7.5, 7.6 and 7.7, the amount of any Liens, Dispositions, Restricted Payments and Investments, as applicable, denominated in any currency other than Dollars shall be calculated based on the applicable Spot Rate and (C) for purposes of any calculation under Sections 7.1 and 7.3, if the Borrower elects to give pro forma effect in such calculation to the entire committed amount of any proposed Indebtedness, whether or not then drawn, such committed amount may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with Section 7.1 or 7.3, but for so long as such Indebtedness is outstanding or in

33

effect, the entire committed amount of such Indebtedness then in effect shall be included in any calculations under Sections 7.1 and 7.3.

        1.5    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE 2.   AMOUNT AND TERMS OF COMMITMENTS

        2.1    Loans.

        (a)    Subject to the terms and conditions hereof and the Orders, the Lenders hereby severally, but not jointly, agree to make term loans in Dollars ("Loans") to the Borrower (i) on the Closing Date, in an aggregate principal amount not to exceed the Initial Borrowing Amount and (ii) on the Final Borrowing Date, in an aggregate principal amount not to exceed the Final Borrowing Amount; provided, that in no event shall any Lender be required to make Loans to the Borrower in excess of such Lender's Loan Commitment.

        (b)    Each Lender's Loan Commitment shall be (A) permanently reduced on a dollar-for-dollar basis by the aggregate principal amount of any Loans made by such Lender in accordance with this Section 2.1, (B) terminated in full upon the Maturity Date, (C) reduced from time to time pursuant to Section 2.10 and (D) terminated in full to the extent done so pursuant to Article 8.

        (c)    [Reserved].

        (d)    The Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.  The Loans may from time to time be Eurocurrency Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Section 2.2 and Section 2.13.

        (e)    The Loans of each Lender shall be paid in full in cash on the Maturity Date; provided that pursuant to the Plan of Reorganization, in lieu of being paid in full in cash on the Effective Date, the Loans may be converted into Indebtedness of the reorganized Chapter 11 Debtors, as contemplated by, and in accordance with, the Restructuring Support Agreement and the Plan of Reorganization.

        2.2    Procedure for Loan Borrowing.  The Borrower may borrow Loans on the Closing Date and the Final Borrowing Date as set forth in Section 2.1; provided, that the Borrower shall give the Administrative Agent irrevocable written notice (such notice, a "Borrowing Request") (which Borrowing Request must be received by the Administrative Agent, unless otherwise agreed by the Administrative Agent, (x) in the case of Eurocurrency Loans, prior to 11:00 a.m., New York City time, two Business Days prior to the applicable date of borrowing or (y) in the case of ABR Loans, prior to 3:00 p.m., New York City time, one

34

Business Day prior to the applicable date of borrowing) specifying (i) the amount of Loans to be borrowed, subject to the limitations set forth in Section 2.1(a), (ii) the Type of Loans to be borrowed; provided, that if no election as to the Type of Loan is specified, then the requested Loan shall be an ABR Loan, (iii) whether the Loans shall be borrowed on the Closing Date or the Final Borrowing Date, and the applicable anticipated date thereof, (iv) in the case of Eurocurrency Loans, the length of the initial Interest Period therefor and (v) the account into which such Loans are to be disbursed by the Administrative Agent upon receipt of the same from the Lenders. Upon receipt of any Borrowing Request from the Borrower delivered in accordance with this Section 2.2, the Administrative Agent shall promptly notify each Lender thereof. In the case of a borrowing of Loans, each Lender will make the amount of its *pro rata* share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 2:00 P.M., New York City time, on the Closing Date and the Final Borrowing Date, as applicable, in funds immediately available to the Administrative Agent. The proceeds of Loans made on the Closing Date and the Final Borrowing Date, as applicable, will then be made available to the Borrower by the Administrative Agent crediting the account designated in writing by the Borrower to the Administrative Agent in the Borrowing Request with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent.

2.3    [Reserved].

2.4    [Reserved].

2.5    [Reserved].

2.6    [Reserved].

2.7    Defaulting Lenders.

(a)    Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender (or, in the case of a Defaulting Lender under clause (e) of the definition thereof, upon such Defaulting Lender becoming a party to the Restructuring Support Agreement), the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will no longer be deemed a Defaulting Lender.

(b)    Defaulting Lender Waterfall.  Any payment of principal, interest or other amounts (other than the payment of (i) amounts under Section 2.9 and (ii) default interest under Section 2.15(c)) received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise shall be applied by the Administrative Agent as follows:  *first*, to the payment of any amounts owing to such Defaulting Lender to the Administrative Agent pursuant to Section 9.7; *second*, [reserved]; *third*, [reserved]; *fourth*, as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released in order to satisfy such Defaulting

Lender's potential future funding obligations with respect to Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 5.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to be held as security in a cash collateral account pursuant to this Section 2.7(b) shall be deemed paid to and redirected by such Defaulting Lender and shall satisfy the Borrower's payment obligation in respect thereof in full, and each Lender irrevocably consents hereto.

2.8    Interest; Register; Repayment of Loans.

(a)    The Borrower hereby agrees to pay interest on the unpaid principal amount of the Loans made to the Borrower from time to time outstanding from the applicable date of borrowing until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(b)(iv), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal, interest and fees, as applicable, due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.8(c) shall, to the extent permitted by applicable law, be presumptively correct absent demonstrable error of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of the Administrative Agent or any Lender to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

NY 77805691v5

2.9    <u>Agent Payments</u>. The Borrower agrees to pay to the Administrative Agent the payments in the amounts and on the dates as set forth in any agreements with the Administrative Agent.

2.10    <u>Termination or Reduction of Loan Commitments</u>. With the written consent of the Required DIP Lenders, the Borrower may terminate the Loan Commitments on a pro rata basis or, from time to time, to reduce the amount of the Loan Commitments on a pro rata basis. Any such partial reduction shall be in an amount equal to $1,000,000, or a whole multiple of $500,000 in excess thereof, and shall reduce permanently the Loan Commitments. Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of termination under this Section 2.10 if the notice of such termination stated that such notice was conditioned upon the occurrence or non-occurrence of a transaction or the receipt of a replacement of all, or a portion, of the Loan Commitments outstanding at such time, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified date) if such condition is not satisfied.

2.11    <u>Optional Prepayments</u>.

(a)    The Borrower may at any time and from time to time prepay any of the Loans, in whole or in part, without premium or penalty, upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, (i) two Business Days prior thereto, in the case of Eurocurrency Loans and (ii) one Business Day prior thereto, in the case of ABR Loans, which notice shall specify (x) the date and amount of prepayment and (y) whether the prepayment is of Eurocurrency Loans or ABR Loans; <u>provided</u> that if a Eurocurrency Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (<u>provided</u> that any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any transaction or the receipt of proceeds to be used for such payment, in each case specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), together with accrued interest to such date on the amount prepaid. Partial optional prepayments of Loans shall be in an aggregate principal amount of at least $1,000,000 or a whole multiple of $100,000 in excess thereof (in the case of prepayments of ABR Loans).

(b)    In connection with any optional prepayments by the Borrower of the Loans pursuant to this Section 2.11, such prepayments shall be applied on a <u>pro rata</u> basis to the then outstanding Loans irrespective of whether such outstanding Loans are ABR Loans or Eurocurrency Loans.

2.12    <u>Mandatory Prepayments</u>.

(a)    If (x) any Indebtedness (excluding any Indebtedness expressly permitted to be incurred in accordance with Section 7.1) shall be incurred by Holdings, Borrower or any Restricted Subsidiary or (y) Holdings, Borrower or any Restricted Subsidiary shall effect any

37

Equity Issuance (other than to Holdings, the Borrower or any Restricted Subsidiary), in each case, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied substantially simultaneously with (and in any event not later than one Business Day after) the date of receipt of such Net Cash Proceeds toward the prepayment of the Loans as set forth in Section 2.12(d).

(b)    If on any date Holdings or any Restricted Subsidiary shall for its own account receive Net Cash Proceeds from any Asset Sale, Recovery Event or Extraordinary Receipts, such Net Cash Proceeds shall be applied not later than three (3) Business Days after such date toward the prepayment of the Loans as set forth in Section 2.12(d).

(c)    [Reserved].

(d)    Amounts to be applied in connection with prepayments of Loans pursuant to this Section 2.12 shall be applied to the prepayment of the Loans in accordance with Section 2.18(b) until paid in full.  In connection with any mandatory prepayments by the Borrower of the Loans pursuant to this Section 2.12, such prepayments shall be applied on a pro rata basis to the then outstanding Loans irrespective of whether such outstanding Loans are ABR Loans or Eurocurrency Loans; provided that with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Loans that are ABR Loans to the full extent thereof before application to Loans that are Eurocurrency Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.21.  Each prepayment of the Loans under this Section 2.12 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(e)    [Reserved].

(f)    [Reserved].

(g)    Notwithstanding any other provisions of this Section 2.12, (A) to the extent that any or all of the Net Cash Proceeds of any Asset Sale by a Foreign Subsidiary (a "Foreign Asset Sale") or the Net Cash Proceeds of any Recovery Event with respect to  a Foreign Subsidiary (a "Foreign Recovery Event"), in each case giving rise to a prepayment event pursuant to Section 2.12(b) are or is prohibited, restricted or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.12 but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit or restricts repatriation to the United States (the Borrower hereby agreeing to use commercially reasonable efforts to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds will be promptly (and in any event not later than five Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans in accordance with this Section 2.12 and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all of the Net Cash Proceeds of any Foreign Asset Sale or any Foreign Recovery Event derived from a Foreign Subsidiary would have a material adverse tax consequence (taking into account any foreign tax

NY 77805691v5

credit or benefit, in the Borrower's reasonable judgment, expected to be realized in connection with such repatriation) with respect to such Net Cash Proceeds, the Net Cash Proceeds so affected may be retained by the applicable Foreign Subsidiary, provided that, in the case of this clause (B), on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to prepayments pursuant to this Section 2.12, the Borrower shall apply an amount equal to such Net Cash Proceeds to such prepayments as if such Net Cash Proceeds had been received by the Borrower rather than such Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds had been repatriated (or, if less, the Net Cash Proceeds that would be calculated if received by such Foreign Subsidiary).

2.13    <u>Conversion and Continuation Options</u>.

(a)    The Borrower may elect from time to time to convert Eurocurrency Loans made to the Borrower to ABR Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date; provided that if any Eurocurrency Loan is so converted on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21.  The Borrower may elect from time to time to convert ABR Loans made to the Borrower to Eurocurrency Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); provided that no ABR Loan may be converted into a Eurocurrency Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Required DIP Lenders in its or their sole discretion not to permit such conversions.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurocurrency Loan may be continued as such by the Borrower giving irrevocable written notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1 and no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed continuation date, of the length of the next Interest Period to be applicable to such Loans; provided that if any Eurocurrency Loan is so continued on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21; provided, further, that no Eurocurrency Loan may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required DIP Lenders have determined in its or their sole discretion not to permit such continuations; and provided, further, that (i) if the Borrower shall fail to give any required notice as described above in this paragraph such Eurocurrency Loans shall be automatically continued as Eurocurrency Loans having an Interest Period of one month's duration on the last day of such then-expiring Interest Period and (ii) if such continuation is not permitted pursuant to the preceding proviso, such Eurocurrency Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

39

2.14    Maximum Number of Eurocurrency Loans.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of Eurocurrency Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that no more than ten Eurocurrency Loans shall be outstanding at any one time.

2.15    Interest Rates and Payment Dates.

(a)    Each Eurocurrency Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurocurrency Rate determined for such day plus the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.15 plus 2.00%; (ii) if all or a portion of any interest or premium payable on any Loan or any commitment payment or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans plus 2.00%, in each case, with respect to clauses (i) and (ii) above, from the date of such nonpayment until such amount is paid in full (after as well as before judgment); and (iii) if an Event of Default shall have occurred, the Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.15 plus 2.00%; provided that no amount shall be payable pursuant to this Section 2.15(c) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender; provided further that no amounts shall accrue pursuant to this Section 2.15(c) on any overdue Loan, commitment payment, premium or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)    Interest shall be payable by the Borrower in arrears on each Interest Payment Date; provided that interest accruing pursuant to clauses (i) and (ii) or paragraph (c) of this Section 2.15 shall be payable from time to time on demand.

2.16    Computation of Interest and Other Payments.

(a)    Interest and other amounts payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that interest on ABR Loans shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurocurrency Rate.  Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

NY 77805691v5

(b)      Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct in the absence of demonstrable error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a) and Section 2.15(b).

2.17     <u>Inability to Determine Interest Rate</u>.

(a)      If prior to the first day of any Interest Period for any Eurocurrency Loan:

(i)      the Administrative Agent shall have determined (which determination shall be presumptively correct absent demonstrable error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurocurrency Rate for such Interest Period, or

(ii)     the Administrative Agent shall have received notice from the Required DIP Lenders that by reason of any changes arising after the Closing Date, the Eurocurrency Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurocurrency Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurocurrency Loans shall be continued as ABR Loans and (z) any outstanding Eurocurrency Loans shall be converted, on the last day of the then-current Interest Period with respect thereto, to ABR Loans.  Until such notice has been withdrawn by the Administrative Agent (which action the Administrative Agent will take promptly after the conditions giving rise to such notice no longer exist), no further Eurocurrency Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans to Eurocurrency Loans.

(b)      If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) of this Section have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) of this Section have not arisen but the supervisor for the administrator of the Eurocurrency Base Rate has made a public statement identifying a specific date after which the Eurocurrency Base Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the Eurocurrency Base Rate that gives due consideration to the then-prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; <u>provided</u> that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.  Notwithstanding anything to the contrary in Section 10.1, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five

41

Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required DIP Lenders stating that such Lenders object to such amendment.

2.18    <u>Pro Rata Treatment and Payments</u>.

(a)    Subject to Section 2.7, each payment in respect of principal or interest in respect of any Loans and each payment in respect of commitment payments shall be applied to the obligations owing to the Lenders, <u>pro</u> <u>rata</u> according to the respective amounts then due and owing to such Lenders.

(b)    Each mandatory prepayment of the Loans shall be allocated among the Loans then outstanding <u>pro rata</u>.  Amounts repaid or prepaid on account of the Loans may not be reborrowed.

(c)    [Reserved].

(d)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, premium, fees or otherwise, shall be made without setoff, deduction or counterclaim and shall be made prior to 3:00 P.M., New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Funding Office, in immediately available funds.  Any payment received by the Administrative Agent after 3:00 P.M., New York City time may be considered received on the next Business Day in the Administrative Agent's sole discretion.  The Administrative Agent shall distribute such payments to the relevant Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the Eurocurrency Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurocurrency Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the applicable borrowing date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any

42

amounts owing under this paragraph shall be presumptively correct in the absence of demonstrable error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such applicable borrowing date, the Administrative Agent shall give notice of such fact to the Borrower and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans, on demand, from the Borrower. Nothing herein shall be deemed to limit the rights of the Administrative Agent or the Borrower against any Defaulting Lender.

(f)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the relevant Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each relevant Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.19    Requirements of Law.

(a)    Except with respect to Excluded Taxes and Indemnified Taxes, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority first made, in each case, subsequent to the Closing Date:

(i)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurocurrency Rate hereunder;

(ii)    shall subject any Recipient to any Taxes on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liability or capital attributable thereto; or

(iii)    shall impose on such Lender any other condition not otherwise contemplated hereunder;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Eurocurrency Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, in Dollars, within

43

thirty Business Days after the Borrower's receipt of a reasonably detailed invoice therefor (showing with reasonable detail the calculations thereof), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.19, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have reasonably determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any entity controlling such Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) from any Governmental Authority first made, in each case, subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such entity's capital as a consequence of its obligations hereunder to a level below that which such Lender or such entity could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such entity's policies with respect to capital adequacy or liquidity requirements) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a reasonably detailed written request therefor (consistent with the detail provided by such Lender to similarly situated borrowers), the Borrower shall pay to such Lender, in Dollars, such additional amount or amounts as will compensate such Lender or such entity for such reduction.

(c)    A certificate prepared in good faith as to any additional amounts payable pursuant to this Section 2.19 submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of demonstrable error. Notwithstanding anything to the contrary in this Section 2.19, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.19 for any amounts incurred more than 120 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that if the circumstances giving rise to such claim have a retroactive effect, then such 120-day period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section 2.19 shall survive the termination of this Agreement and the payment of the Obligations. Notwithstanding the foregoing, the Borrower shall not be obligated to make payment to any Lender with respect to penalties, interest and expenses if written demand therefor was not made by such Lender within 120 days from the date on which such Lender makes payment for such penalties, interest and expenses.

(d)    Notwithstanding anything in this Section 2.19 to the contrary, solely for purposes of this Section 2.19, (i) the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date.

NY 77805691v5

2.20    <u>Taxes</u>.

(a)    Except as otherwise provided in this Agreement or as required by law, all payments made by the Borrower or any Loan Party under this Agreement and the other Loan Documents to any Recipient under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, the amounts so payable to the applicable Recipient shall be increased to the extent necessary so that after deduction or withholding of such Indemnified Taxes (including Indemnified Taxes attributable to amounts payable under this Section 2.20(a)) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    In addition, the Borrower or any Loan Party under this Agreement and the other Loan Documents shall pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Whenever any Taxes are paid by the Borrower and any Loan Party under this Section, as promptly as possible thereafter the Borrower or applicable Loan Party, as the case may be, shall send to the Administrative Agent for the account of the Administrative Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower or applicable Loan Party showing payment thereof, a copy of the return reporting such payment, or, if not, such other evidence of payment as may be reasonably satisfactory to the Administrative Agent or such Lender.   The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting

45

requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (d)(i), (ii) and (iv) of this Section 2.20(d)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Solely for purposes of this paragraph (d), "Lender" shall also refer to each Agent, such that each Agent shall be required to provide the documentation required by this paragraph (d) as if it were a Lender. Without limiting the generality of the foregoing:

(i) Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "Non-US Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Borrower and to the Lender from which the related participation shall have been purchased) (A) two accurate and complete copies of IRS Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, (B) in the case of a Non-US Lender claiming exemption from United States federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F-1 and two accurate and complete copies of IRS Form W-8BEN or W-8BEN-E, or any subsequent versions or successors to such forms or (C) to the extent a Non-US Lender is not the beneficial owner, two accurate and complete copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a statement substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable, provided that if the Non-US Lender is a partnership and one or more direct or indirect partners of such Non-US Lender are claiming the portfolio interest exemption, such Non-US Lender may provide a statement substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner, in each case properly completed and duly executed by such Non-US Lender claiming complete exemption from, or a reduced rate of, United States federal withholding tax on all payments by the Borrower or any Loan Party under this Agreement and the other Loan Documents. Such forms shall be delivered by each Non-US Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-US Lender shall, promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Lender, update such form. Each Non-US Lender shall (X) promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose) and (Y) take such steps as shall not be disadvantageous to it, in its reasonable judgment, and as may be reasonably necessary (including the re-designation of its lending office pursuant to Section 2.23) to avoid any requirement of applicable laws of any such jurisdiction that the Borrower or any Loan Party make any deduction or withholding for Taxes from amounts payable to such Lender. Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this paragraph that such Non-US Lender is not legally able to deliver.

46

(ii)       Each Lender (and, in the case of a Lender that is a non-United States pass-through entity, each of its beneficial owners) that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "US Lender") shall deliver to the Borrower and the Administrative Agent two accurate and complete copies of IRS Form W-9, or any subsequent versions or successors to such form and certify that such Lender is not subject to backup withholding.  Such forms shall be delivered by each US Lender on or before the date it becomes a party to this Agreement.  In addition, each US Lender shall, promptly upon the obsolescence or invalidity of any form previously delivered by such US Lender, update such form.  Each US Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certifications to the Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose).

(iii)      Any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(iv)      If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Administrative Agent as may be necessary for the Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Each Lender shall, promptly upon the obsolescence or invalidity of any documentation previously delivered by such Lender, update such documentation. Each Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered documentation to the Borrower (or any other form of documentation adopted by the United States taxing authorities for such purpose).  Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(e)       [reserved].

(f)     If any Recipient determines, in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to Section 2.20), it shall promptly pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid under this Section 2.20 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such indemnifying party, upon the request of such Recipient, shall repay the amount paid over to the indemnifying party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority other than any such penalties, interest or other charges resulting from the gross negligence or willful misconduct of the relevant Recipient) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require any Recipient to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Borrower or any other Person.  In no event will any Recipient be required to pay any amount to an indemnifying party the payment of which would place such Recipient in a less favorable net after-Tax position than such Recipient would have been in if the additional amounts giving rise to such refund of any Indemnified Taxes had never been paid.

(g)     [reserved].

(h)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower or any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower or any Loan Party to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c)(iii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (h).

(i)     [Reserved].

(j)     Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

2.21    Indemnity.  Other than with respect to Taxes, which shall be governed solely by Section 2.20, the Borrower agrees to indemnify each Lender for, and to hold each

Lender harmless from, any loss or expense (other than lost profits, including the loss of Applicable Margin) that such Lender actually sustains or incurs as a consequence of (a) any failure by the Borrower in making a borrowing of, conversion into or continuation of Eurocurrency Loans after the Borrower has given notice requesting the same in accordance with the provisions of this Agreement, (b) any failure by the Borrower in making any prepayment of or conversion from Eurocurrency Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment, conversion or continuation of Eurocurrency Loans on a day that is not the last day of an Interest Period with respect thereto. A reasonably detailed certificate as to (showing in reasonable detail the calculation of) any amounts payable pursuant to this Section 2.21 submitted to the Borrower by any Lender shall be presumptively correct in the absence of demonstrable error. This covenant shall survive the termination of this Agreement and the payment of the Obligations.

2.22    Illegality. Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case, first made after the Closing Date, shall make it unlawful for any Lender to make or maintain Eurocurrency Loans as contemplated by this Agreement, such Lender shall promptly give notice thereof to the Administrative Agent and the Borrower, and (a) the commitment of such Lender hereunder to make Eurocurrency Loans, continue Eurocurrency Loans as such and convert ABR Loans to Eurocurrency Loans shall be suspended during the period of such illegality and (b) such Lender's Loans then outstanding as Eurocurrency Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law. If any such conversion of a Eurocurrency Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.21.

2.23    Change of Lending Office. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.19, 2.20(a)-(c) or 2.22 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided that such designation is made on terms that, in the good faith judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage; provided, further, that nothing in this Section 2.23 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.19, 2.20(a)-(c) or 2.22.

2.24    Replacement of Lenders. The Borrower shall be permitted to (a) replace with one or more Eligible Assignees (the "Replacement Entities") or (b) prepay or terminate, without premium or penalty (but subject to Section 2.21), the Loans or Loan Commitments, as applicable, of any Lender (each such Lender, a "Replaced Lender") that (i) requests reimbursement for amounts owing or otherwise results in increased costs imposed on the Borrower or on account of which the Borrower is required to pay additional amounts to any Governmental Authority pursuant to Section 2.19, 2.20 or 2.21 (to the extent a request made by a Lender pursuant to the operation of Section 2.21 is materially greater than requests made by other Lenders) or gives a notice of illegality pursuant to Section 2.22, (ii) is a Defaulting Lender, (iii) is, or the Borrower reasonably believes could constitute, a Disqualified Institution, or

49

(iv) has refused to consent to any waiver or amendment with respect to any Loan Document that requires such Lender's consent and has been consented to by the Required DIP Lenders; provided that, in the case of a replacement pursuant to clause (a) above,

(A)    such replacement does not conflict with any Requirement of Law,

(B)    the Replacement Entities shall purchase, at par, all Loans and other amounts owing to such Replaced Lender on or prior to the date of replacement,

(C)    the Borrower shall be liable to such Replaced Lender under Section 2.21 (as though Section 2.21 were applicable) if any Eurocurrency Loan owing to such Replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto,

(D)    the Replacement Entities, (x) if not already a Lender, shall be reasonably satisfactory to the Administrative Agent to the extent that an assignment to such Replacement Entity of the rights and obligations being acquired by it would otherwise require the consent of the Administrative Agent pursuant to Section 10.6(b) and (y) shall pay (unless otherwise paid by the Borrower) any processing and recordation fee required under Section 10.6(b)(ii)(B),

(E)    the Administrative Agent and any Replacement Entities shall execute and deliver, and such Replaced Lender shall thereupon be deemed to have executed and delivered, an appropriately completed Assignment and Assumption to effect such substitution,

(F)    the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.19 or 2.20, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated,

(G)    in respect of a replacement pursuant to clause (iv) above, the Replacement Entities shall consent to such amendment or waiver, and

(H)    any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the Replaced Lender.

Prepayments pursuant to clause (b) above (i) shall be accompanied by accrued and unpaid interest on the principal amount so prepaid up to the date of such prepayment and (ii) shall not be subject to the provisions of Section 2.18. The termination of the Revolving Commitments of any Lender pursuant to clause (b) above shall not be subject to the provisions of Section 2.18. In connection with any such replacement under this Section 2.24, if the Replaced Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Assumption and/or such other documentation and (b) the date as of which all obligations of the Borrower owing to the Replaced Lender relating to the Loans and participations so assigned shall be paid in full to

50

such Replaced Lender, then such Replaced Lender shall be deemed to have executed and delivered such Assignment and Assumption and/or such other documentation as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Replaced Lender, and the Administrative Agent shall record such assignment in the Register.

ARTICLE 3.    [RESERVED]

ARTICLE 4.    REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, each of Holdings and the Borrower hereby represents and warrants (as to itself and each of its Restricted Subsidiaries) to the Agents and each Lender, which representations and warranties shall be deemed made on the Closing Date (after giving effect to the Transactions) and on the date of each borrowing of Loans:

4.1    Financial Condition.

(a)    The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at December 31, 2017, and the related statements of income, stockholders' equity and of cash flows for the fiscal year ended on such date, reported on by and accompanied by an unqualified report from E&Y, present fairly in all material respects the financial condition of the Borrower and its Subsidiaries as at such dates and the results of their operations, their cash flows and their changes in stockholders' equity for the fiscal year then ended. All such financial statements, including the related schedules and notes thereto and year-end adjustments, have been prepared in accordance with GAAP (except as otherwise noted therein).

(b)    The unaudited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of June 30, 2019, and the related statements of income, stockholders' equity and of cash flows for the fiscal periods ended on such date each as certified by a Responsible Officer, present fairly in all material respects the financial condition of the Borrower and its Subsidiaries as at such dates and the results of their operations, their cash flows and their changes in stockholders' equity for the respective fiscal periods then ended (subject to normal year-end audit adjustments and the absence of footnotes). All such financial statements and the notes thereto have been prepared in accordance with GAAP (except as otherwise noted therein and subject to normal year-end audit adjustments and the absence of footnotes).

4.2    No Change.    Since the Closing Date, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

4.3    Existence; Compliance with Law.    Each Chapter 11 Debtor is a debtor in the Chapter 11 Cases. Except as set forth in Schedule 4.3, each of Holdings and its Restricted Subsidiaries (a) (i) is duly organized (or incorporated), validly existing and in good standing (or, only where applicable, the equivalent status in any foreign jurisdiction) under the laws of the jurisdiction of its organization or incorporation, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a

51

Material Adverse Effect, (ii) subject to the entry of the Orders, has the corporate or other organizational power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and (iii) is duly qualified as a foreign corporation or other entity and in good standing (where such concept is relevant) under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except, in each case, to the extent that the failure to be so qualified or in good standing (where such concept is relevant) would not have a Material Adverse Effect and (b) is in compliance with all Requirements of Law except to the extent that any such failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

4.4    Corporate Power; Authorization; Enforceable Obligations.

(a)    Subject to the entry of the Orders, each Loan Party has the corporate or other organizational power and authority to execute and deliver, and perform its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to the entry of the Orders, each Loan Party has taken all necessary corporate or other action to authorize the execution and delivery of, and the performance of its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the Loans on the terms and conditions of this Agreement, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    Subject to the entry of the Orders, no consent or authorization of, filing with, or notice to, any Governmental Authority is required to be obtained or made by any Loan Party for the Loans hereunder or such Loan Party's execution and delivery of, or performance of its obligations under, or validity or enforceability of, this Agreement or any of the other Loan Documents to which it is party, as against or with respect to such Loan Party, except (i) consents, authorizations, filings and notices described in Schedule 4.4, (ii) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (iii) consents, authorizations, filings and notices the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect and (iv) the filings referred to in Section 4.17.

(c)    Subject to the entry of the Orders, each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. Subject to the entry of the Orders, assuming the due authorization of, and execution and delivery by, the parties thereto (other than the applicable Loan Parties), this Agreement constitutes, and each other Loan Document upon execution and delivery by each Loan Party that is a party thereto will constitute, a legal, valid and binding obligation of each such Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms (provided that, with respect to the creation and perfection of security interests with respect to the Capital Stock of Foreign Subsidiaries (other than the Capital Stock of a UK Guarantor), only to the extent enforceability thereof is governed by the Uniform Commercial Code or the Bankruptcy Code), except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium,

52

administration or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing (but only to the extent such concept may be recognized under the relevant jurisdiction) and, in each case of the UK Guarantors and each UK Security Document, subject to the UK Legal Reservations and the UK Perfection Requirements.

4.5     No Legal Bar.  Subject to the entry of the Orders, assuming the consents, authorizations, filings and notices referred to in Section 4.4(b) are obtained or made and in full force and effect, the execution, delivery and performance of this Agreement and the other Loan Documents by the Loan Parties thereto, the borrowings hereunder and the use of the proceeds thereof will not (a) violate the organizational or governing documents of (i) the Borrower or (ii) except as would not reasonably be expected to have a Material Adverse Effect, any other Loan Party, (b) except as would not reasonably be expected to have a Material Adverse Effect, violate any Requirement of Law binding on Holdings or any of its Restricted Subsidiaries, (c) except as would not reasonably be expected to have a Material Adverse Effect, violate any Contractual Obligation of Holdings or any of its Restricted Subsidiaries or (d) except as would not have a Material Adverse Effect, result in or require the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens permitted by Section 7.3).

4.6     No Material Litigation.  Except as set forth in Schedule 4.6 and the commencement of the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened against Holdings or any of its Restricted Subsidiaries or against any of their Properties which, taken as a whole, would reasonably be expected to have a Material Adverse Effect or, to the extent such litigation, investigation or proceeding has a reasonable likelihood of adverse determination, and such determination would reasonably be expected to prevent or enjoin the Transactions.

4.7     No Default.  No Default or Event of Default has occurred and is continuing.

4.8     Ownership of Property; Liens.  Except as set forth in Schedule 4.8A (and in the case of the UK Guarantors, subject to the UK Legal Reservations), each of Holdings and its Restricted Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all its Real Property, and good title to, or a valid leasehold interest in, all of its other Property (other than Intellectual Property), in each case, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and none of such Property is subject to any Lien except as permitted by the Loan Documents.  Schedule 4.8B lists all Real Property owned in fee simple with a Fair Market Value in excess of $2,500,000 by any Loan Party as of the Closing Date.

4.9     Intellectual Property.  Each of Holdings and its Restricted Subsidiaries owns, or has a valid license or right to use, all Intellectual Property necessary for the conduct of its business as currently conducted free and clear of all Liens except as permitted by the Loan Documents, except where the failure to do so would not reasonably be expected to have a

53

Material Adverse Effect.  To the Borrower's knowledge, the use of such Intellectual Property by Holdings or its Restricted Subsidiaries does not infringe on the rights of any Person in a manner that would reasonably be expected to have a Material Adverse Effect.  Holdings and its Restricted Subsidiaries take all reasonable actions that in the exercise of their reasonable business judgment should be taken to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.10    Taxes.  Each of Holdings and its Restricted Subsidiaries (a) has filed or caused to be filed all federal, state, provincial, foreign and other Tax returns that are required to be filed and (b) has paid or caused to be paid all Taxes shown to be due and payable on said returns and all other Taxes, fees or other charges imposed on it or on any of its Property by any Governmental Authority (other than (i) any returns or amounts that are not yet due or (ii) amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required in conformity with GAAP have been provided on the books of Holdings or such Restricted Subsidiary, as the case may be), except in each case where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.11    Federal Regulations.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for any purpose that violates the provisions of the regulations of the Board.

4.12    ERISA .

(a)    Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect:  (i) neither a Reportable Event nor a failure to meet the minimum funding standards (within the meaning of Section 412(a)(2) of the Code or Section 302(a)(2) of ERISA) has occurred during the five year period prior to the date on which this representation is made with respect to any Single Employer Plan, and each Single Employer Plan has complied with the applicable provisions of ERISA and the Code; (ii) no termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen on the assets of Holdings or any of its Restricted Subsidiaries, during such five-year period; the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Single Employer Plan allocable to such accrued benefits; (iii) none of Holdings or any of its Restricted Subsidiaries has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA; (iv) none of Holdings or any of its Restricted Subsidiaries would become subject to any liability under ERISA if Holdings or such Restricted Subsidiary were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made; and (v) no Multiemployer Plan is in Reorganization or Insolvent.

(b)    Holdings and its Restricted Subsidiaries have not incurred, and do not reasonably expect to incur, any liability under ERISA or the Code with respect to any plan within the meaning of Section 3(3) of ERISA which is subject to Title IV of ERISA or

Section 412 of the Code or Section 302 of ERISA that is maintained by a Commonly Controlled Entity (other than Holdings and its Restricted Subsidiaries) (a "Commonly Controlled Plan") merely by virtue of being treated as a single employer under Title IV of ERISA with the sponsor of such plan that would reasonably be likely to have a Material Adverse Effect and result in a direct obligation of Holdings or any of its Restricted Subsidiaries to pay money.

(c)    [Reserved].

(d)    Neither Holdings nor any of its Restricted Subsidiaries is or has at any time been (a) an employer (for the purposes of sections 38 to 51 of the Pensions Act 2004) of an occupational pension scheme which is not a money purchase scheme (both terms as defined in the Pensions Schemes Act 1993) or (b) to Holdings' or any Restricted Subsidiary's knowledge, having made due and careful inquiry, "connected" with or an "associate" (as those terms are used in sections 38 and 43 of the Pensions Act 2004) of such an employer, where being so "connected" with or an "associate" of such employer would result in a direct obligation of Holdings or any of its Restricted Subsidiaries to pay money that would have a Material Adverse Effect.

4.13    Investment Company Act.  No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

4.14    Subsidiaries.  The Subsidiaries listed on Schedule 4.14 constitute all the Subsidiaries of Holdings at the Closing Date.  Schedule 4.14 sets forth as of the Closing Date the name and jurisdiction of incorporation of each Subsidiary and, as to each Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party, and includes an organizational chart that includes all of the Subsidiaries of Holdings.

4.15    Environmental Matters.  Other than exceptions to any of the following that would not reasonably be expected to have a Material Adverse Effect, none of Holdings or any of its Restricted Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law for the operation of the Business; or (ii) has become subject to any Environmental Liability.

4.16    Accuracy of Information, etc..  As of the Closing Date, no statement or information (excluding the projections and pro forma financial information referred to below) contained in this Agreement, any other Loan Document or any certificate furnished to the Administrative Agent or the Lenders or any of them (in their capacities as such), by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, including the Transactions, when taken as a whole, contained as of the date such statement, information or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not materially misleading.  As of the Closing Date, the projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of Holdings to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the

55

Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

4.17    Security Documents.

(a)    With respect to the Loan Parties that are Chapter 11 Debtors:

(i)    this Agreement and the Security Documents, including the Orders, are effective to create in favor of the Administrative Agent, for the benefit of the Lenders and any other Secured Parties, valid, binding, enforceable, non-avoidable and automatically and fully and properly perfected Liens on, and security interests in, the Collateral pledged under the Loan Documents and the Orders, in each case, having the priorities set forth in the Orders and subject only to the Carve-Out in all respects;

(ii)    pursuant to the Orders, no filing or other action will be necessary to perfect or protect such Liens and security interests; and

(iii)    pursuant to and to the extent provided in the Orders, the Obligations of the Loan Parties under this Agreement will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof), subject only to the Carve-Out in all respects, which claims shall have recourse to all of the Loan Parties' assets (including avoidance actions and the proceeds thereof).

(b)    With respect to the Loan Parties that are not Chapter 11 Debtors:

(i)    Subject to Section 6.10, the Guarantee and Collateral Agreement and the other Security Documents are each effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a lawful, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under Article 9 of the UCC or any equivalent law in any Specified Jurisdiction (including any proceeds of any such item of Collateral), except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing (but only to the extent such concept may be recognized under the relevant jurisdiction) and, in each case of the UK Guarantors and each UK Security Document, subject to the UK Legal Reservations and the UK Perfection Requirements. In the case of (i) the Pledged Securities described in the Guarantee and Collateral Agreement and the other Security Documents (other than Excluded Collateral) when any stock certificates or notes, as applicable, representing such Pledged Securities are delivered to the Collateral Agent (or, in the case of Pledged

NY 77805691v5

Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Credit Agreement) together with any proper endorsements executed in blank and such other actions have been taken with respect to the Pledged Securities of Foreign Subsidiaries as are required under the applicable law of the jurisdiction of organization or incorporation of the applicable Foreign Subsidiary (it being understood that no such actions under applicable Law of the jurisdiction of organization of the applicable Foreign Subsidiary (other than the United Kingdom in respect of the UK Guarantors) shall be required by any Loan Document), (ii) the Collateral comprised of registered and pending patents, industrial designs, trademarks and copyrights under any Specified Jurisdiction, upon the completion of the filings and other actions specified on Schedule 4.17, and (iii) the other Collateral described in the Guarantee and Collateral Agreement and the other Security Documents (other than Excluded Collateral), when financing statements in appropriate form are filed in the offices specified on Schedule 4.17 (or, in the case of other Collateral not in existence on the Closing Date, such other offices as may be appropriate) and such other filings and actions as are specified on Schedule 4.17 are made (or, in the case of other Collateral not in existence on the Closing Date, such other filings or actions as may be appropriate), the Collateral Agent shall have a fully perfected first priority Lien (or with respect to the ABL Facility First Priority Collateral, a fully perfected second priority Lien) on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (including any proceeds of any item of Collateral) (to the extent a security interest in such Collateral can be perfected through the filing of such documents and financing statements in the offices specified on Schedule 4.17 (or, in the case of other Collateral not in existence on the Closing Date, such other offices as may be appropriate) and the other filings and actions specified on Schedule 4.17 (or, in the case of other Collateral not in existence on the Closing Date, such other filings and actions as may be appropriate), and through the delivery of the Pledged Securities required to be delivered on the Closing Date), as security for the Secured Obligations, in each case prior in right to the Lien of any other Person (except (i) in the case of Collateral other than Pledged Securities that comprise stock of wholly-owned Subsidiaries, Liens permitted by Section 7.3, (ii) Liens having priority by operation of law and (iii) with respect to the ABL Facility First Priority Collateral) to the extent required by the Guarantee and Collateral Agreement and the other Security Documents.

(ii)        Upon the execution and delivery of any Mortgage to be executed and delivered pursuant to Section 6.8(b), such Mortgage shall be effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien on the Mortgaged Property described therein and proceeds thereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing (but only to the extent such concept may be recognized under the relevant jurisdiction) and, in each case of the UK Guarantors and each UK Security Document, subject to the UK Legal Reservations and the UK Perfection Requirements; and when such Mortgage is filed in the recording office designated by the Borrower, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan

57

Parties in such Mortgaged Property and the proceeds thereof, as security for the Secured Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (other than Liens permitted by Section 7.3 or other encumbrances or rights permitted by the relevant Mortgage).

(iii)    Under the laws of any Foreign Guarantor's jurisdiction of incorporation or organization it is not necessary that the Security Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar taxes or fees be paid on or in relation to the Security Documents or the transactions contemplated by the Security Documents, except (i) registration of the particulars of each Security Document granted by a UK Guarantor at Companies House in England and Wales under section 859A of the Companies Act 2006, and, in each case, payment of associated fees, (ii) as applicable, registration of the particulars of each Security Document creating a Lien in respect of any Real Property located in England and Wales at the Land Registry or Land Charges Registry in England and Wales and the payment of associated fees and (iii) registration of the particulars of each Security Document creating a Lien in respect of any Intellectual Property registered in the United Kingdom at the Trade Marks Registry at the Patent Office in England and Wales and payment of associated fees, which registrations, filings, taxes and fees will be made and paid promptly after the date of the relevant Security Document.

4.18    [Reserved].

4.19    Anti-Terrorism.  As of the Closing Date, (a) Holdings and its Restricted Subsidiaries are in compliance with the USA Patriot Act and the Proceeds of Crime (Money Laundering), including any guidelines thereunder, and any other applicable anti-money laundering, sanctions, anti-terrorist financing and "know your client" policies and laws, (b) none of Holdings and its Restricted Subsidiaries is a person on the list of "Specially Designated Nationals and Blocked Persons" or subject to the limitations and prohibitions under any other U.S. Department of Treasury's Office of Foreign Asset Control regulation or executive order, and (c) none of Holdings and its Restricted Subsidiaries is a person on the list of "Financial Sanctions: Consolidated List of Targets" or "Ukraine: list of persons subject to restrictive measures in view of Russia's actions destabilizing the situation in Ukraine", each administered and enforced by Her Majesty's Treasury, in each case, as amended, supplemented or substituted from time to time and except as would not reasonably be expected to have a Material Adverse Effect.

4.20    Use of Proceeds.  The Borrower will use the proceeds of the Loans solely in compliance with Section 6.9 of this Agreement.

4.21    Labor Matters.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against Holdings or its Restricted Subsidiaries pending or, to the knowledge of Holdings and the Borrower, threatened, (b) hours worked by and payment made to employees of Holdings or its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters and (c) all payments due from Holdings or any of its Restricted Subsidiaries on account of employee health and welfare

insurance have been paid or accrued as a liability on the books of Holdings or such Restricted Subsidiary, as applicable.

4.22    Budget. The Initial Budget, each Approved Budget and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.  A true and complete copy of the Initial Budget, as agreed to with the Required DIP Lenders as of the Closing Date, is attached as Annex A.

4.23    OFAC.  No Loan Party, nor, to the knowledge of Holdings or the Borrower, any of its Related Parties, (i) is currently the subject of any Sanctions, (ii) is located, organized or residing in any Designated Jurisdiction in violation of any applicable Sanctions, or (iii) is or has been (within the previous five years) engaged in any transaction with any Person who, to the knowledge of Holdings or the Borrower, was at the time of such transaction the subject of Sanctions or who was at the time of such transaction located, organized or residing in any Designated Jurisdiction in violation of any applicable Sanctions.  No Loan, nor the proceeds from any Loan, has been used by any Loan Party, or to the knowledge of Holdings or the Borrower, any of their respective Related Parties, directly or indirectly, to lend, contribute, provide or has otherwise been made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions, or in any other manner that will, in each case, result in any violation by any party hereto (including any Lender, Lead Arranger or Administrative Agent) of Sanctions.

4.24    FCPA.    Holdings, the Borrower and each of its Subsidiaries is in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended, except as would not reasonably be expected to result in a Material Adverse Effect.  No part of the proceeds of the Loans has been or will be used by Holdings or its Subsidiaries, directly or indirectly, for any payments to any Person, governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the U.S. Foreign Corrupt Practices Act of 1977, as amended, in each case, except as would not reasonably expected to have a Material Adverse Effect.

4.25    Centre of Main Interests.  For the purposes of Regulation (EU) 2015/848 of 20 May 2015 on insolvency proceedings (recast) (the "Regulation"), the centre of main interest of each Loan Party to which the Regulation applies (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(10) of the Regulation) in any other jurisdiction.

4.26    [Reserved].

4.27    Orders.  The Interim DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent

and Required DIP Lenders, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective. After entry of the Final DIP Order, the Final DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and Required DIP Lenders, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

4.28    Bankruptcy Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date, in accordance with applicable Requirements of Law and proper notice thereof under the circumstances, and proper notice under the circumstances of (x) the motion seeking approval of the Loan Documents and entry of the Orders, as applicable and (y) the hearings for the approval of the Interim DIP Order have been held by the Bankruptcy Court.

(b)    After the entry of the Orders, the Obligations will constitute [DIP Superpriority Claims] (as defined in the Orders) having the priorities set forth in the Orders, subject to the Carve-Out in all respects.

## ARTICLE 5.   CONDITIONS PRECEDENT

5.1    Conditions to Closing Date and Borrowing of Loans on the Closing Date. This Agreement, and the obligations of the Lenders to make Loans on the Closing Date in an amount equal to the Initial Borrowing Amount, shall become effective as of the Business Day (the "Closing Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to, or otherwise waived by, the Required DIP Lenders:

(a)    Credit Agreement and Loan Documents.   Subject to Section 6.10, the Administrative Agent (or its counsel) shall have received from each Loan Party a counterpart signature signed by each such Loan Party of (A) this Agreement (solely in respect of the Borrower and Holdings), (B) the Guarantee and Collateral Agreement, and (C) in the case of the Borrower only, any Note requested by a Lender at least three Business Days prior to the Closing Date.

(b)    Fees.  (i) All fees and other amounts due and payable hereunder or under any other Loan Document by the Borrower on or prior to the Closing Date, including, to the extent invoiced at least two Business Days prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses and reasonable fees, charges and disbursements of Cravath, Swaine & Moore LLP, counsel to the Administrative Agent, and Norton Rose Fulbright, foreign counsel to the Administrative Agent, shall have been paid; and (ii) all reasonable and documented out-of-pocket expenses and reasonable fees, charges and disbursements, to the extent invoiced at least two Business Days prior to the Closing Date, of the Lender Advisors, including Stroock and the Specified Financial Advisor, shall have been paid.

(c)    Payment.   The Borrower shall have paid the payments required by the Payment Letter.

(d)    <u>Legal Opinion</u>.  The Administrative Agent shall have received an executed legal opinion of Kirkland & Ellis LLP, special New York and California counsel to the Loan Parties.

(e)    <u>Closing Certificate; Officer's Certificate</u>.  The Administrative Agent shall have received (i) a certificate of the Borrower and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a certificate of the Borrower certifying as to the satisfaction of the conditions set forth in Section 5.3(a).

(f)    <u>KYC Information</u>.  The Lenders shall have received from the Borrower and each of the Loan Parties, at least three Business Days prior to the Closing Date, (i) documentation and other information requested by any Lender a reasonable period prior to the required delivery date that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (ii) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Lenders shall have received from the Borrower, at least three Business Days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower.

(g)    <u>Interim DIP Order</u>.  The Bankruptcy Court shall have entered the Interim DIP Order no later than two (2) Business Days after the Petition Date, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders.

(h)    <u>Initial Budget</u>.  The Administrative Agent and the Lenders shall have received the Initial Budget, which shall be in form and substance satisfactory to the Administrative Agent and the Lenders.

(i)    <u>Plan of Reorganization</u>.  The Plan of Reorganization shall have been filed with the Bankruptcy Court and, to the extent not otherwise waived by the Required DIP Lenders, each other Milestone required to be complied with prior to or concurrently with the entry of the Interim DIP Order shall have been complied with.

(j)    <u>Liens</u>.  Subject to Section 6.10 and in the case of the UK Security Documents, subject to the UK Legal Reservations and the UK Perfection Requirements, the Collateral Agent shall have a valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected Lien on the Collateral to the extent required by this Agreement and the Interim DIP Order, having the priorities set forth in the Interim DIP Order and subject to the Carve-Out.

(k)    <u>Filings</u>.  Each Uniform Commercial Code financing statement and each intellectual property security agreement required by the Security Documents to be filed in order to create in favor of the Collateral Agent, a perfected Lien on the Collateral having the priorities set forth in the Orders shall have been filed.

(l)    <u>Pledged Securities; Stock Powers</u>.  The Collateral Agent shall have received the certificates, if any, representing the shares of Pledged Securities held by a Loan

61

Party pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof.

(m)    Insurance.   Subject to Section 6.10, the Collateral Agent shall have been named as an additional insured with respect to liability policies (other than worker's compensation policies and public liability policies) and the Collateral Agent shall be named as loss payee with respect to the property insurance (other than public property policies) maintained by the Borrower and each other Loan Party.

(n)    ABL Intercreditor Amendment.   The Administrative Agent shall have received a legal, valid and binding copy of an amendment to the Prepetition ABL Intercreditor Agreement, which shall be in form and substance acceptable to the Administrative Agent and the Required DIP Lenders.

(o)    Canadian Amendment.   The Administrative Agent shall have received a legal, valid and binding copy of an amendment to the Prepetition Canadian Facility Credit Agreement, which shall be in form and substance acceptable to the Administrative Agent and the Required DIP Lenders.

(p)    Closing Date.   The Closing Date shall have occurred on or before the date that is three (3) Business Days after the date of entry of the Interim DIP Order.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

5.2    Conditions to Borrowing of Loans on the Final Borrowing Date.   The obligations of the Lenders to make Loans to the Borrower on the Final Borrowing Date in an amount equal to the Final Borrowing Amount is subject to the satisfaction (or waiver in writing by the Required DIP Lenders) of the following conditions precedent:

(a)    Final DIP Order.   The Bankruptcy Court shall have entered the Final DIP Order no later than thirty five (35) calendar days after the Petition Date, which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders.

(b)    Confirmation Order.   The Bankruptcy Court shall have entered the Confirmation Order no later than thirty five (35) calendar days after the Petition Date, which Confirmation Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders.

5.3    Conditions to Each Borrowing.   The agreement of each Lender to make any Loan hereunder (including the Loan on the Closing Date) is subject to the satisfaction (or waiver in writing by the Required DIP Lenders) of the following conditions precedent:

NY 77805691v5

(a)  <u>Representations and Warranties; No Default</u>.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect) as of such earlier date. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date.

(b)  <u>Restructuring Support Agreement</u>.  The Administrative Agent shall have received a copy of the Restructuring Support Agreement, duly executed and delivered by each of the parties thereto, and such Restructuring Support Agreement shall be in full force and effect and shall not have been amended, waived or otherwise modified without the prior written consent of the Required DIP Lenders.  The Restructuring Support Agreement shall be in full force and effect, and no breach, default or event of default shall have occurred and be continuing thereunder. Each Lender that owns Prepetition Loan Obligations shall be a party to the Restructuring Support Agreement.

(c)  <u>Motions and Documents</u>.  All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance satisfactory to the Required DIP Lenders.

(d)  <u>Validity and Priority of Liens</u>.  Subject to Section 6.10, the Administrative Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected Liens on, and security interests in, the Collateral, in each case, having the priorities set forth in the Orders and subject only to the Carve-Out in all respects.

(e)  <u>Borrowing Request</u>.  The Administrative Agent shall have received a signed Borrowing Request from the Borrower in respect of each applicable Loan in accordance with the requirements of <u>Section 2.2</u>.

The borrowing of Loans on the Final Borrowing Date shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in Section 5.2 and this Section 5.3 have been satisfied.

## ARTICLE 6.   AFFIRMATIVE COVENANTS

Each of Holdings and the Borrower (on behalf of itself and each of the Restricted Subsidiaries) hereby agrees that from and after the Closing Date, so long as the Loan Commitments remain in effect, or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations for which no claim has been asserted), Holdings and the Borrower shall, and shall cause (except in the case of the covenants set forth in Section 6.1, Section 6.2, Section 6.7 and Section 6.11) each of the Restricted Subsidiaries to:

6.1    <u>Financial Statements</u>.  Furnish to the Administrative Agent for delivery to each Lender (which may be delivered via posting on the Platform):

(a)    within 90 calendar days after the end of each fiscal year of the Borrower, (i) a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth, in comparative form the figures as of the end of and for the previous year, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (ii) a customary management's discussion and analysis of the important operational and financial developments during such fiscal year and the Updated Budget;

(b)    within 45 calendar days after the end of each of the first three quarterly periods of each fiscal year of Holdings, commencing with the fiscal quarter ending September 30, 2019, (i) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth, in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (ii) a customary management's discussion and analysis of the important operational and financial developments during such fiscal quarter; and

(c)    within 20 calendar days after the end of each calendar month, commencing with the calendar month ending September 30, 2019, (i) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such calendar month and the related unaudited consolidated statements of income and of cash flows for such month and the portion of the fiscal year through the end of such calendar month, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (ii) a customary management's discussion and analysis of the important operational and financial developments during such calendar month;

all such financial statements to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as disclosed therein and except in the case of the financial statements referred to in clause (b), for customary year-end adjustments and the absence of complete footnotes).  Any financial statements or other deliverables required to be delivered pursuant to this Section 6.1 and any financial statements or reports required to be delivered pursuant to clause (d) of Section 6.2 shall be deemed to have been furnished to the Administrative Agent on the date that (i) such financial statements or deliverable (as applicable) is posted on the Platform and (ii) the Administrative Agent has been provided written notice of such posting.

64

Documents required to be delivered pursuant to this Section 6.1 may also be delivered by posting such documents electronically with written notice of such posting to the Administrative Agent and if so posted, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on the Platform.

6.2    Certificates; Other Information.   Furnish to the Administrative Agent for delivery to each Lender, or, in the case of clause (f), to the relevant Lender (in each case, which may be delivered via posting on the Platform):

(a)    [reserved];

(b)    concurrently with the delivery of any financial statements pursuant to Section 6.1(a), (b) and (c), (i) a Compliance Certificate of a Responsible Officer on behalf of the Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default that has occurred and is continuing except as specified in such certificate and (ii) to the extent not previously disclosed to the Administrative Agent, (x) a description of any Default or Event of Default that occurred, (y) a description of any new Subsidiary and of any change in the name or jurisdiction of organization of any Loan Party since the date of the most recent list delivered pursuant to this clause (or, in the case of the first such list so delivered, since the Closing Date) to the extent not previously disclosed pursuant to Section 6.8 and (z) solely in the case of financial statements delivered pursuant to Section 6.1(a), a listing of any material registrations of or applications for registered or applied for Intellectual Property by any Loan Party filed with the United States Copyright Office, the United States Patent and Trademark Office or any similar office in any other Specified Jurisdiction since the last such report;

(c)    not later than 105 days after the end of each fiscal year of Holdings, a consolidated forecast for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected cash flow and projected income);

(d)    to the extent applicable, promptly after the same become publicly available, copies of all financial statements and reports that Holdings may make to, or file with, the SEC, in each case to the extent not already provided pursuant to Section 6.1 or any other clause of this Section 6.2;

(e)    promptly (and no later than the next Business Day) with delivery or provision thereof, any written notices delivered, or other written information required to be delivered to the administrative agent or collateral agent or lenders pursuant to the terms of the Prepetition ABL Facility Loan Documents, the Prepetition Priming Term Facility Loan Documents, the Prepetition Term Facility Loan Documents and/or the Prepetition Canadian Facility Credit Agreement; and

(f)    promptly, such additional financial and other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Subsidiary as the Administrative Agent (for its own account or upon the request from any Lender) may from time to time reasonably request.

NY 77805691v5

Notwithstanding anything to the contrary in this Section 6.2, (a) none of Holdings or any of its Restricted Subsidiaries will be required to disclose any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information and (b) unless such material is identified in writing by the Borrower as "Public" information, the Administrative Agent shall deliver such information only to "private-side" Lenders (i.e., Lenders that have affirmatively requested to receive information other than Public Information).

Documents required to be delivered pursuant to this Section 6.2 may be delivered by posting such documents electronically with notice of such posting to the Administrative Agent and if so posted, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on Holdings' website or (ii) on which such documents are posted on the Borrower's behalf on the Platform.

6.3    Payment of Taxes.    Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its Taxes, governmental assessments and governmental charges (other than Indebtedness), except (a) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves required in conformity with GAAP with respect thereto have been provided on the books of Holdings or its Restricted Subsidiaries, as the case may be, or (b) to the extent that failure to pay or satisfy such obligations would not reasonably be expected to have a Material Adverse Effect.

6.4    Conduct of Business and Maintenance of Existence, etc.; Compliance. (a) Preserve and keep in full force and effect its corporate or other existence and take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 or except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Requirements of Law (including ERISA, Environmental Laws, and the USA Patriot Act) except to the extent that failure to comply therewith would not reasonably be expected to have a Material Adverse Effect and provided that with respect to Environmental Laws, none of Holdings, the Borrower or any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.5    Maintenance of Property; Insurance.

(a)    Keep all Property useful and necessary in its business in reasonably good working order and condition, ordinary wear and tear excepted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    Take all reasonable steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or other equivalent

NY 77805691v5

Governmental Authority under any Specified Jurisdiction, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the material registered or applied for Intellectual Property owned by Holdings or its Restricted Subsidiaries, including filing of applications for renewal, affidavits of use and affidavits of incontestability, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(c)    Maintain insurance with financially sound and reputable insurance companies on all its Property that is necessary in, and material to, the conduct of business by Holdings and its Restricted Subsidiaries, taken as a whole, in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business, and except as the Administrative Agent may otherwise agree, use its commercially reasonable efforts to ensure that all such material insurance policies shall, to the extent customary (but in any event, not including business interruption insurance and personal injury insurance) name the Administrative Agent (or in the case of Prepetition ABL Facility Collateral, the collateral agent under the Prepetition ABL Credit Agreement), as applicable, as additional insured party or loss payee.

(d)    With respect to any Mortgaged Properties, if at any time the area in which the Premises (as defined in the Mortgages, if any) are located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), use commercially reasonable efforts to obtain flood insurance in such reasonable total amount as the Collateral Agent may from time to time reasonably require, and otherwise to ensure compliance with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time.

6.6    Inspection of Property; Books and Records; Discussions.

(a)    Keep proper books of records and accounts in a manner to allow financial statements to be prepared in conformity with GAAP or, with respect to Subsidiaries organized outside of the United States, the local accounting standards applicable to the relevant jurisdiction.

(b)    (x) Permit representatives designated by the Administrative Agent and the Specified Financial Advisor to visit and inspect any of its properties and examine and make abstracts from any of its books and records upon notice and at such times during normal business hours, (y) permit representatives designated by the Administrative Agent and the Specified Financial Advisor to have discussions regarding the business, operations, properties and financial and other condition of Holdings and its Restricted Subsidiaries with officers of Holdings and its Restricted Subsidiaries upon notice and at such times during normal business hours (provided that (i) a Responsible Officer of Holdings or the Borrower shall be afforded the opportunity to be present during such discussions and (ii) such discussions shall be coordinated by the Administrative Agent and the Specified Financial Advisor) and (z) permit representatives of the Administrative Agent and the Specified Financial Advisor to have discussions regarding the business, operations, properties and financial and other condition of Holdings and its Restricted Subsidiaries with its independent certified public accountants to the extent permitted by the internal policies of such independent certified public accountants upon notice and at such times

67

during normal business hours (provided that a Responsible Officer of Holdings the Borrower shall be afforded the opportunity to be present during such discussions). Each Monday, the Borrower shall discuss expected disbursements for the upcoming week with the Specified Financial Advisor prior to making any such disbursements. Notwithstanding anything to the contrary in this Section 6.6 and solely with respect to the representatives of the Administrative Agent, none of Holdings, the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discuss, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information.

6.7    Notices.  Promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof, give notice to the Administrative Agent of:

(a)    the occurrence of any Default or Event of Default;

(b)    any litigation, investigation or proceeding which may exist at any time between Holdings or any of its Restricted Subsidiaries and any other Person, that in either case, would reasonably be expected to have a Material Adverse Effect;

(c)    the occurrence of any Reportable Event, where there is any reasonable likelihood of the imposition of liability on any Loan Party as a result thereof that would reasonably be expected to have a Material Adverse Effect;

(d)    any other development or event that has had or would reasonably be expected to have a Material Adverse Effect;

(e)    any other material written notices or material developments or events related to a transfer of the Borrower's creative services business, including its subsidiaries that operate the creative services business and certain other assets included in the creative services business, to one or more third party investors unaffiliated with the Borrower and any other alternative sale transaction relating to the Borrower; and

(f)    any written notices or material information delivered to lenders under the Prepetition Loan Documents;

(g)    any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice pursuant to Section 6.7(a) shall be accompanied by a statement of a Responsible Officer setting forth in reasonable detail the occurrence referred to therein and stating what action the Borrower or the relevant Restricted Subsidiary proposes to take with respect thereto.

6.8    Additional Collateral, etc.

(a)    With respect to any Property (other than Excluded Collateral) located in any Specified Jurisdiction having a value, individually or in the aggregate, of at least $1,000,000 acquired after the Closing Date by any Loan Party (other than (i) any interests in Real Property and any Property described in paragraph (c) or paragraph (d) of this Section 6.8, (ii) [reserved], and (iii) Instruments, Certificated Securities and Chattel Paper, which are referred to in the last sentence of this paragraph) as to which the Collateral Agent for the benefit of the Secured Parties does not have a perfected Lien, promptly take all actions reasonably requested by the Collateral Agent to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Loan Documents and with the priority required by Section 4.17 and subject, in the case of any UK Guarantors to the UK Perfection Requirements and UK Legal Reservations) in such Property (with respect to Property of a type owned by a Loan Party as of the Closing Date to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in such Property as of the Closing Date), including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the other Security Documents or by law or as may be reasonably requested by the Collateral Agent.  If any amount in excess of $1,000,000 payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper (or, if more than $1,000,000 in the aggregate payable under or in connection with the Collateral shall become evidenced by Instruments, Certificated Securities or Chattel Paper), such Instrument, Certificated Security or Chattel Paper shall be promptly delivered to the Collateral Agent indorsed in a manner reasonably satisfactory to the Collateral Agent to be held as Collateral pursuant to this Agreement (or, in the case of any such Collateral that is Prepetition ABL Facility Collateral, delivered to the collateral agent under the Prepetition ABL Credit Agreement).

(b)    With respect to any fee interest in any Material Real Property acquired after the Closing Date by any Loan Party (other than Excluded Real Property) (which, for the purposes of this paragraph, shall include any Material Real Property that was previously Excluded Real Property that becomes Material Real Property that is not Excluded Real Property), (i) give notice of such acquisition to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver a first priority Mortgage (subject to liens permitted by Sections 7.3(a), (b), (c), (d), (e), (g) (to the extent securing Indebtedness permitted by Section 7.2(c)), (j), (cc), (dd) and (ee)) in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such Real Property (provided that no Mortgage shall be obtained if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such Mortgage are excessive in relation to the value of the security to be afforded thereby), (ii) if reasonably requested by the Collateral Agent (A) provide the Lenders with a lenders' title insurance policy with extended coverage covering such Real Property in an amount equal to the purchase price (if applicable) or the Fair Market Value of the applicable Material Real Property, as determined in good faith by the Borrower and reasonably acceptable to the Administrative Agent, as well as a current ALTA survey thereof, together with a surveyor's certificate unless the title insurance policy referred to above shall not contain an exception for any matter shown by a survey (except to the extent an existing survey has been provided and specifically incorporated into such title insurance policy or if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such survey are excessive in relation to the value of the security to be afforded thereby), each in form and substance reasonably satisfactory to the Collateral Agent, and (B) provide to the Administrative

69

Agent evidence of flood hazard insurance if any portion of the improvements on the owned Material Real Property is currently or at any time in the future identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any amendment or successor act thereto) or otherwise being designated as a "special flood hazard area or part of a 100 year flood zone", in an amount equal to 100% of the full replacement cost of the improvements (or such lower amount as shall be reasonably specified by the Collateral Agent); provided, however, that a portion of such flood hazard insurance may be obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended and (iii) if reasonably requested by the Collateral Agent, deliver to the Collateral Agent customary legal opinions relating to the matters described above, which opinions shall be in form and substance reasonably satisfactory to the Collateral Agent.

(c)    With respect to any new Subsidiary that is a Non-Excluded Subsidiary created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any Subsidiary that was previously an Excluded Subsidiary that becomes a Non-Excluded Subsidiary) by any Loan Party, promptly (i) give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement, the other Security Documents or such other documents as the Collateral Agent reasonably deems necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary that is owned by such Loan Party, (ii) deliver to the Collateral Agent (or, in the case of Pledged Collateral (as defined in the Guarantee and Collateral Agreement) that is Prepetition ABL Facility Collateral, the collateral agent under the Prepetition ABL Credit Agreement) the certificates, if any, representing such Capital Stock (other than Excluded Collateral), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of such Loan Party, and (iii) cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement or the other Security Documents, as applicable, and (B) (x) to take such actions reasonably requested by the Collateral Agent to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Collateral described in the Guarantee and Collateral Agreement or the other Security Documents, as applicable, with respect to such new Subsidiary (to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in the same type of Collateral as of the Closing Date), including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the other Security Documents or by law or as may be reasonably requested by the Collateral Agent and (y) comply with the provisions of Section 6.8(b) with respect to any Material Real Property owned by such Subsidiary.  Without limiting the foregoing, if (i) the aggregate Consolidated Total Assets or annual consolidated revenues of all Restricted Subsidiaries designated as "Immaterial Subsidiaries" hereunder shall at any time exceed 7.5% of Consolidated Total Assets or annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time) or (ii) if any Restricted Subsidiary shall at any time cease to constitute an Immaterial Subsidiary under the definition of "Immaterial Subsidiary"

70

(based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), the Borrower shall promptly, (x) in the case of clause (i) above, rescind the designation as "Immaterial Subsidiaries" of one or more of such Restricted Subsidiaries so that, after giving effect thereto, the aggregate Consolidated Total Assets or annual consolidated revenues, as applicable, of all Restricted Subsidiaries so designated (and which designations have not been rescinded) shall not exceed 7.5% of Consolidated Total Assets or annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), as applicable, and (y) in the case of clauses (i) and (ii) above, to the extent not already effected, (A) cause each affected Restricted Subsidiary to take such actions to become a "Subsidiary Guarantor" hereunder and under the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments referred to in this paragraph (c) to the extent such affected Subsidiary is not otherwise an Excluded Subsidiary and (B) cause the owner of the Capital Stock of such affected Restricted Subsidiary to take such actions to pledge such Capital Stock to the extent required by, and otherwise in accordance with, the Guarantee and Collateral Agreement or the other Security Documents, as applicable, and execute and deliver the documents and other instruments required hereby and thereby unless such Capital Stock otherwise constitutes Excluded Collateral. Notwithstanding the foregoing in this clause (c), no Chapter 11 Debtor shall be an Immaterial Subsidiary.

(d)     With respect to any new first-tier Foreign Subsidiary created or acquired after the Closing Date by any Loan Party, promptly (i) give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement or any other Security Document as the Collateral Agent reasonably deems necessary or reasonably advisable in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary (other than any Excluded Collateral) that is owned by such Loan Party and (ii) deliver to the Collateral Agent (or, in the case of Pledged Collateral (as defined in the Guarantee and Collateral Agreement) that is Prepetition ABL Facility Collateral, the collateral agent under the Prepetition ABL Credit Agreement) the certificates, if any, representing such Capital Stock (other than any Excluded Collateral), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of such Loan Party.

(e)     Notwithstanding anything in this Section 6.8 or any Security Document to the contrary:

(i)     neither Holdings nor any of its Restricted Subsidiaries shall be required to take any actions in order to create or perfect the security interest in the Collateral granted to the Collateral Agent for the benefit of the Secured Parties under the laws of any jurisdiction outside of the Specified Jurisdictions; provided, that Holdings and its Restricted Subsidiaries shall take all actions reasonably requested by the Administrative Agent or the Required DIP Lenders to create and perfect security interests under local law in the Capital Stock of Foreign Subsidiaries (other than Excluded Equity Securities) required to be pledged under this Agreement or any other Loan Document.

NY 77805691v5

(ii)    no control agreement shall be required with respect to (i) any Excluded Account or (ii) any other Deposit Accounts for which control agreements are not required under Section 5.3 of the Guarantee and Collateral Agreement or the other Security Documents, as applicable;

(iii)    no Liens other than any English law floating charge granted by a UK Guarantor shall be required to be pledged or created with respect to any of the following Property (collectively, the "Excluded Collateral"):

(A)    (x) assets located outside the Specified Jurisdictions (it being agreed that each deposit account of any Loan Party shall be deemed to be located within the Specified Jurisdictions regardless of where the financial institution with respect to such deposit account is organized or located and any accounts receivable, notes payable or other amounts owing to any Loan Party shall be deemed to be located within the Specified Jurisdictions regardless of where the account debtor, payor or obligor, as applicable in respect thereof, is organized or located), (y) motor vehicles or other assets subject to certificates of title unless a Lien may be perfected against the same by the filing of a financing statement or by the Orders or (z) applications for any trademarks that have been filed with the U.S. Patent and Trademark Office on the basis of an "intent to use" with respect to such trademarks until an appropriate amendment to allege usage or statement of use is filed in and accept by the United States Patent and Trademark Office and any successor office,

(B)    any property or asset to the extent that such grant of a security interest is prohibited or effectively restricted by any applicable law or requires a consent not obtained of any Governmental Authority pursuant to such applicable laws, unless the Orders override any such prohibition or restriction,

(C)    any Excluded Accounts and any Excluded Equity Securities,

(D)    (w) any assets owned on or acquired after the Closing Date, to the extent that, and for so long as, taking such actions would violate applicable law or regulation (after giving effect to Section 9-406(d), 9-407(a), 9-408 or 9-409 of the Uniform Commercial Code and other applicable law and the Orders), (x) any assets acquired before or after the Closing Date, to the extent that and for so long as such grant would violate an enforceable contractual obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on such assets in contemplation or in connection with the acquisition of such assets, (y) any assets (1) owned on the Closing Date or (2) acquired after the Closing Date with Indebtedness of the type permitted pursuant to Section 7.2(c), in each case in this clause (y) that is secured by a Lien permitted by Section 7.3 so long as the documents governing such Lien do not permit the pledge of such assets to the Collateral Agent, or (z) any lease, license or other agreement, any asset embodying rights, priorities or privileges granted under such leases, licenses or agreements, or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a

72

security interest therein would violate, breach or invalidate such lease, license or agreement or purchase money arrangement or create a right of acceleration, modification, termination or cancellation in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code and other applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code and other applicable law notwithstanding such prohibition,

      (E)    (x) any assets to the extent a security interest in such assets would result in material adverse tax consequences (including as a result of the operation of Section 956 of the IRS Code or any similar law or regulation in any applicable jurisdiction) as reasonably determined by the Borrower, or (y) solely with respect to Loan Parties that are not Chapter 11 Debtors, any assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein outweigh the value of the security afforded thereby,

      (F)    (x) solely with respect to Loan Parties that are not Chapter 11 Debtors, any leasehold interest in Real Property (and any Fixtures relating thereto) and (y) solely with respect to Loan Parties that are not Chapter 11 Debtors, any Fixtures relating to any owned Real Property to the extent that the Collateral Agent is not entitled to a security interest with respect to such owned Real Property under the terms of this Agreement, and

      (G)    solely with respect to Loan Parties that are not Chapter 11 Debtors, any owned Real Property other than Material Real Property, but in any event excluding any Excluded Real Property.

      (f)    [Reserved].

      (g)    From time to time the Loan Parties shall execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Collateral Agent may reasonably request for the purposes implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of renewing the rights of the Secured Parties with respect to the Collateral as to which the Collateral Agent, for the benefit of the Secured Parties, has a fully effective, enforceable and perfected Lien pursuant hereto or thereto, including filing any financing or continuation statements or financing statement amendments under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created thereby. Notwithstanding the foregoing, the provisions of this Section 6.8 shall not apply to assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein or perfection thereof outweigh the value of the security afforded thereby. The Administrative Agent may grant extensions of time or waivers of requirement for the creation or perfection of security interests in or the obtaining of insurance (including title insurance) or surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties

on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Loan Documents.

6.9    <u>Use of Proceeds</u>.

(a)    Subject to the Orders and the other Loan Documents, proceeds of the Loans made on the Closing Date will be used only for the following purposes: (a) to repay (on a dollar-for-dollar basis), satisfy and discharge all accrued and unpaid Prepetition Super Priming Obligations (including, for the avoidance of doubt, all interest thereon accrued through the Closing Date and all premiums, fees and expenses payable thereon); (b) to pay interest, fees, costs and expenses related to the Facility (including the fees, costs, disbursements and expenses of the Agents and their counsel, financial advisors, consultants and other professionals), (c) to pay the fees, costs and expenses of the estate professionals retained in the Chapter 11 Cases and approved by the Bankruptcy Court, (d) to fund the Carve-Out, (e) to pay the fees, costs, disbursements and expenses of the Lenders (including the fees and expenses of Stroock & Stroock & Lavan LLP ("<u>Stroock</u>"), counsel to certain Lenders, the Specified Financial Advisor, and such other consultants, local counsel, financial advisors and other professionals as reasonably required by the Required DIP Lenders (together with Stroock and the Specified Financial Advisor, collectively, the "<u>Lender Advisors</u>")), (f) to make all permitted payments of costs of administration of the Chapter 11 Cases, (g) to pay such prepetition expenses as are consented to by the Required DIP Lenders and approved by the Bankruptcy Court, (h) to satisfy any adequate protection obligations owing under the Orders; (i) to make any other payments permitted by the Approved Budget; and (j) for general corporate and working capital purposes of the Debtors during the Chapter 11 Cases.

(b)    Subject to the Orders and the other Loan Documents, proceeds of Loans made on the Final Borrowing Date shall be used solely for the following purposes: (a) to (and solely in such amount as is required to) repay, satisfy and discharge in full in cash any Prepetition Super Priming Obligations that were not repaid, satisfied and discharged in full with proceeds of Loans made on the Closing Date; (b) for working capital and general corporate purposes in accordance with the Approved Budget; (c) for professional fees; and (d) for such other purposes as expressly consented to in writing by the Required DIP Lenders.

(c)    Notwithstanding anything to the contrary contained in any Loan Documents, no proceeds of any Loans shall be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the Facility or the Prepetition Loan Documents; provided that the creditors' committee, if any, may use up to $35,000 of the proceeds in respect of the foregoing.

6.10    <u>Post Closing Date</u>. Satisfy the requirements set forth on Schedule 6.10, if any, on or before the date set forth opposite such requirements or such later date as consented to by the Administrative Agent in its reasonable discretion.

NY 77805691v5

6.11    Credit Ratings.  The Borrower shall use commercially reasonable efforts to obtain, and thereafter maintain, a rating from S&P and Moody's of the Facility (but no specific rating).

6.12    Line of Business.  Continue to operate solely as a Permitted Business.

6.13    Changes in Jurisdictions of Organization; Name.  Provide prompt written notice to the Collateral Agent of any change of name or change of jurisdiction of organization of any Loan Party, and deliver to the Collateral Agent all additional executed financing statements, financing statement amendments and other documents reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests to the extent provided for in the Security Documents.

6.14    [Reserved].

6.15    Additional Chapter 11 Reporting.

(a)    Initial Budget/Approved Budget.  The Loan Parties shall ensure that the Initial Budget shall be in effect as the Approved Budget at all times until superseded with the consent of the Required DIP Lenders.

(b)    Updated Budget.  Not later than 5:00 p.m. Pacific time on each Monday after the Petition Date, the Loan Parties shall deliver to the Administrative Agent and the Lenders a supplement to the Approved Budget covering the 13-week period that commences with the week in which such supplemental budget is delivered, consistent with the form and level of detail set forth in the Initial Budget (each such supplement, an "Updated Budget").  For the avoidance of doubt, the Updated Budget shall not constitute the Approved Budget.

(c)    Variance Reporting.  Not later than 5:00 p.m. Pacific time on each Monday after the Petition Date, the Loan Parties shall deliver to the Administrative Agent and the Lenders a variance report (each, a "Variance Report") setting forth, in reasonable detail, (a) on a line-by-line basis, any differences between actual receipts and disbursements for each line item for the prior week versus projected receipts and disbursements set forth in each of (x) the Approved Budget and (y) the Updated Budget, in each case, for each such line item for such prior week and (b) on a cumulative basis for the period from the first date in the original Initial Budget to the report date (each such period, a "Test Period") the difference between actual Net Cash Flows for such Test Period and projected Net Cash Flows set forth for such Test Period in the Approved Budget, together with a statement certifying compliance with the Budget Covenant (as defined below), which statement shall be accompanied by supporting evidence reflecting such as is required by the Required DIP Lenders to ascertain compliance with the Budget Covenant.

(d)    Management Conference Calls.  The Borrower shall arrange for a teleconference with the Lenders and their professionals (including Stroock and the Specified Financial Advisor)  (the "Management Conference Call") to take place at least once per calendar week (at such time as is reasonably satisfactory to the Required DIP Lenders), which Management Conference Call shall (i) require participation by at least one senior member of the Borrower's management team and such professional advisors to the Borrower as the Required

DIP Lenders and Lender Advisors elect (provided, that, each Lender, the Specified Financial Advisor and any other Lender Advisors shall be provided with an invitation to, and details of, such Management Conference Call at least two (2) Business Days prior to the scheduled date therefor) and (ii) include discussion of the Variance Report, the Chapter 11 Cases, the financial and operational performance of Holdings and its Subsidiaries, and such other matters as may be requested by the Lenders.

   6.16 <u>UK Pensions</u>.  Ensure that neither it nor any of its Restricted Subsidiaries is an employer (for the purposes of sections 38 to 51 of the Pensions Act 2004) of an occupational pension scheme which is not a money purchase scheme (both terms as defined in the Pension Schemes Act 1993) or to Holdings' or any Restricted Subsidiary's knowledge having made due and careful inquiry, "connected" with or an "associate" of (as those terms are used in sections 38 or 43 of the Pensions Act 2004) such an employer, where being so "connected" with or an "associate" of such employer would result in a direct obligation of Holdings or any of its Restricted Subsidiaries to pay money that would have a Material Adverse Effect.

   6.17 <u>Centre of Main Interests</u>.  Each Loan Party that is incorporated in a jurisdiction to which the Regulation applies shall maintain its "centre of main interests" in its jurisdiction of incorporation for the purposes of the Regulation.

   6.18 <u>People with Significant Control Regime</u>.  Each of Holdings and each of its Restricted Subsidiaries shall (a) within the relevant timeframe, comply with any notice it receives pursuant to Part 21A of the Companies Act 2006 from any company incorporated in England and Wales whose shares are the subject of a Lien in favor of the Administrative Agent or Collateral Agent and (b) promptly provide the Administrative Agent with a copy of that notice.

   6.19 <u>Restructuring Support Agreement</u>.  Maintain at all times the Restructuring Support Agreement in full force and effect with respect to all parties party thereto (including the Loan Parties).

   6.20 <u>Sale Process</u>.  Use commercially reasonable efforts, (a) in consultation with the Lenders, to (i) explore bona fide potential transactions identified by the Lenders for the sale by the Loan Parties or any of their Subsidiaries of the assets or equity interests of any or all of the businesses comprising the Distribution business and/or all of the Creative business (the "<u>Subject Dispositions</u>"), (ii) promptly respond to reasonable diligence requests made in connection with the Subject Dispositions and (iii) provide the Lenders with regular updates regarding the status of the Subject Dispositions and information materials prepared with respect to such Subject Dispositions; and (b) to (i) explore bona fide potential transactions identified by the Borrower for the sale by the Loan Parties or any of their Subsidiaries of the assets or equity interests of any or all of the businesses comprising the Distribution business and/or all of the Creative business and (ii) provide the professional advisors to the Lenders with updates on reasonable basis regarding the status of the transactions described clause (b)(i).

ARTICLE 7.  NEGATIVE COVENANTS

Each of Holdings and the Borrower hereby agrees that from and after the Closing Date, so long as the Loan Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), each of Holdings and the Borrower shall not, and shall not permit any of the Restricted Subsidiaries to:

7.1    Financial Covenants.

(a)    Permit with respect to any Test Period, the actual Net Cash Flows for such Test Period to be lower than the projected Net Cash Flows set forth in the Approved Budget for such period by an amount in excess of $3,000,000 (such permitted variance, the "Permitted Variance" and, such limitation, the "Budget Covenant").

(b)    Permit Consolidated Adjusted EBITDA at the end of each calendar month (beginning with the calendar month in which the Closing Date occurs) to be more than 25% lower than the Consolidated Adjusted EBITDA for such month set forth in the business plan that was delivered to the Specified Financial Advisor on September 1, 2019.

7.2    Indebtedness.    Create, issue, incur, assume, or permit to exist any Indebtedness, except:

(a)    Indebtedness of Holdings and any of its Restricted Subsidiaries pursuant to any Loan Document;

(b)    Indebtedness of Holdings or any of its Restricted Subsidiaries owing to Holdings or any of its Restricted Subsidiaries, provided that (i) any such Indebtedness owing by a Loan Party to a Restricted Subsidiary that is not a Loan Party is expressly subordinated in right of payment to the Obligations pursuant to the Global Intercompany Note or otherwise and (ii) any such Indebtedness owing by a non-Loan Party to a Loan Party is permitted by Section 7.7;

(c)    (x) Capital Lease Obligations, and Indebtedness incurred to finance the acquisition, construction or improvement of any fixed or capital assets (or reimburse the cost thereof), in an aggregate outstanding principal amount for this clause (i) not to exceed $500,000 at the time of such incurrence; and (y) Indebtedness in respect of up to $1,100,000 aggregate principal amount of Capital Leases acquired in connection with the Designated Acquisition;

(d)    [reserved];

(e)    Guarantee Obligations (i) by Holdings or any of its Restricted Subsidiaries of obligations of Holdings, the Borrower or any Subsidiary Guarantor not prohibited by this Agreement to be incurred, (ii) by any Loan Party of obligations of any Non-Guarantor Subsidiary or joint venture or other Person not a Subsidiary to the extent permitted by Section 7.7, and (iii) by any Non-Guarantor Subsidiary of obligations of any other Non-Guarantor Subsidiary not prohibited by this Agreement to be incurred;

77

(f)    Indebtedness of Holdings or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by Holdings or such Restricted Subsidiary in the ordinary course of business and consistent with past practice against insufficient funds, so long as such Indebtedness is promptly repaid;

(g)    [reserved];

(h)    Indebtedness in the form of earn-outs, indemnification, incentive, non-compete, consulting, ordinary course deferred purchase price or other similar arrangements and other contingent obligations in respect of acquisitions or Investments permitted by Section 7.7 (both before or after any liability associated therewith becomes fixed), including any such obligations which may exist on the Closing Date as a result of acquisitions consummated prior to the Closing Date;

(i)    [reserved];

(j)    [reserved];

(k)    Indebtedness outstanding on or prior to the Petition Date and constituting Prepetition Loan Obligations;

(l)    Indebtedness of Holdings or any of its Restricted Subsidiaries in respect of workers' compensation claims, bank guarantees, warehouse receipts or similar facilities, property casualty or liability insurance, take-or-pay obligations in supply arrangements, self-insurance obligations, performance, bid, customs, government, VAT, duty, tariff, appeal and surety bonds, completion guarantees, and other obligations of a similar nature, in each case in the ordinary course of business and consistent with past practice;

(m)    Indebtedness incurred by Holdings or any of its Restricted Subsidiaries arising from agreements providing for indemnification related to sales, leases or other Dispositions of goods or adjustment of purchase price or similar obligations in any case incurred in connection with the acquisition or Disposition of any business, assets or Subsidiary;

(i)    Indebtedness pursuant to the 2019 Mafco Note in an aggregate principal amount at any time outstanding not to exceed $4,750,000;

(n)    [reserved];

(o)    [reserved];

(p)    [reserved];

(q)    Indebtedness of Holdings or any Restricted Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business and consistent with past practice or otherwise consistent with industry practice in an aggregate outstanding face amount not to exceed $500,000;

78

(r)    Indebtedness (i) owing to any insurance company in connection with the financing of any insurance premiums permitted by such insurance company in the ordinary course of business and consistent with past practice and (ii) in the form of pension and retirement liabilities not constituting an Event of Default, to the extent constituting Indebtedness;

(s)    (i) Guarantee Obligations made in the ordinary course of business and consistent with past practice; provided that such Guarantee Obligations are not of Indebtedness for Borrowed Money, (ii) Guarantee Obligations in respect of lease obligations of Holdings and its Restricted Subsidiaries, (iii) Guarantee Obligations in respect of Indebtedness of Non-Guarantor Subsidiaries the aggregate principal amount of which shall not exceed $500,000 at any time outstanding, (iv) Guarantee Obligations in respect of Indebtedness permitted by clause (r)(ii) above, (v) Guarantee Obligations by Holdings or any of its Restricted Subsidiaries of any Restricted Subsidiary's purchase obligations under supplier agreements and in respect of obligations of or to customers, distributors, franchisees, lessors, licensees and sublicensees; provided that such Guarantee Obligations are not of Indebtedness for Borrowed Money, and (vi) Guarantee Obligations of the Borrower or any Subsidiary of Indebtedness of any Person that is not a Subsidiary; provided that any such Guarantee under this clause (vi) shall be treated as an Investment in such Person for purposes of Section 7.7;

(t)    [reserved];

(u)    [reserved];

(v)    Indebtedness in an aggregate principal amount outstanding at any time not to exceed $1,000,000;

(w)    unsecured Indebtedness representing deferred compensation or stock-based compensation to employees of Holdings, any Parent Company, the Borrower or any Restricted Subsidiary incurred in the ordinary course of business and consistent with past practice; provided, that the aggregate principal amount of all Indebtedness outstanding at any time pursuant to this clause (v) shall not exceed $1,000,000;

(x)    [reserved];

(y)    Indebtedness (and Guarantee Obligations in respect thereof) in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business and consistent with past practice;

(z)    (i) Indebtedness of Holdings or any of its Restricted Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary or joint venture in the ordinary course of business and consistent with past practice and (ii) Indebtedness of Holdings or any of its Restricted Subsidiaries to any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business and consistent with past practice in connection with the cash management operations (including in respect of intercompany self-insurance arrangements);

79

(aa)    the Existing Foreign Intercompany Indebtedness and any amendment, extension or replacement thereof, in an aggregate principal amount at any time outstanding not to exceed the aggregate principal amount outstanding as of the Closing Date and the promissory notes which shall be pledged to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement or the other Security Documents and Permitted Refinancings thereof;

(bb)    [reserved];

(cc)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations described in clauses (a) through (aa) above; and

(dd)    (A) unsecured Indebtedness of the Borrower (i) incurred under the 2018 Mafco Line of Credit Agreement to fund the working capital purposes of the Borrower and its Subsidiaries and (ii) in respect of paid-in-kind interest on such Indebtedness (it being understood that such Indebtedness in respect of paid-in-kind interest shall not constitute Funded Debt); provided that the terms of such Indebtedness (x) do not provide for any scheduled amortization, scheduled payments of principal, mandatory redemption, sinking fund obligations or similar scheduled payments (other than regularly scheduled payments of interest in the form of additional principal) or a final maturity prior to the date that is 91 days after the date referred to in clause (a) of the definition of "Maturity Date", (y) provide that the interest applicable to such Indebtedness will be payable only in the form of additional principal and at a rate not to exceed the rate that is equal to three-month LIBOR plus 0.50% per annum, compounded quarterly, and (z) do not include any financial maintenance covenants more restrictive than (or in addition to) those contained in this Agreement; (B) unsecured Indebtedness of the Borrower under the 2018 Mafco Loan in an aggregate principal amount not to exceed $50,000,000; and (C) unsecured Indebtedness of Deluxe Broadcast Services Limited under the 2017 Mafco Broadcast Services Loan in an aggregate principal amount not to exceed $7,000,000; and

(ee)    (i) Indebtedness (including Capital Lease Obligations) outstanding on the Closing Date or committed to be incurred as of such date and listed (including such commitment amount) on Schedule 7.2(ee) of the Prepetition Super Priming Credit Agreement as of the Closing Date (or to the extent not listed on such Schedule 7.2(ee) where the aggregate principal amount of such Indebtedness is less than $1,000,000) and any Permitted Refinancing thereof.

Notwithstanding anything contained herein to the contrary, Holdings, the Borrower and the other Loan Parties shall not permit any Non-Guarantor Subsidiary to create, issue, incur, assume, or permit to exist (x) any Preferred Stock (other than as held by the Borrower or any Restricted Subsidiary) or (y) any Disqualified Capital Stock.

Notwithstanding anything contained herein to the contrary, Holdings, the Borrower and the other Loan Parties shall not, and shall not permit their Restricted Subsidiaries, to create, issue, incur, assume, or permit to exist any Indebtedness for Borrowed Money that is secured by Liens on the Collateral on a *pari passu* or senior basis to the Liens on the Collateral securing the Obligations pursuant to the Loan Documents.

7.3     Liens.     Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)     (i) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings and for which Holdings, or its Restricted Subsidiaries, as applicable, shall have set aside adequate reserves with respect thereto maintained on the books of Holdings or its Restricted Subsidiaries, as the case may be, to the extent required by GAAP, and (ii) Liens for Taxes which are imposed solely as a result of the failure of a member (other than Holdings, the Borrower and the Subsidiaries) of a Tax Group to timely pay Taxes imposed on it, or such Tax Group's income or gains;

(b)     landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and consistent with past practice which are not overdue for a period of more than 60 days or (i) that are being contested in good faith by appropriate proceedings or (ii) with respect to which the failure to make payment could not reasonably be expected to have a Material Adverse Effect;

(c)     (i) pledges, deposits or statutory trusts in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens incurred in the ordinary course of business and consistent with past practice securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to Holdings or any of its Restricted Subsidiaries in respect of such obligations;

(d)     deposits and other Liens to secure the performance of bids, government, trade and other similar contracts (other than for borrowed money), leases, subleases, statutory or regulatory obligations, surety, judgment and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice;

(e)     encumbrances shown as exceptions in the title insurance policies insuring the Mortgages, easements, zoning restrictions, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and consistent with past practice that, in the aggregate, do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of Holdings or any of its Restricted Subsidiaries;

(f)     Liens in existence on the Closing Date (after giving effect to the Transactions) listed on Schedule 7.3(f) of the Prepetition Super Priming Credit Agreement as of the Closing Date (or to the extent not listed on such Schedule 7.3(f), where the Fair Market Value of the Property to which such Lien is attached is less than $2,000,000);

(g)     Liens securing Indebtedness of Holdings or any of its Restricted Subsidiaries incurred pursuant to Section 7.2(c) and Section 7.2(r); provided that (A) [reserved], (B) in the case of any such Liens securing Indebtedness incurred pursuant to Section 7.2(r), such Liens do not encumber any Property other than cash paid to any such insurance company in respect of such insurance, (C) [reserved]; (D) in the case of Liens securing Guarantee

81

Obligations pursuant to Section 7.2(e), the underlying obligations are secured by a Lien permitted to be incurred pursuant to this Agreement and (E) in the case of any such Liens securing Indebtedness incurred pursuant to Section 7.2(c), such Liens shall encumber only the assets subject to such Capital Lease or acquired with the proceeds of such Indebtedness;

(h)    Liens created pursuant to the Loan Documents;

(i)    Liens arising from judgments in circumstances not constituting an Event of Default under Section 8.1(h);

(j)    Liens on Property or assets acquired pursuant to an acquisition permitted under Section 7.7 (and the proceeds thereof) or assets of a Restricted Subsidiary in existence at the time such Restricted Subsidiary is acquired pursuant to an acquisition permitted under Section 7.7 and not created in contemplation thereof and Liens created after the Closing Date in connection with any refinancing, refundings, replacements or renewals or extensions of the obligations secured thereby permitted hereunder, provided that no such Lien is spread to cover any additional Property (other than other Property of such Restricted Subsidiary or the proceeds or products of the acquired assets or any accessions or improvements thereto and after-acquired property subjected to a Lien pursuant to terms existing at the time of such acquisition) after the Closing Date (unless such Lien utilizes a separate basket under this Section 7.3);

(k)    [reserved];

(l)    receipt of progress payments and advances from customers in the ordinary course of business and consistent with past practice to the extent same creates a Lien on the related inventory and proceeds thereof;

(m)    Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods;

(n)    Liens arising out of consignment or similar arrangements for the sale by Holdings and its Restricted Subsidiaries of goods through third parties in the ordinary course of business and consistent with past practice;

(o)    Liens solely on any cash earnest money deposits made by Holdings or any of its Restricted Subsidiaries in connection with an Investment permitted by Section 7.7;

(p)    Liens deemed to exist in connection with Investments permitted by Section 7.7(b) that constitute repurchase obligations;

(q)    Liens upon specific items of inventory, equipment or other goods and proceeds of Holdings or any of its Restricted Subsidiaries arising in the ordinary course of business and consistent with past practice securing such Person's obligations in respect of bankers' acceptances and letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory, equipment or other goods;

(r)    [reserved];

82

(s)    any interest or title of a lessor under any leases or subleases entered into by Holdings or any of its Restricted Subsidiaries in the ordinary course of business and consistent with past practice and any financing statement filed in connection with any such lease;

(t)    [reserved];

(u)    (i) Liens that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of Holdings or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings and its Restricted Subsidiaries and consistent with past practice or (C) relating to purchase orders and other agreements entered into with customers of Holdings or any of its Restricted Subsidiaries in the ordinary course of business and consistent with past practice, (ii) other Liens securing cash management obligations in the ordinary course of business and consistent with past practice and (iii) Liens encumbering reasonable and customary initial deposits and margin deposits in respect of, and similar Liens attaching to, commodity trading accounts and other brokerage accounts incurred in the ordinary course of business and consistent with past practice and not for speculative purposes;

(v)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(w)    Liens on Capital Stock in joint ventures and other non-wholly owned entities securing obligations of such joint venture or entity and options, put and call arrangements, rights of first refusal and similar rights relating to Capital Stock in joint ventures and other non-wholly owned entities;

(x)    Liens securing obligations in respect of trade-related letters of credit permitted under Section 7.2 and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(y)    other Liens with respect to obligations, the principal amount of which do not exceed $1,000,000 at any time outstanding;

(z)    licenses, sublicenses, cross-licensing or pooling of, or similar arrangements with respect to, Intellectual Property granted by Holdings or any of its Restricted Subsidiaries which do not interfere in any material respect with the ordinary conduct of the business of Holdings or such Restricted Subsidiary;

(aa)    Liens arising from precautionary UCC financing or Canadian PPSA financing statement filings (or other similar filings in non-U.S. jurisdictions) regarding leases, subleases, licenses or consignments, in each case, entered into by Holdings or any of its Restricted Subsidiaries;

(bb)    Liens on cash and Cash Equivalents (and the related escrow accounts) in connection with the issuance into (and pending the release from) escrow of any Indebtedness permitted under Section 7.2, and, in each case, any Permitted Refinancing thereof;

(cc)    (i) Liens on the Collateral securing Indebtedness incurred pursuant to Section 7.2(k), underlined, that such liens shall have the priorities set forth in the Orders, and (ii) Liens solely on the Deluxe One Assets securing Indebtedness incurred pursuant to Section 7.2(n), underlined, that such liens shall have the priorities set forth in the Orders;

(dd)    zoning or similar laws or rights reserved to or vested in any Governmental Authority to control or regulate the use of any real property;

(ee)    the reservations, limitations, provisos and conditions expressed in any original grants from the Crown of real or immoveable property in Canada, which do not materially impair the use of the affected land for the purpose used or intended to be used by that person; and

(ff)    any extension, renewal or replacement of the foregoing or the following; provided that the Liens permitted by this clause (ff) shall not extend to or cover any additional Indebtedness (other than applicable Permitted Refinancings) or property (other than the proceeds or products thereof or any accessions or improvements thereto and after-acquired property subjected to a Lien pursuant to terms no broader than the equivalent terms existing at the time of such extension, renewal or replacement, and other than a substitution of like property) unless such Lien uses a separate basket under this Section 7.3.

7.4    Fundamental Changes.    Consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business in one or a series of related transactions, except in accordance with the Plan of Reorganization and implementation thereof, including as may be set forth in the Restructuring Transaction Memorandum (as defined in the Plan of Reorganization).

7.5    Dispositions of Property.    Dispose of any of its owned Property (including receivables) whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock (other than directors' qualifying shares) to any Person, except:

(a)    (i) the Disposition of surplus, obsolete, damaged or worn out Property (including intellectual property no longer material to the business of the Borrower and the Subsidiaries, scrap and byproducts) in the ordinary course of business and consistent with past practice, Dispositions of Property no longer used or useful or economically practicable to maintain in the conduct of the business of the Borrower and other Restricted Subsidiaries in the ordinary course and consistent with past practice and Dispositions of Property necessary in order to comply with applicable Requirements of Law or licensure requirements (as determined by the Borrower in good faith), (ii) the sale of defaulted receivables in the ordinary course of business and consistent with past practice and (iii) sales, leases or other dispositions of inventory reasonably determined by the management of the Borrower to be no longer useful or necessary in the operation of the Business;

(b)    (i) the sale of inventory or other Property in the ordinary course of business and consistent with past practice, (ii) the cross-licensing, pooling, sublicensing or

licensing of, or similar arrangements (including disposition of marketing rights) with respect to, Intellectual Property in the ordinary course of business and consistent with past practice, and (iii) the contemporaneous exchange, in the ordinary course of business and consistent with past practice, of Property for Property of a like kind, to the extent that the Property received in such exchange is of a Fair Market Value equivalent to the Fair Market Value of the Property exchanged (provided that after giving effect to such exchange, the Fair Market Value of the Property of any Loan Party subject to Liens in favor of the Collateral Agent under the Security Documents is not materially reduced);

(c)    Dispositions permitted by Section 7.4;

(d)    the sale or issuance of (i) any Subsidiary's Capital Stock to any Loan Party and (ii) the Capital Stock of any Non-Guarantor Subsidiary that is a Restricted Subsidiary to any other Non-Guarantor Subsidiary that is a Restricted Subsidiary, in each case, including in connection with any tax restructuring activities not otherwise prohibited hereunder;

(e)    [reserved];

(f)    (i) any Recovery Event; provided that the requirements of Section 2.12(b) are complied with in connection therewith; and (ii) any event that would constitute a Recovery Event but for the Dollar threshold set forth in the definition thereof;

(g)    the leasing, licensing, occupying pursuant to occupancy agreements or sub-leasing of Property that would not materially interfere with the required use of such Property by Holdings or its Restricted Subsidiaries;

(h)    [reserved];

(i)    the sale or discount, in each case without recourse and in the ordinary course of business and consistent with past practice, of accounts receivable arising in the ordinary course of business and consistent with past practice, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(j)    transfers of condemned or expropriated Property as a result of the exercise of "eminent domain", expropriation or other similar policies to the respective Governmental Authority or agency that has condemned or expropriated the same (whether by deed in lieu of condemnation, expropriation or otherwise), and transfers of properties that have been subject to a casualty to the respective insurer of such Property as part of an insurance settlement;

(k)    [reserved];

(l)    [reserved];

(m)    the transfer of Property (i) by any Loan Party to any other Loan Party or (ii) from a Non-Guarantor Subsidiary to (A) any Loan Party; provided that the portion (if any) of such Disposition made for more than Fair Market Value shall constitute an Investment and

85

comply with Section 7.7 or (B) any other Non-Guarantor Subsidiary that is a Restricted Subsidiary;

(n)    the Disposition of cash and Cash Equivalents in the ordinary course of business and consistent with past practice;

(o)    (i) Liens permitted by Section 7.3, (ii) Restricted Payments permitted by Section 7.6, (iii) Investments permitted by Section 7.7 and (iv) sale and leaseback transactions permitted by Section 7.10;

(p)    Dispositions of Investments in joint ventures and other non-wholly owned entities to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements, shareholder agreements and similar binding arrangements;

(q)    [reserved];

(r)    [reserved];

(s)    the unwinding of Hedge Agreements permitted hereunder, pursuant to their terms;

(t)    [reserved];

(u)    [reserved];

(v)    the sale of services, or the termination of any contracts, in each case in the ordinary course of business and consistent with past practice;

(w)    [reserved]; and

(x)    Dispositions of Property between or among Holdings and/or its Restricted Subsidiaries as a substantially simultaneous interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (q) above.

Notwithstanding anything to the contrary contained herein, (i) no Loan Party shall Dispose of any material Intellectual Property except for any such Disposition to another Loan Party and (ii) no Restricted Subsidiary that is not a Loan Party shall dispose of any material Intellectual Property except for any such Disposition to the Borrower or any other Restricted Subsidiary for no more than Fair Market Value, in each case, other than non-exclusive licenses solely to the extent otherwise permitted by this Agreement.

7.6    <u>Restricted Payments</u>.    Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of Holdings or any of its Restricted Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, including pursuant to any Synthetic Purchase Agreement, either

NY 77805691v5

directly or indirectly, whether in cash or Property or in obligations of Holdings or such Restricted Subsidiary (collectively, "Restricted Payments"), except that:

(a)    (i) any Restricted Subsidiary may make Restricted Payments to any Loan Party and (ii) Non-Guarantor Subsidiaries may make Restricted Payments to other Non-Guarantor Subsidiaries;

(b)    [reserved];

(c)    the Borrower or any Restricted Subsidiary may make Restricted Payments to Holdings in an amount not to exceed $100,000 in any fiscal year, to the extent necessary to pay general corporate and overhead expenses incurred by Holdings in the ordinary course of business;

(d)    Holdings may make Restricted Payments in the form of Capital Stock of Holdings (other than Disqualified Capital Stock);

(e)    [reserved];

(f)    [reserved];

(g)    [reserved];

(h)    [reserved];

(i)    [reserved];

(j)    to the extent constituting Restricted Payments, Holdings and its Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Sections 7.4, 7.5 and 7.7; and

(k)    any non-wholly owned Restricted Subsidiary of Holdings may declare and pay cash dividends to its equity holders generally so long as Holdings or its respective Subsidiary which owns the equity interests in the Restricted Subsidiary paying such dividend receives at least its proportional share thereof (based upon its relative holding of the equity interests in the Restricted Subsidiary paying such dividends and taking into account the relative preferences, if any, of the various classes of equity interest of such Restricted Subsidiary).

Notwithstanding anything contained in any Loan Document to the contrary, Holdings, the Borrower and the other Loan Parties shall not, and shall not permit their Restricted Subsidiaries to, make any Restricted Payment in respect of any Capital Stock issued in connection with the conversion or exchange of Junior Financing or any Mafco Indebtedness.

Notwithstanding anything contained in any Loan Document to the contrary, Holdings, the Borrower and the other Loan Parties shall not, and shall not permit their Restricted Subsidiaries to, pay any management fees to the Sponsor.

87

7.7    <u>Investments</u>.  Make any advance, loan, extension of credit (by way of guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or all or substantially all of the assets constituting an ongoing business from, or make any other similar investment in, any other Person (all of the foregoing, "<u>Investments</u>"), except:

(a)    (i) extensions of trade credit in the ordinary course of business and consistent with past practice, (ii) loans and advances made to distributors, customers, vendors and suppliers in the ordinary course of business and consistent with past practice, (iii) purchases and acquisitions of inventory, supplies, materials and equipment, in each case in the ordinary course of business and consistent with past practice, to the extent such purchases and acquisitions constitute Investments, (iv) Investments among Holdings and its Restricted Subsidiaries in connection with the sale of inventory and parts in the ordinary course of business and consistent with past practice, and (v) purchases and acquisitions of Intellectual Property or purchases of contract rights or licenses or leases of Intellectual Property, to the extent such purchases and acquisitions constitute Investments;

(b)    Investments in Cash Equivalents and Investments that were Cash Equivalents when made;

(c)    Investments arising in connection with (i) the incurrence of Indebtedness permitted by Section 7.2(e), (s) or (y) to the extent arising as a result of Indebtedness among Holdings or any of its Restricted Subsidiaries and Guarantee Obligations permitted by such Section 7.2(e), (s) or (y) and payments made in respect of such Guarantee Obligations and (ii) guarantees by Holdings or any of its Restricted Subsidiaries of leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business and consistent with past practice or otherwise not prohibited hereunder;

(d)    [reserved];

(e)    Investments (i) (other than those relating to the incurrence of Indebtedness permitted by Section 7.7(c)) by Holdings or any of its Restricted Subsidiaries in Holdings, the Borrower or any Person that, prior to such Investment, is a Loan Party (or is a Subsidiary that becomes a Loan Party in connection with such Investment), (ii) by Loan Parties in any Non-Guarantor Subsidiaries so long as such Investment is part of a series of Investments by Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the initial Investment being invested substantially simultaneously in one or more Loan Parties or (iii) comprised solely of equity purchases by Holdings or any of its Restricted Subsidiaries in any other Restricted Subsidiary made for tax purposes, so long as the Borrower provides to the Administrative Agent evidence reasonably acceptable to the Administrative Agent that, after giving <u>pro forma</u> effect to such Investments, the granting, perfection, validity and priority of the security interest of the Secured Parties in the Collateral, taken as a whole, is not impaired in any material respect by such Investment;

(f)    [reserved];

88

(g)    [reserved];

(h)    [reserved];

(i)    Investments (including debt obligations) received in the ordinary course of business by Holdings or any of its Restricted Subsidiaries and consistent with past practice in connection with (w) the bankruptcy or reorganization of suppliers, customers and other Persons, (x) settlement of delinquent obligations of, and other disputes with, suppliers, customers and other Persons arising in the ordinary course of business and consistent with past practice, (y) endorsements for collection or deposit and (z) customary trade arrangements with customers, including consisting of Capital Stock of customers issued to the Borrower or any Subsidiary in consideration for goods provided and/or services rendered;

(j)    Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(k)    (i) Investments outstanding on the Closing Date (after giving effect to the Transactions) and listed on Schedule 7.7 and (ii) any extensions, renewals or replacements of such Investments set forth on Schedule 7.7 so long as the amount of any such extension, renewal or replacement is not greater than the amount so extended, renewed or replaced;

(l)    Investments of Holdings or any of its Restricted Subsidiaries under Hedge Agreements permitted hereunder;

(m)    [reserved];

(n)    Investments made on or substantially concurrently with the Closing Date to consummate the Transactions;

(o)    to the extent constituting Investments, transactions expressly permitted (other than by reference to this Section 7.7 or any clause thereof) under Sections 7.4, 7.5 and 7.6;

(p)    [reserved];

(q)    Investments arising directly out of the receipt by Holdings or any of its Restricted Subsidiaries of non-cash consideration for any sale of assets permitted under Section 7.5;

(r)    (i) Investments resulting from pledges and deposits referred to in Sections 7.3(c) and (d), and (ii) cash earnest money deposits made in connection with other Investments permitted by Section 7.7;

(s)    Investments in the ordinary course of business and consistent with past practice consisting of (i) the licensing, sublicensing, cross-licensing, pooling or contribution of, or similar arrangements with respect to, Intellectual Property, and (ii) the transfer or licensing of non-U.S. Intellectual Property to a Foreign Subsidiary;

(t)    [reserved];

(u)     Investments in the ordinary course of business and consistent with past practice consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers;

(v)     any other Investments made after the Closing Date (i) in an aggregate amount made not to exceed $1,000,000 or (ii) to the extent permitted in accordance with, and set forth in, the Initial Budget;

(w)     advances of payroll payments to employees, or fee payments to directors or consultants, in the ordinary course of business and consistent with past practice;

(x)     [reserved];

(y)     Investments in respect of capital expenditures (subject to compliance with Section 7.15 to the extent applicable);

(z)     [reserved];

(aa)    Investments to the extent that payment for such Investments is made solely by the issuance of Capital Stock (other than Disqualified Capital Stock) of Holdings (or any Parent Company) to the seller of such Investments (it being understood that, for the avoidance of doubt, no payment for any such Investment under this Section 7.7(aa) may be made in the form of proceeds from the issuance of such Capital Stock, or in reliance on the receipt of any such proceeds); and

(bb)    Investments in respect of Customer Advances made by the Borrower and the Subsidiaries in any fiscal year not to exceed $3,000,000.

It is further understood and agreed that for purposes of determining the value of any Investment outstanding for purposes of this Section 7.7, such amount shall be deemed to be the amount of such Investment when made, purchased or acquired less any returns on such Investment (not to exceed the original amount invested).

7.8     Prepayments, Etc. of Indebtedness; Amendments.

(a)     Optionally prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner the principal amount of any Indebtedness that is expressly subordinated by contract in right of payment to the Obligations (other than intercompany Indebtedness permitted hereunder and Indebtedness of the type described in clause (c) of the definition of such term) (collectively, "Junior Financing") (it being understood that, for the avoidance of doubt, (A) payments of regularly scheduled interest and principal on all of the foregoing shall be permitted and (B) the term "Junior Financing" does not include any Indebtedness under the Prepetition ABL Credit Agreement), or make any payment in violation of any subordination terms of any Junior Financing Documentation, except

(i)     [reserved],

(ii)      the conversion of any Junior Financing to Capital Stock (other than Disqualified Capital Stock); and

(iii)      the prepayment, redemption, purchase, defeasance or other satisfaction of any Prepetition Super Priming Obligations to consummate the Transactions;

(b)      amend, modify or change any term or condition of (x) any Junior Financing Documentation, in each case, governing Indebtedness in an aggregate principal amount or having aggregate commitments individually in excess of $15,000,000, (y) any Mafco Indebtedness or (z) the Prepetition Loan Documents, in any manner that is, taken as a whole with any contemporaneous amendments to such documentation, materially adverse to the interests of the Lenders;

(c)      prepay, redeem, purchase, defease or otherwise satisfy any Mafco Indebtedness; or

(d)      optionally prepay Indebtedness outstanding under the Prepetition Loan Documents.

7.9      <u>Transactions with Affiliates</u>.  Enter into any transaction, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate thereof (other than Holdings or any of its Restricted Subsidiaries) unless (a) such transaction is otherwise not prohibited under this Agreement and (b) such transaction (or transactions) is upon terms no less favorable to Holdings or such Restricted Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.  Notwithstanding the foregoing, Holdings and its Restricted Subsidiaries may:

(i)      make any Restricted Payment permitted pursuant to Section 7.6 or any Investment permitted pursuant to Section 7.7;

(ii)      perform their obligations pursuant to the Transactions; and

(iii)      enter into transactions set forth on Schedule 7.9 of the Prepetition Super Priming Credit Agreement as of the Closing Date.

For the avoidance of doubt, this Section 7.9 shall not apply to employment, benefits, compensation, bonus, retention and severance arrangements with, and payments of compensation or benefits (including customary fees, expenses and indemnities) to or for the benefit of, current or former employees, consultants, officers or directors of Holdings or any of its Restricted Subsidiaries in the ordinary course of business and consistent with past practice.

7.10      <u>Sales and Leasebacks</u>.  Enter into any arrangement, with any Person providing for the leasing by Holdings or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by Holdings or any of its Restricted Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of Holdings or any of its Restricted Subsidiaries, which Property Holdings or such Subsidiary intends to use for substantially the

91

same purpose, except for (i) sales or transfers by Holdings or any of its Restricted Subsidiaries to any Loan Party and (ii) sales or transfers by any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary that is a Restricted Subsidiary.

7.11   Changes in Fiscal Periods.  Permit the fiscal year of Holdings to end on a day other than December 31; provided, that Holdings may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, Holdings, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

7.12   Negative Pledge Clauses.  Enter into any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement or the other Security Documents, other than:

(a)     this Agreement and the other Loan Documents;

(b)     any agreements governing Indebtedness and/or other obligations secured by a Lien permitted by this Agreement (in which case, any prohibition or limitation shall only be effective against the assets subject to such Liens permitted by this Agreement);

(c)     software and other Intellectual Property licenses pursuant to which such Loan Party is the licensee of the relevant software or Intellectual Property, as the case may be (in which case, any prohibition or limitation shall relate only to the assets subject to the applicable license);

(d)     Contractual Obligations incurred in the ordinary course of business and consistent with past practice which (i) limit Liens on the assets that are the subject of the applicable Contractual Obligation or (ii) contain customary provisions restricting the assignment, transfer or pledge of such agreements;

(e)     any agreements regarding Indebtedness or other obligations of any Non-Guarantor Subsidiary not prohibited under Section 7.2 (in which case, any prohibition or limitation shall only be effective against the assets of such Non-Guarantor Subsidiary and its Subsidiaries);

(f)     prohibitions and limitations in effect on the Closing Date and listed on Schedule 7.12;

(g)     customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(h)     customary provisions restricting the subletting, assignment, pledge or other transfer of any lease governing a leasehold interest;

NY 77805691v5

(i)     customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses, sublicenses, cross license, pooling and similar agreements not prohibited hereunder;

(j)     any agreement in effect at the time any Person becomes a Subsidiary of Holdings or is merged with or into Holdings or a Subsidiary of Holdings, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary of Holdings or party to such merger;

(k)     restrictions imposed by applicable law or regulation or license requirements;

(l)     restrictions in any agreements or instruments relating to any Indebtedness permitted to be incurred by this Agreement (including indentures, instruments or agreements governing any Permitted Refinancings of each of the foregoing) (i) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Restricted Subsidiaries than the encumbrances contained in this Agreement (as determined in good faith by the Borrower) or (ii) if such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to create and maintain the Liens on the Collateral pursuant to the Security Documents;[;

(m)     restrictions in respect of Indebtedness secured by Liens permitted by Sections 7.3(g) relating solely to the assets or proceeds thereof secured by such Indebtedness;

(n)     customary provisions restricting assignment of any agreement entered into in the ordinary course of business and consistent with past practice;

(o)     restrictions arising in connection with cash or other deposits not prohibited hereunder and limited to such cash or other deposit;

(p)     restrictions and conditions contained in the Prepetition Loan Documents; and

(q)     the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in clauses (a) through (p) above, provided that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

93

7.13    Clauses Restricting Subsidiary Distributions.  Enter into any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, Holdings or any of its Restricted Subsidiaries or (b) make Investments in Holdings or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of or consisting of

(i)    this Agreement or any other Loan Documents;

(ii)    [reserved];

(iii)    customary net worth provisions contained in Real Property leases entered into by Holdings and its Restricted Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower to meet its ongoing payment obligations hereunder or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement or the other Security Documents;

(iv)    agreements related to Indebtedness permitted by this Agreement (including indentures, instruments or agreements governing any Permitted Refinancings of each of the foregoing) to the extent that (x) the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Restricted Subsidiaries than the encumbrances and restrictions contained in this Agreement (as determined in good faith by the Borrower) or (y) such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(v)    licenses, sublicenses, cross-licensing or pooling by Holdings and its Restricted Subsidiaries of, or similar arrangements with respect to, Intellectual Property in the ordinary course of business and consistent with past practice (in which case such restriction shall relate only to such Intellectual Property);

(vi)    Contractual Obligations incurred in the ordinary course of business and consistent with past practice which include customary provisions restricting the assignment, transfer  or pledge thereof;

(vii)    customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(viii)    customary provisions restricting the subletting or assignment of any lease governing a leasehold interest;

NY 77805691v5

(ix)    customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses and similar agreements not prohibited hereunder;

(x)    any agreement in effect at the time any Person becomes a Subsidiary of Holdings or is merged with or into Holdings or a Subsidiary of Holdings, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary of Holdings or party to such merger;

(xi)    encumbrances or restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business and consistent with past practice;

(xii)    encumbrances or restrictions imposed by applicable law, regulation or customary license requirements;

(xiii)    any agreement in effect on the Closing Date and described on Schedule 7.13;

(xiv)    restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement, or other obligations secured by liens permitted pursuant to Section 7.3, if such restrictions or conditions apply only to the property or assets securing such Indebtedness or obligations;

(xv)    restrictions and conditions contained in the Prepetition Credit Agreements or the other Prepetition Loan Documents; and

(xvi)    the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in sub-clauses (i) through (xv) above, provided that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

7.14    Limitation on Hedge Agreements.  Enter into any Hedge Agreement other than Hedge Agreements entered into in the ordinary course of business and consistent with past practice and not for speculative purposes.

7.15    Capital Expenditures.    Permit the aggregate amount of Capital Expenditures made by the Borrower and the Subsidiaries to exceed the amount set forth therefor in the Initial Budget.

7.16    Business of Holdings.  With respect to Holdings, engage in any business activities or have any assets or liabilities other than its ownership of the Capital Stock of the

NY 77805691v5

Borrower and liabilities incidental thereto, including its liabilities pursuant to the Loan Documents and the Prepetition ABL Facility Loan Documents or Indebtedness secured by Liens incurred pursuant to Sections 7.3(g), (p), (y) and (cc) (and (ff) to the extent relating to any Liens referred to in the foregoing clauses) (and any Permitted Refinancings in respect of any of the foregoing) to which it is a party.

7.17    Chapter 11 Cases.

(a)    Except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is *pari passu* with, or senior to, the Obligations.

(b)    Make or permit to be made any amendment, modification, supplement or change to the Orders, as applicable, (other than immaterial modifications or modifications to correct grammatical, ministerial or typographical errors) without the prior written consent of the Required DIP Lenders.

(c)    Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent, any Lender, any other Secured Party and any Prepetition Secured Party with respect to this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby.

(d)    Subject to the Restructuring Support Agreement, make (i) any payments on account of Accounts Payable Claims (as defined in the Restructuring Support Agreement, as amended), (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court after notice and a hearing and (b) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget or otherwise with the consent of the Required DIP Lenders.

(e)    File any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or such lesser time as may be acceptable to Required DIP Lenders in their reasonable discretion)) notice and the opportunity to review and comment on each such motion.

7.18    Milestones.    Fail to comply with any of the milestones set forth on Schedule 7.18 hereto (the "Milestones").

ARTICLE 8.   EVENTS OF DEFAULT

8.1    Events of Default.    If any of the following events shall occur and be continuing:

NY 77805691v5

(a)    The Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof or (ii) any interest owed by it on any Loan, or any other amount payable by it hereunder or under any other Loan Document, within three (3) Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate or other document furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall in either case prove to have been inaccurate in any material respect and such inaccuracy is adverse to the Lenders on or as of the date made or deemed made or furnished; or

(c)    Any Loan Party shall default in the observance or performance of any agreement contained in Section 6.7(a), Section 6.8, Section 6.9, Section 6.10, Section 6.16, Section 6.19, Section 6.20 or Article 7; or

(d)    (i) Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8.1), and such default shall continue unremedied for a period of 15 days after such Loan Party receives from the Administrative Agent or the Required DIP Lenders notice of the existence of such default or (ii) any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1 or Section 6.15 and such default shall continue unremedied for a period of 5 days after such Loan Party receives from the Administrative Agent or the Required DIP Lenders notice of the existence of such default; or

(e)    Holdings or any of its Restricted Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness for Borrowed Money on the scheduled or original due date with respect thereto beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or (ii) default in making any payment of any interest on any such Indebtedness for Borrowed Money beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness for Borrowed Money or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event of default shall occur, the effect of which payment or other default or other event of default is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required (but after giving effect to any applicable cure period), such Indebtedness for Borrowed Money to become due prior to its Stated Maturity or to become subject to a mandatory offer to purchase by the obligor thereunder; provided that (A) a default, event or condition described in this paragraph shall not at any time constitute an Event of Default unless, at such time, one or more defaults or events of default of the type described in this paragraph shall have occurred and be continuing with respect to Indebtedness for Borrowed Money the outstanding principal amount of which individually exceeds $10,000,000, and in the case of Indebtedness for Borrowed Money of the types described in clauses (i) and (ii) of the definition thereof, with respect to such Indebtedness which exceeds such amount either individually or in the aggregate; (B) this paragraph (e) shall

97

not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer, destruction or other disposition of the Property or assets securing such Indebtedness for Borrowed Money if such sale, transfer, destruction or other disposition is not prohibited hereunder and under the documents providing for such Indebtedness, or (ii) any Guarantee Obligations except to the extent such Guarantee Obligations shall become due and payable by any Loan Party and remain unpaid after any applicable grace period or period permitted following demand for the payment thereof and (C) a default, event or condition described in this paragraph shall not at any time constitute an Event of Default if the exercise of the rights and remedies by a holder of such Indebtedness against the obligors thereof is subject to the automatic stay in the Chapter 11 Cases; provided, further, that no Event of Default under this clause (e) shall arise or result from any change of control (or similar event) under any other Indebtedness for Borrowed Money that is triggered due to the Permitted Investors (as defined herein) obtaining the requisite percentage contemplated by such change of control provision, unless both (x) such Indebtedness for Borrowed Money shall become due and payable or shall otherwise be required to be repaid, repurchased, redeemed or defeased, whether at the option of any holder thereof or otherwise and (y) at such time, Holdings and/or its Restricted Subsidiaries would not be permitted to repay such Indebtedness for Borrowed Money in accordance with the terms of this Agreement; provided, however, if the exercise of any rights or remedies by a holder of such Indebtedness or beneficiary of such Guarantee with respect to any of the foregoing events is stayed by the Bankruptcy Code or enjoined by the Bankruptcy Court, then such events shall not constituted an "Event of Default" so long as such exercise of rights or remedies remain stayed or enjoined; or

(f)        [reserved]; or

(g)        (i) Holdings or any of its Restricted Subsidiaries shall incur any liability in connection with any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) a failure to meet the minimum funding standards (as defined in Section 302(a) of ERISA), whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Lien shall arise on the assets of Holdings or any of its Restricted Subsidiaries, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Single Employer Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate in a distress termination under Section 4041(c) of ERISA or in an involuntary termination by the PBGC under Section 4042 of ERISA, (v) Holdings or any of its Restricted Subsidiaries shall, or is reasonably likely to, incur any liability as a result of a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan or a Commonly Controlled Plan; and in each case in clauses (i) through (vi) above, which event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in a direct obligation of Holdings or any of its Restricted Subsidiaries to pay money that would reasonably be expected to have a Material Adverse Effect; or

(h)        One or more final judgments or decrees shall be entered against Holdings or any of its Restricted Subsidiaries (other than a judgment or decree against a Loan Party that is

NY 77805691v5

a Chapter 11 Debtor entered prior to the Petition Date that is subject to the automatic stay in the Chapter 11 Cases) pursuant to which Holdings and any such Restricted Subsidiaries taken as a whole has a liability (not paid or fully covered by third-party insurance or effective indemnity) of $10,000,000 or more (net of any amounts which are covered by insurance or an effective indemnity), and all such judgments or decrees shall not have been vacated, discharged, dismissed, stayed or bonded within 60 days from the entry thereof; or

(i)    (i) Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof in accordance with the terms thereof or hereof) to be in full force and effect or shall be asserted in writing by the Borrower or any Guarantor not to be a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Security Document with respect to any material portion of the Collateral of the Loan Parties on a consolidated basis shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priorities set forth in the Orders) in the securities, assets or properties covered thereby, except to the extent that (x) any such loss of perfection or priority results from limitations of foreign laws, rules and regulations as they apply to pledges of Capital Stock in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent (or, in the case of the Prepetition ABL Facility Collateral, the collateral agent under the Prepetition ABL Credit Agreement) to maintain possession of certificates actually delivered to it representing securities pledged under the Guarantee and Collateral Agreement, the other Security Documents or otherwise or to file UCC continuation statements, (y) such loss is covered by a lender's title insurance policy and the Administrative Agent shall be reasonably satisfied with the credit of such insurer or (z) any such loss of validity, perfection or priority is the result of any failure by the Collateral Agent (or, in the case of the Prepetition ABL Facility Collateral, the collateral agent under the Prepetition ABL Credit Agreement) to take any action necessary to secure the validity, perfection or priority of the security interests or (iii) the Guarantee Obligations pursuant to the Security Documents by any Loan Party of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms hereof or thereof), or such Guarantee Obligations shall be asserted in writing by any Loan Party not to be in effect or not to be legal, valid and binding obligations; or

(j)    (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or (ii) for any reason whatsoever, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Investors) shall become the "beneficial owner" (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, of more than the greater of (x) 35% of the then outstanding voting securities having ordinary voting power of Holdings and (y) the percentage of the then outstanding voting securities having ordinary voting power of Holdings owned, directly or indirectly, beneficially (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) by the Permitted Investors (it being understood that if any such person or group includes one or more Permitted Investors, the outstanding voting securities having ordinary voting power of Holdings directly or indirectly owned by the Permitted Investors that are part of such person or group shall not be treated as being owned by such person or group for purposes of determining whether this clause (y) is triggered) (any of the foregoing, a "Change of Control");

99

(k)        the Restructuring Support Agreement is terminated by any party thereto or otherwise terminates in accordance with the terms thereof; or

(l)        any of the following shall have occurred in the Chapter 11 Cases:

(i)        the bringing of a motion by any Chapter 11 Debtor or other Loan Party, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash; (ii) to grant any Lien other than Liens expressly permitted under this Agreement and the Orders upon or affecting any Collateral; (iii) except as provided in this Agreement and the Orders, as the case may be, to use cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required DIP Lenders; or (iv) that requests or seeks authority for or that approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent and the Lenders hereunder or their interest in the Collateral;

(ii)        the filing by any Chapter 11 Debtor, or other Loan Party, of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, to which the Administrative Agent and the Required DIP Lenders do not consent or otherwise agree to the treatment of their claims;

(iii)        the termination of any Chapter 11 Debtor's exclusive right to file and solicit acceptances of a plan of reorganization;

(iv)        the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization (other than the Plan of Reorganization, unless consistent in all material respects with the Restructuring Support Agreement as in effect on the Closing Date and otherwise satisfactory to the Required DIP Lenders);

(v)        the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document or any of the Orders in a manner adverse to the Administrative Agent and the Lenders, in any case, without the prior written consent of the Required DIP Lenders;

(vi)        the payment of, or application by any Loan Party for authority to pay, any prepetition claim without the Required DIP Lenders' prior written consent other than (i) as provided in any "first day order" in form and substance reasonably acceptable to the Required DIP Lenders, or (ii) as set forth in the Approved Budget (subject to the Permitted Variances) unless otherwise permitted under this Agreement;

(vii)        the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Chapter 11 Debtor or other Loan Party, for an order seeking the appointment of, in either case, without the consent of the Required DIP Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with

100

expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Chapter 11 Debtors or with the power to conduct an investigation of (or compel discovery from) the Agents or the Lenders or any Prepetition Secured Parties;

(viii)   the sale, without the Administrative Agent's and the Required DIP Lenders' consent, of all or substantially all of the Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise;

(ix)    the dismissal of the Chapter 11 Cases;

(x)    the Chapter 11 Debtors shall institute any proceeding or investigation, or support the same instituted by any other person, challenging the status and/or validity of the Liens securing the Obligations or any Liens securing any Prepetition Loan Obligations;

(xi)    the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or any Chapter 11 Debtor, or other Loan Party, shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(xii)   the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Administrative Agent;

(xiii)   the entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xiv)   the failure of any Loan Party to perform any of its obligations under the Orders or any violation of any of the terms of the Orders, to the extent any such failure or violation is the direct result of the conduct of the Loan Parties;

(xv)    the challenge by any Loan Party to the validity, extent, perfection or priority of any liens granted under the Prepetition Loan Documents or the Loan Documents;

(xvi)   the remittance, use or application of cash collateral of the Loan Parties other than in accordance with the Orders;

(xvii)   other than the Orders, the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and the Secured Parties, without the prior written consent of the Required DIP Lenders;

(xviii)  other than the DIP Motion and Orders, the filing of a motion by any Loan Party requesting, or the entry of any order granting, any superpriority claim which is senior or pari passu with the Lenders' claims;

(xix)    other than the Orders, the entry of an order precluding the Administrative Agent or the Prepetition Agent from having the right to, or being permitted to, "credit bid";

(xx)    other than as set forth in the Orders, any attempt by any Loan Party to reduce, avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt;

(xxi)    the reversal, vacation or stay of the effectiveness of the Orders or any provision thereof without the prior written consent of the Required DIP Lenders;

(xxii)  the payment of or granting adequate protection with respect to any prepetition Indebtedness (other than with respect to payment permitted under any "first day order" in form and substance satisfactory to the Required DIP Lenders or as set forth in the Orders);

(xxiii)  subject to the Orders, an application for any of the orders described in this Section 8.01(l) shall be made by a Person other than the Administrative Agent or the Lenders and such application is not, to the extent requested by the Administrative Agent or the Required DIP Lenders, contested by any Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(xxiv)  the cessation of Liens, security interests or superpriority claims granted with respect to this Agreement or the Obligations to be valid, binding, enforceable and non-avoidable, and (with respect to the Liens) automatically, fully and properly perfected, in all respects; or

(xxv)  the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the Orders, the Liens granted under the Security Documents and the Collateral,

then, and in any such event:  with the consent of the Required DIP Lenders, the Administrative Agent may, or upon the request of the Required DIP Lenders, the Administrative Agent shall, by notice to the Borrower (i) declare the Loan Commitments to be terminated forthwith, whereupon the Loan Commitments shall immediately terminate; (ii) declare the Loans (with accrued interest thereon) and all fees and other Obligations and amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable; (iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents, in each case, as directed by the Required DIP Lenders, including (y) setting-off any and all amounts in accounts maintained by the Loan Parties with the Administrative Agent or the Lenders against the Obligations and/or cause Administrative Agent to enforce any and all Liens and security interests created pursuant to Security Documents; and (iv) deliver written notice to the Bankruptcy Court

that, pursuant to the Orders, the automatic stay provisions of section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit the Administrative Agent and the Lenders to exercise all rights and remedies provided for in the Loan Documents upon the expiration of the Remedies Notice Period.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower and each other Loan Party.

   8.2 [Reserved].

   8.3 Bankruptcy Code and Other Remedies.

   (a) Bankruptcy Code Remedies.  During the continuance of an Event of Default, subject to the Remedies Notice Period and the Orders, the Administrative Agent may exercise, in addition to all other rights and remedies granted to it in this Agreement (including, without limitation, Section 8.1) and in any other instrument or agreement securing, evidencing or relating to any Obligation, all rights and remedies of a secured party under the Bankruptcy Code, the Uniform Commercial Code and any other applicable law.

   (b) Disposition of Collateral.  Subject to the Orders, without limiting the generality of the foregoing, the Administrative Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Orders and any notice required by law referred to below, including compliance with the Remedies Notice Period) to or upon any Loan Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Orders)), during the continuance of any Event of Default (personally or through its agents or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Loan Party or any other Person notice or opportunity for a hearing on the Administrative Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) Dispose of, sell, grant option or options to purchase and deliver any Collateral (enter into contractual obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, (iv) withdraw all cash and Cash Equivalents in any deposit account or securities account of a Loan Party and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any deposit account or securities account pursuant to any related control agreement.  The Administrative Agent shall have the right, upon any such public sale or sales and, to the extent permitted by the Bankruptcy Code and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold (and, in lieu of actual payment of the purchase price, may "credit bid" or otherwise set off the amount of such price against the Obligations), free of any right or equity of redemption of any Loan Party, which right or equity is hereby waived and released.

   (c) Management of the Collateral.  Subject to the Orders, each Loan Party further agrees, that, during the continuance of any Event of Default, subject to the Remedies

103

Notice Period, (i) at the Administrative Agent's request, it shall assemble the Collateral and make it available to the Administrative Agent at places that the Administrative Agent shall reasonably select, whether at such Loan Party's premises or elsewhere, (ii) without limiting the foregoing, the Administrative Agent also has the right to require that each Loan Party store and keep any Collateral pending further action by the Administrative Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Administrative Agent is able to sell any Collateral, the Administrative Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent and (iv) the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.  The Administrative Agent shall not have any obligation to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral while such Collateral is in the possession of the Administrative Agent.

(d)     Direct Obligation.  Subject to the Orders, neither the Administrative Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Loan Party or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirements of Law.  To the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such sale or other disposition.

(e)     Commercially Reasonable.  To the extent that any Requirements of Law impose duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent to do any of the following:

(i)     fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Administrative Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)     fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of

Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(iii)    fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)    advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring any such Collateral;

(v)    exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Administrative Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)    dispose of assets in wholesale rather than retail markets;

(vii)    disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)    purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of any Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of any Collateral.

Each Loan Party acknowledges that the purpose of clauses (i) through (viii) of this Section 8.3 is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in such clauses.  Without limitation upon the foregoing, nothing contained herein shall be construed to grant any rights to any Loan Party or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 8.3.

(f)    Deficiency.  Each Loan Party shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Administrative Agent or any other Secured Party to collect such deficiency.

105

## ARTICLE 9.  THE AGENTS

9.1    <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints each Agent as the agent of such Lender under the Loan Documents and each such Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of the applicable Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of the applicable Loan Documents, together with such other powers as are reasonably incidental thereto, including the authority to enter into any Joinder Agreement, Lender Joinder Agreement and any Extension Amendment. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agents shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents.[1]

9.2    <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under the applicable Loan Documents by or through any of its branches, agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither Agent shall be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.  Each Agent and any such agent or attorney-in-fact may perform any and all of its duties by or through their respective Related Persons.  The exculpatory provisions of this Article shall apply to any such agent or attorney-in-fact and to the Related Persons of each Agent and any such agent or attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

9.3    <u>Exculpatory Provisions</u>.  Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder or the creation, perfection or priority of any Lien purported to be created by the Security Documents or the value or the sufficiency of any Collateral.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party, nor shall any Agent be required to take any action that, in its opinion or the opinion

---

[1]    NTD: discuss UK intercreditor.

of its counsel, may expose it to liability that is not subject to indemnification under Section 10.5 or that is contrary to any Loan Document or applicable law.

9.4    Reliance by the Agents.  The Agents shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Agents.  Each Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  Each Agent shall be fully justified in failing or refusing to take any action under the applicable Loan Document unless it shall first receive such advice or concurrence of the Required DIP Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under the applicable Loan Documents in accordance with a request of the Required DIP Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.  In determining compliance with any conditions hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.

9.5    Notice of Default.  Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders.  The Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required DIP Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6    Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance

NY 77805691v5

upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the applicable Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents hereunder, the Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, Property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of either Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

          9.7    <u>Indemnification</u>.  The Lenders severally agree to indemnify each Agent in its capacity as such, and in its capacity as initial Lender solely to the extent set forth in clause (b) below (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section 9.7 (or, if indemnification is sought after the date upon which the Loan Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against (a) such Agent in any way relating to or arising out of, the Loan Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing or (b) Agent, in its capacity as initial Lender, in any way relating to or arising out of receipt of any payments made pursuant to the Payment Letter that are subsequently paid to any Lender that is assigned any Loan and/or Loan Commitments; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The agreements in this Section 9.7 shall survive the payment of the Loans and all other amounts payable hereunder.

          9.8    <u>Agent in Its Individual Capacity</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made by it, each Agent shall have the same rights and powers under the applicable Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

          9.9    <u>Successor Agents</u>.[2]

---

[2]      NTD: Provisions with respect to the resignation and replacement of Credit Suisse as administrative agent and collateral agent to be included in final agreement.

NY 77805691v5

(a)       Subject to the appointment of a successor as set forth herein, any Agent may resign upon 30 days' notice to the Lenders, the Borrower and the other Agent effective upon appointment of a successor Agent.  Upon receipt of any such notice of resignation, the Required DIP Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall be a bank that has an office in New York, New York with a combined capital and surplus of at least $500,000,000 and shall (unless an Event of Default under Section 8.1(a) or Section 8.1(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor Agent shall have been so appointed by the Required DIP Lenders with such consent of the Borrower and shall have accepted such appointment within 30 days after the retiring Agent's giving of notice of resignation, such Agent's resignation shall become effective and the Required DIP Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required DIP Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be, with the qualifications set forth above.  After any retiring Agent's resignation as Agent, the provisions of this Article 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

(b)       If at any time either the Borrower or the Required DIP Lenders determine that any Person serving as an Agent is a Defaulting Lender, the Borrower by notice to the Lenders and such Person or the Required DIP Lenders by notice to the Borrower and such Person may, subject to the appointment of a successor as set forth herein, remove such Person as an Agent.  If such Person is removed as an Agent, the Required DIP Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8.1(a) or Section 8.1(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any holders of the Loans.  Such removal will, to the fullest extent permitted by applicable law, be effective on the date a replacement Agent is appointed.

(c)       Any resignation by the Administrative Agent pursuant to this Article 9 shall also constitute its resignation as the Collateral Agent.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Collateral Agent.

9.10    Authorization to Release Liens and Guarantees.  The Agents are hereby irrevocably authorized by each of the Lenders to effect any release or subordination of Liens or Guarantee Obligations contemplated by Section 10.15.

NY 77805691v5

9.11    Agents May File Proofs of Claim.    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, to the maximum extent permitted by applicable law, each Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether either Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a)    to file a proof of claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under Sections 2.9 and 10.5) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agents and, if either Agent shall consent to the making of such payments directly to the Lenders to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due to such Agent under Sections 2.9 and 10.5.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize such Agent to vote in respect of the claim of any Lender or in any such proceeding.

9.12    [Reserved].

9.13    [Reserved].

9.14    [Reserved].

9.15    [Reserved].

9.16    Appointment of the Collateral Agent as UK Security Trustee.    For the purposes of any Liens created under a UK Security Document, the following additional provisions shall apply, in addition to the provisions set out in this Article 9 or otherwise hereunder.

(a)    In this Section 9.16, the following expressions have the following meanings:

"Appointee" means any receiver, administrator or other insolvency officer appointed in respect of any Loan Party or its assets.

NY 77805691v5

"Charged Property" means the assets of a Loan Party subject to a security interest under a UK Security Document.

"Delegate" means any delegate, agent, attorney or co-trustee appointed by the Collateral Agent (in its capacity as security trustee).

(b)    The Secured Parties appoint the Collateral Agent to hold the security interests constituted by the UK Security Documents on trust for the Secured Parties on the terms of the Loan Documents and the Collateral Agent accepts that appointment.

(c)    The Collateral Agent, its subsidiaries and associated companies may each retain for its own account and benefit any fee, remuneration and profits paid to it in connection with (i) its activities under the Loan Documents and (ii) its engagement in any kind of banking or other business with any Loan Party.

(d)    Nothing in this Agreement constitutes the Collateral Agent as a trustee or fiduciary of, nor shall the Collateral Agent have any duty or responsibility to, any Loan Party.

(e)    The Collateral Agent shall have no duties or obligations to any other Person except for those which are expressly specified in the Loan Documents or mandatorily required by applicable law.

(f)    The Collateral Agent may appoint one or more Delegates on such terms (which may include the power to sub-delegate) and subject to such conditions as it thinks fit, to exercise and perform all or any of the duties, rights, powers and discretions vested in it by the UK Security Documents and shall not be obliged to supervise any Delegate or be responsible to any person for any loss incurred by reason of any act, omission, misconduct or default on the part of any Delegate.

(g)    The Collateral Agent may (whether for the purpose of complying with any law or regulation of any overseas jurisdiction, or for any other reason) appoint (and subsequently remove) any person to act jointly with the Collateral Agent either as a separate trustee or as a co-trustee on such terms and subject to such conditions as the Collateral Agent thinks fit and with such of the duties, rights, powers and discretions vested in the Collateral Agent by the UK Security Documents as may be conferred by the instrument of appointment of that person.

(h)    The Collateral Agent shall notify the Lenders of the appointment of each Appointee (other than a Delegate).

(i)    The Collateral Agent may pay reasonable remuneration to any Delegate or Appointee, together with any costs and expenses (including legal fees) reasonably incurred by the Delegate or Appointee in connection with its appointment. All such remuneration, costs and expenses shall be treated, for the purposes of this Agreement, as paid or incurred by the Collateral Agent.

(j)    Each Delegate and each Appointee shall have every benefit, right, power and discretion and the benefit of every exculpation (together, "Rights") of the Collateral Agent (in its capacity as security trustee) under the UK Security Documents, and each reference to the

Collateral Agent (where the context requires that such reference is to the Collateral Agent in its capacity as security trustee) in the provisions of the UK Security Documents which confer Rights shall be deemed to include a reference to each Delegate and each Appointee.

(k)    Each Secured Party confirms its approval of the UK Security Documents and authorizes and instructs the Collateral Agent: (i) to execute and deliver the UK Security Documents; (ii) to exercise the rights, powers and discretions given to the Collateral Agent (in its capacity as security trustee) under or in connection with the UK Security Documents together with any other incidental rights, powers and discretions; and (iii) to give any authorizations and confirmations to be given by the Collateral Agent (in its capacity as security trustee) on behalf of the Secured Parties under the UK Security Documents.

(l)    The Collateral Agent may accept without inquiry the title (if any) which any person may have to the Charged Property.

(m)    Each other Secured Party confirms that it does not wish to be registered as a joint proprietor of any security interest constituted by a UK Security Document and accordingly authorizes: (i) the Collateral Agent to hold such security interest in its sole name (or in the name of any Delegate) as trustee for the Secured Parties and (ii) the Land Registry (or other relevant registry) to register the Collateral Agent (or any Delegate or Appointee) as a sole proprietor of such security interest.

(n)    Except to the extent that a UK Security Document otherwise requires, any moneys which the Collateral Agent receives under or pursuant to a UK Security Document may be: (i) invested in any investments which the Collateral Agent selects and which are authorized by applicable law or (ii) placed on deposit at any bank or institution (including the Collateral Agent) on terms that the Collateral Agent thinks fit, in each case in the name or under the control of the Collateral Agent, and the Collateral Agent shall hold those moneys, together with any accrued income (net of any applicable Taxes) to the order of the Lenders, and shall pay them to the Lenders on demand.

(o)    On a disposal of any of the Charged Property which is permitted under the Loan Documents, the Collateral Agent shall (at the cost of the Loan Parties) execute any release of the UK Security Documents or other claim over that Charged Property and issue any certificates of non-crystallization of floating charges that may be required or take any other action that the Collateral Agent considers desirable.

(p)    The Collateral Agent shall not be liable for (i) any defect in or failure of the title (if any) which any person may have to any assets over which security is intended to be created by a UK Security Document, (ii) any loss resulting from the investment or deposit at any bank of moneys which it invests or deposits in a manner permitted by a UK Security Document, (iii) the exercise of, or the failure to exercise, any right, power or discretion given to it by or in connection with any Loan Document or any other agreement, arrangement or document entered into, or executed in anticipation of, under or in connection with, any Loan Document or (iv) any shortfall which arises on enforcing a UK Security Documents.

112

(q)    The Collateral Agent shall not be obligated to (i) obtain any authorization or environmental permit in respect of any of the Charged Property or a UK Security Documents, (ii) hold in its own possession a UK Security Document, title deed or other document relating to the Charged Property or a UK Security Document, (iii) perfect, protect, register, make any filing or give any notice in respect of a UK Security Document (or the order of ranking of a UK Security Document), unless that failure arises directly from its own gross negligence or willful misconduct or (iv) require any further assurances in relation to a UK Security Document.

(r)    In respect of any UK Security Document, the Collateral Agent shall not be obligated to: (i) insure, or require any other person to insure, the Charged Property or (ii) make any inquiry or conduct any investigation into the legality, validity, effectiveness, adequacy or enforceability of any insurance existing over such Charged Property.

(s)    In respect of any UK Security Documents, the Collateral Agent shall not have any obligation or duty to any person for any loss suffered as a result of: (i) the lack or the inadequacy of any insurance or (ii) the failure of the Collateral Agent to notify the insurers of any material fact relating to the risk assumed by them, or of any other information of any kind, unless Required DIP Lenders have requested it to do so in writing and the Collateral Agent has failed to do so within fourteen (14) days after receipt of that request.

(t)    Every appointment of a successor Collateral Agent under a UK Security Document shall be by deed.

(u)    Section 1 of the Trustee Act 2000 shall not apply to the duty of the Collateral Agent in relation to the trusts constituted by this Agreement.

(v)    In the case of any conflict between the provisions of this Agreement and those of the Trustee Act 1925 or the Trustee Act 2000, the provisions of this Agreement shall prevail to the extent allowed by law, and shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000.

(w)    The perpetuity period under the rule against perpetuities if applicable to this Agreement and any UK Security Document shall be 80 years from the date of this Agreement.

## ARTICLE 10. MISCELLANEOUS

### 10.1    Amendments and Waivers.

(a)    Except to the extent otherwise expressly set forth in this Agreement (including Sections 2.25, 7.11 and 10.16) or the applicable Loan Documents, neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1.  The Required DIP Lenders and each Loan Party party to the relevant Loan Document may, subject to the acknowledgment of the Administrative Agent, or, with the written consent of the Required DIP Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding, deleting or

113

otherwise modifying any provisions to this Agreement or the other Loan Documents or changing in any manner the rights or obligations of the Agents or the Lenders or of the Loan Parties or their Subsidiaries hereunder or thereunder or (ii) waive, on such terms and conditions as the Required DIP Lenders or the Administrative Agent may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall

(A)      forgive or reduce the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date or reduce the amount of any amortization payment in respect of any Loans, reduce the stated rate, form or manner of payment of any interest, fee or premium payable hereunder (except (i) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required DIP Lenders)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Loan Commitment, in each case without the written consent of each Lender directly and adversely affected thereby, which such consent of each Lender directly and adversely affected thereby shall be sufficient to effect such waiver without regard for a Required DIP Lender consent;

(B)      amend, modify or waive any provision of paragraph (a) of this Section 10.1 without the written consent of all Lenders;

(C)      reduce any percentage specified in the definition of Required DIP Lenders;

(D)      consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents (except as provided in Section 7.4(i));

(E)      release all or substantially all of the value of the Collateral or release all or substantially all of the value of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders (except as expressly permitted hereby (including pursuant to Section 7.4 or 7.5) or by any Security Document);

(F)      (i) amend, modify or waive any provision of Section 2.18, or Section 6.6 of the Guarantee and Collateral Agreement or otherwise subordinate the Obligations in right of payment, (ii) except as set forth in the Orders, subordinate the Liens on the Collateral securing the Obligations to any other Lien on the Collateral or (iii) amend, modify or waive any provision of Section 7.2 or Section 7.3, in each case, without the written consent of all Lenders; or

(G)      amend, modify or waive any provision of Section 9 with respect to any Agent without the written consent of such Agent.

114

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing unless limited by the terms of such waiver; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

       (b)     [Reserved].

       (c)     [Reserved].

       (d)     Furthermore, notwithstanding the foregoing, if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an ambiguity, mistake, omission, defect, or inconsistency, in each case, in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to this Agreement or any other Loan Document if the same is not objected to in writing by the Required DIP Lenders within five Business Days following receipt of notice thereof; it being understood that posting such amendment electronically on the Platform to the Required DIP Lenders shall be deemed adequate receipt of notice of such amendment.

       (e)     Furthermore, notwithstanding the foregoing, this Agreement may be amended, supplemented or otherwise modified in accordance with Sections 7.11 and 10.16.

       (f)     Notwithstanding anything to the contrary herein, (a) any amendment, modification, waiver or other action which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders or Other Affiliates, except that (x) the Loan Commitment of any such Defaulting Lender may not be increased or extended, the maturity of the Loans of any such Defaulting Lender may not be extended, the rate of interest on any of such Loans may not be reduced and the principal amount of any of such Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, modification, waiver or other action that by its terms adversely affects any such Defaulting Lender in its capacity as a Lender in a manner that differs in any material respect from, and is more adverse to such Defaulting Lender than it is to, other affected Lenders shall require the consent of such Defaulting Lender and (b) each Other Affiliate, in connection with any (i) consent to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or (ii) direction to Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, agrees that such Other Affiliate shall be deemed to have voted its interest as a Lender without discretion in such proportion as the allocation of voting with respect to such matter by Lenders who are not Other Affiliates. Each Other Affiliate, solely in its capacity as a Lender, hereby further agrees that if any Loan Party shall be subject to any voluntary or involuntary proceeding commenced under any Debtor Relief Law, such Other Affiliate shall be deemed to have voted in such proceedings in the same proportion as the allocation of voting with respect to such matter by those Lenders who are not Other Affiliate, except to the extent that any plan under the Debtor Relief Laws proposes to treat

NY 77805691v5

the Obligations of the Loan Parties under the Loan Documents held by such Other Affiliate in a manner that is disproportionately less favorable to such Other Affiliate than the proposed treatment of similar Obligations of the Loan Parties under the Loan Documents held by other Lenders. Each Other Affiliate agrees and acknowledges that the foregoing constitutes an irrevocable proxy in favor of Administrative Agent to vote or consent on behalf of such Other Affiliate in any proceeding in the manner set forth above.

### 10.2    Notices; Electronic Communications.

(a)    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered or posted to the Platform, or three Business Days after being deposited in the mail, postage prepaid, hand delivered, or, in the case of telecopy notice, when sent (except in the case of a telecopy notice not given during normal business hours (New York time) for the recipient, which shall be deemed to have been given at the opening of business on the next Business Day for the recipient), addressed as follows in the case of the Borrower or the Agents, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such Person or at such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| The Borrower, Holdings or any other Loan Party: | Deluxe Entertainment Services Group Inc. |
| | 2400 West Empire Avenue |
| | Burbank, California 91504 |
| | Attention:  Chief Financial Officer and General Counsel |
| | Telecopy:  (323) 389-0506 |
| | Telephone:  (323) 960-1817 |
| | |
| With a copy (which shall not constitute notice) to: | Kirkland & Ellis LLP |
| | 601 Lexington Avenue |
| | New York, NY 10022 |
| | Attention:  Jonathan S Henes, P.C.; Melissa J. Hutson, P.C. |
| | Telephone:  (212)446-4927; (212) 446-6459 |
| | |
| Administrative Agent: | Credit Suisse AG |
| | Eleven Madison Avenue, 23rd Floor |
| | New York, NY 10010 |
| | Attention: Loan Operations – Agency Manager |
| | Telecopy: (212) 322-2291 |
| | Telephone: (919) 994-6396 |
| | |
| | Email: agency.loanops@credit-suisse.com |

116

Collateral Agent:          Credit Suisse AG
Eleven Madison Avenue, 23rd Floor
New York, NY 10010
Attention: Loan Operations – Boutique Management
Telecopy:  (212) 325-8315
Telephone: (212) 538-3525

Email: ops-collateral@credit-suisse.com

<u>provided</u> that any notice, request or demand to or upon the Agents, the Lenders or the Borrower shall not be effective until received.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by posting to the Platform or by any electronic communications pursuant to procedures approved by the Administrative Agent; <u>provided</u> that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  Any Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

(c)    The Borrower, each Agent and each Lender hereby acknowledges that (i) Holdings, the Borrower, the Administrative Agent and/or the Lead Arranger will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on the Platform, and (ii) certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive information other than information of a type that would reasonably be expected to be publicly available if Holdings or the Borrower were a public company, or not material with respect to Holdings, the Borrower or its Subsidiaries, or their respective securities, for purposes of the United States Federal and state securities laws (collectively, "<u>Public Information</u>").  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that is Public Information and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public Information (although it may be sensitive and proprietary) (<u>provided</u>, <u>however</u>, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 10.14); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; <u>provided</u> that there is no requirement that the Borrower identify any such information as "PUBLIC."

117

(d)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Persons (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party or any of its Related Persons; provided, however, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)    Each of the Borrower, the Administrative Agent may change its address and telecopier or telephone number for notices and other communications hereunder by notice to such other Persons.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain information other than Public Information.

(f)    The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices of borrowing) believed in good faith by the Administrative Agent to be given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.3    No Waiver; Cumulative Remedies.

(a)    No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

(b)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.1 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (i) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) [reserved], (iii) any Lender from exercising setoff rights in accordance with 10.7(b) (subject to the terms of Section 10.7(a)), or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law.

10.4    Survival.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

10.5    Payment of Expenses; Indemnification.  Except with respect to Taxes which are addressed in Section 2.20, the Borrower agrees (a) to pay or reimburse each Agent and the Lenders for all of their reasonable and documented out-of-pocket costs and expenses incurred in connection with the syndication of the Facilities (other than fees payable to syndicate members) and the development, preparation, execution and delivery of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification hereto or thereto, including the reasonable and documented fees and disbursements of a single firm of counsel and, if necessary, a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may reasonably be necessary, for the Lenders (selected by Required DIP Lenders), taken as a whole, including Stroock and the Specified Financial Advisor and, as to the Agents only, the administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements and other charges of a single firm of counsel to the Agents (plus one firm of special regulatory counsel and one firm of local counsel per material jurisdiction as may reasonably be necessary in connection with collateral matters) in connection with all of the foregoing, (b) to pay or reimburse each Lender and each Agent for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents referred to in Section 10.5(a) above (including all such costs and expenses incurred in connection with any legal proceeding, including any proceeding under any Debtor Relief Law or in connection with the Chapter 11 Cases and any other workout or restructuring), including the reasonable and documented fees and disbursements of a single firm of counsel and, if necessary,

119

a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may reasonably be necessary, for each of the Agents, taken as a whole, and the reasonable and documented fees and disbursements of a single firm of counsel and, if necessary, a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may reasonably be necessary for the Lenders (selected by Required DIP Lenders), taken as a whole, including Stroock and the Specified Financial Advisor and (c) to pay, indemnify or reimburse each Lender, each Agent and their respective Affiliates, and their respective partners that are natural persons, members that are natural persons, officers, directors, employees, trustees, advisors, agents and controlling Persons (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements arising out of any actions, judgments or suits of any kind or nature whatsoever, arising out of or in connection with any claim, action or proceeding (any of the foregoing, a "Proceeding") relating to or otherwise with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents referred to in Section 10.5(a) above and the transactions contemplated hereby and thereby, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties and the reasonable fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower hereunder (all the foregoing in this clause (c), collectively, the "Indemnified Liabilities"); provided that, the Borrower shall not have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities have resulted from (i) the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Persons as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto), (ii) a material breach of the Loan Documents by such Indemnitee or its Related Persons as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto), (iii) disputes solely among Indemnitees or their Related Persons (it being understood that this clause (iii) shall not apply to the indemnification of an Agent or the Lead Arranger in a suit involving an Agent or the Lead Arranger in its capacity as such that does not involve an act or omission by any Parent Company, Holdings, Borrower or any of its Subsidiaries as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto)), or (iv) any settlement of any Proceeding effected without the Borrower's consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with the Borrower's written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, the Borrower shall indemnify and hold harmless each Indemnitee from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this Section 10.5.  For purposes hereof, a "Related Person" of an Indemnitee means (i) if the Indemnitee is any Agent or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors, employees, agents and controlling Persons, any of such Agent and its Affiliates and their respective officers, directors, employees, agents and controlling Persons; provided that solely for purposes of Section 9, references to each Agent's Related Persons shall also include such Agent's trustees and advisors, and (ii) if the Indemnitee is any Lender or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers,

NY 77805691v5

directors, employees, agents and controlling Persons, any of such Lender and its Affiliates and their respective officers, directors, employees, agents and controlling Persons.  All amounts due under this Section 10.5 shall be payable promptly after receipt of a reasonably detailed invoice therefor.  Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the Borrower at the address thereof set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive repayment of the Obligations.

10.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (other than in accordance with Section 7.4(i)) without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) subject to Section 2.24, no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b)    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may, in compliance with applicable law, assign (other than to any Disqualified Institution or a natural person) to one or more assignees including an Other Affiliate, Holdings or any Subsidiary to the extent contemplated by Sections 10.6(g) and (h), respectively (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loan Commitments and the Loans at the time owing to it) (x) with the prior written consent (such consent not to be unreasonably withheld or delayed, it being understood that it shall be deemed reasonable for the Borrower to withhold such consent in respect of a prospective Lender if the Borrower reasonably believes such prospective Lender would constitute a Disqualified Institution) of the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment (other than an assignment in respect of any Loans) to a Lender, an Affiliate of a Lender or an Approved Fund (other than a Defaulting Lender) and (y) solely to the extent that such Assignee is a party to the Restructuring Support Agreement or becomes a party to the Restructuring Support Agreement prior to, or concurrently with, such assignment.

(ii)    Subject to Section 2.24, assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loan Commitments or Loans, the amount of the Loan Commitments or Loans of the assigning Lender subject to each such assignment (determined as of (I) the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or (II) if earlier, the "trade date" (if any) specified in such Assignment and Assumption) shall not be less than $1,000,000, unless the Administrative Agent otherwise consents; provided that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

121

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent and the Borrower (or, at the Borrower's request, manually) together with a processing and recordation fee of $3,500 to be paid by either the applicable assignor or assignee (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided that only one such fee shall be payable in the case of contemporaneous assignments to or by two or more related Approved Funds; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire and all applicable tax forms.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (I) a Lender, (II) an Affiliate of a Lender, (III) an entity or an Affiliate of an entity that administers or manages a Lender or (IV) an entity or an Affiliate of an entity that is the investment advisor to a Lender.  Notwithstanding the foregoing, no Lender shall be permitted to make assignments under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption, the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be subject to the obligations under and entitled to the benefits of Sections 2.19, 2.20, 2.21, 10.5 and 10.14).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 10.6 (and will be required to comply therewith), other than any sale to a Disqualified Institution, which shall be null and void.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Loan Commitments of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive absent demonstrable error for such purposes), notwithstanding notice to the

122

contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee (except as contemplated by Section 2.24), the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder) and all applicable tax forms, the processing and recordation fee referred to in paragraph (b) of this Section 10.6 (unless waived by the Administrative Agent) and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and promptly record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i)    Any Lender may, without the consent of any Person, in compliance with applicable law, sell participations (other than to any Disqualified Institution) to one or more banks or other entities (excluding Other Affiliates) (a "Participant"), in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Loan Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this Section 10.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.19, 2.20 and 2.21 (if such Participant agrees to have related obligations thereunder) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.6.  Notwithstanding the foregoing, no Lender shall be permitted to sell participations under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.19, 2.20 or 2.21 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater amounts.  No Participant shall be entitled to the benefits of Section 2.20 unless such Participant complies with Section 2.20(d), (e) or (g), as (and to the extent) applicable, as if such Participant were a Lender.

(iii)    Each Lender that sells a participation, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a register on which it enters the name and addresses of each Participant, and the

principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loan Commitments, Loans, or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Loan Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  Unless otherwise required by the Internal Revenue Service, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (it its capacity as such) shall have no responsibility for maintaining a Participant Register. Section 10.6(b)(iv) and this Section 10.6(c)(iii) shall be construed so that the Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and the Loans shall be treated by the parties hereto as such.

(d)    Any Lender may, without the consent of or notice to the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section 10.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring the same (in the case of an assignment, following surrender by the assigning Lender of all Notes representing its assigned interests).

(f)    The Borrower may prohibit any assignment if it would require the Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction and the Borrower shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee to determine whether any such filing or qualification is required or whether any assignment is otherwise in accordance with applicable law.

(g)    Notwithstanding anything to the contrary herein, no Lender may assign all or any portion of its Loan Commitment or Loans hereunder to any Other Affiliate or to Holdings or any of its Subsidiaries.

(h)    [Reserved].

NY 77805691v5

(i)    None of the Sponsor, any Other Affiliate, Holdings or any of its Subsidiaries may acquire by assignment, participation or otherwise any right to or interest in any of the Loan Commitments or Loans hereunder (and any such attempted acquisition shall be null and void).

(j)    [Reserved].

(k)    Notwithstanding anything to the contrary contained herein, the replacement of any Lender pursuant to Section 2.24 shall be deemed an assignment pursuant to Section 10.6(b) and shall be valid and in full force and effect for all purposes under this Agreement.

(l)    Any assignor of a Loan or Loan Commitment or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or purchaser of such participation in the relevant Assignment and Assumption or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Institution. Neither of the Agents shall have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Institutions.

10.7    Adjustments; Set off.

(a)    Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of the principal Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in Section 8.1(f), or otherwise) in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's principal Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that (i) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (ii) the provisions of this Section 10.7 shall not be construed to apply to any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement (including prepayments received pursuant to Sections 10.6(g) or (h)) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) after the expiration of any cure or grace periods, to set off and appropriate and apply against such amount any and all deposits (general or special, time or

125

demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate, branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8   Counterparts.   This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.   Delivery of an executed signature page of this Agreement by facsimile or electronic (i.e., "pdf" or "tiff") transmission shall be effective as delivery of a manually executed counterpart hereof.   A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9   Severability.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10   Integration.   This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof.

10.11   GOVERNING LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY AND, AS MAY BE APPLICABLE, THE BANKRUPTCY CODE.

10.12   Submission to Jurisdiction; Waivers.   Each party hereto hereby irrevocably and unconditionally:

(a)   submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party to the exclusive jurisdiction of of the Bankruptcy Court, and to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the Supreme Court of the State of New York for the County of New York (the "New York Supreme Court"), and the United States District Court for the Southern District of New York (the "Federal District Court" and, together with the New York Supreme Court, the "New York Courts"), and appellate courts from either of them; provided that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other

security for the Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this Section 10.12 would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment and (iii) if all such New York Courts decline jurisdiction over any person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction;

(b)    consents that any such action or proceeding may be brought in the New York Courts and appellate courts from either of them, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 10.12 any special, exemplary, punitive or consequential damages (provided that such waiver shall not limit the indemnification obligations of the Loan Parties to the extent such special, exemplary, punitive or consequential damages are included in any third party claim with respect to which the applicable Indemnitee is entitled to indemnification under Section 10.5).

10.13    Acknowledgments.  The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither the Agents nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and Lenders, on the one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor;

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders;

NY 77805691v5

(d)    no advisory or agency relationship between it and any Agent or Lender (in their capacities as such) is intended to be or has been created in respect of any of the transactions contemplated hereby,

(e)    the Agents and the Lenders, on the one hand, and the Borrower, on the other hand, have an arms-length business relationship,

(f)    the Borrower is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents,

(g)    each of the Agents and the Lenders is engaged in a broad range of transactions that may involve interests that differ from the interests of the Borrower and none of the Agents or the Lenders has any obligation to disclose such interests and transactions to the Borrower by virtue of any advisory or agency relationship, and

(h)    none of the Agents or the Lenders (in their capacities as such) has advised the Borrower as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including the validity, enforceability, perfection or avoidability of any aspect of any of the transactions contemplated hereby under applicable law, including the U.S. Bankruptcy Code or any consents needed in connection therewith), and none of the Agents or the Lenders (in their capacities as such) shall have any responsibility or liability to the Borrower with respect thereto and the Borrower has consulted with its own advisors regarding the foregoing to the extent it has deemed appropriate.

To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

10.14    Confidentiality. Each of the Agents and the Lenders agree to treat any and all information, regardless of the medium or form of communication, that is disclosed, provided or furnished, directly or indirectly, by or on behalf of the Borrower or any of its Affiliates in connection with this Agreement or the transactions contemplated hereby (including any potential amendments, modifications or waivers, or any request therefor), whether furnished before or after the Closing Date ("Confidential Information"), as strictly confidential and not to use Confidential Information for any purpose other than evaluating the Transactions and negotiating, making available, syndicating and administering this Agreement (the "Agreed Purposes"). Without limiting the foregoing, each Agent and each Lender agrees to treat any and all Confidential Information with adequate means to preserve its confidentiality, and each Agent and each Lender agrees not to disclose Confidential Information, at any time, in any manner whatsoever, directly or indirectly, to any other Person whomsoever, except (1) to its partners that are natural persons, members that are natural persons, directors, officers, employees, counsel, advisors, trustees and Affiliates (collectively, the "Representatives"), to the extent necessary to permit such Representatives to assist in connection with the Agreed Purposes (it being understood that the Representatives to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential

Information confidential, with the applicable Agent or Lender responsible for the breach of this Section 10.14 by such Representatives as if they were party hereto), (2) to any pledgee referred to in Section 10.6(d) and prospective Lenders and participants in connection with the syndication (including secondary trading) of the Facilities and Loan Commitments and Loans hereunder (excluding any Disqualified Institution), in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this Section 10.14, (3) to any party or prospective party (or their advisors) to any swap, derivative or similar transaction under which payments are made by reference to the Borrower and the Obligations, this Agreement or payments hereunder, in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this Section 10.14, (4) upon the request or demand of any Governmental Authority having or purporting to have jurisdiction over it, (5) in response to any order of any Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, provided, that in the case of clauses (4) and (5), the disclosing Agent or Lender, as applicable, agrees, to the extent practicable and not prohibited by applicable Law, to notify the Borrower prior to such disclosure and cooperate with the Borrower in obtaining an appropriate protective order, (6) to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Facilities, (7) information that has been publicly disclosed other than in breach of this Section 10.14, (8) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or in connection with examinations or audits of such Lender, (9) to the extent reasonably required or necessary in connection with the exercise of any remedy under the Loan Documents, provided each Agent and Lender uses commercially reasonable efforts to ensure that such information is kept confidential in connection with such exercise of remedies and the recipient is informed of the confidential nature of the information, (10) to the extent the Borrower has consented to such disclosure in writing, (11) to any other party to this Agreement, or (12) by the Administrative Agent to the extent reasonably required or necessary to obtain a CUSIP for any Loans or Loan Commitment hereunder, to the CUSIP Service Bureau. Each Agent and each Lender acknowledges that (i) Confidential Information includes information that is not otherwise publicly available and that such non-public information may constitute confidential business information which is proprietary to the Borrower and/or its Affiliates and (ii) the Borrower has advised the Agents and the Lenders that it is relying on the Confidential Information for its success and would not disclose the Confidential Information to the Agents and the Lenders without the confidentiality provisions of this Agreement. All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws. Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Assumption, the provisions of this Section 10.14 shall survive with respect to each Agent and

Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively.

          10.15   Release of Collateral and Guarantee Obligations; Subordination of Liens.

          (a)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Disposition of Property permitted by the Loan Documents (including by way of merger or amalgamation and including any assets transferred to a Subsidiary that is not a Loan Party in a transaction permitted by this Agreement) or any Loan Party becoming an Excluded Subsidiary or ceasing to be a Subsidiary, all Liens and Guaranties on such assets or all assets of such Excluded Subsidiary or former Subsidiary shall automatically terminate and the Collateral Agent shall (with notice to the Lenders) execute and deliver all releases reasonably necessary or desirable (i) to evidence the release of Liens created in any Collateral being Disposed of in such Disposition (including any assets of any Loan Party that becomes an Excluded Subsidiary) or of such Excluded Subsidiary or former Subsidiary, as applicable, (ii) to provide notices of the termination of the assignment of any Property for which an assignment had been made pursuant to any of the Loan Documents which is being Disposed of in such Disposition or of such Excluded Subsidiary or former Subsidiary, as applicable, (iii) to release the Guaranty and any other obligations under any Loan Document of any Person being Disposed of in such Disposition or which becomes an Excluded Subsidiary or former Subsidiary, as applicable, and (iv) to acknowledge any Excluded Collateral is not subject to any Lien under the Loan Documents. Any representation, warranty or covenant contained in any Loan Document relating to any such Property so Disposed of (other than Property Disposed of to Holdings or any of its Restricted Subsidiaries) or of a Loan Party which becomes an Excluded Subsidiary or former Subsidiary, as applicable, shall no longer be deemed to be repeated once such Property is so Disposed of. Notwithstanding anything to the contrary contained herein or in any other Loan Document, with the prior written consent of the Required DIP Lenders (subject to Section 10.1(a)(E)), any Loan Party (other than Holdings and the Borrower) may be released from its Guaranty, and any Lien on any asset of any such Loan Party securing the Obligations may be released, and the Administrative Agent and Collateral Agent will take all reasonable action requested by the Required DIP Lenders and the Borrower to evidence any such release.

          (b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than any contingent or indemnification obligations for which no claim has been asserted) have been paid in full, all Loan Commitments have terminated or expired, upon the request of the Borrower, all Liens and Guaranties shall automatically terminate and the Collateral Agent shall (with notice to the Lenders) take such actions as shall be required to release its security interest in all Collateral and/or any other claim over that Collateral and issue any certificates of non-crystallization of floating charges that may be required or take any other action that the Borrower or Collateral Agent considers desirable, and to release all Guarantee Obligations under any Loan Document, whether or not on the date of such release there may be outstanding obligations in respect of contingent or indemnification obligations for which no claim has been asserted. Any such release of Guarantee Obligations shall be deemed subject to the provision that such Guarantee Obligations shall be reinstated if after such release any portion of any payment in respect of the obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy,

dissolution, liquidation or reorganization of, arrangement, adjustment, winding up, dissolution, composition, assignments for the benefit of creditors, formal or informal moratoria, compromises, suspension of payments, extensions generally with creditors or other relief with respect to the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, trustee, receiver, administrator, compulsory manager, controller or similar officer for, the Borrower or any Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower, and (other than with respect to any action as may be necessary or desirable to evidence the subordination of the Liens on the ABL Facility First Priority Collateral securing the Obligations in accordance with the terms of the ABL Intercreditor Agreement) with the written consent of each Lender, in connection with any Liens permitted by the Loan Documents, the Collateral Agent shall take such actions as shall be required to subordinate the Lien on any Collateral to any Lien permitted under Section 7.3.

10.16  <u>Accounting Changes</u>.  In the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial ratios, covenants, standards or terms in this Agreement, then following notice either from the Borrower to the Administrative Agent or from the Administrative Agent to the Borrower (which the Administrative Agent shall give at the request of the Required DIP Lenders), the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating Holdings' financial condition and covenant capacities shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  If any such notices are given then, regardless of whether such notice is given prior to or following such Accounting Change, until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required DIP Lenders and have become effective, all financial ratios, covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  Any amendment contemplated by the prior sentence shall become effective upon the consent of the Required DIP Lenders, it being understood that a Lender shall be deemed to have consented to and executed such amendment if such Lender has not objected in writing within five Business Days following receipt of notice of execution of the applicable amendment by the Borrower and the Administrative Agent, it being understood that the posting of an amendment referred to in the preceding sentence electronically on the Platform to the Lenders shall be deemed adequate receipt of notice of such amendment.  "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC, in each case, occurring after the Closing Date. Notwithstanding anything to the contrary contained in this Section 10.16 or in the definition of "Capital Lease Obligations," only those leases (assuming for purposes hereof that such leases were in existence as of December 15, 2018) that would constitute capital leases in conformity with GAAP as of December 15, 2018 shall be considered capital leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

NY 77805691v5

10.17  <u>WAIVERS OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND FOR ANY COUNTERCLAIM THEREIN.

10.18  <u>USA PATRIOT ACT and UK "Know Your Customer" Checks</u>.

(a)    Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Publ. 107 56 (signed into law October 26, 2001)) (the "USA Patriot Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of such Loan Parties and other information that will allow such Lender to identify the Loan Parties in accordance with the USA Patriot Act, and the Borrower agrees to provide such information from time to time to any Lender or Agent reasonably promptly upon request from such Lender or Agent.

(b)    (i) If (A) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement; (B) any change in the status of a Foreign Guarantor after the date of this Agreement; (C) a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer; or (D) any law, regulation, applicable market guidance or internal policy in relation to the period review and/or updating of customer information obliges the Administrative Agent or any Lender (or, in the case of clause (C) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Foreign Guarantor shall promptly upon the request of the Administrative Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Lender) or any Lender (for itself or, in the case of the event described in paragraph (C) above, on behalf of any prospective new Lender) in order for the Administrative Agent, such Lender or, in the case of the event described in clause (C) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Loan Documents; and (ii) each Lender shall promptly upon the request of the Administrative Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself) in order for the Administrative Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Loan Documents.

10.19  <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder,

together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.19 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

10.20    <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.21    <u>Electronic Execution of Assignments and Certain Other Documents</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

10.22    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

The following terms shall for purposes of this Section 10.24 have the meanings set forth below:

"Bail-In Action":  the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of such EEA Financial Institution.

"Bail-In Legislation":  with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"EEA Financial Institution":  (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country":  any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority":  any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"EU Bail-In Legislation Schedule":  the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Write-Down and Conversion Powers":  with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA

NY 77805691v5

Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

10.23  <u>Judgment Currency</u>.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of each Loan Party in respect of any such sum due from them to the Administrative Agent or the Secured Parties hereunder or under the other Loan Documents shall, notwithstanding any judgment in any currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or the relevant Secured Party of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or the relevant Secured Party may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or such Secured Party from a Loan Party in the Agreement Currency, each Loan Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or such Secured Party in such currency, the Administrative Agent or such Lender agrees to return the amount of any excess to the Loan Party (or to any other Person who may be entitled thereto under applicable law).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

135

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

DELUXE ENTERTAINMENT SERVICES GROUP INC.,
as Borrower

By: _____
     Name:
     Title:

DX HOLDINGS LLC,
as Holdings

By: _____
     Name:
     Title:

136

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH
as Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

137

## **<u>Schedule 1.1</u>**

Loan Commitments

[To come]

**Schedule 7.18**

**Milestones**

The Loan Parties shall comply with the following Milestones:

1.  Commence the Chapter 11 Cases on or before October 3, 2019;

2.  File the Plan of Reorganization, the disclosure statement for the Plan, in form and substance acceptable to the Required DIP Lenders (the "Disclosure Statement"), and the motion (in form and substance acceptable to the Required DIP Lenders) seeking to schedule a combined hearing to consider confirmation of the Plan and approval of the Disclosure Statement on the Petition Date;

3.  Obtain entry of the Interim DIP Order approving the DIP Facility by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than two (2) Business Days after the Petition Date);

4.  Obtain entry of (a) the Confirmation Order (as defined in the Restructuring Support Agreement), (b) an order approving the Disclosure Statement and all other related relief, and (c) an order approving the Exit First Lien Facility (which may be the Confirmation Order), in each case, in form and substance acceptable to the Required DIP Lenders, by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-five (35) calendar days after the Petition Date); and

5.  Cause the Effective Date to occur as soon as reasonably practicable after entry of the Confirmation Order by the Bankruptcy Court (but in no event later than fourteen (14) calendar days after the entry of the Confirmation Order).

NY 77805691v5

**<u>Exhibit C</u>**

**DIP Commitment Letter**

EXECUTION VERSION

October 2, 2019


Deluxe Entertainment Services Group Inc.
2400 West Empire Avenue
Burbank, California 91504
Attention:  Board of Directors, Chief Financial Officer and General Counsel


## DIP FACILITY COMMITMENT LETTER

### UP TO $115,000,000 SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN FACILITY


Ladies and Gentlemen:

We understand that DELUXE ENTERTAINMENT SERVICES GROUP INC., a Delaware corporation (the "**Company**"), DX HOLDINGS LLC, a Delaware limited liability company ("**Holdings**") and certain of the Company's direct and indirect subsidiaries (such subsidiaries, together with Holdings, the "**Guarantors**" and, together with the Company, collectively, the "**Debtors**" and "**you**"), may determine to file voluntarily petitions under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "**Bankruptcy Court**") (such petitions, collectively, the "**Chapter 11 Cases**").  In connection with the Chapter 11 Cases, each Commitment Party (as defined below) is pleased to inform you of its several but not joint commitment to provide (directly or through an affiliate) to the Debtors, as debtors and debtors-in-possession during the Chapter 11 Cases, in each case, on the terms, and subject to the conditions set forth in this letter agreement (together with the Summary of Terms and Conditions attached hereto as Annex I (together with all attachments thereto, the "**DIP Term Sheet**") and all other annexes, schedules, exhibits or attachments hereto, collectively, this "**DIP Commitment Letter**") the principal amount set forth opposite such Commitment Party's name on Schedule I hereto of a senior secured super-priority debtor-in-possession term loan facility (the "**DIP Facility**") in such aggregate principal amount (not exceeding $115,000,000) as is approved by the Bankruptcy Court in the Final DIP Order (the "**DIP Commitment**").  For the avoidance of doubt, the DIP Commitments are subject to the funding of the loans under the DIP Facility on the Closing Date by the DIP Agent, the DIP Arranger or another financial institution (the "**Initial Lender**") reasonably acceptable to the Commitment Parties, following which each Commitment Party will negotiate with the Initial Lender to purchase such loans in an amount equal to each respective Commitment Party's DIP Commitments on terms, subject to documentation and within a timeframe to be agreed among the Commitment Parties and the Initial Lender.

Capitalized terms used in this letter agreement but not defined herein shall have the meanings given to them in the DIP Term Sheet.  For the purposes of this DIP Commitment Letter, the term (i)

"**Commitment Party**" means each of the financial institutions and other entities named on <u>Schedule I</u> hereto (where applicable, in such entity's capacity as investment advisor or manager with respect to certain managed accounts) and/or one or more affiliates designated by such entities, and "**Commitment Parties**", "**we**" or "**us**" is a collective reference to each such Commitment Party and (ii) "**Transactions**" means, collectively, the entering into and funding of the DIP Facility and any transactions in connection therewith (including the payment of any related fees and expenses).

The Company's obligations in respect of the DIP Facility shall be guaranteed by Holdings and the other Guarantors, and the Debtors' obligations in respect of the DIP Facility shall constitute super-priority claims under Bankruptcy Code section 364(c)(1) and be entitled to first priority security interests under Bankruptcy Code sections 364(c)(2), (c)(3) and (d)(1), in each case, as more fully described in the DIP Term Sheet.

The Debtors agree that an institution reasonably acceptable to the Commitment Parties and the Debtors will act as the sole administrative agent and collateral agent in respect of the DIP Facility (in such capacities, together with its successors and permitted assigns in such capacities, the "**DIP Agent**") on the terms and subject to the conditions set forth in this DIP Commitment Letter and the DIP Term Sheet. The Debtors also agree that the Commitment Parties may require that an institution acceptable to the Commitment Parties act as the sole arranger in respect of the DIP Facility (in such capacity, together with its successors and permitted assigns, the "**DIP Arranger**") on the terms and subject to the conditions set forth in this DIP Commitment Letter and the DIP Term Sheet. Except as set forth herein, without the prior written consent of the Commitment Parties, no other arrangers, bookrunners, or other agents or co-agents will be appointed, or other titles conferred with respect to the DIP Facility. Except as set forth in that certain DIP Payments Letter of even date herewith by and among the Commitment Parties and the Debtors providing, among other things, for certain payments relating to the DIP Facility (the "**DIP Payments Letter**"), without the prior written consent of the Commitment Parties, no DIP Lender (as defined in the DIP Term Sheet) will receive any compensation of any kind for its commitment to participate in the DIP Facility.

The Commitment Parties may syndicate the DIP Facility to one or more financial institutions that hold Prepetition Junior Obligations (as defined in the DIP Term Sheet) in accordance with syndication procedures acceptable to the Commitment Parties. Notwithstanding the foregoing, in connection with any syndication of the DIP Facility, no Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Closing Date), including its commitments in respect thereof, until after the initial funding of the DIP Facility has occurred on the Closing Date.

1. <u>Conditions Precedent</u>. The obligations of the Commitment Parties hereunder are several and not joint and are in all respects subject to the satisfaction (or waiver by the Commitment Parties, in their sole discretion) of the conditions precedent set forth in the DIP Term Sheet under the heading "Conditions Precedent to Closing, Initial Draw Date and Additional DIP Draws" in the DIP Term Sheet.

2. <u>Information; Representations and Warranties; Covenants</u>. Each Debtor represents and warrants that (i) all information that has been or will hereafter be made available to the DIP Agent, DIP Arranger or any Commitment Party or their financial or legal advisors by or on behalf of the Debtors or any of their respective affiliates or representatives in connection with the Transactions (other than the

Projections (as defined below), the "**Information**"), when taken as a whole, is and will be complete and correct in all material respects as of the time provided and does not and will not contain any untrue statement of a material fact known at the time such Information was provided or omit to state a then-known material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made, and (ii) all financial projections, if any, that have been or will be prepared by or on behalf of the Debtors or any of their respective representatives and made available to the DIP Agent, DIP Arranger or any Commitment Party or their financial or legal advisors in connection with the transactions contemplated hereby (the "**Projections**") have been or will be prepared in good faith based upon reasonable assumptions at the time made and at the time the related Projections are made available to such parties (it being understood that such Projections are subject to uncertainties and contingencies, many of which are beyond the Debtors' control, and that no assurance can be given that the Projections will be realized). If at any time from the date hereof until the effectiveness of the DIP Loan Documents, any of the representations and warranties in the preceding sentence would be incorrect if the Information or Projections were then being furnished, and such representations and warranties were then being made, at such time, then the Debtors will promptly supplement, or cause to be promptly supplemented, the Information and the Projections so that such representations and warranties contained in this paragraph will be correct at such time. In issuing this DIP Commitment Letter and in arranging and providing the DIP Facility, the DIP Agent, the DIP Arranger and the Commitment Parties will be entitled to use, and to rely on the accuracy of, the Information and Projections furnished to them by or on behalf of the Debtors and their respective affiliates without responsibility for independent verification thereof.

3.     Indemnification. The Debtors agree, jointly and severally and irrespective of the occurrence of the Closing, to indemnify and hold harmless the DIP Agent, DIP Arranger, each Commitment Party and each DIP Lender, in each case, in such capacities, and each of their respective affiliates, and each of their and their affiliates' respective officers, directors, employees, agents, advisors, legal counsel, consultants, representatives, controlling persons, members and successors and permitted assigns (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, expenses (including, without limitation, reasonable fees and disbursements of counsel) and liabilities (including any actions or other proceedings commenced or threatened in respect thereof), joint or several, that may be incurred by or asserted or awarded against any Indemnified Person (including, without limitation, in connection with any action, investigation, litigation or proceeding or the preparation or conduct of a defense in connection therewith (whether or not such Indemnified Person is a party to any such action, investigation, litigation or proceeding)), in each case, arising out of or in connection with or by reason of this DIP Commitment Letter (including the DIP Term Sheet), the DIP Payments Letter, the DIP Loan Documents, the Transactions or any other transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct. The Debtors further agree to reimburse each Indemnified Person promptly upon (but in any event within two days of) demand for all legal and other expenses incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to any such investigation, litigation or proceeding to which the indemnity in this paragraph applies (including, without limitation, in connection with the enforcement of the indemnification obligations set forth herein). In the case of any such investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective, whether or not such investigation, litigation or proceeding is brought by any Debtor, any

securityholder or creditor of any Debtor, an Indemnified Person or any other person, or an Indemnified Person is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Person shall be liable for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such damages have resulted from (in each case as finally determined by a court of competent jurisdiction in a final and non-appealable judgment) the willful misconduct or gross negligence of such Indemnified Person.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor, or any of its securityholders or creditors for or in connection with the transactions contemplated hereby.

The Debtors further agree that, without the prior written consent of an Indemnified Person, the Debtors will not enter into any settlement of any such investigation, litigation or other proceeding to which the indemnity in this Section 3 applies unless such settlement (i) includes an express and unconditional release of such Indemnified Person from the party bringing such lawsuit, claim or other proceeding of such Indemnified Person from liability and claims that are the subject matter of such proceedings and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such Indemnified Person.

4.      Fees; Costs and Expenses.  The Debtors will pay (or cause to be paid) the fees set forth in the DIP Payments Letter and any fee letter entered into with the DIP Agent.  The Company and the other Debtors shall jointly and severally pay promptly after receipt of an invoice from the DIP Arranger, the DIP Agent, the Commitment Parties or counsel to the Commitment Parties all reasonable and documented fees and out-of-pocket costs, expenses and disbursements of the DIP Arranger, the DIP Agent and the Commitment Parties as follows:  (a)(i) other than with respect to the fees and out-of-pocket costs, expenses and disbursements of counsel and financial advisors to the DIP Arranger, the DIP Agent and the Commitment Parties covered in clause (a)(ii), all reasonable and documented fees and out-of-pocket costs, expenses and disbursements of the DIP Arranger, DIP Agent and the Commitment Parties and (ii) with respect to the fees and out-of-pocket costs, expenses and disbursements of counsel and financial advisors to the DIP Arranger, the DIP Agent and the Commitment Parties, reasonable and documented fees and out-of-pocket costs, expenses and disbursements of the following: (w) one counsel, one local counsel and one special counsel, if any, in each relevant material jurisdiction to the DIP Arranger and the DIP Agent; provided, however, that the United Kingdom, Canada and Australia shall be deemed relevant material jurisdictions for all purposes, (x) Stroock & Stroock & Lavan LLP and its local counsel and special counsel, if any, in each relevant material jurisdiction (including, for the avoidance of doubt, the United Kingdom, Canada and Australia), (y) FTI Consulting, Inc. and (z) other professional advisors hired by any of the foregoing counsel named or referenced above (all of the foregoing professionals, collectively, "**DIP Professionals**"), in each case, in connection with the DIP Facility and the preparation, negotiation, execution and delivery of this DIP Commitment Letter, the DIP Payments Letter, the DIP Loan Documents, the DIP Orders and the administration of the DIP Facility, including, without limitation, all due diligence, syndication, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent and the Commitment Parties in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents; and (b)

reasonable and documented fees and out-of-pocket costs, expenses and disbursements of the DIP Arranger, the DIP Agent and the Commitment Parties (including reasonable and documented fees and out-of-pocket costs, expenses and disbursements of the DIP Professionals) incurred in connection with (i) the enforcement of any of their rights and remedies hereunder or under the DIP Payments Letter or the DIP Loan Documents or enforcing any DIP Loan Document or Order or DIP Obligation or any security therefor or exercising or enforcing any other right or remedy available by reason of an Event of Default (as defined in the DIP Term Sheet); (ii) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or in any insolvency or bankruptcy proceeding; (iii) commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal proceeding relating to the DIP Obligations, any Debtor, any of Holdings' Subsidiaries and related to or arising out of the transactions contemplated hereby or under the DIP Payments Letter or the DIP Loan Documents and the DIP Order; and (iv) taking any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) described in clauses (i) through (iii) above.

5.    <u>Confidentiality</u>.  By accepting delivery of this DIP Commitment Letter, each Debtor agrees that the existence, contents and terms of this DIP Commitment Letter (including the DIP Term Sheet and the Exit First Lien Facility Term Sheet) and the DIP Payments Letter, are confidential and are solely for its confidential use in connection with the transactions contemplated hereby and that, without the prior written consent of the Commitment Parties, neither the existence, nor the terms and contents hereof and thereof shall be disclosed by it to any person or entity (whether legal or other entity), other than officers, directors, employees, agents, representatives, equity-holders, accountants, attorneys and other advisors of the Debtors, and then only on a confidential basis in connection with the transactions contemplated hereby.   Notwithstanding the foregoing, following the Debtors' acceptance of the provisions hereof and its return of an executed counterpart of this DIP Commitment Letter, the Debtors may disclose this DIP Commitment Letter (including, for the avoidance of doubt, the DIP Term Sheet) (but not the DIP Payments Letter or any part thereof) (i) as compelled in a judicial or administrative proceeding or as otherwise required by applicable law (in which case the Debtors agree to provide prompt written notice thereof to the Commitment Parties, to the extent legally permitted to do so), (ii) in filings with the Bankruptcy Court presiding over the Chapter 11 Cases and (iii) in any suit or legal action or proceeding relating to the Debtors' exercise of any rights or remedies hereunder or under the DIP Payments Letter (in which case the Debtors agree to provide prompt written notice thereof to the Commitment Parties and to limit disclosure to relevant proceedings and court filings relating thereto), it being understood and agreed that this clause (iii) shall not permit any disclosure in the context of any marketing or press materials or other form of general public release.

If the DIP Payments Letter is required to be filed with the Bankruptcy Court or disclosed to the United States Trustee appointed in the jurisdiction of the Chapter 11 Cases (the "**U.S. Trustee**") or any statutory committee appointed in the Chapter 11 Cases for purposes of obtaining approval to pay any fees provided for therein or otherwise, then you agree that you shall promptly notify the DIP Arranger, the DIP Agent and the Commitment Parties and take all commercially reasonable actions necessary to prevent the DIP Payments Letter from becoming publicly available, including, without limitation, filing a motion or an ex parte request pursuant to sections 105(a) and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure seeking a Bankruptcy Court order authorizing you to file the DIP Payments Letter under seal to the maximum extent permitted by the Bankruptcy Court; *provided, however,* that if the Bankruptcy Court does not permit such filing under seal, then any such filing shall be redacted to the maximum extent permitted by the Bankruptcy Court

and approved by the Commitment Parties in writing.  The provisions of this section shall survive any termination or completion of the arrangement provided by this DIP Commitment Letter.

6.      No Third Party Reliance, Etc.  The agreements of the Commitment Parties hereunder and of any Lender that issues a commitment to provide financing under the DIP Facility are made solely for the benefit of the Debtors and may not be relied upon or enforced by any other person; provided, however, that the DIP Agent (including in its capacity as the initial lender under the DIP Facility) is a third party beneficiary of the agreements of the Commitment Parties in this DIP Commitment Letter and of the provisions of Section 10 hereof and shall be entitled to enforce such agreements and provisions.

7.      Sharing Information; Absence of Fiduciary Relationship.  You acknowledge that the DIP Arranger, DIP Agent, each Commitment Party and/or one or more of their affiliates may provide financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with the interests of the Debtors.  None of the DIP Arranger, the DIP Agent, any Commitment Party, or any of their affiliates will use in connection with the Transactions, or furnish to the Debtors, confidential information that the DIP Arranger, the DIP Agent, such Commitment Party or any of their affiliates obtained or may obtain from any other person.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you, on the one hand, and the DIP Arranger, the DIP Agent and/or any of the Commitment Parties, on the other hand, has been or will be created in respect of any of the transactions contemplated by this DIP Commitment Letter or the DIP Term Sheet, irrespective of whether the Commitment Parties or their respective affiliates have advised or are advising you on other matters, and (b) you will not bring or otherwise assert any claim against the DIP Arranger, the DIP Agent or any of the Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the DIP Arranger, DIP Agent and Commitment Parties shall have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Debtors, including the Debtors' stockholders, employees or creditors.

You further acknowledge that each of the DIP Arranger, the DIP Agent and the Commitment Parties and their respective affiliates (collectively, the "**Group**") is a full service securities firms engaged in securities trading and brokerage activities as well as providing investment banking and other financial services.  In the ordinary course of business, any member of the Group may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and your subsidiaries and other companies with which you or your subsidiaries may have commercial or other relationships.  With respect to any securities and/or financial instruments so held by any member of the Group, or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.  Accordingly, there may be situations where parts of the Group and/or their clients either now have or may in the future have interests, or take actions, that may conflict with the Debtors' interests.  For example, the Group may, in the ordinary course of business, engage in trading in financial products or undertake other investment businesses for their own account or on behalf of other clients, including without limitation, trading in or holding long, short or derivative

positions in securities, loans or other financial products of the Debtors or its affiliates or other entities connected with the DIP Facility or the transactions contemplated hereby.

8.    <u>Commitment Termination</u>.    This DIP Commitment Letter and each Commitment Party's commitments and undertakings set forth in this DIP Commitment Letter will terminate and expire automatically on the earliest to occur of:

    (a)    11:59 p.m. New York City time on October 2, 2019 (as such time may be extended with the prior written consent of the Commitment Parties and the Company) unless by such time (i) the Debtors and each of the Commitment Parties executes and delivers this DIP Commitment Letter and (y) the Debtors execute and deliver the DIP Payments Letter;

    (b)    the Closing Date;

    (c)    the date on which any issuance, placement, incurrence or funding of debt securities or bank financing by any of the Debtors with third parties (other than the DIP Facility) is consummated;

    (d)    (i) 11:59 p.m., New York City time, on October 3, 2019, unless Petition Date shall have occurred prior to such time and, if the Petition Date has occurred by such time, at 11:59 p.m., (ii) New York City time, on the date that is two (2) business days after such Petition Date, unless, prior to that time, the Bankruptcy Court shall have entered the Interim DIP Order or (iii) if the Interim DIP Order has been entered by such time, at 11:59 p.m., New York City time, on the date that is two (2) business days thereafter (as such time may be extended with the prior written consent of the Commitment Parties and the Company) unless all DIP Loan Documents have been executed and delivered by all parties thereto by such time; or

    (e)    the filing by any Debtor of any motion or request in the Chapter 11 Cases or in any other legal proceeding seeking, or the entry by the Bankruptcy Court of, an order (i) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) terminating or modifying the exclusive right of the Debtors to file a plan of reorganization under section 1121 of the Bankruptcy Code.

9.    <u>Assignments</u>.    This DIP Commitment Letter and the DIP Payments Letter may not be assigned by any Debtor to any other person or entity without the prior written consent of each Commitment Party, and any attempted assignment without such consent shall be void.  Except in connection with the syndication of the DIP Facility as set forth above, prior to the entry of the Final DIP Order, no Commitment Party may assign its rights or obligations with respect to its portion of the DIP Facility commitments under this DIP Commitment Letter that have not been funded (other than an assignment to an affiliate of such Commitment Party), without the consent of each other Commitment Party.

10.    <u>Amendments</u>.    This DIP Commitment Letter and the DIP Payments Letter may not be amended or any provision hereof waived or modified except by written agreement signed by each party hereto (which amendment, waiver or modification may be effected via email); <u>provided</u> that any amendment or other modification hereof that affects the rights or obligations of the DIP Agent or the DIP Arranger shall require the consent of the DIP Agent or the DIP Arranger, as applicable.

11.    <u>Governing Law; Waiver of Jury Trial; Jurisdiction</u>.  This DIP Commitment Letter and the DIP Payments Letter, and the rights and obligations of the parties hereunder and thereunder and any claim, controversy or dispute arising under or in connection herewith or therewith shall be governed by, and construed in accordance with, the laws of the State of New York.  Each party hereto irrevocably waives, to the fullest extent permitted by law, all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this DIP Commitment Letter or the Transactions or the actions of the parties hereto in the negotiation, performance or enforcement hereof.  By its execution and delivery of this DIP Commitment Letter, each of the parties hereby irrevocably and unconditionally agrees that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this DIP Commitment Letter or the DIP Payments Letter, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any federal or state court in the borough of Manhattan, the city of New York, and by execution and delivery of this DIP Commitment Letter, each of the parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction, following the commencement of the Chapter 11 Cases, each of the parties agrees that the Bankruptcy Court shall have exclusive jurisdiction with respect to any matter under or arising out of or in connection with this DIP Commitment Letter and the DIP Payments Letter; <u>provided</u>, that the parties acknowledge that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court.

12.    <u>Counterparts</u>.  This DIP Commitment Letter and the DIP Payments Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same DIP Commitment Letter or DIP Payments Letter, respectively.  Delivery of an executed counterpart of a signature page to this DIP Commitment Letter or the DIP Payments Letter by facsimile or electronic transmission (e.g., "pdf") shall be as effective as delivery of a manually executed counterpart of this DIP Commitment Letter or the DIP Payments Letter, respectively.

13.    <u>Entire Agreement</u>.  This DIP Commitment Letter and the DIP Payments Letter set forth the entire agreement among the parties with respect to the matters addressed herein and therein and supersedes all prior communications, written or oral, with respect hereto.

14.    <u>Termination</u>.  You may terminate this DIP Commitment Letter upon written notice to the DIP Arranger, the DIP Agent and the Commitment Parties at any time, <u>provided</u>, that the provisions of Section 2, Section 3, Section 4, Section 5, Section 6, the second paragraph of Section 7, Section 11 and this Section 14 of this DIP Commitment Letter shall survive the expiration and termination of this DIP Commitment Letter until such time as such provisions shall be superseded by the comparable provisions in the DIP Loan Documents.

15.    <u>PATRIOT Act Notification</u>.  The Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**PATRIOT Act**"), the Commitment Parties and each Lender is required to obtain, verify and record information that identifies the issuer and each guarantor under the DIP Facility, which information includes the name, address, tax identification number and other information regarding the issuer and each guarantor that will allow the Commitment Parties or such Lender to identify the issuer

and each guarantor in accordance with the PATRIOT Act and is effective as to each Commitment Party and each Lender.

Please indicate your acceptance of the provisions hereof by signing the enclosed copy of this DIP Commitment Letter and returning them to the Commitment Parties.  This DIP Commitment Letter shall be effective upon the execution thereof by the Commitment Parties and the Debtors irrespective of whether it has been acknowledged by the DIP Arranger or the DIP Agent.

The Commitment Parties are pleased to have been given the opportunity to assist you in connection with this financing.

*[Remainder of Page Intentionally Left Blank]*

**ACCEPTED AND AGREED on** October    2   , **2019:**

**DELUXE ENTERTAINMENT SERVICES GROUP INC.**

By:  _____
    Name:    John Eric Cummins
    Title:    Executive Vice President,
           Chief Financial Officer and
           Treasurer

**DX HOLDINGS LLC**

By:  _____
    Name:    Paul Savas
    Title:    Executive Vice President and
           Chief Financial Officer

ACCEPTED AND AGREED on <u>October</u>  <u>2</u> , 2019:

**DELUXE ENTERTAINMENT SERVICES GROUP INC.**

By: _____
      Name:    John Eric Cummins
      Title:    Executive Vice President,
             Chief Financial Officer and
             Treasurer

**DX HOLDINGS LLC**

By: _____
      Name:    Paul Savas
      Title:    Executive Vice President and
             Chief Financial Officer

Very truly yours,

**ALCOF II NUBT, L.P.**
**By:  Arbour Lane Fund II GP, LLC,**
**Its General Partner,** as a Commitment Party

By:    _____
          Name:    Kenneth Hoffman
          Title:     Manager

Deluxe – DIP Commitment Letter

Very truly yours,

**AVENUE CREDIT OPPORTUNITIES FUND
I-A, L.P.**

By: Avenue Credit Opportunities Partners I-A,
LLC,
      *its General Partner*

By: GL Credit Opportunities Partners I-A, LLC,
      *its Managing Member*, as a Commitment
Party

By: _____
    Name:    William C. Maier
    Title:     Senior Portfolio Manager

Very truly yours, **CIFC Event Driven Opportunities
Master Fund, LP**
as a Commitment Party
By: CIFC Asset Management LLC, as Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2012-II-R, Ltd.**
as a Commitment Party
By: CIFC VS Management LLC, its Collateral Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2013-I, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2013-II, Ltd.**
as a Commitment Party
By:  CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2013-III-R Ltd.**

as a Commitment Party

By: CIFC VS Management LLC, as Collateral Manager

By: 

Name: Ira Ginsburg

Title: Managing Director

Very truly yours, **CIFC Funding 2013-IV, Ltd.**
as a Commitment Party
By:  CIFC Asset Management LLC, its Collateral
Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2014, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Portfolio
Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2014-III, Ltd.**
as a Commitment Party
BY: CIFC Asset Management LLC, its Collateral
Manager


By: _____
     Name: Ira Ginsburg
     Title: Managing Director

Very truly yours, **CIFC Funding 2014-II-R, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, as Collateral
Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2014-IV-R, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2014-V, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2015-I, Ltd.**
as a Commitment Party
BY: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2015-II, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2015-III, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager


By: _____
     Name: Ira Ginsburg
     Title: Managing Director

Very truly yours, **CIFC Funding 2015-IV, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2015-V, Ltd**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager


By: _____
     Name: Ira Ginsburg
     Title: Managing Director

Very truly yours, **CIFC Funding 2016-I, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
   Name: Ira Ginsburg
   Title: Managing Director

Very truly yours, **CIFC Funding 2017-I, Ltd**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2017-II, Ltd.**
as a Commitment Party
By: CIFC CLO Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2017-III, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2017-IV, Ltd.**
as a Commitment Party
By: CIFC CLO Management LLC, its Collateral
Manager, by and on behalf of each of its series, Series
M-1, Series O-1 and Series R-1


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2017-V, Ltd.**
as a Commitment Party
By: CIFC CLO MANAGEMENT II LLC, as Collateral
Manager
 By and on behalf of each of its series, SERIES M-1,
SERIES O-1, and SERIES R-1

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2018-I, Ltd.**
as a Commitment Party
By: CIFC CLO MANAGEMENT II LLC, as Collateral
Manager
By and on behalf of each of its series, SERIES M-1,
SERIES O-1, and SERIES R-1

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2018-II, Ltd.**
as a Commitment Party
By: CIFC CLO Management II LLC, its Collateral
Manager, by and on behalf of each of its series, Series
M-1, Series O-1 and Series R-1

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2018-III, Ltd.**
as a Commitment Party


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Funding 2018-IV, Ltd.**
as a Commitment Party
By: CIFC CLO Management II LLC, as Collateral
Manager
By and on behalf of each of its series, SERIES M-1,
SERIES O-1, and SERIES R-1


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Loan Opportunity Fund II, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **CIFC Loan Opportunity Fund, Ltd.**
as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager


By: _____
      Name: Ira Ginsburg
      Title: Managing Director

Very truly yours, **JSS Special Investments FCP (SIF)**
as a Commitment Party
By: CIFC Asset Management LLC, its Sub-Investment
Manager

By: _____

    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours, **Swiss Capital Alternative Strategies Funds SPC re: SC Alternative Strategy 10 SP**

as a Commitment Party

By: _____

    Name: Ira Ginsburg
    Title: Managing Director

Very truly yours,

**CION INVESTMENT CORPORATION,** as a
Commitment Party

By:

Name:    Gregg Bresner
Title:    Chief Investment Officer

Very truly yours,

**Covenant Credit Partners CLO III, Ltd.,** as a
Commitment Party

By: _____
    Name:    Christopher Brogdon
    Title:     Assistant Portfolio Manager

Very truly yours,

ELLINGTON CLO MANAGEMENT LLC.

ON BEHALF OF:

ELLINGTON CLO I, LTD.
ELLINGTON CLO II, LTD.
ELLINGTON CLO III, LTD.,

as a Commitment Party

By: _____

Name: MARK HERON
Title: Portfolio Manager

Very truly yours,

**Invesco Oppenheimer Fundamental Alternatives Fund**, as a Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

Very truly yours,

**HarbourView CLO VII-R, LTD**, as a
Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

Very truly yours,

**Invesco Oppenheimer Master Loan Fund**, as a
Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

Very truly yours,

**Invesco Oppenheimer Senior Floating Rate Fund**, as a
Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

Very truly yours,

**Invesco Oppenheimer Senior Floating Rate Plus Fund**,
as a Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

Very truly yours,

**NPB Manager Fund, SPC. – Segregated
Portfolio 105,** as a Commitment Party

By: _____

     Name:    Damion Brown
     Title:    Managing Director

**Abbott AbbVie Multiple Employer Pension Plan Trust,** as a Commitment Party

By: _____

Name:    Damion Brown

Title:     Managing Director

Very truly yours,

**Abbott Laboratories Annuity Retirement
Trust,** as a Commitment Party

By: _____
Name:    Damion Brown
Title:    Managing Director

**MidOcean Tactical Credit Fund II, LP**, as a
Commitment Party

By:

Name:   Damion Brown
Title:    Managing Director

Very truly yours,

**MJX Asset Management LLC,** as a Commitment
Party

By: _____

     Name:    Fred Taylor
     Title:     Managing Director

Very truly yours,

**American Beacon Sound Point Enhanced
Income Fund,** as a Commitment Party

By:

Name:     Kevin Gerlitz
Title:     Chief Financial Officer

Very truly yours,

**American Beacon Sound Point Floating Rate
Income Fund, a series of American Beacon
Funds,** as a Commitment Party

By:
_____
Name:    Kevin Gerlitz
Title:    Chief Financial Officer

Very truly yours,

**Kaiser Foundation Hospitals,** as a Commitment
Party

By:

Name:   Kevin Gerlitz
Title:   Chief Financial Officer

Very truly yours,

**Kaiser Permanente Group Trust,** as a
Commitment Party

By: _____

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

Very truly yours,

**Neuberger Berman Alternative Funds** –
**Neuberger Berman Absolute Return Multi-
Manager Fund,** as a Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

Very truly yours,

**Principal Funds, Inc. Global Multi-Strategy Fund,** as a Commitment Party

By:

Name:     Kevin Gerlitz
Title:      Chief Financial Officer

Very truly yours,

**Privilege Underwriters Reciprocal Exchange,** as a Commitment Party

By: _____

    Name:    Kevin Gerlitz
    Title:     Chief Financial Officer

Very truly yours,

**PURE Insurance Company,** as a Commitment Party

By: _____

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

Very truly yours,

**Sound Point Credit Opportunities Master Fund, L.P.,** as a Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

Very truly yours,

**Sound Point Montauk Fund, L.P.,** as a
Commitment Party

By:

| | |
|---|---|
| Name: | Kevin Gerlitz |
| Title: | Chief Financial Officer |

Very truly yours,

**Sound Point Senior Floating Rate Master Fund,
L.P.,** as a Commitment Party

By: _____

        Name:    Kevin Gerlitz
        Title:     Chief Financial Officer

Very truly yours,

**Sound Point Strategic Capital Fund, LP,** as a Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

Very truly yours,

**Teamsters Pension Trust Fund of Philadelphia
& Vicinity,** as a Commitment Party

By: _____

    Name:    Kevin Gerlitz
    Title:    Chief Financial Officer

Very truly yours,

**THL Credit Senior Loan Fund by**
**THL Credit Advisors LLC, as Adviser,**
as a Commitment Party

By: _____
      Name:    Brian W. Good
      Title:     Senior Managing Director

## Schedule I

### Commitment Parties and Commitments

| Lender | Gross Commitment | % of DIP |
|---|---|---|
| CIFC | $ 25,900,000.00 | 22.5% |
| Cion | 24,000,000.00 | 20.9% |
| Arbour Lane | 22,000,000.00 | 19.1% |
| Invesco (OFI Global) | 14,000,000.00 | 12.2% |
| Sound Point Capital | 11,139,114.95 | 9.7% |
| MJX | 5,398,590.90 | 4.7% |
| ELLINGTON MANAGEMENT GROUP LLC | 4,000,000.00 | 3.5% |
| MIDOCEAN PARTNERS- FM | 3,000,000.00 | 2.6% |
| Avenue | 2,980,934.91 | 2.6% |
| THL CREDIT SENIOR LOAN STRATEGIES LLC- FM | 1,581,359.24 | 1.4% |
| Covenant | 1,000,000.00 | 0.9% |
| Total: | $ 115,000,000.00 | 100.0% |

## SENIOR SECURED SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT FACILITY

### SUMMARY OF TERMS AND CONDITIONS

Capitalized terms used but not otherwise defined in this Summary of Terms and Conditions (this "DIP Term Sheet") shall have the meanings assigned thereto in the DIP Facility Commitment Letter this DIP Term Sheet is attached to and, if not defined therein, in the Prepetition Priming Credit Agreement (as defined below).

| | |
|---|---|
| **Borrower:** | DELUXE ENTERTAINMENT SERVICES GROUP INC., a Delaware corporation (the "Borrower"), in its capacity as a debtor and debtor-in-possession in the case (together with the cases of its affiliated debtors and debtors-in-possession, collectively, the "Chapter 11 Cases") to be filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court"). The date of commencement of the Chapter 11 Cases is referred to herein as the "Petition Date". |
| **Guarantors:** | DX HOLDINGS LLC, a Delaware limited liability company ("Holdings"), in its capacity as a debtor and debtor-in-possession in the Chapter 11 Cases, and all direct and indirect wholly-owned domestic and foreign Subsidiaries of Holdings other than the Borrower that are guarantors of any Prepetition Debt (but excluding such immaterial Subsidiaries as may be agreed to by the Required DIP Lenders) (together with Holdings, collectively, the "Guarantors" and, together with the Borrower, the "Debtors"), on a joint and several basis. |

"Prepetition Debt" means indebtedness or obligations arising in connection with one or more of the following:

(a)    that certain Third Amended and Restated Asset-Based Revolving Credit Agreement dated as of July 31, 2019 (as modified from time to time prior to, and as in effect on, the Petition Date, the "Prepetition ABL Credit Agreement", and all debt and other Obligations (as defined therein) thereunder, the "Prepetition ABL Obligations"), among the Borrower, Holdings, the lenders from time to time party thereto, Credit Suisse AG, as administrative agent (in such capacity, the "Prepetition ABL Administrative Agent"), and Bank of America, N.A., as collateral agent (in such capacity, the "Prepetition ABL Collateral Agent");

(b)    that certain Senior Secured Super Priming Term Loan Credit Agreement, dated as of September 19, 2019 (as modified from time to time prior to, and as in effect on, the Petition Date, the "Prepetition Senior Priming Credit Agreement", and all debt and other Obligations (as defined therein) thereunder (including all make-whole payments and prepayment premiums applicable thereto), the "Prepetition Senior Priming Obligations"), among the Borrower, Holdings, the lenders from time to time party thereto, and Credit Suisse AG, as administrative agent and collateral agent (in such capacities, the "Prepetition Senior Priming Agent");

(c)    that certain Senior Secured Priming Delayed Draw Term Loan Credit Agreement, dated as of July 31, 2019 (as modified from time to time prior to, and as in effect on, the Petition Date, the "Prepetition Priming Credit Agreement", and all debt and other Obligations (as defined therein) thereunder (including any prepayment premium applicable thereto), the "Prepetition Priming Obligations"), among the Borrower, Holdings, the lenders from time to time party thereto, and Credit Suisse AG, as administrative agent and collateral agent (in such capacities, the "Prepetition Priming Agent"); and

(d)    that certain Fifth Amended and Restated Credit Agreement, dated as of July 31, 2019 (as modified from time to time prior to, and as in effect on, the Petition Date, the "Prepetition Junior Credit Agreement", and all debt and other Obligations (as defined therein) thereunder (including any prepayment premium applicable thereto), the "Prepetition Junior Obligations" and, together with the Prepetition Senior Priming Obligations and the Prepetition Priming Obligations, the "Prepetition Term Obligations"), among the Borrower, Holdings, the lenders from time to time party thereto, and Credit Suisse AG, as administrative agent and collateral agent (in such capacities, the "Prepetition Junior Agent").

**DIP Agent:**    An institution selected by the Commitment Parties and reasonably acceptable to the Borrower will act as administrative agent and collateral agent for the DIP Lenders with respect to the DIP Facility (in such capacities, the "DIP Agent") and will perform the duties customarily associated with such roles.

**DIP Lenders:**    The lenders under the DIP Facility (each a "DIP Lender", and, collectively, the "DIP Lenders") shall be the Commitment Parties (and/or one or more of their respective designated affiliates and/or related funds or accounts) and, subject to the DIP Commitment Letter (including the syndication of the DIP Facility contemplated thereby) and the DIP Credit Agreement (including the assignment provisions therein), such other financial institutions or entities (if any) that become party to the DIP Credit Agreement in accordance with its terms and the DIP Commitment Letter; provided, that (a) each DIP Lender (other than any financial institution (other than any Commitment Party) that acts as the initial DIP Lender under the DIP Credit Agreement) that owns any Prepetition Debt shall at all times be a party to that certain Restructuring Support Agreement, dated as of August 30, 2019 (together with all exhibits, schedules and attachments thereto, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time), by and among the Company, Holdings, the other Loan Parties, each of the Consenting Creditors (as defined therein) party thereto, MacAndrews & Forbes Media Group, Inc., MAFCO Three LLC, and MacAndrews Deluxe Holdings LLC (the "Restructuring Support Agreement") and (b) in the initial syndication of the DIP Loans, each DIP Lender that holds any Prepetition Junior Obligations but does not hold any Prepetition Priming Obligations shall, by becoming an initial DIP Lender in such syndication be deemed to irrevocably offer to purchase, at par, Prepetition Priming Obligations in an aggregate amount equal to its Available Amount. "Available Amount" means, with respect to each DIP Lender, an amount equal to the lesser of (x) such DIP Lender's *pro rata* share of the

2

aggregate amount of Prepetition Priming Obligations based on the amount of such DIP Lender's Prepetition Junior Obligations as compared to all of the Prepetition Junior Obligations and (y) the amount made available by the holders of the Prepetition Senior Obligations to be so purchased in their sole discretion.

**Type and Amount of the DIP Facility:**  A multi-draw new money senior secured super-priority debtor-in-possession term loan facility (the "<u>DIP Facility</u>", and the term loans thereunder, "<u>DIP Loans</u>") in such aggregate principal amount (not exceeding $115,000,000) as is approved by the Bankruptcy Court in the Final DIP Order (as defined below) (the aggregate principal amount of the DIP Lenders' commitments (the "<u>DIP Commitments</u>") under the DIP Facility, the "<u>Total DIP Commitments</u>").

DIP Loans shall (subject to the DIP Orders (as defined below) and the borrowing conditions set forth herein and in the DIP Credit Agreement) be incurred as follows:

(a) in one draw on the Closing Date (as defined below) (the DIP Loan made thereon, the "<u>Initial DIP Loan</u>") in such aggregate principal amount (not exceeding $55,000,000) as is approved by the Bankruptcy Court in the Interim DIP Order; <u>provided</u>, that, to the extent that the Interim DIP Order does not permit all Prepetition Senior Priming Obligations (including any premiums, including any "make-whole" premiums) to be repaid, satisfied and discharged in full with proceeds of Initial DIP Loan, the aggregate principal amount of Initial DIP Loan shall be reduced by the amount of such accrued and unpaid Prepetition Senior Priming Obligations (including any premiums, including any "make-whole" premiums) that are not permitted to be so discharged; and

(b) subject to entry by the Bankruptcy Court of the Final DIP Order and the Confirmation Order (as defined in the Restructuring Support Agreement), and otherwise in accordance with the applicable terms of the Restructuring Support Agreement and the Plan (as defined in the Restructuring Support Agreement), in one draw on the date that is immediately prior to the Effective Date (as defined in the Restructuring Support Agreement) in an aggregate principal amount equal to the lesser of (i) $60,000,000 *plus* the aggregate amount (if any) of Prepetition Senior Priming Obligations that were not repaid, satisfied and discharged in full with proceeds of Initial DIP Loan and (ii) such amount as is approved by the Bankruptcy Court in the Final DIP Order.

Once repaid or prepaid, no portion of the DIP Loans may be reborrowed.

**Amortization:**  None.

**Interest:**  At all times prior to the occurrence of an Event of Default (as defined below), interest on the DIP Loans shall accrue at a rate per annum equal to (x) in the case of LIBOR loans, LIBOR (to be subject to a 1.00% floor and otherwise defined in accordance with the Documentation Principles) plus 7.50% and (y) in the case of ABR loans, an adjusted base rate (to be subject to a 2.50% floor and otherwise defined in accordance with the Documentation Principles) plus 6.50% (the "<u>Interest Rate</u>") and, in each case, shall be payable in cash, monthly in arrears.

3

All overdue amounts shall accrue interest at the Interest Rate plus 2.00% per annum and shall be payable in cash, on demand, and upon the occurrence and during the continuance of an Event of Default, interest on the DIP Loans shall accrue at the Interest Rate plus 2.00% per annum and shall be payable in cash.

All interest shall be computed on the basis of a 360-day year consisting of twelve (12) 30-day months, except that ABR loans shall be computed on the basis of a 365-day year.

**Agency Fee:** The Debtors shall pay an agency fee to the DIP Agent on the Closing Date in an amount to be agreed between the Debtors and the DIP Agent.

**Documentation:** The DIP Facility shall be subject to terms and conditions that are usual and customary for debtor-in-possession financings and consistent with this DIP Term Sheet, and such other terms and conditions as are required by the Required DIP Lenders and the DIP Agent; provided, that all terms and conditions applicable to the DIP Facility shall be satisfactory to the Required DIP Lenders and the DIP Agent. Subject to the foregoing, the DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement, in form and substance substantially similar to the Prepetition Senior Priming Credit Agreement (with such modifications satisfactory to the DIP Lenders and the DIP Agent as are (i) set forth herein and (ii) usual and customary for debtor-in-possession financings, and/or otherwise necessary or desirable to effectuate the financing contemplated hereby and/or to reflect the capital structure and operational requirements of the Loan Parties) (the "DIP Credit Agreement"), (b) an order (in form and substance acceptable to the Required DIP Lenders and the DIP Agent) entered by the Bankruptcy Court approving the DIP Facility on an interim basis (the "Interim DIP Order"), (c) an order (in form and substance acceptable to the Required DIP Lenders and the DIP Agent) entered by the Bankruptcy Court approving the DIP Facility and the New First Lien Term Loan (as described on Exhibit C hereto) on a final basis and in accordance with the requirements of the Restructuring Support Agreement (the "Final DIP Order", and together with the Interim DIP Order, the "DIP Orders") and (d) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, control agreements, guarantees, mortgages and other legal documentation or instruments as are, in each case, usual and customary for financings of this type, necessary or desirable to effectuate the financing contemplated hereby and/or otherwise reasonably required by the Required DIP Lenders or the DIP Agent (including such agreements, documents and instruments constituting "Loan Documents" under, and as defined in, the Prepetition Senior Priming Credit Agreement) (all of the foregoing, together with the DIP Credit Agreement and the DIP Orders, in each case, in form and substance satisfactory to the Required DIP Lenders and the DIP Agent, collectively, the "DIP Loan Documents"). The foregoing shall collectively be referred to herein as the "Documentation Principles".

4

**Closing Date:** The business day on or immediately after the date of entry of the Interim DIP Order on which all of the conditions precedent to effectiveness and initial borrowings under the DIP Credit Agreement set forth in the DIP Credit Agreement are satisfied or waived by the Required DIP Lenders in accordance with the DIP Credit Agreement (such date, the "Closing Date").

**Maturity:** All unfunded DIP Commitments will terminate, and all DIP Obligations (as defined below) will be immediately due and payable in full in cash on the earliest of:

    (a)   the first anniversary of the Closing Date (the "Maturity Date");

    (b)   if the Final DIP Order has not been entered by the Bankruptcy Court on or before the date that is thirty-five (35) calendar days after the Petition Date, on such date;

    (c)   the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;

    (d)   the date of acceleration of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an Event of Default (as defined below) pursuant to the terms of the DIP Credit Agreement; and

    (e)   the Effective Date; provided, that, subject to the approval by the Bankruptcy Court of the Plan and subject further to, and in accordance with, the Restructuring Support Agreement, DIP Obligations may be satisfied and discharged on the Effective Date pursuant to a refinancing thereof with proceeds of, or (as the case may be) a roll thereof into, the New First Lien Term Loan.

**Use of Proceeds:** Subject to the applicable DIP Order and the other DIP Loan Documents, proceeds of the Initial DIP Loan will be used only for the following purposes: (a) to repay (on a dollar-for-dollar basis), satisfy and discharge all accrued and unpaid Prepetition Senior Priming Obligations (including, for the avoidance of doubt, all interest thereon accrued through the Closing Date and all premiums, fees and expenses payable thereon); (b) to pay interest, fees, costs and expenses related to the DIP Facility (including the fees, costs, disbursements and expenses of the DIP Agent and its counsel, financial advisors, consultants and other professionals (collectively, the "DIP Agent Advisors"), (c) to pay the fees, costs and expenses of the estate professionals retained in the Chapter 11 Cases and approved by the Bankruptcy Court, (d) to fund the Carve Out (as defined below), (e) to pay the fees, costs, disbursements and expenses of the DIP Lenders (including the fees and expenses of Stroock & Stroock & Lavan LLP ("Stroock"), counsel to certain DIP Lenders, FTI Consulting, Inc. ("FTI"), financial advisor to certain DIP Lenders, and such other consultants, local counsel, financial advisors and other professionals as reasonably required by the Required DIP Lenders (together with Stroock and FTI, collectively, the "DIP Lender Advisors")), (f) to make all permitted payments of costs of administration of the Chapter 11 Cases, (g) to pay such prepetition expenses as are consented to by the Required DIP Lenders and approved by the Bankruptcy Court, (h) to satisfy any adequate protection obligations owing under the DIP Orders, as set forth below, (i) to make any other payments permitted by the Approved Budget, and (j) for general corporate and working capital purposes of the Debtors during the Chapter 11 Cases.

Subject to the applicable DIP Order and the other DIP Loan Documents,

proceeds of DIP Loans made after the Closing Date shall be used solely for the following purposes: (a) to (and solely in such amount as is required to) repay, satisfy and discharge in full in cash any Prepetition Senior Priming Obligations that were not repaid, satisfied and discharged in full with proceeds of Initial DIP Loans, (b) for working capital and general corporate purposes in accordance with the Approved Budget and (c) for such other purposes as consented to by the Required DIP Lenders.

For the avoidance of doubt and notwithstanding anything to the contrary herein, no proceeds of any DIP Loans shall be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facility or the Prepetition Debt; provided that the creditors' committee, if any, may use up to $35,000 of the proceeds in respect of the foregoing.

| | |
|---|---|
| **Mandatory Prepayments:** | The DIP Credit Agreement will contain the following mandatory prepayment events ("<u>Mandatory Prepayments</u>"): subject to the DIP Orders and the ABL Intercreditor Agreement, prepayments of 100% of the net cash proceeds received by any of the Debtors from (a) any asset sale (or series of related asset sales), (b) insurance and condemnation events, (c) equity (other than intercompany equity issuances) or debt issuances and (d) extraordinary receipts, in each case, subject to such customary exceptions as may be agreed by the Required DIP Lenders and set forth in the DIP Credit Agreement. Mandatory Prepayments will result in a dollar-for-dollar permanent reduction of the then-outstanding DIP Loans. |
| **Voluntary Prepayments**: | The DIP Loans may be prepaid in whole or in part at any time and from time to time after the Closing Date, without premium or penalty. Each prepayment shall be accompanied by payment of all accrued and unpaid interest. |
| **Priority and Security under DIP Facility:** | All obligations of the Borrower and the Guarantors to the DIP Agent and the DIP Lenders under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees, expenses, disbursements, reimbursement obligations, indemnities and any and all other amounts due or payable under the DIP Facility (collectively, the "<u>DIP Obligations</u>"), shall be secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens and security interests (such liens and securing interests securing the DIP Obligations, collectively, the "<u>DIP Liens</u>") in all DIP Collateral (as defined below) on the following basis: |

    (a)  pursuant to Bankruptcy Code §364(c)(2) (subject to the Carve Out), the DIP Liens shall have first-priority (or with respect to Unencumbered Assets (as defined below) that would constitute ABL Priority Collateral, second-priority) with respect to all DIP Collateral that is not subject to another valid, perfected, enforceable and non-avoidable lien or security interest as of the Petition Date (such DIP Collateral, the "<u>Unencumbered Assets</u>"); and

    (b)  pursuant to Bankruptcy Code §364(c)(3) and §364(d)(1), the DIP Liens on all DIP Collateral other than Unencumbered Assets shall rank:

            (x)  junior only to (i) the Carve Out; (ii) valid, unavoidable and

6

enforceable liens or security interests on such DIP Collateral existing on the Petition Date which are (A) fully and properly perfected as of the Petition Date to the extent required by Bankruptcy Code §546(b) or (B) perfected subsequent to the Petition Date, in the manner and to the extent permitted by Bankruptcy Code §546(b), in each case, solely to the extent that such liens and security interests are permitted to be senior to the DIP Liens on such DIP Collateral pursuant to the DIP Orders; and (iii) solely with respect to any assets that are or would constitute ABL Priority Collateral, the liens thereon securing the Prepetition ABL Obligations and the adequate protection liens granted under the DIP Orders in favor of the Prepetition ABL Collateral Agent; and

(y) senior to any and all other liens on and security interests in such DIP Collateral, including, without limitation, the liens and security interests thereon securing the Prepetition Senior Priming Obligations, the Prepetition Priming Obligations, the Prepetition Junior Obligations, the 2018 Mafco Loan, the 2019 Mafco Note and all other Indebtedness of any Debtor existing prior to the Petition Date.

The DIP Liens shall be effective and perfected as of the entry of the Interim DIP Order and without requiring the execution, filing or recording of mortgages, security agreements, pledge agreements, control agreements, financing statements or other agreements or instruments, or the taking of any action to obtain possession or control of any collateral. However, the Required DIP Lenders may, in their sole discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence and/or the taking of any action so that the DIP Agent obtains possession or control of any collateral (other than ABL Priority Collateral).

As used herein:

"ABL Priority Collateral" means "ABL Facility First Priority Collateral", as such term is defined in the Third Amended and Restated ABL Intercreditor Agreement, dated as of September 19, 2019 (the "ABL Intercreditor Agreement"), by and among the Borrower, the other DIP Loan Parties, the Prepetition Senior Priming Agent, the Prepetition Priming Agent, the Prepetition Junior Agent and the collateral agent under the Prepetition ABL Credit Agreement.

"DIP Collateral" means all assets and properties of the Debtors (whether tangible or intangible; whether real, personal, or mixed; whether owned by, or owing to, the Debtors on the Petition Date, or acquired by or arising in favor of the Debtors after the Petition Date (including under any trade names, styles, or derivations thereof) and whether owned or consigned by or to, or leased from or to, or thereafter acquired by, the Debtors, and regardless of where located, before or after the Petition Date, including, without limitation: (a) all assets securing the Prepetition Debt, including all assets constituting "Collateral" as such term is defined in the Guarantee and Collateral Agreement (as defined in the Prepetition

Senior Priming Credit Agreement) (collectively, the "Prepetition Collateral"), (b) all money, cash and cash equivalents; (c) each deposit account, securities account, commodities account and each other account of any of the Debtors, together with all money, cash, cash equivalents, instruments and other property deposited therein or credited thereto from time to time; (d) all accounts and other receivables (including those owed to the Debtors generated by intercompany transactions); (e) all contracts and contract rights; (f) all instruments, documents and chattel paper; (g) all securities (whether or not marketable); (h) all goods, as-extracted collateral, equipment, inventory and fixtures; (i) all real property interests; (j) all interests in leaseholds, (k) all franchise rights; (l) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property (collectively, "Intellectual Property Collateral"); (m) all general intangibles; (n) all capital stock, limited liability company interests, partnership interests and financial assets; (o) all investment property; (p) all supporting obligations; (q) all letters of credit issued to the Debtors and letter of credit rights; (r) all commercial tort claims; (s) all other claims and causes of action and the proceeds thereof (including all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof); (t) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (u) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; (v) all Deluxe One Assets; and (w) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; provided, however, that (i) with the consent of the Required DIP Lenders, the DIP Collateral shall not include certain immaterial assets and (ii) certain other customary assets reasonably acceptable to the Required DIP Lenders shall be excluded (collectively, the "Excluded Assets"); provided, further, however, that Excluded Assets shall not include proceeds and products of any of the assets that constitute Excluded Assets.

**Superpriority DIP Claims:**    Effective immediately upon entry of the Interim DIP Order, all of the claims of the DIP Agent and the DIP Lenders on account of the DIP Obligations shall be entitled to the benefits of section 364(c)(1) and 364(e) of the Bankruptcy Code, and shall have superpriority, in each of the Chapter 11 Cases or any Successor Cases, over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provisions of the Bankruptcy Code (the "Superpriority DIP Claims"), subject only to the Carve Out.

The Superpriority DIP Claims will, at all times during the period that the DIP Loans remain outstanding and have not otherwise been indefeasibly paid in full in cash or rolled into a new exit facility upon the Effective Date (including, without limitation, until expiration of any challenge periods associated therewith), remain senior in priority to all other claims or administrative expenses, including without limitation any claims allowed pursuant to the obligations under or in connection with the Prepetition Debt and any adequate protection claims granted thereunder, subject only to the Carve Out.   The

8

Superpriority DIP Claims shall have recourse against each of the Debtors on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (subject to the terms of the DIP Orders), including, subject to entry of the Final DIP Order, Avoidance Actions and the proceeds thereof.

**Carve Out:**

The "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in <u>clause (iii)</u> below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in <u>clause (iii)</u> below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees (including success or transaction fees) and expenses (collectively, the "<u>Professional Fees</u>") accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), and any Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first Business Day (as defined in the DIP Loan Agreement) following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees in an aggregate amount not to exceed $750,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this <u>clause (iv)</u> being the "<u>Post-Carve-Out Trigger Notice Cap</u>").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the DIP Lenders, the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Ad Hoc Committee and counsel to the ABL Administrative Agent, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked; *provided that* nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, or <u>(iv)</u> above, on any grounds.

On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (if any) (the "<u>Termination Declaration Date</u>"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including Cash Collateral) as of such date and any available cash thereafter held by any Chapter 11 Debtor to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees.

The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Professional Fees (the "<u>Pre-Carve-Out Trigger Notice Reserve</u>") prior to any and all other claims (including the DIP Superiority Claim). On the Termination Declaration Date,  after funding

9

the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.

All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facility has been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Prepetition Lenders to be paid to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, in accordance with their rights and priorities as of the Petition Date in accordance with the Intercreditor Agreements.

All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facility has been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case, any such excess shall be paid to the Prepetition Agents to be paid to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, in accordance with their rights and priorities as of the Petition Date in accordance with the Intercreditor Agreements.

Notwithstanding anything herein or the DIP Loan Documents to the contrary: (i) if either of the Carve-Out Reserves is not funded in full in the amounts set forth herein, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the DIP Agent or the Prepetition Agents, as applicable; (ii) following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded or unless the proceeds of such sweep or foreclosure are applied immediately to fund the Carve-Out Reserves, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent or the Prepetition Agents for application in accordance with the Interim DIP Order; (iii) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP Loans under the DIP Facility or increase or reduce the balance of the DIP Superpriority Claim outstanding; (iv) the failure of the Carve-Out Reserves to satisfy, in full, the Allowed Professional Fees shall not affect or impair the priority of the Carve-Out; and (v) in no way shall any of the Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any budget or financial projection delivered in connection with the Interim DIP Order or the DIP Facility be construed as a cap or limitation on the amount of the

Allowed Professional Fees due and payable by, or that may be administrative claims allowed against, the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in the Interim DIP Order, the DIP Facility or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.  Any payment or reimbursement made on a final basis on or after the occurrence of the Termination Declaration Date in respect of any Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities (including the DIP Superpriority Claim and the DIP Liens) and any and all other forms of adequate protection, liens, or other claims securing the DIP Obligations or the Prepetition Debt (including any liens and claims granted on account of the Adequate Protection Obligations).

| **Chapter 11 Cases Milestones:** | The Debtors shall be required to comply with milestones related to the Debtors' Chapter 11 Cases as are set forth on <u>Exhibit A</u> hereto and in the Restructuring Support Agreement, and such other milestones as may be included in the DIP Credit Agreement, as determined by the Required DIP Lenders in their sole discretion (collectively, the "<u>Milestones</u>"). |
|---|---|
| **Financial & Other Reporting:** | The DIP Credit Agreement shall contain financial reporting and other information delivery requirements determined in accordance with the Documentation Principles, including (without limitation) the requirement that the Loan Parties (a) deliver to the DIP Agent (for distribution to the DIP Lenders) (i) annual, quarterly and monthly financials, accompanied by a compliance certificate, comparative figures and management discussion and analysis of financial performance and operations (the scope, level of detail, form and substance of which shall be satisfactory to the Required DIP Lenders), (ii) the Initial Budget (as defined below) and weekly Updated Budgets (as defined below); (iii) a weekly Variance Report (as defined below); (iv) without limitation of the foregoing, such additional financials, reports and other information as are contemplated pursuant to Sections 6.1, 6.2 and 6.7 of the Prepetition Senior Priming Credit Agreement and as otherwise determined in accordance with the Documentation Principles; and (b) hold a teleconference (on a weekly or such other basis (but not more than once per week) reasonably satisfactory the Required DIP Lenders) with the DIP Lenders and their professionals (including Stroock and FTI) to discuss the Variance Report, the Chapter 11 Cases, the financial and operational performance of Holdings and its Subsidiaries, and such other matters as may be requested by the Required DIP Lenders (the foregoing reporting and information delivery requirements, collectively, the "<u>Reporting Requirements</u>"). |

"<u>Approved Budget</u>" means the Initial Budget, until supplemented by a Budget that has been approved by the Required DIP Lenders in their sole discretion.

"<u>Budget</u>" means a 13-week cash flow forecast (in form and substance consistent

with the Initial Budget referred to in the Prepetition Senior Priming Credit Agreement and acceptable to the Required DIP Lenders) setting forth all line-item and cumulative cash receipts and expenditures (including all necessary and required expenses which the Borrower and its Subsidiaries expect to incur) on a weekly basis for the 13-week period covered thereby.

"Initial Budget" means a Budget for the 13-week period beginning as of the Monday of the week immediately prior to the week in which the Closing Date occurs.

"Net Cash Flows" means, for any period, an amount equal to (x) total receipts for such period *less* (y) total disbursements for such period (excluding disbursements in respect of regularly scheduled interest and amortization on Indebtedness for borrowed money and any professional fees), in each case, for all such categories as set forth in the Initial Budget.

"Updated Budget" means (i) a Budget delivered on the first Monday occurring after the Closing Date and covering the 13-week period that commences with the Monday of the week in which the Closing Date occurred and (ii) a Budget delivered on each Monday thereafter and covering the 13-week period that commences with the Monday of the week immediately prior to the date of delivery of such Budget.

"Variance Report" means a variance report (in form and substance acceptable to the Required DIP Lenders) setting forth, in reasonable detail, (a) on a line-by-line basis, any differences between actual receipts and disbursements for each line item for the prior week versus projected receipts and disbursements set forth in each of (x) the Approved Budget and (y) the Updated Budget, in each case, for each such line item for such prior week and (b) on a cumulative basis for the period from the first date in the Initial Budget to the report date (each such period, a "Test Period") the difference between actual Net Cash Flows for such Test Period and projected Net Cash Flows set forth for such Test Period in the Approved Budget, together with a statement certifying compliance with the Budget Covenant (as defined below), which statement shall be accompanied by supporting evidence reflecting such as is required by the Required DIP Lenders to ascertain compliance with the Budget Covenant.

| | |
|---|---|
| **Conditions Precedent to Closing, Initial Draw Date and Additional DIP Draws:** | The effectiveness of the DIP Credit Agreement and the other DIP Loan Documents and the agreements of the Commitment Parties under the DIP Commitment Letter and of the DIP Lenders under the DIP Loan Documents, and the closing of, and funding under, the DIP Facility shall, in each case, be subject to satisfaction (or waiver by Required DIP Lenders) of the conditions precedent set forth on Exhibit B. |
| **Representations and Warranties:** | The DIP Loan Documents shall contain representations and warranties customary for financings of this type and otherwise consistent with the Documentation Principles. |
| **Affirmative and Negative Covenants:** | The DIP Loan Documents shall contain usual and customary affirmative and negative covenants and such covenants as shall be determined in accordance with the Documentation Principles, including, without limitation: |

1. compliance with the Milestones;
2. compliance with the Reporting Requirements;
3. usual and customary negative covenants, including limitations on incurrence of indebtedness, liens, dispositions of assets, mergers, restricted payments, investments, fundamental changes, transactions with affiliates, burdensome agreements, prepayments of debt and use of proceeds of DIP Facility and cash collateral; provided, that no priming indebtedness or pari indebtedness shall be permitted without the consent of all DIP Lenders; and
4. Borrower shall use commercially reasonable efforts to obtain, a rating from Moody's and from S&P with respect to the DIP Facility (but no specific rating).

| | |
|---|---|
| **Financial Covenants:** | The DIP Credit Agreement shall contain the following financial covenants: (a) the requirement that the Loan Parties shall not permit, with respect to any Test Period, the actual Net Cash Flows for such Test Period to be lower than the projected Net Cash Flows set forth in the Approved Budget for such period by an amount in excess of $3,000,000 (the "Budget Covenant") and (b) the requirement that the Loan Parties shall not permit Adjusted EBITDA (to be defined in the DIP Credit Agreement in a manner reasonably satisfactory to the Required DIP Lenders and consistent with the Documentation Principles) at the end of each calendar month (beginning with the calendar month in which the Closing Date occurs) to be more than 25% lower than the Adjusted EBITDA for such month set forth in the business plan that was delivered to FTI on September 1, 2019.<br><br>The foregoing, collectively, the "Financial Covenants". |
| **Events of Default and Remedies:** | The DIP Credit agreement shall contain defaults and events of default (each, an "Event of Default") as are usual and customary for financings of this type and as shall be determined in accordance with the Documentation Principles, including, without limitation, the following: |

1. failure by the Loan Parties to pay (i) principal when due under the DIP Facility and (ii) interest or other amounts within three (3) business days of when due under the DIP Facility;
2. failure by the Debtors to comply with the Milestones;
3. failure to comply with (i) affirmative covenants, (ii) negative covenants or (iii) the Financial Covenants under the DIP Credit Agreement;
4. non-performance or breach of representations, warranties and other obligations under the DIP Credit Agreement or the other DIP Loan Documents, subject to, in the case of other covenants, a cure period acceptable to the Required DIP Lenders;
5. Change of Control (to be defined in a manner reasonably satisfactory to the Required DIP Lenders and consistent with Documentation Principles);
6. the Debtors shall institute any proceeding or investigation or support the same by any other person who may challenge the status and/or validity of the DIP Liens or any Liens securing any Prepetition Debt;
7. termination of the Restructuring Support Agreement;
8. dismissal or conversion of the Chapter 11 Cases; and
9. the filing by the Debtors of a chapter 11 plan of reorganization that is not the

Plan.

In all cases subject to the terms of the DIP Orders and the ABL Intercreditor Agreement, the DIP Agent and the DIP Lenders shall have customary remedies determined appropriate by the Required DIP Lenders, including, without limitation, without further order from the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default, subject to the notice period in the DIP Orders, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loans under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts and sweep all funds contained in the Debtors' deposit accounts; (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations.

The Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in the DIP Orders and in the DIP Loan Documents.

| | |
|---|---|
| **Adequate Protection:** | The holders of the Prepetition Debt may receive such adequate protection as is acceptable to the Debtors, the Required DIP Lenders and the holders of the applicable series of Prepetition Debt. To the extent the Prepetition Senior Priming Obligations are not repaid in full with the proceeds of the DIP Term Facility upon entry of an interim order approving such facility as set forth above, on the Effective Date (as defined in the Restructuring Support Agreement) of the Plan, the holders of the Prepetition Senior Priming Obligations shall receive a payment, in cash, equal to 10.0% of the Prepetition Senior Priming Obligations as "adequate protection", which payment shall be in addition to any other adequate protection provided thereon (the "Senior Priming Payment"), from the proceeds of the New First Lien Term Loan. |
| **Required DIP Lenders:** | DIP Lenders holding a majority of the aggregate outstanding principal amount of the DIP Loans and the aggregate undrawn commitments under the DIP Facility (the "Required DIP Lenders"). |
| **Assignments:** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles, including (without limitation) the requirement that each assignee shall become a party to the Restructuring Support Agreement prior to or concurrently with acquiring any DIP Loans. |

14

| | |
|---|---|
| **Marshalling; 552(b) Waiver and Waiver of 506(c) Claims:** | The DIP Orders shall (i) provide that in no event shall the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, as applicable, and (ii) approve the waiver of all claims under section 506(c) of the Bankruptcy Code. The DIP Orders shall also provide that the lenders, administrative agents, collateral agents and other secured parties under the Prepetition Debt shall be entitled to all rights and benefits of section 552(b) of the Bankruptcy Code, and that the "equities of the case" exception shall not apply to such persons or to the Prepetition Debt. |
| **Miscellaneous:** | The DIP Credit Agreement and the DIP Orders will, among other provisions deemed appropriate by the Required DIP Lenders and the DIP Agent (in their reasonable discretion), also contain the following, each of which shall be in form and substance reasonably satisfactory to the Required DIP Lenders and the DIP Agent: |

(a) A provision providing an indemnification from the Borrower and each of the Guarantors to the DIP Agent and each of the DIP Lenders that is usual and customary for transactions of this type and that is in form and substance reasonably satisfactory to the DIP Agent and the Required DIP Lenders and consistent with Documentation Principles.

(b) A provision providing for the reimbursement of fees, costs and expenses of the DIP Agent and each of the DIP Lenders (including, without limitation, the fees, costs and expenses of the DIP Lender Advisors and DIP Agent Advisors).

(c) A provision that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization, the DIP Agent, at the direction of the Required DIP Lenders, shall have the absolute right to credit bid a portion or the full amount of all DIP Obligations.

(d) Usual and customary yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes).

(e) LIBOR replacement and/or fallback provisions consistent with current market practice and otherwise acceptable to the Required DIP Lenders and the DIP Agent.

(f) A stipulation by the Debtors, subject to customary challenge periods, as to the enforceability of the Prepetition Debt, the validity, priority and perfection of all liens securing the Prepetition Debt, and a release by the Debtors of all claims and causes of action against the holders of Prepetition Debt.

| | |
|---|---|
| **Syndication:** | All holders of Prepetition Junior Obligations may participate in the DIP Facility pursuant to syndication procedures acceptable to the Required DIP Lenders. |

| | |
|---|---|
| **Governing Law:** | Except as governed by the Bankruptcy Code, New York. |
| **Counsel to the Commitment Parties and initial DIP Lenders:** | Stroock & Stroock & Lavan LLP |

## EXHIBIT A

### Milestones

The Debtors shall be required to comply with the following Milestones:

1.    Commence the Chapter 11 Cases on or before October 3, 2019 (such date, the "<u>Petition Date</u>");

2.    File the Plan, the disclosure statement for the Plan, in form and substance acceptable to the Required DIP Lenders (the "<u>Disclosure Statement</u>"), and the motion (in form and substance acceptable to the Required DIP Lenders) seeking to schedule a combined hearing to consider confirmation of the Plan and approval of the Disclosure Statement on the Petition Date;

3.    Obtain entry of an interim order approving the DIP Facility (in form and substance acceptable to the Required DIP Lenders) by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than two (2) business days after the Petition Date);

4.    Obtain entry of (a) the Confirmation Order (as defined in the Restructuring Support Agreement), (b) an order approving the Disclosure Statement and all other related relief, and (c) an order approving the New First Lien Term Loan (which may be the Confirmation Order), in each case, in form and substance acceptable to the Required DIP Lenders, by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-five (35) calendar days after the Petition Date); and

5.    Cause the Effective Date to occur as soon as reasonably practicable after entry of the Confirmation Order by the Bankruptcy Court (but in no event later than fourteen (14) calendar days after the entry of the Confirmation Order).

## EXHIBIT B

## Conditions Precedent

1) Conditions to Closing Date and Borrowing of Initial DIP Loans on the Closing Date.

   a) DIP Loan Documents shall be in form and substance reasonably satisfactory to the Required DIP Lenders and the DIP Agent and consistent with the DIP Term Sheet and all DIP Loan Documents required to be executed by the Closing Date shall have been executed and delivered to the DIP Agent.

   b) All fees, costs, disbursements and expenses of the DIP Agent, the DIP Agent Advisors, the DIP Lenders and the DIP Lender Advisors due under the DIP Credit Agreement shall have been paid in full in cash or shall be so paid on the Closing Date from the proceeds of the Initial DIP Loans.

   c) The DIP Agent shall have received an executed legal opinion of Kirkland & Ellis LLP, special New York and California counsel to the Loan Parties.

   d) The DIP Agent shall have received (i) a secretary's (or other officer's) certificate of the Borrower and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrower.

   e) The DIP Lenders shall have received from the Borrower and each of the Loan Parties, at least three Business Days prior to the Closing Date, (i) documentation and other information requested by any DIP Lender a reasonable period prior to the required delivery date that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (ii) if the Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lenders shall have received from the Borrower, at least one Business Day prior to the Closing Date, a beneficial ownership certification in relation to the Borrower.

   f) The Interim DIP Order shall have been entered by the Bankruptcy Court and shall be in full force and effect.

   g) The DIP Agent and the DIP Lenders shall have received the Initial Budget and such other customary legal opinions, customary officer's closing certificates, organizational documents, customary evidence of authorization and good standing certificates in jurisdictions of formation/organization, in each case with respect to the Borrower and the Guarantors (to the extent applicable) in connection with closing.

   h) The Plan shall have been filed with the Bankruptcy Court and each other Milestone that is required to be complied with prior to or concurrently with entry of the Interim DIP Order shall have been complied with.

   i) The Borrower shall have obtained, or shall have used commercially reasonable efforts to obtain, a rating from Moody's and from S&P with respect to the DIP Facility (but no specific rating).

j)   The DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the DIP Loan Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order.

k)   Each Uniform Commercial Code financing statement and each intellectual property security agreement required by the DIP Loan Documents to be filed in order to create in favor of the DIP Agent a perfected lien on the DIP Collateral having the priorities set forth in the Orders shall have been filed.

l)   The DIP Agent shall have received the certificates, if any, representing the shares of pledged securities held by a Loan Party pledged pursuant to the DIP Loan Documents.

m)   Subject to post-closing requirements, the DIP Agent shall have been named as an additional insured with respect to liability policies (other than worker's compensation policies and public liability policies) and the DIP Agent shall be named as loss payee with respect to the property insurance (other than public property policies) maintained by the Borrower and each other Loan Party.

n)   The DIP Agent shall have received a legal, valid and binding copy of an amendment to the ABL Intercreditor Agreement, which shall be in form and substance acceptable to the DIP Agent and the Required DIP Lenders.

o)   The DIP Agent shall have received a legal, valid and binding copy of an amendment to the Canadian Facility Credit Agreement (as defined in the Prepetition Senior Priming Credit Agreement), which shall be in form and substance acceptable to the DIP Agent and the Required DIP Lenders.

p)   The Closing Date shall have occurred on or before the date that is three business days after the date of entry of the Interim DIP Order.

2)   Conditions to each Borrowing (other than the Borrowing of the Initial DIP Loans).

a)   The Final DIP Order shall have been entered by the Bankruptcy Court by the date that is thirty five (35) calendar days after the Petition Date and shall be in full force and effect.

b)   The confirmation order shall have been entered by the Bankruptcy Court by the date that is thirty five (35) calendar days after the Petition Date and shall be in full force and effect

3)   Conditions to each Borrowing.

a)   Each of the representations and warranties made by any Loan Party in or pursuant to the DIP Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or material adverse effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or material adverse effect) as of such earlier date.

b)   There shall be no Default or Event of Default under the DIP Credit Agreement.

19

a)  The DIP Agent shall have received a copy of the Restructuring Support Agreement, duly executed and delivered by each of the parties thereto, and such Restructuring Support Agreement shall be in full force and effect and shall not have been amended, waived or otherwise modified without the prior written consent of the Required DIP Lenders.  The Restructuring Support Agreement shall be in full force and effect, and no breach, default or event of default shall have occurred and be continuing thereunder. Each DIP Lender  (other than any financial institution (other than any Commitment Party) that acts as the initial DIP Lender under the DIP Credit Agreement) that owns any Prepetition Debt shall be a party to the Restructuring Support Agreement.

b)  All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance satisfactory to the Required DIP Lenders and the DIP Agent.

c)  Subject to post-closing requirements, the DIP Agent shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on, and security interests in, the Collateral, in each case, having the priorities set forth in the Orders and subject only to the payment in full in cash of any amounts due under the Carve-Out.

d)  The DIP Agent shall have received a signed borrowing request from the Borrower.

## EXHIBIT C

### New First Lien Term Loan[1]

| Principal | $115 million in the aggregate[2] |
|---|---|
| Economics | • *Rate*: LIBOR plus 6.50% (with a LIBOR floor of 1.00%) per annum, payable in cash on a quarterly basis; **provided** that interest payments may be paid in kind, subject to a minimum cash payment of LIBOR plus 5.00%.<br><br>• *Duration Payment*: On the third and fourth anniversary of the Effective Date, a duration payment in an amount equal to 10.0% of the New First Lien Term Loans then outstanding shall be paid in kind |
| Maturity | March 25, 2024 |
| Borrower | Creative Intermediate Holdco |
| Guarantors | As restructured, all direct and indirect material domestic subsidiaries and material foreign subsidiaries organized in the United Kingdom, in each case, of Restructured DESG, including Distribution Intermediate Holdco and its subsidiaries, but excluding Restructured DESG |
| Security | Secured by substantially all of the assets of the Borrower and the Guarantors, including 100% of the capital stock of first-tier non-loan parties (other than customary exclusions), and so long as permitted by then-applicable contractual provisions thereof<br><br>The liens securing the New First Lien Term Loan Facility shall (a) rank senior to the liens securing the Exit ABL Facility with respect to all "term priority collateral", (b) rank junior to the liens securing the Exit ABL Facility with respect to all "ABL priority collateral", and (c) rank senior to all liens securing the New Second Lien Term Loans with respect to all collateral. |
| Call Protection | Any prepayment or repayment (whether optional or mandatory) or refinancing of all or a portion of the New First Lien Term Loans, including, for the avoidance of doubt, upon any acceleration of the loans, shall be subject to the following premiums: (i) from the Effective Date to (but excluding) the third anniversary of the Effective Date, 30.00% of the amount of New First Lien Term Loans so prepaid or repaid, (ii) from (and including) the third anniversary of the Effective Date to (but excluding) the fourth anniversary of the Effective Date, 20.0% of the amount of New First Lien Term Loans so prepaid or repaid, and (iii) from (and including) the fourth anniversary of the Effective Date and at all times thereafter, 10.0% of the amount of New First Lien Term Loans so prepaid or repaid |

---

[1] Capitalized terms used but not defined in this Exhibit C shall have the meanings ascribed thereto in the Restructuring Support Agreement, including the exhibits thereto.

[2] The portion drawn as of the Effective Date shall reflect an amount necessary to repay amounts outstanding under the DIP Term Facility and, if not already repaid, the principal amount of, together with any premiums due under, the Senior Priming Term Loan Facility.

| Covenants | Customary for financings of this type and otherwise acceptable to the Company and the Requisite Consenting Creditors |
|---|---|
| **Conditions Precedent** | Subject to the satisfaction or waiver of conditions precedent acceptable to the Company and the Requisite Consenting Creditors |
| **Other Terms** | To be mutually agreed by the Company and the Requisite Consenting Creditors |
| **Governing Law** | New York |

**Exhibit D**

**DIP Agent Fee Letter**

[CS&M Draft—10/03/2019]

**CREDIT SUISSE LOAN FUNDING LLC**
Eleven Madison Avenue
New York, NY 10010

**CONFIDENTIAL**

October [●], 2019

Deluxe Entertainment Services Group Inc.
2400 West Empire Avenue
Burbank, California 91504
Attention of:    Eric Cummins
                        Chief Financial Officer

Deluxe Entertainment Services Group Inc.
Senior Secured Super-Priority Debtor-In-Possession Term Loan Facility
Fee Letter

Ladies and Gentlemen:

You have advised Credit Suisse Loan Funding LLC ("**CSLF**" and, together with its affiliates, "**Credit Suisse**", "**we**" or "**us**") that Deluxe Entertainment Services Group Inc., a Delaware corporation and a debtor and a debtor-in-possession ("**you**" or "**the Borrower**") intend to obtain a senior secured super-priority debtor-in-possession term loan facility in an aggregate principal amount of up to $115,000,000 (the "**DIP Facility**") in connection with the filing by the Borrower and certain of its affiliates of voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "**Bankruptcy Court**") (such petitions, collectively, the "**Chapter 11 Cases**").

1.    Fees.

As consideration for the services of Credit Suisse in connection with the DIP Facility, you agree to pay (or cause to be paid) to CSLF a structuring fee equal to ███████████████████████████████████████████████████████████████████████ In addition, in the event that ████████████████████████████████████████████████████████████████████████████████████████████████████ you agree to pay (or cause to be paid) to CSLF an additional structuring fee in an amount equal to ████████████████████████████████████████████████████████████████████████████████

In its capacity as administrative agent in respect of the DIP Facility, CSLF (or its designated affiliate) will be paid an annual administration fee (the "**Administration Fee**") in the amount of ██████ for each year of the DIP Facility ████████████████████████

████████████████████████████████████████████████████

Such annual Administration Fee (if any) will be in addition to reimbursement of Credit Suisse's out-of-pocket expenses (and, for the avoidance of doubt, Credit Suisse shall be entitled to such reimbursement irrespective of whether any Administration Fee is required to be paid hereunder).

You agree that, once paid, the fees or any part thereof payable hereunder will not be refundable under any circumstances. All fees payable hereunder will be paid in immediately available funds and shall not be subject to reduction by way of setoff or counterclaim, and shall be in addition to any other amounts payable to CSLF pursuant to any other agreement or for acting in any other capacity. All fees received by CSLF hereunder may be shared among CSLF and its affiliates as CSLF and its affiliates may determine in their sole discretion.

2.    Indemnification; Expenses.

You agree (a) to indemnify and hold harmless us and our affiliates, officers, directors, employees, agents, advisors, representatives, controlling persons, members and successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with any claim, litigation, investigation or proceeding relating to this Fee Letter and the transactions contemplated hereby, the DIP Facility or any related transaction (any of the foregoing, a "***Proceeding***"), regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates or shareholders), and to reimburse each such Indemnified Person upon presentation of a summary statement, together with any supporting documentation reasonably requested by you, for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing by one firm of counsel for all Indemnified Persons, taken as a whole (and, if necessary, by a single firm of local counsel in each appropriate jurisdiction for all Indemnified Persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnified Person or Persons affected by such conflict informs you of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnified Person or Persons)), *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to (A) losses, claims, damages, liabilities or related expenses (i) to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction (or settlement tantamount thereto) to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Person or any Related Party (as defined below), (ii) arising out of a material breach by such Indemnified Person (or any of such Indemnified Person's Related Parties) of its obligations under this Fee Letter, or (iii) arising out of any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission by you or any of your affiliates and that is brought by an Indemnified Person against any other Indemnified Person (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against Credit Suisse in its capacity or in fulfilling its role as administrative agent or any similar role under the DIP Facility) or (B) any settlement entered into by such Indemnified Person (or any of such Indemnified Person's Related Parties) without your written consent (such consent not to be unreasonably withheld, delayed or conditioned); *provided*, however, that the foregoing indemnity will apply to any such settlement

in the event that you were offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to assume such defense, and (b) to reimburse us from time to time, upon presentation of a reasonably detailed invoice therefor and any supporting documentation reasonably requested by you, for all reasonable out-of-pocket expenses (including but not limited to expenses of our due diligence investigation, consultants' and other professionals' fees, syndication expenses, travel expenses and fees, disbursements and other charges of counsel, *provided*, that any legal fees and expenses shall be limited to the fees and expenses of (i) one counsel for all Indemnified Persons taken as a whole, (ii) a single local counsel for all Indemnified Persons taken as a whole in each relevant jurisdiction, (iii) any special counsel CSLF determines to be necessary for all Indemnified Persons taken as a whole and (iv) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of Indemnified Persons similarly situated), in each case, incurred in connection with the DIP Facility and the preparation, negotiation and enforcement of this Fee Letter, the definitive documentation for the DIP Facility and any ancillary documents and security arrangements in connection therewith.  You agree that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries, affiliates, equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except solely to you, and then solely to the extent of direct, as opposed to indirect, special, punitive or consequential damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have primarily resulted from such Indemnified Person's gross negligence or willful misconduct.  For purposes hereof, "***Related Party***" of an Indemnified Person means (a) a controlled or controlling affiliate of such Indemnified Person, or any of its or their respective officers, directors, employees and agents, and (b) any agents or advisors of such Indemnified Person acting at the direction of such Indemnified Person.

You shall not be liable for any settlement of any Proceeding effected without your consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with your written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this Section 2.

3.    Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

You acknowledge that we may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein or otherwise.  We agree that we will not furnish confidential information obtained from you by virtue of the transactions contemplated by this Fee Letter or our other relationships with you to other companies.  You also acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Fee Letter, or to furnish to you, confidential information obtained by us from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and CSLF is intended to be or has been created in respect of any of the transactions contemplated by this Fee Letter, irrespective of whether CSLF has advised or is advising you on other matters, (b) CSLF, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of CSLF, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Fee Letter, (d) you have been advised that CSLF is engaged in a broad range of transactions that

may involve interests that differ from your interests and that CSLF has no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship and (e) you waive, to the fullest extent permitted by law, any claims you may have arising out of or in connection with the transactions contemplated by this Fee Letter against CSLF for breach of fiduciary duty or alleged breach of fiduciary duty and agree that CSLF shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

You further acknowledge that we are a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, CSLF may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of you and other companies with which you may have commercial or other relationships. With respect to any securities and/or financial instruments so held by us or any of our customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. Additionally, you acknowledge and agree that we are not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including, without limitation, with respect to any consents needed in connection with the transactions contemplated hereby). You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby (including, without limitation, with respect to any consents needed in connection therewith), and we shall not have any responsibility or liability to you with respect thereto. Any review by us of you or the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of us and shall not be on behalf of you or any of your affiliates.

The Borrower acknowledges that we and our affiliates are or may be acting as lenders and agents under other credit agreements to which the Borrower is party (the "*Credit Agreements*"), and the Borrower's and its affiliates' rights and obligations under any such other agreement with CSLF or any of its affiliates (including the Credit Agreements) that currently or hereafter may exist are, and shall be, separate and distinct from the rights and obligations of the parties pursuant to this Fee Letter, and none of such rights and obligations under such other agreements shall be affected by any performance or lack of performance of services hereunder by CSLF or any of its affiliates. The Borrower further acknowledges that CSLF and its affiliates may currently or in the future participate in other debt or equity transactions on behalf of or render financial advisory services to the Borrower or other companies that may be involved in a competing transaction. The Borrower hereby agrees that CSLF may render its services in connection with the transactions contemplated by this Fee Letter notwithstanding any actual or potential conflict of interest presented by the foregoing, and the Borrower hereby waives any conflict of interest claims relating to the relationship between CSLF and its affiliates and the Borrower and its affiliates in connection with the transactions contemplated hereby, on the one hand, and the exercise by CSLF or any of its affiliates of any of their rights and duties under any credit or other agreement (including the Credit Agreements), on the other hand. The terms of this paragraph shall survive the expiration or termination of this Fee Letter for any reason whatsoever.

4.    Jurisdiction.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the

United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Fee Letter or the transactions contemplated hereby, and agrees that all claims in respect of any such action or proceeding may be heard and determined only in such New York State court or, to the extent permitted by law, in such Federal court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such New York State or Federal court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Fee Letter or the transactions contemplated hereby in any such New York State court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Service of any process, summons, notice or document by registered mail addressed to any of the parties hereto at the addresses above shall be effective service of process against such party for any suit, action or proceeding brought in any such court.

5.    Waiver of Jury Trial.

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER.**

6.    General.

This Fee Letter shall not be assignable by any party hereto without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and Indemnified Persons) and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Persons).  Any and all services to be provided by CSLF hereunder may be performed and any and all rights of CSLF hereunder may be exercised by or through any of its affiliates or branches and, in connection with the provision of such services, CSLF may exchange with such affiliates and branches information concerning you and the other companies that may be the subject of the transactions contemplated by this Fee Letter, and to the extent so employed, such affiliates and branches shall be entitled to the benefits afforded to CSLF hereunder.

You agree that you will not disclose this Fee Letter or the contents hereof or our activities pursuant hereto to any person without the prior written approval (such approval not to be unreasonably withheld, conditioned or delayed) of CSLF, except that you may disclose this Fee Letter and the contents hereof (a) to Holdings, to MacAndrews & Forbes Incorporated and its subsidiaries, and to your and their respective directors, officers, shareholders, employees, attorneys, accountants and advisors on a confidential and need-to-know basis, (b) pursuant to the order of any court or administrative agency in any pending legal or administrative proceeding or as otherwise required by applicable law, regulations or interpretations thereof or compulsory legal process or as required by a governmental authority (in which case you agree to inform us promptly thereof to the extent lawfully permitted to do so), and (c) if CSLF consents to such proposed disclosure.

If this Fee Letter is required to be filed with the Bankruptcy Court, or disclosed to the United States Trustee appointed in the jurisdiction of the Chapter 11 Cases (the "*U.S. Trustee*") or any statutory committee appointed in the Chapter 11 Cases for purposes of obtaining approval to pay any fees provided for herein or otherwise, then you agree that you shall promptly notify us and take all commercially reasonable actions necessary to prevent this Fee Letter from becoming publicly available, including, without limitation, filing a motion or an ex parte request pursuant to sections 105(a) and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure seeking a Bankruptcy Court order authorizing you to file this Fee Letter under seal to the maximum extent permitted by the Bankruptcy Court; *provided*, however, that if the Bankruptcy Court does not permit such filing under seal, then any such filing shall be redacted to the maximum extent permitted by the Bankruptcy Court and approved by us in writing. Notwithstanding anything in this agreement to the contrary, the provisions of this section shall survive any termination or completion of the transactions contemplated by this Fee Letter.

We will treat as confidential all confidential information provided to us by or on behalf of you hereunder solely for the purpose of providing the services which are subject of this Fee Letter; *provided* that nothing herein shall prevent us from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law or compulsory legal process, (b) upon the request or demand of any Governmental Authority having jurisdiction over us or any of our affiliates (in which case we agree to inform you promptly thereof to the extent reasonably practicable and lawfully permitted to do so), (c) to the extent that such information becomes publicly available other than by reason of improper disclosure by us or any of our affiliates or any related party thereof in violation of this paragraph, (d) to our affiliates and to our and their respective employees, legal counsel, independent auditors and other experts or agents on a need-to-know basis and who are informed of the confidential nature of such information (and CSLF shall be responsible for compliance with this paragraph by its affiliates and its and their employees, legal counsel, independent auditors and other experts or agents), (e) to assignees or participants or potential assignees or participants who agree to be bound by the terms of this paragraph or substantially similar confidentiality provisions, (f) to the extent such information is independently developed by us or (g) for purposes of establishing a "due diligence" defense. Our obligations under this paragraph shall terminate automatically and be superseded by the confidentiality provisions in the definitive documentation for the DIP Facility on the Closing Date. To the extent not earlier terminated, our obligations under this paragraph shall automatically terminate on the second anniversary hereof.

You acknowledge that information and documents relating to the DIP Facility may be transmitted through SyndTrak, Intralinks, LendAmend, the internet, e-mail or similar electronic transmission systems and that we shall not be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner except to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of CSLF or any of its Related Persons. We may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or worldwide web as we may choose, and circulate similar promotional materials, after the closing of the transactions contemplated hereby in the form of a "tombstone" or otherwise describing your name, and the amount, type and closing date of such transactions contemplated hereby, all at our expense.

This Fee Letter may not be amended or any provision hereof waived or modified except by an agreement in writing signed by each of the parties hereto. **THIS FEE LETTER AND**

**ALL CLAIMS AND CONTROVERSIES IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.** This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile or other customary means of electronic transmission shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Fee Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Fee Letter.

The compensation, reimbursement, indemnification, confidentiality (except as otherwise expressly stated herein), jurisdiction, governing law and waiver of jury trial provisions contained herein and the provisions of Section 3 hereof shall remain in full force and effect regardless of whether the definitive financing documentation relating to the DIP Facility shall be executed and delivered and notwithstanding the termination of this Fee Letter; *provided* that your obligations under this Fee Letter under such provisions, other than those relating to confidentiality (which shall remain in full force and effect), shall automatically terminate and be superseded by the provisions of the definitive documentation for each of the DIP Facility upon the execution and effectiveness thereof to the extent covered thereby.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Fee Letter by returning to us an executed counterpart hereof, whereupon this Fee Letter shall become a binding agreement between us.

*[Remainder of this page intentionally left blank]*

Very truly yours,

CREDIT SUISSE LOAN FUNDING LLC

by _____

    Name:
    Title:

[Signature Page to Fee Letter]

[[5241498]]

Accepted and agreed to as of the date first written above:

DELUXE ENTERTAINMENT SERVICES GROUP INC.

by _____
      Name:
      Title:

[Signature Page to Fee Letter]

[[5241498]]

**<u>Exhibit F</u>**

**Commitment Party Fee Letter**

EXECUTION VERSION

October 2, 2019

Deluxe Entertainment Services Group Inc.
2400 West Empire Avenue
Burbank, California 91504
Attention: Board of Directors, Chief Financial Officer and General Counsel

PAYMENTS LETTER

UP TO $115,000,000 SENIOR SECURED SUPER-PRIORITY
DEBTOR-IN-POSSESSION TERM LOAN FACILITY

Ladies and Gentlemen:

Reference is made to that certain DIP Facility Commitment Letter, dated the date hereof (together with the DIP Term Sheet referred to therein and attached thereto, and all other exhibits, annexes, schedules and other attachments thereto, in each case, as may be amended, amended and restated, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Commitment Letter"), by and among Deluxe Entertainment Services Group Inc., a Delaware corporation (the "Company"), DX Holdings LLC, a Delaware limited liability company ("Holdings"), certain of the Company's direct and indirect subsidiaries (together with the Company and Holdings, collectively, "you") and the persons party thereto as the Commitment Parties (as defined therein). For the avoidance of doubt, the DIP Commitments are subject to the funding of the loans under the DIP Facility on the Closing Date by the DIP Agent, the DIP Arranger or another financial institution (the "Initial Lender") reasonably acceptable to the Commitment Parties, following which each Commitment Party will negotiate with the Initial Lender to purchase such loans in an amount equal to each respective Commitment Party's DIP Commitments on terms, subject to documentation and within a timeframe to be agreed among the Commitment Parties and the Initial Lender. Unless otherwise noted, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Commitment Letter.

This letter (as may be amended, amended and restated, restated, supplemented or otherwise modified from time to time, this "Letter") is the DIP Payments Letter referred to in the DIP Commitment Letter.

1.    Payments.

(a) As consideration for the Commitment Parties who are party to the DIP Commitment Letter on the date hereof backstopping the DIP Facility and funding their commitments under the DIP Facility, you agree to pay (or cause to be paid), in accordance with the terms of this Letter, to each such Commitment Party, for its own account, a non-refundable payment in an amount equal to ███████████████████████████████████

Deluxe Entertainment Services Group Inc.
October 2, 2019
Page 2



(b) As partial consideration for making of the DIP Loans by the DIP Lenders, you agree to pay (or cause to be paid), in accordance with the terms of this Letter, to each DIP Lender, for its own account, a non-refundable payment in an amount equal to

(c) The parties hereto agree (x) that the Payments shall constitute "secured obligations" for all purposes under the DIP Loan Documents and (y) to treat the Payments as additional payments of interest on the DIP Loans (or, if required by applicable law, as a premium for the right for you to put the DIP Loans to the DIP Lenders), in each case for U.S. federal income tax purposes.

The parties hereto agree that (a) once paid, the Payments or any part thereof shall not be refundable under any circumstances, (b) each Commitment Party and each DIP Lender may, in its sole discretion, share all or a portion of any of the Payments received by it with any other person or entity and (c) the Payments shall be in addition to any other payments and reimbursement and indemnification obligations due to any Commitment Party or any DIP Lender pursuant to the DIP Commitment Letter and the DIP Loan Documents, which shall be payable in accordance with the DIP Commitment Letter and/or the DIP Loan Documents, as applicable, and shall not be subject to reduction by way of set-off or counterclaim.

2.    <u>Miscellaneous</u>.  Your agreement under this Letter shall be (a) legally binding upon and enforceable against you and your successors and permitted assigns and (b) enforceable by the Commitment Parties without regard to any act, event or circumstance except as expressly set forth herein.

This Letter may not be amended or waived except by an instrument in writing signed by the parties hereto.

2

Deluxe Entertainment Services Group Inc.
October 2, 2019
Page 3

      THIS LETTER WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.  <u>Section 5</u> of the DIP Commitment Letter shall be incorporated by reference in and apply to this Letter, *mutatis mutandis*.

      This Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

      This Letter shall be effective as of the date first written above when executed by you.

      Very truly yours,

      *[Remainder of page intentionally left blank]*

3

**ACCEPTED AND AGREED:**


**DELUXE ENTERTAINMENT SERVICES GROUP INC.**

By: _____
       Name:   John Eric Cummins
       Title:    Executive Vice President, Chief Financial
                    Officer and Treasurer



**DX HOLDINGS LLC**

By: _____
       Name:   Paul Savas
       Title:    Executive Vice President and Chief
                    Financial Officer

**ACCEPTED AND AGREED:**

**DELUXE ENTERTAINMENT SERVICES GROUP INC.**

By: _____

      Name:   John Eric Cummins
      Title:    Executive Vice President, Chief Financial
              Officer and Treasurer

**DX HOLDINGS LLC**

By: _____

      Name:   Paul Savas
      Title:    Executive Vice President and Chief
              Financial Officer

**ALCOF II NUBT, L.P.**
**By:  Arbour Lane Fund II GP, LLC,**
**Its General Partner,** as a Commitment Party,
as a Commitment Party

By:  _____

Name:    Kenneth Hoffman
Title:    Manager

Deluxe – Payments Letter (DIP Facility)

NY 77837105v5

**AVENUE CREDIT OPPORTUNITIES FUND I-A, L.P.**

By: Avenue Credit Opportunities Partners I-A, LLC,
     *its General Partner*

By: GL Credit Opportunities Partners I-A, LLC,
     *its Managing Member*, as a Commitment Party

By: _____
    Name:    William C. Maier
    Title:     Senior Portfolio Manager

**CIFC Event Driven Opportunities Master Fund, LP
**, as a Commitment Party
By: CIFC Asset Management LLC, as Collateral Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2012-II-R, Ltd. ,** as a Commitment
Party
By: CIFC VS Management LLC, its Collateral Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2013-I, Ltd. ,** as a Commitment Party
By:  CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2013-II, Ltd. ,** as a Commitment Party
By:  CIFC Asset Management LLC, its Collateral
Manager


By: _____
     Name: Ira Ginsburg
     Title: Managing Director

**CIFC Funding 2013-III-R Ltd. ,** as a Commitment
Party
By: CIFC VS Management LLC, as Collateral Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2013-IV, Ltd. ,** as a Commitment Party
By:  CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2014, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Portfolio
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2014-III, Ltd. ,** as a Commitment Party
BY: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2014-II-R, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, as Collateral Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2014-IV-R, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2014-V, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2015-I, Ltd. ,** as a Commitment Party
BY: CIFC Asset Management LLC, its Collateral
Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2015-II, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2015-III, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2015-IV, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
Name: Ira Ginsburg
Title: Managing Director

**CIFC Funding 2015-V, Ltd ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2016-I, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2017-I, Ltd ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
   Name: Ira Ginsburg
   Title: Managing Director

**CIFC Funding 2017-II, Ltd. ,** as a Commitment Party
By: CIFC CLO Management LLC, its Collateral
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2017-III, Ltd. ,** as a Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: 
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2017-IV, Ltd. ,** as a Commitment Party
By: CIFC CLO Management LLC, its Collateral
Manager, by and on behalf of each of its series, Series
M-1, Series O-1 and Series R-1

By: _____
      Name: Ira Ginsburg
      Title: Managing Director

**CIFC Funding 2017-V, Ltd. ,** as a Commitment Party
By: CIFC CLO MANAGEMENT II LLC, as Collateral
Manager
 By and on behalf of each of its series, SERIES M-1,
SERIES O-1, and SERIES R-1


By: _____
   Name: Ira Ginsburg
   Title: Managing Director

**CIFC Funding 2018-I, Ltd. ,** as a Commitment Party
By: CIFC CLO MANAGEMENT II LLC, as Collateral Manager
By and on behalf of each of its series, SERIES M-1, SERIES O-1, and SERIES R-1

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2018-II, Ltd. ,** as a Commitment Party
By: CIFC CLO Management II LLC, its Collateral
Manager, by and on behalf of each of its series, Series
M-1, Series O-1 and Series R-1

By: _____

    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Funding 2018-III, Ltd. ,** as a Commitment Party

By:

Name: Ira Ginsburg
Title: Managing Director

**CIFC Funding 2018-IV, Ltd. ,** as a Commitment Party
By: CIFC CLO Management II LLC, as Collateral
Manager
By and on behalf of each of its series, SERIES M-1,
SERIES O-1, and SERIES R-1

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Loan Opportunity Fund II, Ltd. ,** as a
Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager


By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CIFC Loan Opportunity Fund, Ltd. ,** as a
Commitment Party
By: CIFC Asset Management LLC, its Collateral
Manager

By: _____
   Name: Ira Ginsburg
   Title: Managing Director

**JSS Special Investments FCP (SIF) ,** as a
Commitment Party
By: CIFC Asset Management LLC, its Sub-Investment
Manager

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**Swiss Capital Alternative Strategies Funds SPC re: SC Alternative Strategy 10 SP ,** as a Commitment Party

By: _____
    Name: Ira Ginsburg
    Title: Managing Director

**CION INVESTMENT CORPORATION,** as a
Commitment Party

By: _____

Name:   Gregg Bresner

Title:    Chief Investment Officer

**Covenant Credit Partners CLO III, Ltd.,** as a
Commitment Party

By: _____
     Name:     Christopher Brogdon
     Title:     Assistant Portfolio Manager

ELLINGTON CLO MANAGEMENT LLC.

ON BEHALF OF:

ELLINGTON CLO I, LTD.
ELLINGTON CLO II, LTD.
ELLINGTON CLO III, LTD.,


as a Commitment Party

By: _____

Name: MARK HERON

Title: Portfolio Manager

**HarbourView CLO VII-R, LTD**, as a
Commitment Party


By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

**Invesco Oppenheimer Fundamental Alternatives Fund**, as a Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

**Invesco Oppenheimer Master Loan Fund**, as a
Commitment Party


By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

**Invesco Oppenheimer Senior Floating Rate Fund**, as a
Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

**Invesco Oppenheimer Senior Floating Rate Plus Fund**,
as a Commitment Party

By: _____
Name: Kathleen Schmitz
Title: Authorized Signatory

Very truly yours,

**NPB Manager Fund, SPC. – Segregated
Portfolio 105,** as a Commitment Party

By: _____

    Name:    Damion Brown
    Title:    Managing Director

**Abbott AbbVie Multiple Employer Pension
Plan Trust,** as a Commitment Party

By: _____

Name:    Damion Brown
Title:    Managing Director

Very truly yours,

**Abbott Laboratories Annuity Retirement Trust, as a Commitment Party**

By: _____

Name:    Damion Brown
Title:    Managing Director

**MidOcean Tactical Credit Fund II, LP**, as a
Commitment Party

By: _____

     Name:    Damion Brown
     Title:     Managing Director

**MJX ASSET MANAGEMENT LLC,** as a
Commitment Party

By: _____

Name:
Title:      Frederick H. Taylor
           Managing Director

**American Beacon Sound Point Enhanced Income Fund,** as a Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

**American Beacon Sound Point Floating Rate Income Fund, a series of American Beacon Funds,** as a Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

**Kaiser Foundation Hospitals,** as a Commitment Party

By:

Name: Kevin Gerlitz
Title: Chief Financial Officer

**Kaiser Permanente Group Trust,** as a
Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

**Neuberger Berman Alternative Funds –
Neuberger Berman Absolute Return Multi-
Manager Fund,** as a Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

**Principal Funds, Inc. Global Multi-Strategy Fund,** as a Commitment Party

By:

Name:     Kevin Gerlitz
Title:      Chief Financial Officer

**Privilege Underwriters Reciprocal Exchange,** as
a Commitment Party

By:

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

**PURE Insurance Company,** as a Commitment Party

By: _____

　　　Name:　　Kevin Gerlitz
　　　Title:　　Chief Financial Officer

Very truly yours,

**Sound Point Credit Opportunities Master
Fund, L.P.,** as a Commitment Party

By: _____

       Name:    Kevin Gerlitz
       Title:     Chief Financial Officer

**Sound Point Montauk Fund, L.P.,** as a
Commitment Party

By:

Name:     Kevin Gerlitz
Title:     Chief Financial Officer

Very truly yours,

**Sound Point Senior Floating Rate Master Fund, L.P.,** as a Commitment Party

By: _____

Name:   Kevin Gerlitz
Title:   Chief Financial Officer

**Sound Point Strategic Capital Fund, LP,** as a
Commitment Party

By: _____

Name:    Kevin Gerlitz
Title:    Chief Financial Officer

**Teamsters Pension Trust Fund of Philadelphia & Vicinity,** as a Commitment Party

By: _____

Name:   Kevin Gerlitz
Title:   Chief Financial Officer

Very truly yours,

**THL Credit Senior Loan Fund by**
**THL Credit Advisors LLC, as Adviser,**
as a Commitment Party

By: _____

    Name:    Brian W. Good
    Title:    Senior Managing Director